IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WERNER L. POLAK, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| JOHN M. KOBAYASHI, | ) | C.A. No. 05-330 (JJF) |
| Defendant, | ) | |
| and | ) | |
| POKOBO, L.L.C., | ) | |
| Nominal Defendant. | ) | |

**APPENDIX OF UNREPORTED CASES CITED IN
PLAINTIFF'S OPENING BRIEF IN SUPPORT
OF HIS MOTION TO REMAND**

MORRIS, NICHOLS, ARSHT & TUNNELL
Martin P Tully (#465)
David A. Harris (#3568)
Susan W. Waesco (#4476)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
swaesco@mnat.com
  Attorneys for Plaintiff

June 15, 2005

# TABLE OF CONTENTS

Tab

<u>Cases</u>

*Actrade Fin. Techs. Ltd. v. Aharoni,*
    2003 WL 22389891 (Del. Ch.)    1

*Cornerstone Techs., LLC v. Conrad,*
    2003 WL 1787959 (Del. Ch.)    2

*DiGiacobbe v. Sestak,*
    2003 WL 1016985 (Del. Ch.)    3

*In re Silver Leaf, L.L.C.,*
    2004 WL 1517127 (Del. Ch.)    4

*In re Tricord Sys., Inc.,*
    2003 WL 1873523 (D. Del.)    5

*Jacobson v. Dryson Acceptance Corp.,*
    2002 WL 75473 (Del. Ch.)    6

*Ketterson v. Wolf,*
    2001 WL 940909 (D. Del.)    7

*Lewis v. Consol. Freightways Corp. of Del.,*
    2005 WL 503317 (E.D. Pa.)    8

*Nomura Asset Capital v. Overland Co., Inc.,*
    2003 WL 138093 (D. Del.)    9

*Peoples Benefit Life Ins. Co. v. Dale,*
    1999 WL 33545578 (S.D. Miss)    10

*Pepsi-Cola Bottling Co. of Salisbury, Md. v. Handy,*
    2000 WL 364199 (Del. Ch.)    11

*Shamrock Holdings of California, Inc. v. Arenson,*
    2005 WL 400198 (D. Del.)    12

1

Westlaw.

Not Reported in A.2d, 2003 WL 22389891, 29 Del. J. Corp. L. 573
**(Cite as: Not Reported in A.2d)**

**C**
Not Reported in A.2d, 2003 WL 22389891, 29 Del.
J. Corp. L. 573

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
ACTRADE FINANCIAL TECHNOLOGIES LTD.
and Actrade Commerce, Ltd., Plaintiffs,
v.
Amos AHARONI, Defendant.
**No. Civ.A. 20168.**

Submitted July 31, 2003.
Decided Oct. 17, 2003.

Daniel A. Dreisbach , Lisa A. Schmidt , James H.
McMackin, III , Richards, Layton & Finger ,
Wilmington, Delaware; Daniel J. Lefell , Stacey A.
Shortall , Ariel Cannon , Paul, Weiss, Rifkind,
Wharton & Garrison LLP, New York, New York,
for the Plaintiffs.
Neal J. Levitsky , Fox Rothschild LLP ,
Wilmington, Delaware; Sigmund S. Wissner-Gross
, May Orenstein , Clifford J. Bond , Heller,
Horowitz & Feit, P.C., New York, New York, for
the Defendant.

*MEMORANDUM OPINION AND ORDER*

LAMB, Vice Chancellor.

I.

*1 A Delaware corporation and its wholly owned
foreign subsidiary sued their former Chairman and
CEO, a non-US resident, for breach of fiduciary
duty and misappropriation of monies. On a motion
to dismiss, the court concludes that it has properly
obtained jurisdiction over the non-resident
defendant by means of the director service statute,
10 *Del. C.* § 3114. The court also concludes that the
use of that statute to obtain jurisdiction over a

foreign resident does not involve the service of
process outside the United States and, therefore,
does not require compliance with the Hague
Convention governing service abroad of judicial
writs. The court also concludes that the matters
asserted in the complaint are properly within its
jurisdiction and that the complaint should neither be
dismissed nor stayed in favor of a substantially
different action pending in the Cayman Islands.

II.

A. *The Parties*

The plaintiff, Actrade Financial Technologies Ltd. (
"Actrade DE"), is a Delaware corporation. Actrade
DE wholly owns several subsidiary companies
whose business is selling short-term financing
agreements. FN1 Actrade Commerce Ltd. ("Actrade
Commerce"), an Antiguan corporation, is one of
these subsidiaries and is also a plaintiff in this
action. Actrade DE and Actrade Commerce are
sometimes hereinafter referred to as "Actrade" or "
the plaintiff."

> FN1. Actrade DE wholly owns Actrade
> International, a New York corporation.
> Actrade International wholly owns
> Antiguan corporation Actrade S.A.
> Actrade S.A. wholly owns Bahamian
> corporation Actrade Resources and
> Antiguan corporation Actrade Commerce
> Ltd.

The defendant, Amos Aharoni, a resident of the
State of Israel, was the Chairman of the Board of
Actrade DE and one of the company's founders. He
was also the sole director and officer of Actrade
Commerce, as well as other directly and indirectly
owned subsidiaries of Actrade DE.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 2

Not Reported in A.2d, 2003 WL 22389891, 29 Del. J. Corp. L. 573
**(Cite as: Not Reported in A.2d)**

### B. *The Disputed Transfers*

The complaint alleges that, on or about June 25, 2002, Aharoni faxed a wire transfer instruction to Banco Comercial Portuguese ("BCP") in the Cayman Islands directing BCP to transfer $10,009,200 from Actrade Commerce's account at BCP to International Clearing Corporation ("ICC"). The complaint further alleges that, on or about July 12, 2002, Aharoni faxed another wire transfer instruction from Israel to BCP in the Cayman Islands ordering it to transfer $21,656,700 from Actrade Commerce's account at BCP to the account of an entity called Fort. The total amount of these transfers ("disputed transfers") is approximately $31.6 million.

On August 2, 2002, Actrade DE's board of directors instructed its Audit Committee to investigate alleged improprieties in the operations of Actrade DE and its subsidiaries. On August 8, 2002, counsel for the Audit Committee wrote to Aharoni seeking to interview him and obtain all Actrade documents under his control. On August 14, Actrade DE's Chief Financial Officer e-mailed Aharoni seeking access to all documents under Aharoni's control. On August 28, 2002, the Audit Committee faxed to Aharoni's U.S. and Israeli counsels copies of a document preservation letter that Actrade DE had received from the SEC and the U.S. Attorney's Office. On September 6, 2002, the Audit Committee again wrote Aharoni's U.S. counsel seeking all Actrade documents in Aharoni's control.

**\*2** Aharoni eventually gave Actrade five loan agreement documents dated July 10, 2002. FN2 These agreements show Actrade Commerce loaning a total of $31.6 million to five foreign entities. FN3 Aharoni contends that these loans explain the disputed transfers and that they have already been repaid with $6 million in interest. Actrade alleges that there was no legitimate business purpose for these loans and that neither Actrade DE nor any Actrade subsidiary has received any payment on them. Actrade further alleges that Aharoni controls ICC and Fort and that he fabricated the loan agreements after the disputed transfers to conceal his theft of $31.6 million from Actrade Commerce.

FN2. Through counsel, Aharoni refused to be interviewed or provide substantive information to the Audit Committee. On August 21, 2002, Aharoni resigned all director and officer positions he had held for Actrade DE and its subsidiaries. In late September 2002, Aharoni made available a group of Actrade documents that were under his control. Among these were the five loan agreements.

FN3. Onyx Holdings, Ltd., Garibaldi do Brazil Limitida, LLC, Vision Art Group, Manerfold Finance Corp., and LLC Setkomp.

### C. *The Interpleader Action*

On September 26, 2002, BCP commenced an interpleader action in the Cayman Islands regarding the ICC and Fort accounts that had received the disputed transfers. BCP named Actrade DE, Actrade Commerce, Actrade Resources, Actrade S.A., ICC, Fort, Commercial Finance Institution ("CFI"), and BCP as claimants to the money in the accounts. By consent order, Actrade DE and its subsidiaries became plaintiffs in that action on May 2, 2003, leaving the remaining parties as defendants. On May 5, 2003, Actrade filed a complaint seeking an accounting, a declaration that Fort and ICC hold the disputed funds as constructive trustees for Actrade, and payment of the amount the accounting determines to be owed. The Cayman Islands action does not include a claim for breach of fiduciary duty and does not name Aharoni as a party, although Aharoni argues that he expects to eventually be named as a third-party defendant.

### D. *The Motion To Dismiss*

Actrade filed a complaint in this court on February 20, 2003, alleging breach of fiduciary duty, misappropriation and conversion of corporate assets, fraud, and corporate waste. Aharoni has moved to dismiss for lack of personal jurisdiction, lack of subject matter jurisdiction, *forum non conveniens,* failure to join necessary parties, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 22389891, 29 Del. J. Corp. L. 573
**(Cite as: Not Reported in A.2d)**

failure to state a claim for which relief can be granted. Alternatively, Aharoni moves for a stay of this action pending the outcome of the Cayman Islands action. Finally, Aharoni moves to strike the complaint's references to the document preservation letter from the SEC and the U.S. Attorney's office as immaterial and "scandalous." In considering a motion to dismiss, this court views all facts in a light most favorable to the non-moving party. FN4

> FN4. *See e.g. Ramunno v. Cawley,* 705 A.2d 1029, 1034 (Del.1998).

### III.

Aharoni challenges this court's personal jurisdiction on two grounds. First, Aharoni claims that this court cannot rely upon 10 *Del. C.* § 3114 to obtain personal jurisdiction over him because he did not commit his allegedly wrongful acts in his capacity as a director of a Delaware corporation (Actrade DE), but rather in his capacity as a director of wholly owned foreign subsidiary (Actrade Commerce). FN5 Second, Aharoni argues that the attempt to serve process on him pursuant to section 3114 violated the Hague Convention of 1963, a treaty of the United States, and therefore failed to confer jurisdiction. FN6 For reasons expressed below, neither of these arguments has merit.

> FN5. Memorandum of Law in Support of Motion to Dismiss the Complaint of Defendant Amos Aharoni Based, *Inter Alia,* Upon Lack of Personal Jurisdiction, Lack of Subject Matter Jurisdiction, *Forum Non* Conveniens, Prior Pending Proceeding, and Failure to Join Necessary Parties, ("Def.Op.Br.") p. 8.

> FN6. Def. Op. Br. p. 12.

### A. *The Reach Of 10* Del. C. *§ 3114*

**\*3** Actrade bases its claim of personal jurisdiction on Delaware's Director Consent statute, 10 *Del. C.* § 3114(a), which reads:

Every nonresident of this State who after

September 1, 1977, accepts election or appointment as a director, trustee or member of the governing body of a corporation organized under the laws of this State or who after June 30, 1978, serves in such capacity and every resident of this State who so accepts election or appointment or serves in such capacity and thereafter removes residence from this State shall, by such acceptance or by such service, be deemed thereby to have consented to the appointment of the registered agent of such corporation (or, if there is none, the Secretary of State) as an agent upon whom service of process may be made in all civil actions or proceedings brought in this State, by or on behalf of, or against such corporation, in which such director, trustee or member is a necessary or proper party, or in any action or proceeding against such director, trustee or member for violation of a duty in such capacity, whether or not the person continues to serve as such director, trustee or member at the time suit is commenced. Such acceptance or service as such director, trustee or member shall be a signification of the consent of such director, trustee or member that any process when so served shall be of the same legal force and validity as if served upon such director, trustee or member within this State and such appointment of the registered agent (or, if there is none, the Secretary of State) shall be irrevocable.

This court has personal jurisdiction over Aharoni because he consented to that jurisdiction by becoming the director of a Delaware corporation. As the Delaware Supreme Court has held, a director "accept[s][his] directorship [of a Delaware corporation] with explicit statutory notice, via § 3114 that [he] could be haled into a Delaware court to answer for the alleged breaches of the duties imposed on [him] by the very laws which empowered [him] to act in his corporate capacities." FN7 Aharoni cannot escape personal jurisdiction under section 3114 by mischaracterizing his alleged wrongful acts as having been done purely in the capacity of directorship of the foreign subsidiary. Actrade DE conducted all of its business through its foreign subsidiaries, "making oversight of subsidiaries a crucial aspect of the [parent] board's function." FN8 Under *Grace,* Aharoni's oversight

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 4

Not Reported in A.2d, 2003 WL 22389891, 29 Del. J. Corp. L. 573
**(Cite as: Not Reported in A.2d)**

or lack thereof of the actions of Actrade Commerce can constitute a breach of fiduciary duty to Actrade DE.

> FN7. *See Armstrong v. Pomerance,* 423 A.2d 174, 177 (Del.1980) (finding personal jurisdiction over foreign directors on a claim for breach of fiduciary duty to a Delaware corporation when directors had no contact with Delaware other than being directors of the Delaware corporation).

> FN8. *See Grace Bros., Ltd. v. Uniholding Corp.,* 2000 WL 982401, at *12 (Del. Ch. July 12, 2000) (hereinafter *Grace* ).

In *Grace,* the defendants who were directors of both a Delaware parent and foreign subsidiary company allowed the subsidiary to assume control over the parent's primary asset and thus become the owner of the parent, to the detriment of the parent's stockholders but to the benefit of the subsidiary. The *Grace* court rejected the defense that "a director of a parent board ... has no duty to stop himself from injuring the parent while wearing his subsidiary hat." FN9 This court found personal jurisdiction over the defendants for the Delaware parent's claim even though the wrongful action occurred through a foreign subsidiary.

> FN9. *Id.* at *13.

*4 Similarly in *Technicorp Int'l II v. Johnston,* FN10 this court found personal jurisdiction over persons who were directors of both a Delaware parent and its foreign subsidiary for wrongful acts done in the name of the subsidiary. Under *Technicorp,* wrongful diversions from a foreign subsidiary are a breach of fiduciary duty to both the subsidiary and to its parent. FN11

> FN10. 2000 WL 713750 (Del. Ch. May 31, 2000) (hereinafter *Technicorp* ).

> FN11. *Id.* at *4.

Aharoni argues that Delaware has little or no interest in hearing this case because the disputed acts took place in either Israel or the Caribbean, directly injured only an Antiguan subsidiary, and any injury to the Delaware company was indirect and incidental. On the contrary, Delaware has a significant interest in protecting Delaware companies from breaches of fiduciary duty by their directors, regardless of where that breach occurs. FN12 That interest is magnified in this case because it seems Actrade DE has no other forum in which to litigate its breach of fiduciary duty claim. Aharoni has not submitted to the personal jurisdiction of the Cayman Islands court, nor is he named as a party in that action. Aharoni's implied consent to Delaware's personal jurisdiction through section 3114 ensures that Actrade DE has a forum in which to litigate its injury.

> FN12. *Id.*

Since this court has personal jurisdiction over Aharoni for Actrade DE's breach of fiduciary duty claim, that jurisdiction extends "to any and all relief that might be necessary to do justice between the parties." FN13 This includes jurisdiction over Actrade Commerce's claims. Under very similar facts, the *Technicorp* court found personal jurisdiction over defendant directors for the claims of a foreign subsidiary because those claims "arise out of the same core facts as [the claims of the parent] and because it was therefore reasonably foreseeable that [the subsidiary] as well as [the parent] would seek to recover those diverted funds in the same lawsuit." FN14

> FN13. *Gans v. MDR Liquidating Corp.,* 1990 WL 2851, at *10 (Del. Ch. Jan. 10, 1990).

> FN14. *Technicorp* at *5 n. 12.

Aharoni's attempt to distinguish *Technicorp* is unpersuasive. He argues that Delaware has a greater interest in enforcing the fiduciary duty owed to a Delaware parent company when the subsidiary was a directly-owned buyout vehicle than when the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 5

Not Reported in A.2d, 2003 WL 22389891, 29 Del. J. Corp. L. 573
**(Cite as: Not Reported in A.2d)**

subsidiary is indirectly owned and conducts ordinary business. FN15 However, Aharoni offers no reason why this difference mandates a disparate result for the same act-breaching a fiduciary duty to a parent company by converting its subsidiary's money for personal use. Since the same core facts are at issue in both of Actrade's claims, the dual-plaintiff suit was entirely foreseeable and *Technicorp* applies. This court has personal jurisdiction over Aharoni for all of Actrade's claims.

FN15. Def. Op, Br. p. 9.

B. *Service Of Process And The Hague Convention*

Aharoni next contends that 10 *Del. C.* § 3114(b), as applied to him, violates the Hague Convention. FN16 Under Aharoni's interpretation of section 3114(b), service is a two-step process that, in his case, included both (1) the service on Actrade's registered agent in Delaware, and (2) the mailing by the Register in Chancery of a copy of that process to him in Israel. Because the second part of this "service" was made on him overseas, he contends, the Hague Convention applies to invalidate the attempted service. FN17 Actrade responds that for the purpose of the Hague Convention, service on Aharoni pursuant to section 3114(b) was accomplished by serving Actrade's registered agent. According to Actrade, the subsequent mailing by the Register in Chancery was not a necessary part of "service," but merely an additional form of notice. Therefore, Actrade argues, the Hague Convention has no application.

FN16. The pertinent part of § 3114(b) is as follows:
Service of process shall be effected by serving the registered agent (or, if there is none, the Secretary of State) with 1 copy of such process in the manner provided by law for service of writs of summons. In addition, the Prothonotary or the Register in Chancery of the court in which the civil action or proceeding is pending shall, within 7 days of such service, deposit in the United States mails, by registered mail,

postage prepaid, true and attested copies of the process, together with a statement that service is being made pursuant to this section, addressed to such director, trustee or member at the corporation's principal place of business and at the residence address as the same appears on the records of the Secretary of State, or, if no such residence address appears, at the address last known to the party desiring to make such service.

FN17. Reply Memorandum of Law in Further Support of Motion to Dismiss the Complaint of Defendant Amos Ahoroni Based, *Inter Alia,* Upon Lack of Personal Jurisdiction, Lack of Subject Matter Jurisdiction, *Forum Non* Conveniens, Prior Pending Proceeding, and Failure to Join Necessary Parties, ("Def.Rep.Br.") p. 5. The Hague Convention, if it applied, would have required that any attempt to serve process on an Israeli resident be mailed to Israel's Directorate of the Courts, rather than directly to the resident. The Register in Chancery mailed Actrade's process directly to Aharoni.

**\*5** As a matter of textual interpretation, Actrade's reading of the statute is by far more compelling. "Service" under the statute is described in the first sentence of the section and is limited to "serving the registered agent." The additional act of mailing is required to be made "within 7 days of such service." This reading is also consistent with the strong public policy of this State to provide a certain and easily accessible forum in which to litigate claims against those who choose to become directors of Delaware corporations. FN18 Delaware's interest in defining and enforcing these obligations is substantial and does not depend on or relate to the place of residence of the director. FN19 Delaware requires appointment of an in-state registered agent in order to effectuate service of foreign directors entirely in Delaware, hence avoiding the more difficult and time-consuming steps necessary to effect service of process on persons outside the state. FN20 The United States Supreme Court has ruled that the Hague Convention applies only to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                         Page 6

Not Reported in A.2d, 2003 WL 22389891, 29 Del. J. Corp. L. 573
**(Cite as: Not Reported in A.2d)**

service effectuated outside the United States. FN21
For that reason, that treaty is irrelevant to section
3114(b) service in Delaware.

> FN18. *See Pestolite, Inc. v. Cordura Corp.,*
> 449 A.2d 263 (Del.Super.1982).

> FN19. *Id.*

> FN20. *Id.* at 266 (§ 3114 enacted
> specifically to ensure jurisdiction over
> directors of Delaware corporations for the
> claims of those corporations in response to
> *Shaffer v. Heitner,* 433 U.S. 186 (1977)).

> FN21.        *See        Volkswagenwerk
> Aktiengesellschaft    v.    Schlunk,*  486  U.S.
> 694, 701 (1988).

For the foregoing reasons, Aharoni's motion to
dismiss for lack of personal jurisdiction and
improper service of process will be denied. FN22

> FN22. Since the court has personal
> jurisdiction pursuant to § 3114 , I decline
> to consider whether 10 *Del. C.* § 366(a)
> (the sequestration statute) could provide an
> alternate basis for personal jurisdiction.

### IV.

Aharoni challenges this court's subject matter
jurisdiction by characterizing the disputed action as
a simple conversion of Actrade funds that can be
fully remedied by damages. FN23 Aharoni argues
that Actrade may invoke equity jurisdiction only if
damages cannot adequately remedy Actrade's
injury. He is simply wrong. This court has subject
matter jurisdiction over claims that are equitable in
nature even if monetary damages are sought in
relief. FN24 Breach of fiduciary duty is a
well-established equitable claim properly invoking
the subject matter jurisdiction of this court. FN25
Aharoni's motion to dismiss for lack of subject
matter jurisdiction must be denied.

> FN23. Def. Rep. Br. pp. 12-13.

> FN24. *See* 10 *Del. C.* § 3411; *see also*
> *International   Business   Machines   v.*
> *Comdisco,* 602  A.2d 74,  78 n. 6 (Del.
> Ch.1991).

> FN25. *See e.g. Clark v. Teeven Holding*
> *Co.,  Inc.,*  625  A.2d  869,  875  (Del.
> Ch.1992)  ("This  Court  thus  has
> jurisdiction  to  hear  such  traditional,
> equitable matters as trusts and fiduciary
> relations").

Aharoni next contends that even if Actrade has an
equitable claim, the court should refuse to exercise
jurisdiction over any related legal claims. Instead,
he argues, the court should sever these claims to the
Superior Court where Aharoni may receive a jury
trial. The facts of this case do not warrant severance
of Actrade's legal claims from the central claim
alleging breach of fiduciary duty. Once this court
finds equity jurisdiction over part of a case, it may,
at its discretion, exercise jurisdiction over related
legal claims. FN26 Factors that may cause this
court to deny a motion to sever include: "to resolve
factual issues; to avoid multiplicity of suits; to
promote judicial efficiency; to do full justice; to
avoid great expense; to afford complete relief in one
action; and to overcome insufficient modes of
procedure at law." FN27 Actrade bases all of its
claims on two allegedly wrongful wire transfers
ordered by Aharoni. Since the factual inquiry for
Actrade's breach of fiduciary duty claim would be
identical to that of the misappropriation, fraud, and
waste claims, all the factors of the *Getty Refining*
test weigh against the duplicative factual inquiry
that severance would cause. FN28 The court will
therefore exercise jurisdiction over all of Actrade's
claims.

> FN26. *See Getty Refining & Marketing*
> *Co. v. Park Oil, Inc.,* 385 A.2d 147, 149
> (Del. Ch.1978).

> FN27. *Id.* at 150.

> FN28. *Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 22389891, 29 Del. J. Corp. L. 573
**(Cite as: Not Reported in A.2d)**

V.

**\*6** Aharoni's motion further asserts a laundry list of reasons why this court should either dismiss or stay the complaint. The arguments made are insubstantial and will be discussed only briefly.

Aharoni's motion to dismiss under the doctrine of *forum non conveniens* fails for two reasons. First, Aharoni offers no persuasive reason why Delaware is an inconvenient forum for a director of a Delaware corporation to litigate a claim for breach of fiduciary duty. Second, Aharoni has failed to suggest a comparable action in a forum so much more convenient that this court should dismiss the present action in its favor.

An action will be dismissed for *forum non conveniens* only in "the rare case where a dismissal of a complaint is appropriate because this forum is overwhelmingly and unduly inconvenient...." FN29 A mere preference for another forum is insufficient: "While there is no doubt that [Aharoni] would prefer to litigate this case in his home [country], he cannot plausibly claim any undue inconvenience from having to defend himself against claims for breach of fiduciary duty in this court. [The defendant] voluntarily chose to serve as the director and principal operating officer of a Delaware corporation. He is an intelligent man who cannot have been ignorant of the possibility that he would face a suit in Delaware in the event of a dispute between himself and [the Delaware corporation he served]." FN30

FN29. *See Caithness Resources, Inc. v. Ozdemir,* 2000 WL 1741941 at 1 (Del. Ch. Nov. 22, 2000).

FN30. *Id.* at \*5.

Additionally, Aharoni does not offer a comparable, more convenient action to which this court should defer. The only other related action currently pending is the Cayman Islands action, which is both incomparable and less convenient than this action. The Cayman Islands action neither names Aharoni as a party nor involves a claim for breach of fiduciary duty. It is difficult to see how an action prosecuting a different claim against a different party would warrant dismissal for *forum non conveniens.*

Even if the Cayman Islands action were comparable, it would certainly be no more convenient than this action. Factors measuring convenience include "(1) the relative ease of access to proof; (2) the availability of compulsory process for witnesses; (3) the possibility of the view of the premises; (4) whether the controversy is dependent upon the application of Delaware law which the courts of this state more properly should decide than those of another jurisdiction; ... and [5] all other practical problems that would make the trial of the case easy, expeditious and inexpensive." FN31 None of these factors weigh in favor of dismissal. The fact that this action may involve the laws of multiple jurisdictions or the compulsion of witnesses therefrom is not compelling because those problems would arise wherever this dispute is litigated. The central claim of this case is breach of fiduciary duty to a Delaware company. This claim requires application of Delaware law within the special expertise of this court. Finally, Aharoni has little cause to complain of inconvenience in defending an action properly before this court when he consented to its jurisdiction.

FN31. *Taylor v. LSI Logic Corp.,* 689 A.2d 1196, 1198-99 (Del.1997).

**\*7** The court also declines to stay this action for the same reasons it declines to dismiss for *forum non conveniens.* Aharoni correctly argues that " discretion should be freely exercised in favor of [a] stay when there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice. involving the same issues and the same parties." FN32 However, a stay in favor of the Cayman Islands action is inappropriate because that case does not involve the same parties or cause of action and that court may not be able to do complete justice for lack of personal jurisdiction over Aharoni.

Not Reported in A.2d                                                                                                    Page 8

Not Reported in A.2d, 2003 WL 22389891, 29 Del. J. Corp. L. 573
**(Cite as: Not Reported in A.2d)**

FN32. *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g. Co.,* 263 A.2d 281, 283 (Del.1970).

Aharoni is not a party to the Cayman Islands action as required by *McWane.* FN33 He argues that since his alleged proxy companies are defendants there, his interests are adequately represented as well. Even if so, this argument entirely misses the point of director liability for breach of fiduciary duty. If Actrade's factual allegations are true, Aharoni is personally liable for breach of fiduciary duty, regardless of whether the proxy companies are liable. FN34 Personal liability is especially important here because the Cayman Islands courts apparently do not have personal jurisdiction over Aharoni. Thus, if Aharoni removed the funds from the accounts of the proxy companies, Actrade would be left without an equitable remedy. Such a result is not the "prompt and complete justice" contemplated by *McWane.* FN35

FN33. *Id.*

FN34. *See e.g, Technicorp.*

FN35. 263 A.2d at 283 (granting a stay because another action could afford the parties "all the discovery, pretrial, and trial advantages" they would have in Delaware and could grant a "speedy, just and complete disposition to the claims" of all parties before the court).

The court also rejects Aharoni's contention that ICC, Fort, CFI, and various Actrade subsidiaries are indispensable parties without whom this court cannot do full and complete justice. Court of Chancery Rule 19(a) lists the factors making a party necessary:

(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a

substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Aharoni argues that Fort, ICC and CFI are indispensable parties because they have a claim to the disputed $31.6 million. This does not affect this court's ability to grant complete relief to the parties before it. The central claim here is that Aharoni breached his fiduciary duty to Actrade by stealing from Actrade Commerce. If Actrade is able to prove this claim, Aharoni will be personally liable for the $31.6 million he allegedly stole, whether or not some other person or entity might also be liable to Actrade.

There is also little risk that these companies will be unable to protect their interests or that Aharoni will be subject to duplicative obligations. If, as alleged, Aharoni controls ICC, Fort and CFI, then Aharoni can adequately defend their interests. If not, this case will only decide whether the disputed transfers were within the scope of Aharoni's authority as a director of Actrade. The alleged proxy companies' liability will not be at issue. The "one satisfaction" rule ensures that Actrade can actually recover the $31.6 million only once, regardless of the number of actions or defendants. FN36 Since ICC, Fort, and CFI are not necessary parties under Rule 19(a), it is unnecessary for the court to consider Aharoni's Rule 19(b) analysis.

FN36. See 47 Am.Jur.2d, *Judgments* § 1009.

**\*8** Similarly, the other Actrade subsidiaries are not necessary parties to this action because the "one satisfaction" rule prevents duplicative recovery and because those subsidiaries are not otherwise interested. FN37 Aharoni offers no legitimate reason why this case cannot go forward without these unrelated parties. FN38

FN37. *Id.*

FN38. Aharoni offers no basis for his contention that any court would force him

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 22389891, 29 Del. J. Corp. L. 573
**(Cite as: Not Reported in A.2d)**

to pay the same $31.6 million multiple times to each Actrade subsidiary. Nor does Aharoni show why this case requires joining Actrade International or Actrade S.A. when those companies had nothing to do with the disputed transfers. While Aharoni may have transferred money from Actrade Resources to Actrade Commerce prior to the disputed transfers, that act appears to have been within Aharoni's director authority and is unchallenged by Actrade. Aharoni suggests his discovery will be hampered without the subsidiary companies, but it is unclear why any information about the disputed transfers, especially payment on the loan agreements, would be outside the control of Actrade DE, owner of all the companies at issue.

Finally, Aharoni worries that he will win here, be able to dismiss Actrade DE and Actrade Commerce from the Cayman Islands action, then be found liable to the other Actrade subsidiaries. This argument is wholly without merit since Aharoni is not a party to the Cayman Islands action and denies he controls the companies that are parties to that action.

Finally, the court will deny Aharoni's motion to the extent it seeks dismissal of the claims for misappropriation, FN39 fraud FN40 and waste FN41 asserted in the complaint. Similarly, the court will deny the motion to strike references to the letter from the SEC and the subpoena from the U.S. Attorney's office. These allegations tend to prove a core element of Actrade's case: that Aharoni created the loan documents after the fact to hide his wrongdoing. Actrade alleges that Aharoni knew that Actrade was under government investigation and still refused to produce the allegedly exonerating loan agreements for several weeks. If true, this fact would tend to prove bad faith and is relevant. FN42 The probative value of such evidence far outweighs any danger of unfair prejudice to Aharoni. FN43

FN39. The motion to dismiss Actrade's conversion claim is premature. Neither

party briefed the issue of whether Antiguan law recognizes a claim for conversion of a specific sum. Since the parties agree that Antiguan law controls, dismissal is inappropriate.

FN40. According to Aharoni, "[n]owhere in their entire complaint do Plaintiffs allege that they were damaged from purported incorrect information contained in the financials." Def. Rep. Br. at 30. However, ¶ 97 of the complaint reads, " Aharoni's representations of fact contained in the purported loan agreements were false when made, were known to be false when made, and were made for purpose of inducing Actrade Commerce to rely on them to their detriment, which Actrade Commerce did." Further, ¶ 98 reads, " [a]s a direct result, Actrade Commerce suffered damages in an amount to be proved at trial." This is an adequate allegation of damage.

FN41. In support of his motion to dismiss the waste claim, Aharoni argues that the loan agreements on their face are evidence that Actrade received reasonable consideration. Of course, the complaint alleges facts that cast doubt on the regularity of those documents. Aharoni's argument that this court is helpless to look beyond the four corners of an allegedly fraudulent document to address allegations of self-dealing waste (Def.Rep.Br. p. 31) is simply wrong.

FN42. Delaware Uniform Rule of Evidence 401 (defining relevant evidence as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable").

FN43. In passing, the court notes that the parties vigorously argue over remedies that might be available, including accounting, sequestration of stock, and constructive trusts. This discussion is premature and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 10

Not Reported in A.2d, 2003 WL 22389891, 29 Del. J. Corp. L. 573
**(Cite as: Not Reported in A.2d)**

unnecessary to the present motion and I decline to make any ruling on it.

VI.

For all of the foregoing reasons, Aharoni's motion to dismiss for lack of personal jurisdiction, lack of subject matter jurisdiction, and *forum non conveniens* is denied. Aharoni's motion to stay or dismiss this action in favor of the Cayman Islands action is denied. Aharoni's motion to dismiss for failure to state a claim and for failure to join necessary parties is denied. Aharoni's motion to strike is denied. IT IS SO ORDERED.

Del.Ch.,2003.
Actrade Financial Technologies Ltd. v. Aharoni
Not Reported in A.2d, 2003 WL 22389891, 29 Del. J. Corp. L. 573

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2

Westlaw.

Not Reported in A.2d

Page 1

Not Reported in A.2d, 2003 WL 1787959
(Cite as: Not Reported in A.2d)

**H**
Not Reported in A.2d, 2003 WL 1787959
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
CORNERSTONE TECHNOLOGIES, LLC,
Arastra, LLC, Kor Holdings, LLC, and Peter A.
Kanjorski Plaintiffs,
v.
Bruce E. CONRAD and Thomas Unger, Defendants.
**No. Civ.A. 19712-NC.**

Submitted: March 11, 2003.
Decided: March 31, 2003.

Daniel L. McKenty , Gerald J. Hager , McCullough
& McKenty, P.A. , Wilmington, Delaware; Richard
A. Breuer, Malvern, Pennsylvania, for Plaintiffs.
John M. Bader , Thomas S. Neuberger, P.A.,
Wilmington, Delaware, for Defendant, Thomas
Unger.
Bruce E. Conrad, Weatherly, Pennsylvania, pro se.

MEMORANDUM OPINION

STRINE, Vice Chancellor.
*1 This opinion resolves motions brought by the
two defendants in this case, Thomas Unger and
Bruce E. Conrad, to dismiss the complaint for lack
of personal jurisdiction. FN1 The opinion also
addresses defendant Conrad's request that this
action be stayed or dismissed in favor of litigation
pending in the state courts of Pennsylvania.
Candidly, the clarity of the factual record and of the
parties' legal arguments is less than ideal, making
summarization of this opinion difficult, and the
body of the opinion more cumbersome and
ambiguous.

> FN1. On January 9, 2003, the plaintiffs
> filed an amended complaint. The

defendants' motions are technically
directed at that earlier complaint, as
opposed to the more recent - and more
important - amended complaint. The
plaintiffs point out that "[d]efendants
declined the opportunity to file new
motions to the amended complaint and
elected to treat the motions and briefs
already filed as being addressed to the
amended complaint." Pls.' Answering Br.
at 2. In any event, the parties have
proceeded on the understanding that the
motions to dismiss (along with the
associated briefs) are responsive to the
amended complaint.

In rough terms, this case involves an unwieldy
dispute between the Kanjorski family and
defendants Unger and Conrad, arising out of their
involvement in two limited liability companies
whose operations are based in Pennsylvania, but
which are domiciled in Delaware. The names of
those companies are Cornerstone Technologies,
LLC and Arastra, LLC (collectively, the "LLCs" or
the "Companies"); both are named plaintiffs. The
other plaintiffs are Peter A. Kanjorski, who claims
to own 20% of the units of the two LLCs, and Kor
Holdings, LLC, a Kanjorski family holding entity,
claiming to own 60% of the LLCs' units.

Defendant Unger joined the Companies as an
employee sometime after their formation and is
alleged by the plaintiffs to claim an ownership share
in them.

Defendant Conrad (who is representing himself *pro
se* ) is alleged to have been one of the original
members and managers of both of the LLCs, and to
have been granted a 20% ownership interest in each.

In this case, the plaintiffs seek various forms of
declaratory, injunctive, and monetary relief against
Unger and Conrad.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 2

Not Reported in A.2d, 2003 WL 1787959
(Cite as: Not Reported in A.2d)

As to Unger, the plaintiffs seek a declaration that he does not own any units of either LLC. The problem with this request is that the instrument upon which Unger supposedly bases his claim to units was executed entirely in Pennsylvania well after the LLCs were first formed and only references his possible receipt of units in another entity, not the two LLCs. FN2 Thus, the sole theory that the plaintiffs press regarding the propriety of personal jurisdiction over Unger is that he is subject to jurisdiction under § 3104(c)(1) of the Delaware long-arm statute. The transactions of business in Delaware that the plaintiffs seek to attribute to Unger are the acts of the original founders of the LLCs in forming those entities in Delaware - acts that occurred before Unger was even involved with the LLCs in any manner. The plaintiffs claim that these prior acts can be attributed to Unger because he allegedly claims to have become a member of the LLCs well after they were formed. As a factual matter, of course, this chain of inference is impossible without attributing supernatural powers to Unger and therefore § 3104(c)(1) is not satisfied. For that and other reasons, Unger's motion to dismiss is granted.

> FN2. As I shall also note later, Unger actually disclaims owning units in either of the Companies, and contends that he owns shares in another entity related to the Companies, which is not a party to this case.

As to Conrad, the questions are a bit more difficult and numerous. The plaintiffs have made a *prima facie* showing that Conrad was a founding member, manager, and high-level officer of each of the LLCs. In two counts of their complaint, the plaintiffs seek a declaration that Conrad was properly removed as a manager of the two LLCs. Under 6 *Del. C.* § 18-110(a), Conrad may be served with process over these claims.

**\*2** Somewhat more problematic are certain other claims against Conrad. Stated summarily, these allege that Conrad violated a provision of the LLCs' operating agreements that require their members, among other things, to offer their units to the other

members before trying to sell them to third-parties. The plaintiffs seek various forms of relief tied to that central contention, the primary being declaratory relief clarifying exactly the ownership interests that Conrad (and impliedly others) hold or (the plaintiffs hope) do not hold in the LLCs.

Because there is *prima facie* evidence of Conrad's status as a manager of the LLCs, the plaintiffs argue that jurisdiction over him as to these counts exists under 6 *Del. C.* § 18-109(a), which permits an exercise of personal jurisdiction over a manager (as that term is defined in that subsection) "in all civil actions or proceedings brought in the State of Delaware *involving or relating to the business of the limited liability company* ..." FN3 These counts seek to resolve disputes regarding the manner in and price at which units of the Companies can be transferred under the Buy-Out Provision. This Provision can be viewed as touching on important aspects of the Companies' governance and basic nature, reflecting as it does a commitment by the founding members - of which Conrad was one - that the original members should have the opportunity to buy the other members' units before they passed into the hands of strangers.

> FN3. Emphasis added.

Moreover, the (albeit confusing) record suggests that Conrad has in the past asserted that the Companies issued - or committed to issue - units to certain employees (including Unger), and that these units are therefore exempt from the reach of the Buy-Out Provision. Given the relation of all these issues to the business of the LLCs, § 18-109(a) is a proper basis for the assertion of personal jurisdiction under the teaching of *Assist Stock Management L.L.C. v. Rosheim.* FN4 Furthermore, as a founding manager, member, and top ranking officer of the two Delaware LLCs who personally participated in the choice to invoke the laws of this state to govern the internal affairs of those entities and the contractual duties running among their members, Conrad's constitutional right to due process is not offended by requiring him to face suit here on all the claims raised by the plaintiffs in this case.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 3

Not Reported in A.2d, 2003 WL 1787959
**(Cite as: Not Reported in A.2d)**

FN4. 753 A.2d 974 (Del. Ch.2000).

For these reasons, I therefore grant Unger's motion to dismiss but deny Conrad's.

In the last portion of the opinion, I address Conrad's motion to stay this litigation in favor of other litigation filed against him by Cornerstone in Pennsylvania. Although this motion has been briefed in a somewhat sketchy way, I am convinced that a stay is in order. At the same time it seeks to have Conrad answer substantial claims in this court, Cornerstone - at the instance of the Kanjorskis - has filed serious breaches of fiduciary duty claims against Conrad in Pennsylvania and has secured a trial date for later this year. No sensible reason suggests itself why Cornerstone has split its claims against Conrad in this way because the fiduciary duty claims could have obviously been filed here, and there appears no obstacle to the claims filed here being asserted in the Pennsylvania action.

***3** Furthermore, the Pennsylvania case has the added advantage that Unger is a party there and that others with a possible interest in the suit (*e.g.,* the other possible recipients of unit transfers from Conrad) can be joined to that action. The absence of Unger (and other possible transferees of units from Conrad) from this suit, moreover, has a possible effect none of the parties has addressed. To the extent the plaintiffs seek (in Count I of their complaint) to rescind supposed transfers to Unger and other persons not before the court, the important policy concerns of Court of Chancery Rule 19 will also be implicated.

Although I will not dismiss this action in favor of the Pennsylvania action at this time, it is inefficient and needlessly burdensome for this action to proceed against Conrad simultaneously with a Pennsylvania action that is on a fast track to trial before the end of this year. Although a plaintiff's choice of forum is to be respected, its choice to multiply forums for no apparent purpose need not be indulged at the expense of the defendant's interests and the interests of judicial economy.

*I. Procedural Framework*

As a preliminary matter, it is useful to set forth the procedural framework that governs this motion. On a Rule 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery of record, and may even hold an evidentiary hearing. FN5 The burden of showing a basis for the court's exercise of personal jurisdiction over a nonresident defendant rests with the plaintiffs. FN6 In a case like this one, when no evidentiary hearing has been held, the plaintiffs' burden is a relatively light one - *i.e.,* they must only make "a prima facie showing that the exercise of personal jurisdiction is appropriate." FN7 And, in such a case, "the record is construed in the light most favorable to the plaintiff." FN8

FN5. *See* 1 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 3-3 (2003).

FN6. *See id.;* 2 James Wm. Moore et al., *Moore's Federal Practice* § 12.31(4) (3d ed.2002).

FN7. 1 Wolfe & Pittenger, § 3-3; *see Hart Holding Co. v. Drexel Burnham Lambert Inc.,* 593 A.2d 535, 539 (Del. Ch.1991) ; *Francosteel Corp. v. M/V Charm,* 19 F.3d 624, 626 (11th Cir.1994); 2 Moore, § 12.31(5).

FN8. 1 Wolfe & Pittenger, § 3-3; *see Computer People, Inc. v. Best Int'l Group, Inc.,* 1999 WL 288119, at *5 (Del. Ch. Apr. 27, 1999); 2 Moore, § 12.31(5).

*A. The Facts*

*1. The Formation of the Companies and the Pertinent Features of their Operating Agreements*

Cornerstone and Arastra were both formed by three original members - plaintiff Kor Holdings, plaintiff Peter A. Kanjorski, and defendant Conrad. The plaintiffs have made a *prima facie* showing that each of these three members -including Conrad - signed the operating agreement for each Company.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 4

Not Reported in A.2d, 2003 WL 1787959
**(Cite as: Not Reported in A.2d)**

In one of many unusual aspects to this case, Conrad admits signing the Cornerstone operating agreement but claims that the signature that purports to be his on the Arasta agreement was forged. For purposes of this motion, however, I must draw the inference that the signature on the Arasta agreement was put there by Conrad's own hand.

According to each operating agreement, Kor Holdings has a sixty percent membership interest, while Peter A. Kanjorski and Conrad each hold a twenty percent membership interest. Each of the operating agreements has a provision that requires a member to offer his interest in the Company to the other members and, if they decline, to the Company itself before offering to transfer such an interest to any other person (collectively I refer to the two provisions singularly as the "Buy-Out Provision"). Under each of the operating agreements, a member who does not comply with the Buy-Out Provision **\*4** shall ... indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any such indemnified Persons may incur (including incremental tax liability and lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby. FN9

> FN9. Cornerstone Operating Agreement § 6.5; Arastra Operating Agreement § 6.5.

Each operating agreement provides for a board of managers to manage or direct the management of the business and affairs of the Company. And each operating agreement establishes certain corporate offices, to be appointed by the board of managers. The Chief Executive Officer of each Company is the officer who is, under the operating agreements, responsible for the general management of the Company.

Finally, each operating agreement has a provision that authorizes the actions necessary to form each Company as a Delaware limited liability company. FN10 In other words, the members of the Companies contemplated that certain steps (*e.g.,* a filing with the Delaware Secretary of State) would be necessary to formally form Cornerstone and Arastra as Delaware limited liability companies.

> FN10. Cornerstone Operating Agreement § 1.1; Arastra Operating Agreement § 1.1.

### 2. *Conrad's Involvement with the Companies*

At various points, Conrad served as President, Chief Executive Officer, and manager of Cornerstone and Arastra. The plaintiffs have produced evidence, in the form of a draft September 18, 2000 letter from Conrad to Richard M. Pell, to support their assertion that Conrad was formerly an officer of Cornerstone and Arastra. In that letter, Conrad claims to have been the President and Chief Executive Officer of Cornerstone, Arastra, and a related company. FN11 And, according to the operating agreements, "the Chief Executive Officer shall serve as one of the Managers." FN12

> FN11. *See* Am. Compl. Ex. D ("As you know, on August 4, 2000, you signed an Equity Agreement dated August 15, 2000, which I countersigned in my capacity as President and CEO of Arastra, LLC, Cornerstone Technologies LLC, and Pennsylvania Micronics, LLC ...").

> FN12. Cornerstone Operating Agreement § 3.3(b); Arastra Operating Agreement § 3.3(b).

### 3. *Unger's Involvement with the Companies*

Unger served as an employee of Cornerstone from December 1999 to May 2001. The plaintiffs allege that Unger claims to have come into possession of units in and thus become a member of the Companies. Unger allegedly came into possession of whatever units he owns by way of a September 18, 2000 purported assignment by Conrad to Unger and a May 20, 2001 purported assignment by David Carpenter to Unger.

In keeping with the odd nature of this record, Unger disclaims any ownership of units in either of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 1787959
**(Cite as: Not Reported in A.2d)**

Companies. His co-defendant, Conrad, however, claims that Unger was promised a significant block of units to be issued to him once he became an employee.

### 4. The Chain of Events Leading to this Suit

There is little clarity about the precise nature of the disputes between the Kanjorskis and Unger and Conrad; what is relevant and can be discerned now follows.

It appears that at some point in time Conrad felt that certain employees of the Companies had been promised an equity stake of some kind in an August 15, 2000 agreement. I infer this from a September 18, 2000 letter attached to the complaint and a later letter. The September 18, 2000 letter purports to be from Conrad to Richard M. Pell, and states in pertinent part that:

> *5 As you know, on August 4, 2000, you signed an Equity Agreement dated August 15, 2000, which I countersigned in my capacity as President and CEO of Arastra ... [and] Cornerstone.... At that time it was understood by me that the majority shareholders of the Companies had fully authorized the execution of that Agreement. I have since been informed otherwise.
>
> If the majority shareholders do not ultimately authorize equity grants to you in an acceptable form, I am committed to making you whole for the commitment I made to each of you, Bob Marshall and Tom Unger, from equity which is totally in my control. If this document is accepted by you, I hereby cause to be assigned to you an undivided interest in my 20% holding in the Companies, such that you will have a call on the value of the 20% of the 20% held by me. While I cannot actually deliver shares to you, I intend to bind the value of this 4% equity interest to you as though it were formally held by you through the ownership of share certificates therefor. FN13

FN13. Am. Compl. Ex. D.

That is, all told Conrad (going only by the draft letter) purports to have attempted to transfer

three-fifths of his twenty percent portion, or twelve percent of the Companies. The letter does not reflect any mention of the Buy-Out Provision. Also relevant is the implicit suggestion that Pell, Marshall, and Unger had been promised units in the Companies by Peter Kanjorski and Conrad, acting as Company managers. It is not clear from the record whether Pell, Marshall, or Unger accepted Conrad's offer.

The record then fast-forwards to May 6, 2001. On that day, a number of important events occurred involving the governance of Cornerstone and Arastra. First, Kor Holdings and Peter A. Kanjorski (as purported holders of a total of eighty percent of the original membership units of Cornerstone and Arastra, respectively, in accordance with the literal terms of the operating agreements) executed written consents that (1) removed Conrad as manager of Cornerstone and Arastra; (2) increased the number of managers of each Company to four; and (3) installed Peter A. Kanjorski, Russell P. Kanjorski, Mark A. Kanjorski, and Paul Eric Kanjorski (the " Kanjorskis") as the new managers. Second, the newly constituted boards of managers (1) removed Conrad from his position as President of each Company; (2) removed him from any other position with the Companies; (3) terminated his employment with the Companies; and (4) ended Conrad's ability to act on behalf of the Companies. Third, the boards elected Peter A. Kanjorski to the offices of Chief Executive Officer and President and Paul Eric Kanjorski to the offices of Secretary and Treasurer.

As might be expected, this action triggered the likelihood of lawsuits. In anticipation of legal action, it appears that on May 20, 2001, an individual named David Carpenter executed an assignment that purported to transfer Carpenter's entire interest in Cornerstone and Arastra to Conrad and Unger. FN14 According to the terms of the purported assignment, Conrad and Unger were each to receive fifty percent of Carpenter's (unspecified) holdings in the Companies. In exchange, Carpenter received one dollar and other "valuable consideration."

FN14. See Am. Compl. Ex. A.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 1787959
**(Cite as: Not Reported in A.2d)**

*6 Also, in the May 20 document, Carpenter purported to "assign[ ] any rights he may have in litigation against Peter Kanjorski and others with respect to the [Companies]." FN15 That assignment of litigation rights was to be equally divided between Conrad and Unger. Notably, the assignment letter purporting to assign Carpenter's ownership interest does not indicate any attempt to comply with the Buy-Out Provision. Nor does the document explain how Carpenter acquired his interests in the Companies or his causes of action against Kanjorski and certain unnamed others, except to reference a supposed May 15, 1997 agreement.

FN15. *Id.*

In other litigation, Conrad has asserted that the May 15, 1997 agreement gave himself, Carpenter, and Unger nearly sixty percent of Cornerstone's equity -and that the Kanjorski family was to own nearly 40%. Conrad implies that the equity allocation expressly set forth in the operating agreements is misleading, because Kor was only supposed to hold Unger's nearly twenty percent equity share until Unger became an employee. As indicated, consistent with the generally confusing nature of the record, Unger expressly disclaims any ownership interest in either of the Companies.

On May 30, 2001, Barry H. Dyller, who was then Conrad's lawyer, sent a letter to the plaintiffs' lawyer offering to sell to "the Kanjorski family or any member you designate" Conrad's twenty percent interest in Cornerstone for $3.9881 million. FN16 This offer was expressly made as a confidential offer of settlement.

FN16. Am. Compl. Ex. E.

Finally, on August 16, 2002, the members of each Company voted to ratify the earlier May 6 appointment of managers and to elect those persons appointed on May 6 to the board of managers. That is, the Kanjorskis were elected to the board. On all of the motions made at the members' meetings, Peter Kanjorski and Kor Holdings (as represented

by Peter Kanjorski) voted "yes." Bruce Conrad was absent and therefore did not vote on each measure.

### B. *The Pennsylvania Actions*

There are three Pennsylvania state court actions that relate to the dispute before me. The first is an action filed by defendant Unger on February 12, 2002 in the Court of Common Pleas of Northampton County (the "Employment Action") against Cornerstone. In his complaint, Unger claims that Cornerstone unlawfully terminated him from his position as an executive employee of the Company. Unger argues that this termination violated the provisions of (1) an employment contract between Unger and Cornerstone and (2) the Pennsylvania Human Relations Act, in that Unger's termination was supposedly motivated by Unger's age. In the Employment Action, Unger does not assert any ownership interest in either Cornerstone or Arastra. Unger and Cornerstone are the only parties to the Employment Action.

The second of the related actions was filed against Conrad by Cornerstone in the Court of Common Pleas of Carbon County on July 2, 2002. In that action, Cornerstone sought the return of a company computer (or damages equal to its value) allegedly retained by Conrad after his termination by Cornerstone (the "Replevin Action"), as well as compensatory damages, punitive damages, and an award of attorneys' fees.

*7 In response to the complaint in the Replevin Action, Conrad raised a number of preliminary objections, including that: (1) the actual owners of Cornerstone had not authorized the Replevin Action because Cornerstone is "59.5% owned by Mr. Conrad, Mr. Unger and Dr. Carpenter"; FN17 (2) there were two prior-filed actions (namely, the "Employment Action" and this Delaware action); and that (3) Cornerstone had failed to join certain indispensable parties. On January 15, 2003, the Northampton County Court of Common Pleas denied Conrad's preliminary objections in the Replevin Action. FN18 Cornerstone and Conrad are the only parties to the Replevin Action.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN17. Conrad's Prelim. Objections & Mot. for Summ. J. at 3 (capitalization and bold emphasis omitted).

FN18. *See Cornerstone Techs., LLC. v. Conrad,* No. C0048CV20027475, order at 1 (Pa.Ct.Com.Pl. Jan. 15, 2003).

The third action was filed by Cornerstone against Conrad and Unger on July 2, 2002 in the Court of Common Pleas of Carbon County (the "Equity Action"). In the Equity Action, Cornerstone complained that Conrad and Unger had breached their fiduciary duties, their duties as employees, and their obligations under certain confidentiality agreements, to Cornerstone, by, among other things, improperly disclosing Cornerstone trade secrets and engaging in illicit competition with the Company. Additionally, Cornerstone sought an injunction ordering Conrad and Unger to relinquish control over certain "tangible media" owned by Cornerstone, enjoining them from disclosing Cornerstone trade secrets, and requiring them to account to Cornerstone for any benefit they received as result of any improper disclosure of Cornerstone trade secrets. And, Cornerstone sought a judicial declaration that certain inventions are its property.

Conrad filed preliminary objections to the Equity Action that were identical to the preliminary objections he filed in the Replevin Action, and reiterated his contention that Conrad, Unger, and Carpenter own 59.5% of Cornerstone's equity. On December 20, 2002, the Northampton County Court of Common Pleas overruled all of Conrad's (and Unger's separate) preliminary objections in the Equity Action. FN19 In the Equity Action, Cornerstone is the only plaintiff, and Conrad and Unger are the only defendants.

FN19. *See Cornerstone Techs., LLC. v. Conrad,* No. C0048CV2002-7475, slip op. at 5 (Pa.Ct.Com.Pl. Dec. 20, 2002).

On the same day that the judge overruled Conrad's and Unger's preliminary objections in the Equity Action, he entered an order coordinating that Action

with the Employment Action and Replevin Action, with the result that all three Pennsylvania Actions will proceed in an essentially consolidated manner. That court, the Northampton County Court of Common Pleas, has set a schedule for the consolidated action that mandates that discovery be completed by July 1, 2003, that all dispositive motions be filed by July 15, 2003, and that trial begin on December 15, 2003. FN20

FN20. *See Cornerstone Techs., LLC. v. Conrad,* No. C0048CV2002007475, order at 2 (Pa.Ct.Com.Pl. Jan. 31, 2003).

C. *The Counts of the Complaint*

In summary, the plaintiffs complain that Conrad and Unger are making certain false claims of ownership in Cornerstone and Arastra and that, as a result, uncertainty exists about who can make decisions for the Companies, an uncertainty that supposedly hampers the Companies' ability to deal with third parties. While conceding that Conrad enjoys a twenty percent stake in Cornerstone and Arastra, the plaintiffs seek a judicial declaration that Conrad's interest in the Companies is no more (or less) than that twenty percent and that Unger has no interest at all in the Companies.

*8 The precise counts of the complaint can be grouped as follows:

1. *The Ownership Count*

In Count I, the plaintiffs seek a judicial declaration that Conrad owns solely a twenty percent stake in each of the Companies and that Unger enjoys no such ownership stake whatsoever. The Ownership Count is linked in an important way to the Buy-Out Counts, which I next summarize. The reason is that it is the conduct that is alleged in the Buy-Out Counts that gives rise to the plaintiffs' concern about the proportion of the Companies' equity that is owned by Conrad and Unger.

2. *The Buy-Out Counts*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 8

Not Reported in A.2d, 2003 WL 1787959
**(Cite as: Not Reported in A.2d)**

In Count II, the plaintiffs complain that Conrad's offer to transfer four percent interests in the Companies to each of Pell, Marshall, and Unger violated the Buy-Out Provision. In other words, Conrad should have made an offer to sell the interests to his fellow members and the Companies before making such offers to Pell, Marshall, and Unger.

It is not clear from the record whether the plaintiffs allege that any of Conrad's offers were accepted. To the extent that Pell, Marshall, and/or Unger accepted Conrad's offer, I read the complaint as requesting an invalidation of the transfer(s). Even if the offers were not accepted, the complaint seems to seek a mandatory injunction requiring Conrad to offer the units he offered to Pell, Marshall, and Unger to the other members and/or the Companies who have rights under the Buy-Out Provision at the price that the Provision would have dictated as of September 18, 2000. FN21

         FN21. Am. Compl. at 5.

In Count III, the plaintiffs argue that Conrad's settlement offer, by way of his attorney's letter, to sell his entire stake in Cornerstone to the Kanjorski family also violated the Buy-Out Provision of that Company's operating agreement. As in Count II, Count III seeks to require Conrad to put his equity to the parties having rights under the Buy-Out Provision in accordance with the terms that Provision would have dictated at the time Conrad made his settlement offer. FN22

         FN22. Am. Compl. at 6.

In Count IV, the plaintiffs request an award of attorneys' fees and other litigation expenses incurred in their attempt to enforce the Buy-Out Provision. The plaintiffs argue that the operating agreements require any party that violates the Buy-Out Provision to indemnify the members and the Companies for all costs associated with enforcing the Buy-Out Provision and the indemnity provisions.

                 3. *The Removal Counts*

In Counts V and VI, the plaintiffs seek judicial confirmation of Conrad's removal as a manager and officer of the Companies. Furthermore, the plaintiffs want me to approve the managers' subsequent appointment of Peter Kanjorski as President and CEO and Paul Eric Kanjorski as Secretary and Treasurer of the Companies.

                    II. *Analysis*

To determine whether this court may exercise personal jurisdiction over Unger and Conrad, I must engage in a two-part analysis. FN23 First, I must ask whether a statute of this state authorizes the exercise of personal jurisdiction over each of them. Second, I must determine whether such an exercise of jurisdiction would comport with the due process requirements of the Fourteenth Amendment to the United States Constitution. FN24 The Fourteenth Amendment requires that a nonresident defendant have certain "minimum contacts" with the forum jurisdiction "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " FN25

         FN23. *See* 1 Wolfe & Pittenger, § 3-3.

         FN24. *See Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd.,* 611 A.2d 476, 480-81 (Del.1992), *cert. dismissed,* 507 U.S. 1025 (1993).

         FN25. *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940)); *see also LaNuova D & B, S.p.A. v. Bowe Co.,* 513 A.2d 764, 769-70 (Del.1986) (applying *International Shoe* ).

**\*9** I begin my analysis with defendant Unger.

                 A. *Statutory Analysis*

                    1. *Unger*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 1787959
**(Cite as: Not Reported in A.2d)**

The plaintiffs rely solely on the provisions of Delaware's long-arm statute FN26 to support their claim that this court has personal jurisdiction over Unger. The plaintiffs concede FN27 that the only relevant part of the long-arm statute is 10 *Del. C.* § 3104(c)(1), which provides:

> FN26. 10 *Del. C.* § 3104.

> FN27. *See* Pls.' Answering Br. at 6.

(c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
  (1) Transacts any business or performs any character of work or service in the State ...

Section 3104(c)(1) is a "single act" provision of the long-arm statute. FN28 As such, § 3104(c)(1) supplies a basis for personal jurisdiction "only with respect to claims that have a nexus to such forum-related conduct." FN29 The plaintiffs have only pointed to two acts committed in the State of Delaware that have any relevance to this litigation - *i.e.,* the acts of forming (1) Cornerstone and (2) Arastra as Delaware limited liability companies.

> FN28. *See* 1 Wolfe & Pittenger, § 3-5(a)(1)(i).

> FN29. *Id.; see LaNuova,* 513 A.2d at 768.

But the plaintiffs have not even alleged that Unger committed or caused to be committed either of these acts in the State of Delaware. Unger's name is noticeably absent from the operating agreements. He did not sign those agreements. He is not listed as a member in either agreement. There is no indication whatsoever that he had any role in the founding and formation of either Cornerstone or Arastra. Undeterred by these facts, the plaintiffs advance a novel legal argument - that because Unger allegedly became a member of the Companies *later,* he should be treated for jurisdictional purposes as if he had *earlier*

authorized these acts.

I refuse to adopt the plaintiffs' invitation to engage in metaphysics. Section 3104(c)(1), by its own terms, requires that the transaction of business in question be performed "in person or through an agent." FN30 The plaintiffs have not produced any evidence showing that Unger had anything to do with the filing of the limited liability company documents for Cornerstone and Arastra. Therefore, the plaintiffs have not met their burden to show that Unger transacted any business (either personally or through an agent) in Delaware. Section 3104(c)(1) thus does not supply this court with personal jurisdiction over Unger and his motion must be granted.

> FN30. 10 *Del. C.* § 3104(c).

### 2. *Conrad*

I now turn to the plaintiffs' argument as to why personal jurisdiction exists over Conrad. As with Unger, the plaintiffs initially rely upon § 3104(c)(1) . The plaintiffs argue that Conrad, by signing the operating agreements, authorized an individual (*i.e* ., an agent) to take certain actions in Delaware to effect the formation of Cornerstone and Arastra as Delaware LLCs. FN31 The plaintiffs contend that these acts in Delaware are sufficient to bring Conrad within the scope of § 3104(c)(1). Unlike Unger, however, Conrad cannot as easily disclaim his connection to the acts in Delaware necessary to form the Companies as Delaware LLCs because he was a founding member and top manager of them - *i.e.,* he was an original joint venturer.

> FN31. *See* Cornerstone Operating Agreement § 1.1; Arastra Operating Agreement § 1.1.

**\*10** Two questions emerge regarding the act of forming the LLCs in Delaware. First, is it a transaction of business to form two Delaware LLCs through the Secretary of State's office? Second, if it is, do the claims against Conrad have a sufficient nexus to those acts to satisfy § 3104(c)(1)?

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 1787959
**(Cite as: Not Reported in A.2d)**

I decline to reach either question, because I believe the plaintiffs have raised other more direct statutory grounds for the assertion of personal jurisdiction over Conrad. The second question is an important one and it is preferable to avoid addressing it without the necessity to do so, especially given the less than ideal state of the briefing. FN32

> FN32. The reason the issues are important may be stated thusly. As to the first question, the Delaware Supreme Court's instruction that § 3104(c)(1) be read expansively would seem to counsel in favor of a conclusion that the actual formation of a Delaware entity, by way of a transaction with the Secretary of State, constitutes a transaction of business in Delaware. *See Hercules,* 611 A.2d at 480 ( "[Section] 3104(c) is to be broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause."). Certainly, such a reading does no great violence to the statutory text as an actual transaction has been consummated that involves the payment of money in exchange for the right to form a new legal entity.
>
> The more knotty policy question then becomes one of nexus. Should any claim for a later breach of the terms of the governing instrument of an entity be deemed to have the required nexus to the original transaction in Delaware that gave legal life to that instrument as a legally viable contract? If answered affirmatively, § 3104(c)(1) would operate - subject to constitutional limitations - to ensure service of process against any founder of a Delaware entity to whom the act of formation in Delaware can be attributed in any case involving the proper interpretation or possible breach of that entity's governing instrument. This broad sweep may possibly fulfill the our Supreme Court's command that the long-arm statute be construed liberally, but there is no reason to use this case to test that theoretical possibility.

I find it unnecessary to explore the outer regions of § 3104(c)(1)'s reach because two separate provisions of Delaware's LLC statute provide a sufficient basis to exercise personal jurisdiction over Conrad and no constitutional problem arises with their use.

First, § 18-110(a) sustains jurisdiction over Conrad as to those parts of the Removal Counts relating to his alleged removal and replacement as a manager of the Companies. Second, § 18-109 provides a basis for jurisdiction against Conrad on the other counts of the complaint. I begin with the manager Removal Counts.

### a. *6 Del. C. § 18-110 and the Manager Removal Counts*

The Delaware Limited Liability Company Act, 6 *Del. C.* § 18-110(a), allows this court, upon the application of a member or manager of a limited liability company, to
> determine the validity of any admission, election, appointment, removal or resignation of a manager ... and the right of any person to become or continue to be a manager ... and, in case the right to serve as a manager is claimed by more than 1 person, [to] determine the person or persons entitled to serve as managers.... FN33

> FN33. 6 *Del. C.* § 18-110(a).

Section 18-110(a) also provides for constructive service of process:
> In any such application, the limited liability company shall be named as a party and service of copies of the application upon the registered agent of the limited liability company shall be deemed to be service upon the limited liability company and upon *the person or persons whose right to serve as a manager is contested and upon the person or persons, if any, claiming to be a manager or claiming the right to be a manager* . ... FN34

> FN34. Emphasis added.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 1787959
**(Cite as: Not Reported in A.2d)**

Put simply, § 18-110(a) provides a clear basis for jurisdiction over Conrad as to those parts of the Removal Counts relating to his alleged removal and replacement as a manager of the Companies. In attempting to resist jurisdiction pursuant to § 18-110 , Conrad makes an unusual argument. Namely he argues that he "cannot dispute [his removal as manager because] that has never occurred." Why was he never removed? Because Conrad claims that he "has never served as a manager of the companies nor has there ever been a board of managers [of the companies]." FN35 As such, Conrad in essence argues that he does not fall within the ambit of § 18-110(a) because he is not claiming to be a manager and his right to be a manager cannot be properly contested because the Companies have never had managers. And, indeed, with respect to Arastra, Conrad argues that its operating agreement is a forgery and therefore inoperative. FN36

> FN35. Conrad's Answering Br. at 8.

> FN36. *See id.* at 8 & 10. I have inspected the copy of Arastra Operating Agreement submitted as an exhibit to the amended complaint and it appears that Conrad's signature is authentic. At this point in the proceedings, I therefore must conclude that the plaintiffs have met their *prima facie* burden of showing that Arastra has a valid operating agreement that Conrad signed.

**\*11** If anything, Conrad's answering brief makes me more likely to believe there is a dispute regarding the governance and management of the Delaware LLCs at issue in this case. Conrad calls into question, among other matters, (1) his purported removal as manager and an officer of the Companies; (2) whether Arastra's operating agreement is valid; and (3) whether the Companies have boards of managers.

Moreover, Conrad's rather odd arguments do not suffice to defeat this court's jurisdiction over him. The plaintiffs have produced sufficient evidence to meet their *prima facie* burden to show that Conrad at one time claimed to be a manager - and CEO - of Cornerstone and Arastra. By the literal terms of the

operating agreements, the CEO of the Companies was also to be a manager. FN37 Thus, it is not irrational for the plaintiffs to wish to have a judicial declaration of the validity of Conrad's removal as manager.

> FN37. This fact, coupled with Conrad's status as a founder, large unitholder, and top officer, as well as the reality that the Kanjorskis went to the trouble to vote Conrad off as a manager of both Companies, provides a sufficient factual foundation for me to assume that Conrad was a manager at all relevant times before his purported removal in May 2001.

By the plain terms of § 18-110(a), "the Court of Chancery may hear and determine the validity of any admission, election, appointment, *removal* or resignation of a manager of a limited liability company." FN38 And, the plaintiffs may constructively serve Conrad under § 18-110(a) because he is a "person ... whose right to serve as a manager is contested." If, upon reflection, Conrad adheres to his view that he was never a manager of either Company, he is free to enter into a stipulated judgment to that effect. But his disclaimer of that status does not operate to divest this court of personal jurisdiction over him under § 18-110(a).

> FN38. Emphasis added.

Furthermore, I conclude that because of Conrad's status as a manager, he can also be fairly asked to contest any question of his removal as President (and other offices, such as CEO) in this same action. As with § 3114 of the Delaware General Corporation Law, § 18-110(a) ought to be read sensibly to sweep in sufficiently related claims against an LLC manager so long as there would be no constitutional offense. Conrad was purportedly removed as President of the Companies (and from all other offices at the Companies) on the same day as he was allegedly removed as a manager. There is thus a close nexus between these claims. And if there were any question on that score, it is obvious that another provision of our LLC statute subjects

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 12

Not Reported in A.2d, 2003 WL 1787959
**(Cite as: Not Reported in A.2d)**

Conrad to this court's jurisdiction over his purported removal as CEO and President: § 18-109 of the LLC statute.

### b. § 18-109 and the Removal, Ownership and Buy-Out Counts

Section 18-109 provides a basis for this court's exercise of personal jurisdiction over Conrad with respect to all of the counts of the complaint. Section 18-109(a) permits an exercise of personal jurisdiction over a manager (as that term is defined in that subsection) "in all civil actions or proceedings brought in the State of Delaware *involving or relating to the business of the limited liability company or a violation by the manager ... of a duty to the limited liability company, or any member of the limited liability company." *FN39

FN39. Emphasis added.

**\*12** Clearly, the question of whether Conrad was properly removed as a manager, CEO, and President of the Companies relates to the business of the Companies. Therefore, § 18-109(a) covers the Removal Counts.

The broad scope of § 18-109(a) also allows this court to exercise personal jurisdiction over Conrad with respect to the Ownership and Buy-Out Counts of the complaint. In this case, the issue as to who owns what part of Cornerstone and Arastra (*i.e.,* the issue in the Ownership Count) is "related in some respect" to the management disputes underlying this case - *i.e.,* it relates to the business of the Companies. FN40

FN40. *See Assist Stock Mgmt. L.L.C. v. Rosheim,* 753 A.2d 974, 981 (Del. Ch.2000).

What is alleged is that a small group of joint venturers formed two Delaware LLCs under a contract with strict controls on who could join the ranks of members. To control that membership right, they put in place a strict Buy-Out Provision

that required that members wishing to sell first offer their units back to the other founders, and if they decline, to the Companies themselves.

The equity ownership of the Companies is allegedly clouded because of Conrad's purported failure to abide by that important term in the Companies' operating agreements. As critical, the debate about who owns what has its origins in a dispute about whether Conrad and Peter Kanjorski - as managers and joint venturers - agreed to issue equity in the Companies to Unger and the mysterious David Carpenter in 1997 as well as to certain employees in the year 2000.

In view of the importance of these issues to the capital structure and control of closely-held Delaware LLCs, they obviously relate to the business of those Companies and fall within the literal terms of § 18-109. Put simply, the confusion about ownership arises out of disputed managerial acts. Did the companies promise to issue units to Carpenter and Unger in 1997 and to Unger and certain other employees in 2000? That is, the question of who owns what units depends in a material way on actions Conrad and others took as managers of the Companies. Likewise, these issues also bear a relationship to the validity of the votes removing Conrad as a manager because they relate to the question of whether the plaintiffs had sufficient voting power to cast Conrad out. That is, all of these issues relate to the business of the Companies and therefore satisfy the literal terms of § 18-109(a).

In so concluding, I reach a conclusion consistent with this court's well-reasoned decision in *Assist Stock Management L.L.C. v. Rosheim.* FN41 In that decision, Vice Chancellor Lamb respected the General Assembly's decision to write § 18-109 more broadly than § 3114 of the DGCL, by investing this court with personal jurisdiction over managers in disputes "involving or relating to the business of" their LLCs. FN42 He held that this language must be given effect and that protection against an unconstitutional application of the statute can be afforded by the minimum contacts analysis. FN43

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 1787959
**(Cite as: Not Reported in A.2d)**

FN41. 753 A.2d 974 (Del. Ch.2000).

FN42. In *Assist,* Vice Chancellor Lamb held that a dispute about the ownership interests a manager had in an LLC could be adjudicated when "the ownership question is related in some respect to the [management] matter" in dispute. *Id.* at 981.

FN43. *See Assist,* 753 A.2d at 980.

**\*13** Here, I conclude that all of the Counts bear a clear relation to the business of the LLC and that § 18-109 is satisfied, subject to a minimum contacts analysis. FN44

FN44. I bear some concern about the Buy-Out Count dealing with Conrad's offer to sell his stake in Cornerstone to the Kanjorski family (Count III). As Conrad has noted, it is clear that Conrad's offer was part of a confidential settlement proposal, and, as such may be inadmissible under Delaware Uniform Rule of Evidence 408. Indeed, Conrad's attorney's letter is clearly marked "FOR SETTLEMENT PURPOSES ONLY." In other words, by making his settlement offer, Conrad was attempting to terminate a dispute by offering to sell his interests to the Kanjorskis - the functional equivalent of offering his units to Kor and Peter Kanjorski. Whether such an offer to settle can be conceived of as a breach of the Buy-Out Provision is obviously a matter of some doubt.

Notwithstanding any doubts about the ultimate sustainability of Count III, Conrad can be subjected to this court's personal jurisdiction as to that count. Although Conrad's offer to settle was made after his purported removal as manager of the Companies, Count III is sufficiently related to the other counts in the complaint such that an exercise of personal jurisdiction over Conrad with respect to Count III is proper. *Assist,* 753 A.2d at 981 (when a

defendant is subject to personal jurisdiction under § 18-109 as to certain claims, the court may exercise personal jurisdiction over him as to other sufficiently related claims, and citing a § 3114 decision, *Manchester v. Narragansett Capital, Inc.,* 1989 WL 125190 (Del. Ch. Oct. 18, 1989), in support of that proposition); *see also Infinity Investors Ltd. v. Takefman,* 2000 WL 130622, at \*6 (Del. Ch. Jan. 28, 2000) ("[O]nce jurisdiction is properly obtained over a non-resident director pursuant to § 3114, such non-resident director is properly before the Court for any claims that are *sufficiently related to the cause of action* asserted against such directors in their capacity as directors."), *clarified by,* 2000 WL 268302 (Del. Ch. Feb. 17, 2000) ; *Jaffe v.. Regensberg,* 1980 WL 3039, at \*2 (Del. Ch. Jan. 10, 1980) ("[u]nder § 3114, the relief sought is not the guiding factor because if jurisdiction attaches at all under the statute, the nonresident is before the Court for any and all relief that might be necessary to do justice between the parties by virtue of the fact that the jurisdiction conveyed by the statute is in personam jurisdiction."); 1 Wolfe & Pittenger, § 3-5(a)(2)(iv) (discussing Delaware cases holding that "once a nonresident director is properly before a Delaware court by reason of Section 3114, that director is properly before the court for any relief that the facts may require, even if such relief technically operates against the director in some other capacity, such as that of a stockholder.").

### B. *Constitutional Analysis*

Because 6 *Del. C.* §§ 18-109 and 18-110 provide statutory bases for an exercise of personal jurisdiction with respect to Conrad, I briefly address the constitutional inquiry. As I noted earlier, the due process clause of the Fourteenth Amendment requires that a nonresident defendant have certain "minimum contacts" with the forum jurisdiction "such that the maintenance of the suit does not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 1787959
**(Cite as: Not Reported in A.2d)**

offend traditional notions of fair play and substantial justice." FN45 When determining whether these "minimum contacts" are present, the court should inquire whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." FN46 Once the defendant's minimum contacts with the forum have been established, the court should turn its analysis to issues of fairness and justice . FN47

> FN45. *Int'l Shoe Co.,* 326 U.S. at 316 (citation and internal quotation marks omitted).

> FN46. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980).

> FN47. *See Burger King Corp. v. Rudzewicz,* 471 U.S. at 462, 476-77 (1985).

With respect to the "minimum contacts" analysis, it is clear that Conrad purposefully availed FN48 himself of the benefits and protections of Delaware law and that he cannot be surprised to face this lawsuit here. Conrad and his co-venturers could have formed Cornerstone and Arastra as Pennsylvania entities. Instead, they purposely looked to a neighboring state as a place to domicile their Companies and to provide the governing law for their relations. Not only that, Conrad took on the position of manager, CEO, and President of these Delaware Companies, knowing that as a manager he would be subject to jurisdiction for disputes here relating to the business of the Companies.

> FN48. *See id.* at 475.

As such, Conrad should not be surprised that he has been haled into a Delaware court when disputes have arisen over the governance of those Delaware LLCs relating to such fundamental issues as whether he is still a manager or officer, whether he violated the Buy-Out Provision and what that Provision means, and whether he, as manager, issued equity to certain individuals. FN49

> FN49. *See id.* at 474; *World-Wide Volkswagen Corp.,* 444 U.S. at 297.

Nor is there is anything unfair or unjust about the exercise of personal jurisdiction over Conrad by this court. As a resident of a neighboring state who purposely participated in the founding of the LLCs in Delaware, Conrad will face only minimal inconvenience by having to respond to the claims made against him in this Delaware court action regarding those entities. Moreover, this state has a strong interest in resolving disputes regarding the internal affairs of LLCs formed under its laws. FN50

> FN50. *Cf. Assist,* 753 A.2d at 981 (" Delaware has a strong interest in providing a forum for disputes relating to the ability of managers of an LLC formed under its law to properly discharge their respective managerial functions.").

Because personal jurisdiction over Conrad is authorized by Delaware statutory law and is not constitutionally infirm, his motion to dismiss for lack of personal jurisdiction will be denied.

### III. *Service of Process*

I recognize, as pointed out by Conrad, FN51 that service of process on him was not properly effected pursuant to 6 *Del. C.* § 18-109. Instead, the plaintiffs served the defendants under 10 *Del. C.* §§ 3104 and, inexplicably, 3114. Conrad never raised this issue by way of a formal motion. Given this fact, along with the fact that Conrad received *actual notice* of this suit, equity and common sense counsel in favor of giving the plaintiffs leave to properly serve defendant Conrad pursuant to 6 *Del. C.* § 18-109. FN52 Thus, the plaintiffs shall have leave until April 15, 2003 to effect proper service.

> FN51. *See* Letter from Bruce Conrad to Vice Chancellor Leo E. Strine, Jr. 2 (Mar. 7, 2003).

> FN52. *See Assist,* 753 A.2d at 982

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 15

Not Reported in A.2d, 2003 WL 1787959
**(Cite as: Not Reported in A.2d)**

(permitting plaintiff to cure a technical defect in service of process when it appeared that proper service, if made, would be effective to invoke the court's personal jurisdiction over the defendant).

IV. *Conrad's Motion to Dismiss or Stay this Action in Favor of the Pending Pennsylvania Consolidated Case*

**\*14** In various of his letters to the court, *pro se* defendant Conrad pointed to the inconvenience of facing litigation from Cornerstone in both this state and Pennsylvania. To surface the issue, the court asked the parties to file submissions relating to whether I should stay or dismiss this action pursuant to *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Engineering Co.* FN53 or on other grounds.

FN53. 263 A.2d 281 (Del.1970).

Without burdening the reader with a fulsome explanation of the difficulty of applying *McWane* here, FN54 I proceed to articulate why I believe that I should use my inherent discretion to control my docket and enter a stay. FN55

FN54. One of the reasons it is awkward to shoe-horn this case under *McWane* is that none of the other actions were filed in the first instance by Conrad. Indeed, the two relevant Pennsylvania Actions were filed by Cornerstone and basically involve the Kanjorskis litigating (through Cornerstone) as plaintiffs against Conrad as a defendant.

FN55. *See Joseph v. Shell Oil Co.,* 498 A.2d 1117, 1123 (Del. Ch.1985).

In the Equity Action, Cornerstone - a key plaintiff here who is putatively controlled by the Kanjorskis through Kor - seeks to litigate breach of fiduciary duty claims against Conrad. That action also involves defendant Unger, whom I have concluded is not subject to this court's personal jurisdiction. The Equity Action, and the other related

Pennsylvania actions, are all set to go to trial as consolidated cases later this year.

It remains mysterious to me why the plaintiffs have chosen to spread their claims against Conrad over the court systems of two states. By all measures, it is (modestly) more geographically convenient to litigate this case in Pennsylvania for everyone concerned. Given Cornerstone's own choice to litigate certain Delaware claims - *i.e.,* the fiduciary duty claims - in Pennsylvania, its desire to have a Delaware court adjudicate its other Delaware law claims is inexplicable. Furthermore, it is apparent that the Pennsylvania courts can exercise jurisdiction over Unger and the other parties to whom the plaintiffs believe Conrad either sold or offered to sell the Companies' units.

Given these realities, it is not at all apparent why commercially sensible litigants would engage in litigation tactics of the kind the plaintiffs here have. Whatever the motivation, proper or improper, this court need not indulge the plaintiffs' whim for simultaneous conflict in two different forums of its own choosing against one *pro se* defendant.

Instead, I will stay this action indefinitely, with a view towards permitting Cornerstone to complete its lawsuits against Conrad and Unger in Pennsylvania in accordance with the schedule already established in that case. This will conserve the parties' resources, as well as those of this court. If the plaintiffs are concerned about this method of proceeding, they might usefully consider whether they are actually permitted to split their claims in the fashion they have FN56 and whether it might not be more sensible for them to raise all of their claims against Conrad, Unger, and related parties in one forum that is convenient. In this regard, it is noteworthy that the plaintiffs have failed to provide any reason to believe that the claims they plead here could not be asserted in the consolidated action pending in Pennsylvania. Put simply, any inconvenience to the plaintiffs of the method of proceeding I have imposed is self-inflicted and is outweighed by the burden to Conrad of fighting two battles on two separate fronts at once for no substantial reason.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 16

Not Reported in A.2d, 2003 WL 1787959
**(Cite as: Not Reported in A.2d)**

> FN56. Both this state and Pennsylvania frown on claim splitting. When a party can raise all claims it has against a defendant in one forum at one time, it is generally obligated to do so. *See, e.g., Maldonado v. Flynn,* 417 A.2d 378, 382 (Del. Ch.1980) ( "The rule against claim splitting is an aspect of the doctrine of res judicata and is based on the belief that it is fairer to require a plaintiff to present in one action all of his theories of recovery relating to a transaction, and all of the evidence relating to those theories, than to permit him to prosecute overlapping or repetitive actions in different courts or at different times."); *Coleman v. Coleman,* 522 A.2d 1115, 1120 (Pa.Super.Ct.1987) ("The courts of this Commonwealth have long adhered to the generally accepted view disfavoring the splitting of claims.").

**\*15** Therefore, I grant Conrad's motion for an indefinite stay.


### V. *Conclusion*

For the reasons expressed, (1) Unger's motion to dismiss for lack of personal jurisdiction is granted; (2) Conrad's motion to dismiss for lack of personal jurisdiction is denied; and (3) Conrad's motion for a stay is granted. The stay shall remain in effect indefinitely, but the plaintiffs may perfect service of process on Conrad and may move to lift the stay no earlier than March 1, 2004 or the date of the final termination of the Pennsylvania Equity Action. FN57 IT IS SO ORDERED.

> FN57. Of course, whatever actions the plaintiffs will need to take to effect proper service of process over Conrad by April 15, 2003 are exempt from the stay.

Del.Ch.,2003.
Cornerstone Technologies, LLC v. Conrad
Not Reported in A.2d, 2003 WL 1787959

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.