3

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 1016985
**(Cite as: Not Reported in A.2d)**

**H**
Not Reported in A.2d, 2003 WL 1016985
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Michael F. DIGIACOBBE, Plaintiff,
v.
Joseph P. SESTAK and Chesapeake Construction,
Ltd. Defendants.
**No. Civ.A. 14525.**

Submitted May 7, 2002.
Draft Report July 31, 2002.
Final Report March 3, 2003.

Laraine A. Ryan, Wilmington, Delaware; for
Plaintiff.
Robert C. McDonald , McDonald & Silverman,
Wilmington, Delaware; for Defendants.

MASTER'S REPORT

GLASSCOCK, J.
*1 The plaintiff, Michael F. DiGiacobbe, and the
defendant, FN1 Joseph P. Sestak, were partners in a
home construction business. DiGiacobbe seeks
damages from Sestak for alleged breaches of
fiduciary duty, and an accounting. The case has
been tried, and the parties have submitted post trial
briefs. FN2 This is my report after trial.

> FN1. Chesapeake Construction Co. ("
> Chesapeake") is one of two corporations
> formed by DiGiacobbe and Sestak as part
> of their construction business. Chesapeake
> is named as a defendant in this matter,
> which the plaintiff characterizes, in part, as
> a derivative suit. Chesapeake, however,
> was never served and was not represented
> at trial. The other corporation created by
> the parties under which they ran their

construction business was Sestak and
DiGiacobbe, Ltd. That corporation was not
made a party to this action.

> FN2. This lawsuit was filed on September
> 8, 1995. It was tried before Master Richard
> Kiger, who issued a report after trial on
> January 15, 1998. The Master's report was
> affirmed by this Court on September 18,
> 1998, and an appeal was taken to the
> Supreme Court. The decision of this Court
> was reversed in part and remanded for
> further proceedings on December 17,
> 1999. The presiding Vice Chancellor
> ordered a trial *de novo.* The matter was
> then referred to me, resulting in this report.

I. FACTS

The plaintiff and the defendant were high-school
friends who became reacquainted in the early
1980s. By that time, Mr. DiGiacobbe was working
in the construction industry with his father, and Mr.
Sestak was a draftsman for an architectural firm.
The two men formed a *de facto* partnership and
worked together on a number of houses between
1983 and 1985. In 1986, DiGiacobbe and Sestak
decided to enter into the construction business on
their own on a full-time basis. They incorporated
their business as Sestak and DiGiacobbe, Ltd ("S &
D"). From that point on, both Sestak and
DiGiacobbe worked full time in their construction
business. Sestak did the architectural work for the
firm, as well as most of the office work and some of
the field work. DiGiacobbe spent most of his time
in the field, but he concedes that he also had a role
in the financial affairs of the partnership. S & D is
nominally a corporation but was not operated as
such. Although the corporation is still in existence,
it has never observed any corporate formalities.
There have been no formal shareholders meetings
and there is no board of directors. The ownership of
S & D, like the partnership which it embodied, was
50 percent in Mr. DiGiacobbe (together with his

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 2

Not Reported in A.2d, 2003 WL 1016985
**(Cite as: Not Reported in A.2d)**

wife) and 50 percent in Mr. Sestak (together with his wife). FN3

> FN3. Janet Sestak and Cheryl DiGiacobbe are not parties to this litigation.

From the beginning, the business of Sestak and DiGiacobbe was run on a remarkably (and unfortunately) informal basis. The firm never produced a budget. It had no compensation scheme for its principals. Rather, the partners had an informal agreement under which they took "draws" from the business as they were available and needed. The partners each also borrowed money from the partnership to fund construction of their own homes. Mr. Sestak, on behalf of the business, made this loan to himself, without consulting DiGiacobbe. Once he discovered Sestak's loan to himself, Mr. DiGiacobbe was moved to express his disapproval of this practice by "grabbing [Sestak]" and "putting him up against the wall." Sestak repaid his personal debt to the partnership.

The business was also severely undercapitalized. Mr. Sestak's father-in-law made a loan of $36,000 to enable the business to proceed. It is unclear whether this amount was a loan by Mr. Sestak's father-in-law to the corporation, a loan to the partnership or a loan to Mr. Sestak (or to his wife, Janet Sestak) directly. This amount has not been repaid. Similarly, Mr. DiGiacobbe's father from time to time made thousands of dollars of loans to the business. The business was also forced to borrow thousands of dollars from a Mr. Auggie Fortunato at a very high rate of interest. FN4 The latter loan was repaid.

> FN4. According to Mr. DiGiacobbe the loan was for $35,000 at an interest rate of 50 percent.

**\*2** Sestak and DiGiacobbe were in the business of building custom and semicustom single family homes. A substantial portion of the homes built by the partners were constructed on speculation; that is, the partners would borrow money to purchase land and build a home, pay interest on the construction loan until a buyer was located and the home sold, pay off the loan and retain the net amount as their profit. FN5 During the economic boom years of the late 1980s, the business did well. It began to unravel, however, in the early 1990s. A number of factors are responsible for this decline in the business. First, the business became involved in litigation with a home buyer over a large construction contract, causing the income of the business to be disrupted and its credit-worthiness endangered. Ultimately, according to the plaintiff, the business ended up losing a "great deal of money" on the project. As a result, the business abandoned the corporate form S & D, although it did nothing to wind up the corporate affairs of that entity. Messrs. Sestak and DiGiacobbe simply formed a new corporation, Chesapeake Construction Co. ("Chesapeake") and proceeded to do business under the new name. FN6 At about the same time, and even more problematically for the business, the economic downturn of the early 1990s caused significant difficulties. Interest rates were high, and the market for new housing slowed. The economic downturn came at a particularly bad time for the partnership. In July, 1989, the partners, using S & D as the contracting entity, entered into an agreement with two marketing agents (Duncan Patterson and John Teague, Jr.) to form a joint venture to develop a farm near Newark, Delaware (the "Stone Spring" venture). Under the joint venture agreement, S & D invested $5000 in Stone Spring. S & D was to be the exclusive home builder in the development, and Patterson and Teague were to be the exclusive marketing agents. S & D was to build houses for buyers found by Patterson and Teague, and on speculation. Upon sale of a home site and house to a buyer, S & D was to pay a minimum of $75,000 to Stone Spring, which was the cost of the lot. FN7 The remainder of the purchase price was applied to the construction loan which S & D had obtained in connection with that particular house, and any net remaining was to be retained by S & D.

> FN5. I refer to the "partnership" as being in the speculation home business although, in the conduct of their business, Sestak and DiGiacobbe used a number of different forms to bind themselves contractually. In

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 3

Not Reported in A.2d, 2003 WL 1016985
**(Cite as: Not Reported in A.2d)**

some cases they dealt as Mr. Sestak and Mr. DiGiacobbe, in some cases as Sestak and his wife and DiGiacobbe and his wife, and other cases as either Sestak and DiGiacobbe, Ltd. or Chesapeake Construction Co. Therefore, I will refer generally to transactions of the partners as transactions of "the business".

FN6. Like S & D, Chesapeake was a corporation in name only-it was not capitalized and was simply the alter ego of the partners, the parties here.

FN7. The plaintiff testified that a substantial portion of the $75,000/lot minimum was to be applied to pay down the loan by which the joint venture had obtained the Stone Spring acreage, and that once this obligation was satisfied, the lot purchase price would be lowered, resulting in a higher profit per house for S & D. Nothing in the agreement indicates that the lot price would ever drop below $75,000, however.

The Stone Spring development was a "high end semi-custom" development in which the houses were expected to sell for between $200,000 and $300,000. Unfortunately, the market for such houses became poor in the early 1990s. Home sales were slower than expected and the prices received were lower. The business, (now operating as " Chesapeake") experienced severe cash flow problems. As early as 1991 or 1992, the partners' bookkeeper warned them of the impending cash flow crises. FN8 In late 1994, Sestak, unable to adequately support his family from the business, walked away from his duties as a partner and took a job selling automobiles.

FN8. As a result, the partners took a number of (ultimately futile) cost-cutting measures, notably including firing the bookkeeper.

**\*3** By that time ten houses had been completed in Stone Spring, and one ("lot 8") was nearing

completion. Construction on lot 8 was undertaken by the business on speculation, and the business had obtained a construction loan to build the house. Because of its financial condition, the business was unable to complete the construction without additional funds. Mr. DiGiacobbe attempted to borrow more money, but the bank refused further loans on the Lot 8 construction job. As a result, Messrs. Sestak and DiGiacobbe were forced to negotiate a buy-out with the two remaining Stone Spring Partners, by which the business forfeited its right as exclusive builder in Stone Spring and released all of its interest to the remaining partners, for $65,000. Mr. DiGiacobbe used the proceeds from this sale of his and Sestak's interest in Stone Spring to complete the house on Lot 8. The house was listed for sale for $285,000 but did not find a buyer at or near that price. It eventually sold for $215,000, which represented a net loss to the partnership. At this point, the business was defunct. The business was wound down in the same slovenly way that it had been conducted. The two corporations, which were never capitalized or active in any way, remain undissolved. The records of the business were left at its office condominium on the Kirkwood Highway by Mr. Sestak when he abandoned his post. Mr. DiGiacobbe also had access to these records. Subsequently, the office appears to have been ransacked and records and items removed and lost: both parties disclaim responsibility for this action. The mortgage on the office condominium, which was significantly in arrears, was foreclosed and the condominium disposed of by sheriff's sale.

Mr. DiGiacobbe was aware that Mr. Sestak had been taking draws larger than those take by Mr. DiGiacobbe. According to DiGiacobbe, however, it was not until Sestak left the partnership that he discovered the extent of that disparity, together with what he alleges are other irregularities in Sestak's performance of his duties, leading to this equitable action.

## II. THE COMPLAINT AND THE NATURE OF THIS ACTION

Mr. DiGiacobbe alleges that Mr. Sestak "converted"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 1016985
**(Cite as: Not Reported in A.2d)**

funds of Chesapeake because he took draws from 1992 through 1994 which were larger than those taken by Mr. DiGiacobbe. He also alleges that Sestak mismanaged Chesapeake in a way which caused the business to fail. He seeks damages for this mismanagement and conversion. Finally, he seeks an accounting of amounts due to Chesapeake.

The plaintiff characterizes this action as both a derivative action and as an individual action by Mr. DiGiacobbe as a shareholder of Chesapeake. There are a number of problems in proceeding with this matter as a derivative action on behalf of Chesapeake, however. First, that entity was never served and was not represented at trial. Second, a number of the acts for which DiGiacobbe seeks recovery had nothing to do with the Chesapeake corporate form. For instance, Mr. DiGiacobbe suggests that Mr. Sestak's conversion of assets led to an inability to pay the mortgage on the office condominium, leading in turn to a foreclosure and consequent loss of the equity which he and Sestak had built up in that property. The condominium was not an asset of Chesapeake, however, but was purchased in the name of S & D, with a loan and mortgage guaranteed by the individual parties and their wives. Similarly, he seeks damages for lost profits resulting from the Stone Spring Venture, but Chesapeake was not a party to the Stone Spring Venture. The entity which entered that venture was S & D, and the individual parties and their wives were liable for the note used to secure the Stone Spring acreage.

*4 In other words this is a morass, of the parties' own making. DiGiacobbe and Sestak became involved in a house building venture without a business plan, without a budget, without an agreement as to how they were to be compensated and with disregard for the corporate forms which they undertook and used inconsistently. As a result, in my view, it is inappropriate to differentiate the allegations of the complaint based upon whether the acts complained of involve property of the corporations or Sestak and DiGiacobbe individually. What is clear is that from the beginning the business has been run as a *de facto* 50-50 partnership. The corporations themselves were never active and it makes little sense to try to characterize this action as a derivative or individual corporate claim. At its heart, this is an action for an accounting of partnership assets, involving allegations of an unequal distribution of assets and breaches of fiduciary duty on the part of Mr. Sestak. I will treat it as such.

## III. DISCUSSION

### A) *The Accounting Action*

This action is, stated simply, one which seeks an accounting of the assets of the *de facto* partnership between the parties, which include both assets held by the principals of the partnership as well as the construction business carried on first as S & D and later as Chesapeake. An accounting is an equitable remedy by which a fiduciary is required to account to those to whom he owes his fidelity for the results of the exercise of his duty.

The defendant argues that the accounting action should be dismissed, because an accounting between partners, according to the defendant, will only be undertaken where the party seeking the accounting has been excluded from partnership records, while the evidence here indicates that the plaintiff himself has had access to the records of the partnership since the entity was formed. The defendant's view of the accounting remedy is far too narrow, however. "[E]quitable jurisdiction is ... practically exclusive in procedures for an accounting and settlement of affairs between co-partners themselves. An accounting may be granted wherever a party alleges the wrongdoing of a fiduciary and asks his co-partner for an account and does not get it or is not satisfied with it." *Nero v. Littleton,* Del.Ch., 1622, Jacobs, V.C. (April 30, 1998) (Mem. Op. at 4) (quotations omitted). *See* Pomeroy's Equity Jurisprudence § 1421, at 1078 (1941). This Court will order an accounting between parties as required by equity. *Id.*

Here, the plaintiff has shown that the parties were partners, and as such stood in a fiduciary relationship to one another; and that the partners were to share on an equal basis in the expenses,

Not Reported in A.2d                                                                                    Page 5

Not Reported in A.2d, 2003 WL 1016985
**(Cite as: Not Reported in A.2d)**

profits and losses of the construction business which was the subject of the partnership, including profits of the two corporations formed to conduct the business. The plaintiff argues that the assets of the partnership have been distributed unequally, in favor of the defendant, and that the partnership has suffered from breaches of fiduciary duty by Sestak. Those claims, if substantiated, may be remedied by an accounting.

### 1. The Burden of Proof

**\*5** The burden of proof in an accounting is generally stated simply as resting upon the party who is required to account. *E.g. Pearson v. Rash* (check), Del.Ch., 830-K, Berger, V.C. (Feb. 13, 1985) (Mem.Op.) at 1, citing 1 C.J.S. Accounting, § 39. The burden for establishing a basis for an accounting, however is on the plaintiff.

### 2. The Unequal "Draws"

Under the unique, informal practice of this partnership, each partner was entitled to "draw" from business funds. These payments were in lieu of salary. The draws to Sestak are represented in the record by checks drawn against the partnership's accounts to him; draws to DiGiacobbe are represented by checks drawn to DiGiacobbe's wife, Cheryl. Although on at least one occasion the plaintiff drafted the check which represented his draw, usually the checks representing a partner's draw were drafted by the defendant, the partner who was predominantly responsible for the partnership paperwork. The draws were made to the plaintiff as requested by the plaintiff or his wife, and to the defendant as the defendant chose to make them. By agreement of the partners, the draws of each partner were ultimately to be equal in total, although both parties agree that a substantial inequality in the running total of draws to each partner was tolerated throughout the existence of the partnership. FN9 The plaintiff presented evidence, in the form of checks from the partnership's "Stone Spring" and "Chesapeake" accounts made to the plaintiff's wife and to defendant, which demonstrates that during the time the partnership was doing business under

the Chesapeake name the defendant's draws were greater than those taken by the plaintiff, in the amount of $37,384. The defendant admits that his draws were greater than those taken by the DiGiacobbe's during this period. Sestak also concedes that his personal telephone bill was paid with partnership funds, in the amount of $219, for which he must also account.

> FN9. The parties disagree as to which of the partners was favored, however.

DiGiacobbe also points to a number of checks drawn by Sestak on Chesapeake accounts made out to "cash." DiGiacobbe alleges that these actually represent additional "draws" or money taken by the defendant for his own use, and DiGiacobbe seeks an accounting of these sums. Sestak testified, however, that each of these checks to cash was an expenditure for partnership business. He demonstrated at trial that the larger checks to "cash" represent transfers from one partnership account to another. He testified that as the partnership experienced increased financial difficulties in the 1990s, the partnership checking accounts were occasionally overdrawn, and that obligations represented by "bounced" checks were then made good by cash payments. Finally, he testified that the balance of the "cash" checks were to independent contractors who wished to be paid in cash. This testimony was largely unrebutted. FN10 I find that the defendant has adequately accounted for the funds represented by the checks to "cash" as expenditures of the business.

> FN10. In post-trial briefing the plaintiff argues that some payments of checks made to "cash" are traceable to deposits in the defendant's personal bank accounts. The only testimony cited by the plaintiff is that of DiGiacobbe himself. DiGiacobbe, asked if the "cash" checks were traceable, responded: "They were cashed with [Sestak's] name on them, and I guess deposited into accounts that were not our accounts." After Sestak had rebutted this testimony in his direct examination, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                 Page 6

Not Reported in A.2d, 2003 WL 1016985
**(Cite as: Not Reported in A.2d)**

plaintiff submitted no evidence to the contrary. In post-trial briefing, the plaintiff refers to summaries made by his counsel purporting to establish a link between "cash " checks and Sestak's deposits, but points to no record evidence.

**\*6** Against the $37,603 amount of inequality in draws and payments which the plaintiff has demonstrated, Sestak seeks to offset what he contends were thousands of dollars in unequal draws in the *plaintiff's* favor which defendant alleges had been made before 1992, when the partnership abandoned the S & D corporate structure. The plaintiff admits that an imbalance of several thousand dollars existed at that time, but argues that *he* was the one behind in draws from the business.

Neither party has produced any records, or any evidence other than their own disputed testimony, tending to indicate that an inequality in draws existed prior to the earliest records in evidence, dating from 1992. FN11 Therefore, I find that neither party has demonstrated entitlement to an offset or accounting for inequalities in draws other than those reflected by the 1992-1995 checks as described above.

> FN11. Sestak points to a document, submitted by the plaintiff but never authenticated by either party, labeled " 12/31/92 trial balance" and showing among other entries "loan-M. DiG. 22,500. " This entry has been circled and modified in ink to read (perhaps) "77,501." Sestak argues that this represents proof that DiGiacobbe was "ahead" by $22,500 in 1992. I find the unauthenticated "trial balance" sheet of little or no evidentiary value, however. *See* Joint Ex. Volume II, Tab 6.

### 3. The Breach of Duty Claims

The plaintiff's claim here, stated succinctly, is that Sestak took more money out of the business for his own use than was permitted, that the extra draws

which Sestak wrongfully took caused the business to fail, and that had the business been able to continue, it would have become highly profitable. The lost profits, according to the plaintiff, are the measure of the damages for which the defendant is liable. The plaintiff, however, is unable to demonstrate the validity of any of these propositions.

a) The Draws. No evidence has been presented indicating any agreement, formal or informal, regarding the timing or amount of draws to which each partner was entitled, other than that each partner was entitled to benefit equally from the business. Between 1992 and 1994, the DiGiacobbes removed $67,360 from the business, and Sestak took $104,744, resulting in the roughly $37,000 differential which I have already indicated must be addressed in an accounting. There is nothing in the record indicating that one amount is the "proper" amount of draws for the period, however.

b) The Failure of the Business and Resulting Damages. Assuming that the plaintiff's argument is that the defendant's draws were imprudently large, leading to the failure of the business, the evidence is contrary. The purpose of the business was to create income for DiGiacobbe and Sestak. The business failed because the economic downturn of the early 1990s reduced the market for their product, expensive custom and semi-custom homes. The business was severely undercapitalized, as demonstrated by the willingness of the partners to accept the ruinous interest rate of the Fortunato loan. It was evident from the testimony of both partners that for the last several years of operation, the business was struggling. Sales had slowed. This resulted in ever-increasing cash-flow problems. Subcontractors and suppliers were not being paid in a timely way, and the partnership began to bounce checks. The last house built by the business was on the market for a protracted period and sold at a loss. In the meantime, the business of a cotenant in the office condominium had failed, and Sestak and DiGiacobbe were forced to assume the entire responsibility for the loan on that unit, a space too large and expensive for their needs. While the plaintiff claims the he and the defendant had accumulated substantial equity in this property, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 1016985
**(Cite as: Not Reported in A.2d)**

office condominium was on the market for nearly two years, and was eventually foreclosed on and sold by the lender for an amount substantially below the amount of the mortgage.

**\*7** In this climate, the business failed. It is neither supported by the evidence nor logical to believe that the amount of draws taken by DiGiacobbe was a " proper" and sustainable amount, that the few thousand more per year taken by Sestak was the cause of the business failure, and that Sestak should have or did recognize the impropriety of the size of his draws, but took them nevertheless, leading to the loss of the business. The evidence does not indicate that Sestak breached a duty to the partnership by taking the draws as he did. FN12

> FN12. The plaintiff indicated in his testimony that the partners' draws were to come from the "Chesapeake" account, along with overhead expenses, and that the "Stone Springs" account was to receive and disburse construction loans for the various projects in the Stone Springs development. DiGiacobbe implies that Sestak's use of this account to take draws for himself is what placed the partnership in a negative cash flow position. But DiGiacobbe must have been well aware that draws were being taken from the " Stone Spring" account; a substantial portion of his own draws came from that account.

c) Negligent Mismanagement. DiGiacobbe also argues that Sestak is guilty of "negligent mismanagement" in conducting the business affairs of the partnership, amounting to a breach of fiduciary duty. DiGiacobbe points to bounced checks and cash flow problems as the result of Sestak's financial management, and alleges that this mismanagement led to the collapse of their business. These allegations are unsupported by the evidence, however. The cash flow problems and bounced checks were the result of, not the cause of, the failure of the business. FN13 This is not to say that the business was well run. Record keeping and financial planning and oversight were, to be kind,

haphazard. While Sestak was primarily responsible for the conduct of the financial affaires of the business, DiGiacobbe has conceded that he had access to and responsibility in this area as well. The evidence makes clear that, so long as business remained good, both parties were content to conduct the partnership with remarkably lax and informal oversight of their business affairs. In this context, I find no breach of fiduciary duty in Sestak's conduct of the business affairs, and no evidence that his conduct in that regard led to the failure of the business.

> FN13. DiGiacobbe himself, the sole witness for the plaintiff, testified that "If Joe [Sestak] had not taken that money, we would have been able to continue the way we were and perhaps gotten over the hump. A lot had to do with the interest rates and the market in that particular time. It really hurt us. I don't think it was mismanagement, as far as what we were doing. We were building a good product. We were just having a difficult time selling at that time because the interest rates had gone up."

Moreover, the damages that the plaintiff claims resulted from the loss of the business are purely speculative. DiGiacobbe testified that, but for Sestak's faithlessness or imprudence, "we would have struggled. However, we probably would not have failed." Despite this diffidence, DiGiacobbe asks me to speculate that the business could have weathered the recession, and would have turned a large profit on the rest of the construction in the Stone Spring community. This speculation is undermined by the evidence of the parlous state of the business described above, together with the fact that Sestak and DiGiacobbe sold their exclusive right to construct in Stone Spring for only $65,000. The plaintiff, in his post-trial briefing, bases his damage estimates on the supposition that the Stone Spring development would have "built out" over 24 months with 24 homes. The business, however, never built more than six homes even during its early, successful years. In fact, during four and one-half years the partners built only 11 homes in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 8

Not Reported in A.2d, 2003 WL 1016985
(Cite as: Not Reported in A.2d)

Stone Spring, some of those on speculation, and the build-out of Stone Spring has proved to take over eleven years. DiGiacobbe himself, the sole witness for the plaintiff, testified that, even had the business not failed, "[w]hether we would have made a great deal of money, I'm not sure." The plaintiff has failed to demonstrate that, but for the misconduct which he ascribes to Sestak, the business would have become profitable. FN14

> FN14. The plaintiff has operated another construction business since Sestak left the partnership, an opportunity which he would have missed if the partnership had remained in business and continued to require his full-time attention, as the partners had contemplated.

### 4. Conclusion.

*8 The testimony at trial makes it clear that Sestak took draws larger than those taken by DiGiacobbe, without first consulting with his partner. Sestak also borrowed money from the partnership without DiGiacobbe's assent, a loan that was repaid only after a heated confrontation between the partners. It is abundantly clear that DiGiacobbe feels that Sestak's actions were a breach of trust between the two men, and that he blames the failure of the business on Sestak. The plaintiff has failed to show a breach of fiduciary duty on the part of the defendant, or demonstrate any damages which would have flowed from such a breach, however. Nevertheless, the plaintiff is correct that the assets which the defendant has retained from the partnership exceed the assets retained by the plaintiff in the amount of $37,384, contrary to the agreement of the parties that the assets were to be divided equally. This amount must be accounted for, and the partnership being defunct, distributed to the partners, unless this amount is reduced by the offset claims advanced by Sestak and discussed below.

### B) Defendant's Offset Claims

Sestak claims to be entitled to offset against the amount for which he is required to account on two theories: that he invested disproportionately in the partnership; and that he has paid debts of the partnership subsequent to its abandonment.

1) *Disproportionate investment.* Sestak alleges that his father-in-law provided $36,000 in start-up funds to the partnership shortly after its inception, an amount which has never been repaid. DiGiacobbe disputes that such a payment to the partnership remains outstanding. I need not resolve that dispute, however, because Sestak has failed to demonstrate that he, personally, has a claim against the partnership for the money which was advanced by his father-in-law. Therefore, this portion of the offset claim must fail.

2) *Payment of the outstanding debts of the partnership.* Sestak contends that in accounting to the partnership, he should be able to offset amounts which he alleges he paid to satisfy partnership debt after the business became defunct. FN15

> FN15. DiGiacobbe sought to be reimbursed based on similar claims of debt payment, however, he failed to substantiate those claims at trial and, in fact, it became quite clear that he had not made a number of the payments which he claimed.

a) The condominium loan. The business operated by the parties was run out of a condominium unit (the "office condominium") which was purchased by S & D FN16 with a loan and mortgage from Wilmington Trust Co. Sestak and DiGiacobbe and their wives were guarantors on the loan and, therefore, personally liable for its repayment. Initially, the partners shared the space with another business, but that entity failed and the partners became solely responsible for the mortgage payments. As the parties' business began to fail in the early 1990s, they were unable to make mortgage payments, and Wilmington Trust had the property sold at a sheriff's sale in early 1995. The proceeds of the sale were insufficient to pay off the loan on the property. Wilmington Trust offered to settle the remaining obligation for $25,000, which was less than the outstanding amount of the loan. Sestak

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 1016985
**(Cite as: Not Reported in A.2d)**

accepted this offer and paid Wilmington Trust $25,000, in return for which the obligations of Sestak, his wife, DiGiacobbe, his wife, and the business were satisfied.

> FN16. Some evidence indicates that the office condominium was owned by Chesapeake.

**\*9** The condominium was a partnership asset, used in conducting the business of the partners. The loan was guaranteed by the parties for the convenience and benefit of the partnership. The balance of the loan outstanding after the sheriff's sale was a debt legally collectable from the guarantors, and was an obligation actively being pursued by Wilmington Trust. The satisfaction of the obligation by Sestak worked a direct benefit to the partnership and the partners individually, and he is entitled to offset the amount paid against the amount for which he is required to account.

The plaintiff points out that Wilmington Trust had insisted on payment from Sestak before it would cooperate in another financial transaction which Sestak was pursuing shortly after the sheriff's sale. FN17 It is clear that Sestak felt compelled, for reasons of his own, to settle this debt. The payment, nevertheless, directly benefitted the partnership and the partners individually, and equity requires that it be offset against the amount to be accounted for.

> FN17. This transaction involved the sale of the Sestak family home.

b) Sestak's payment of judgments against him on behalf of the partnership. In contracting for services or materials on behalf of the business, the partners frequently were required to personally guarantee payment. Some of these creditors who had not been paid sought and received personal judgments against Sestak, totaling $7360. FN18 These judgments represent debts on behalf of the partnership, and Sestak's personal obligation was created for the convenience and benefit of the partnership. The judgments against him were equitably judgments against the partnership, and

Sestak's payment of these judgments must be set off against the amount for which he is required to account.

> FN18. These included Lempers Landscaping, Woodmill Condominium Association and Hillcrest Associates.

c) Other payments by Sestak to claimants. Sestak seeks to be permitted to offset payments he made to other claimants against or creditors of the business. According to Sestak these were mostly small amounts owed to various providers of services to the business. DiGiacobbe disputes Sestak's characterization of some of these payments as for business purposes, but I need not resolve this dispute, because I find that, even if these payments were made to individuals who had provided services to the business, Sestak has failed to show that the payments worked a benefit to the partnership. Therefore, no offset is appropriate.

Sestak testified that his reason for making these payments was a personal sense of obligation. "I felt . .. obligated because.... I worked with these people ... and we owe them money and not all these guys are big companies and they ... count on their funds." If true, Sestak's expression of personal responsibility is admirable. It is his burden, however, to demonstrate that any payment which he seeks to impose on the partnership actually worked a benefit for the partnership. Sestak failed to consult with DiGiacobbe before making the payments. The record is silent as to wether these were enforceable obligations and as to whether enforcement, in fact, would have been sought. Without denigrating Sestak's apparent impulse to do the right thing by these claimants, he has simply failed to demonstrate that the payments worked any financial benefit to the partnership or that he was legally compelled to make them on behalf of the partnership. No offset is therefore appropriate.

C) *Net Accounting*

**\*10** Sestak has retained excess draws of $37,603, less all allowable off-sets of $32,360, and must

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 1016985
**(Cite as: Not Reported in A.2d)**

therefore account to the partnership for $5,243.

## IV. SESTAK'S EXCEPTIONS

Sestak takes exception to the draft report on two grounds. FN19 He does not contest my finding that an accounting of the post-1992 "Chesapeake Construction" phase of the partnership indicates that Sestak is "ahead" of the DiGiacobbe in the amount of $5,243. However, he argues that I erred in not off-setting against this amount the sum of two separate transactions occurring during the pre-1992 ( "S & D") phase of the partnership. First, Sestak argues that I should have given him credit for $36,000 in funds made available to the partnership by Sestak's father-in-law, a sum which was never repaid. Second, Sestak argues that I should off-set a draw or loan of $22,500 taken by DiGiacobbe in connection with DiGiacobbe's construction of his family home.

> FN19. A third exception involving a proposed off-set (for money allegedly retained by DiGiacobbe from the sale of Lot 8 in Stone Spring) has been waived by the defendant.

The testimony with respect to these two proposed off-sets is either unclear or disputed in the record. I have addressed the loan from Mr. Sestak's father-in-law to the partnership adequately above: there is simply no evidence that this infusion of cash to the partnership from a third party represents an obligation undertaken by Sestak himself for the benefit of the corporation, or that the funds provided by his father-in-law should otherwise be credited to him in this accounting action. FN20

> FN20. See Transcript, at 154-55.

With respect to the draw or loan taken by Mr. DiGiacobbe for construction of his home, DiGiacobbe acknowledges that he drew out this amount, but asserts that the resulting imbalance in draws was compensated in favor of Sestak. Sestak denies that this is so. FN21 Mr. DiGiacobbe, in fact,

points out quite reasonably that if he had been ahead $22,500 due to his taking a draw for personal home construction, DiGiacobbe would have been unlikely to angrily confront Sestak about a $20,000 draw Sestak had taken for similar purposes (which in fact DiGiacobbe did); and Sestak would have been unlikely to borrow $20,000 from a commercial lender to replace the draw (a process which Sestak testified that he had begun even before the confrontation). FN22

> FN21. Sestak points to the testimony of DiGiacobbe that "[Sestak] had been reimbursed-in fact, I believe that was part of the money he used towards his house." Transcript, at 299-300. Sestak points out that the amount he "loaned" to himself from partnership funds to build his home was repaid, and argues that DiGiacobbe's testimony erroneously conflates the *unrepaid* DiGiacobbe draws for personal home construction with the similar but *repaid* draws of Sestak. I do not read Mr. DiGiacobbe's testimony to be referring to Sestak's $20,000 "self-help" draw, however, but to other funds which Sestak applied to the construction of his home.

> FN22. Transcript, at 162.

My decision that Sestak is not entitled to off-set either the loan from his father-in-law or the DiGiacobbe draw does not rest on the evidentiary grounds stated above, however. The problem is more fundamental. The proposed off-set is a part, but only a part, of transactions between the partners over a period of years before 1992, in the "S & D" phase of the partnership. While the record is clear that unequal draws were not unusual throughout the partnership up to its dissolution, neither the testimony nor partnership records are sufficient to support an accounting before 1992. Although DiGiacobbe had access to these partnership records, it is undisputed that Sestak was the partner primarily responsible for the inadequate state of the financial record keeping. To off-set the two proposed amounts, favorable to Sestak, without any proof of the other transactions between the partners,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 11

Not Reported in A.2d, 2003 WL 1016985
**(Cite as: Not Reported in A.2d)**

would be unfair. This is true particularly in light of the fact that it would allow Sestak what may be a benefit for his own slovenly record keeping. This is sufficient reason to disallow the proposed off-sets; a decision bolstered by the unclear and disputed evidence relied upon by Sestak to demonstrate the proposed off-sets, as described above.

**\*11** Stated simply, it is clear that an accurate accounting of the early partnership years is not possible. While this is unfortunate, it is fair that the consequences of the inadequate state of the records fall upon the party responsible for that portion of partnership operations, Mr. Sestak. Sestak has failed to meet his burden to establish entitlement to the two off-sets he seeks in his exceptions to the draft version of the report. For that reason, the exceptions must be denied.

## V. CONCLUSION

The amount of excess draws and personal telephone payments retained by Sestak is $37,603. Offset against this amount must be the payments made by Sestak on behalf of the partnership in relief of the office condominium loan ($25,000) and to satisfy personal judgments for partnership debt ($7360), totaling $32,360. Therefore, Sestak must account to the partnership in the amount of $37603 less $32,360, or $5243. This amount represents the sole remaining asset of the partnership. It should be distributed equally between the parties. Therefore, Sestak may retain $2,621.50 and must pay $2,621.50 to DiGiacobbe, on behalf of the partnership. Once this report becomes final, the plaintiff should submit a consistent form of order.

Del.Ch.,2003.
Digiacobbe v. Sestak
Not Reported in A.2d, 2003 WL 1016985

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 1517127
**(Cite as: Not Reported in A.2d)**

**C**
Not Reported in A.2d, 2004 WL 1517127
Only the Westlaw citation is currently available.
UNPUBLISHED  OPINION.  CHECK  COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
In re: SILVER LEAF, L.L.C., a Delaware Limited
Liability Company
**No. Civ.A 20611.**

Submitted April 20, 2004.
Decided June 29, 2004.

Bruce E. Jameson , J. Clayton Athey , Prickett,
Jones & Elliott, P.A., Wilmington, Delaware, for
Petitioner/Counterclaim       Defendant,       USIS
International Capital Corporation and Counterclaim
Defendant, Mark Lavi.
Charles J. Brown, III , Elzufon Austin Reardon
Tarloff & Mondell, P.A. , Wilmington, Delaware;
John Fialcowitz , Rita M. Jennings , Lowenstein
Sandler   PC,   Roseland,   New   Jersey,   for
Respondents/Counterclaim         Plaintiffs,       Syndi
Romanoff, David Romanoff, Yehuda Segal and
Silver Leaf, LLC.

*MEMORANDUM OPINION*

LAMB, Vice Chancellor.

I.

**\*1** This action arises out of a dispute between the
three members of an LLC formed for the purpose of
entering into a license to market and sell french fry
vending machines. The LLC eventually lost its
license and as a result the members are engaged in
litigation. The manager of the LLC and two of its
members filed suit in the Superior Court of New
Jersey against the third member, a Delaware
corporation and its sole stockholder asserting claims
for breach of contract, breach of fiduciary duty and
tortious interference.

In response, the corporate defendant in the New
Jersey action filed in this court a petition for
judicial dissolution of the LLC. It then joined its
sole stockholder in asking the New Jersey Superior
Court to dismiss the action without prejudice so that
the entire dispute could be resolved in Delaware.
The motion to dismiss the New Jersey action was
granted. The defendants in this action then
answered the petition and counterclaimed, raising,
in essence, the same claims previously alleged in
New Jersey. In order to bring before this court all of
the claims that had been asserted in New Jersey, the
counterclaims name the sole stockholder of the
corporate member as an additional counterclaim
defendant.

That individual responded to the counterclaims with
a motion to dismiss asserting a lack of personal
jurisdiction, a defense not raised by him in the New
Jersey action. The question presented is whether
this court should entertain that defense or, instead,
find that the individual's conduct in securing a
dismissal of the New Jersey Superior Court action
estops him from asserting a lack of personal
jurisdiction here.

II.

In April 2001, Syndi Romanoff, Yehuda Segal and
USIS formed Silver Leaf, LLC, a Delaware limited
liability company. USIS, an Illinois corporation
engaged in day trading corporate securities, owns a
50% equity interest in Silver Leaf. USIS is wholly
owned by Mark Lavi, who also serves as its sole
director and president. Syndi Romanoff and Yehuda
Segal own the remaining interest in Silver Leaf,
30% and 20% respectively. David Romanoff is the
manager of Silver Leaf.

In February 2002, Silver Leaf entered into an
agreement with Tasty Fries, Inc. for the exclusive
license to sell, market, sublicense and distribute
Tasty Fries' patented french fry vending machines.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 1517127
**(Cite as: Not Reported in A.2d)**

Silver Leaf later ordered ten thousand Tasty Fries machines and arranged to pay for the machines in installments. Over the next few months, the relationship between Silver Leaf and Tasty Fries deteriorated as Tasty Fries prematurely demanded payment for the machines or assurances from Silver Leaf as to its financial condition.

As relations between Tasty Fries and Silver Leaf deteriorated, Lavi represented to Tasty Fries and other third parties that he was the manager of Silver Leaf and, over the objections of the other Silver Leaf members and its manager, conducted business in that capacity. FN1 No machines were ever delivered, and Tasty Fries eventually terminated its agreement with Silver Leaf. The parties dispute the reason for the termination of the license agreement.

> FN1. Lavi sent letters in April 2002 to third parties declaring himself the manager of Silver Leaf. *See* Aff. of David Romanoff Related to Ans. Br. of Resp'ts/Countercl. Pls. In Opp'n to Countercl. Def. Mark Lavi's Mot. to Dismiss, at Ex. F (Memorandum from Mark Lavi to Fred Zemel (April 10, 2002)); Ex. G (Letters to the Ashwood Group, LLC, SAI Marketing, the DMG Group and Tasty Fries (April 15, 2002)).

*2 Silver Leaf, Syndi Romanoff, David Romanoff and Yehuda Segal began litigation in the New Jersey Superior Court relating to the management of Silver Leaf and the events leading up to the termination of its contract with Tasty Fries. In August 2003, Silver Leaf, Syndi Romanoff, David Romanoff and Yehuda Segal filed an action in the New Jersey Superior Court against Lavi and USIS alleging that Lavi conspired with Edward Kelly, Tasty Fries' president and CEO, to terminate Silver Leaf's agreement with Tasty Fries and to misappropriate Silver Leaf's exclusive license with Tasty Fries. FN2

> FN2. Silver Leaf also filed suit in New Jersey Superior Court against Tasty Fries for breach of contract and tortious

interference. Silver Leaf's action against Tasty Fries was removed to the United States District Court for the District of New Jersey. In July 2003, the federal district court action was stayed pending resolution of whether Silver Leaf has authority to bring suit against Tasty Fries.

On October 17, 2003, USIS filed this petition for judicial dissolution of Silver Leaf pursuant to 6 *Del. C.* § 18-802. USIS and Lavi moved to dismiss the New Jersey action arguing that the entire dispute could be and should be resolved in Delaware. Lavi obtained dismissal of the New Jersey action because he represented that the Delaware Court of Chancery had exclusive jurisdiction over disputes between the members and that Delaware was an available forum to hear all of the claims then pending in New Jersey. Lavi argued that "New Jersey's judicial resources should not be wasted on several complicated matters when, in one case in Delaware, all issues can, and hopefully will be resolved." FN3 Based on Lavi's representation that the Delaware Court of Chancery was the appropriate forum to resolve all of the disputes among the members of Silver Leaf, the New Jersey court dismissed the action pending before it. FN4

> FN3. Letter to the Honorable Miriam Span in Reply to Pls.' Opp'n to Defs.' Mot. to Dismiss in *Romanoff, et al. v. Lavi, et al.,* Docket No. C-115-03 (Nov. 3, 2003), *in* Cert. of John Fialcowitz Related to Ans. Br. of Resp'ts/Countercl. Pls. In Opp'n to Countercl. Def. Mark Lavi's Mot. to Dismiss ("Fialcowitz Cert."), at Ex. A.

> FN4. In granting the motion to dismiss, Judge Miriam Span of the New Jersey Superior Court stated: "Well, I agree there should be one jurisdiction. In this case, I agree it should be Delaware.... So the instant matter should be litigated as a whole in the Delaware Chancery Court." Tr. of Lavi's Mot. to Dismiss on November 7, 2003, *in* Fialcowitz Cert., at Ex. B.

Silver Leaf, Syndi Romanoff, Yehuda Segal and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 1517127
(Cite as: Not Reported in A.2d)

David Romanoff, filed a response to the petition for dissolution on November 24, 2003, asserting counterclaims against both USIS and Lavi. FN5 On December 19, 2003, USIS answered the counterclaims and Lavi filed a motion to dismiss for lack of personal jurisdiction. The court heard argument on counterclaim-defendant Lavi's motion to dismiss on April 20, 2004.

> FN5. Respondents counterclaim that Lavi and USIS breached the operating agreement of Silver Leaf in several respects, breached their fiduciary duties and usurped a corporate opportunity, and tortiously interfered in Silver Leaf's contract with Tasty Fries. Respondents further counterclaim that Lavi should be personally responsible for USIS's liabilities. They also plead demand futility in their counterclaim.

### III.

In a motion to dismiss challenging personal jurisdiction pursuant to Court of Chancery Rule 12(b)(2), the party asserting jurisdiction bears the burden of showing a basis for the court's exercise of jurisdiction over the nonresident party. FN6 In general, the court will conduct a two-step analysis: first determining whether service of process on the nonresident is authorized by statute; and, second, deciding whether the exercise of jurisdiction is consistent with due process. FN7

> FN6. See Steinman v. Levine, 2002 WL 31761252, at *8 (Del. Ch. Nov. 27, 2002), aff'd, 822 A.2d 397 (Del.2003).

> FN7. Id.

The court need not address the merits of the motion to dismiss because, as a threshold matter, the doctrine of judicial estoppel bars Lavi's assertion that this court lacks personal jurisdiction. "Judicial estoppel prevents a litigant from advancing an argument that contradicts a position previously taken by that same litigant, and that [a court] was

persuaded to accept as the basis for its ruling." FN8 Judicial estoppel is an equitable doctrine designed to protect the integrity of the judicial process by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." FN9 The court concludes that Lavi should be judicially estopped from arguing before this court that it lacks personal jurisdiction over him when the New Jersey court accepted and relied upon Lavi's representation that the full dispute would be litigated in this court.

> FN8. Siegman v. Palomar Med. Techs., Inc., 1998 WL 409352, at *3 (Del. Ch. July 13, 1998).

> FN9. New Hampshire v. Maine, 532 U.S. 742, 743 (2001). See 28 Am.Jur.2d Estoppel and Waiver § 74 (2003) " Although additional considerations may inform the doctrine's application in specific factual contexts, several factors typically inform the decision whether to apply the doctrine of judicial estoppel in a particular case: whether the party's later position is ' clearly inconsistent' with its earlier position, whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled, and whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." Donald J. Wolfe, Jr. and Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery, § 11-1[c] (2003) (listing similar factors).

*3 Moreover, the exercise of personal jurisdiction over Lavi is consistent with due process in the circumstances presented. A state court may exercise personal jurisdiction over a nonresident defendant so long as there are "minimum contacts" between the defendant and the forum. FN10 The minimum

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 1517127
**(Cite as: Not Reported in A.2d)**

contacts analysis protects a defendant against the burden of litigating in a distant forum, and guarantees that "the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." FN11 "[I]t is essential in each case that there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." FN12

> FN10. *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945). The court considers the conduct of the defendant and the connections among the defendant, the forum and the litigation in determining whether the nonresident defendant has "minimum contacts" with the forum state. *Id.*

> FN11. *World-Wide Volkswagen v. Woodson,* 444 U.S. 286, 292 (1980).

> FN12. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985) (This "purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or the 'unilateral activity of another party or a third person' ") (citations omitted).

Exercising jurisdiction over Lavi would not offend traditional notions of fairness FN13 and Lavi could reasonably anticipate being haled into court in Delaware since Lavi himself is responsible for the connection with Delaware. FN14 First, Lavi undoubtedly authorized and directed the filing in Delaware of USIS's petition for dissolution of Silver Leaf. FN15 He then successfully argued before the New Jersey Superior Court that Delaware is the most appropriate forum to fully resolve the claims then pending in the New Jersey litigation, including claims against him personally. Thus, it is his own conduct that makes it necessary and appropriate to exercise jurisdiction over him in this forum, and not some fortuitous or attenuated contact with this State. FN16

> FN13. *Int'l Shoe Co.,* 326 U.S. at 316.

> FN14. *See Burger King,* 471 U.S. at 472 (" Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a ' substantial connection' with the forum state.") (citation omitted).

> FN15. *Mobil Oil Corp. v. Advanced Envtl. Recycling Techs., Inc.,* 833 F. Supp 437, 446 (D.Del.1993).

> FN16. *See id.*

Furthermore, since the counterclaims focus on Lavi's actions in holding himself out to be the manager of Silver Leaf, Delaware is the appropriate forum to resolve the counterclaims. Delaware "has a strong interest in resolving disputes regarding the internal affairs of LLCs formed under its laws." FN17 By declaring himself to be the manager of Silver Leaf, he impliedly consented to "adjudicate disputes so inherently intertwined with that fiduciary position." FN18 Therefore, jurisdiction over Lavi is consistent with the due process requirements of fairness and justice. FN19

> FN17. *Cornerstone Techs. LLC v. Conrad,* 2003 WL 1787959, at *13 (Del. Ch. Mar. 21, 2003). *See Assist Stock Mgmt. v. Rosheim,* 753 A.2d 974, 981 (Del. Ch.2000) ("Delaware has a strong interest in providing a forum for disputes relating to the ability of managers of an LLC formed under its law to properly discharge their respective managerial functions.").

> FN18. *Assist Stock Mgmt.,* 753 A.2d at 981
> .

> FN19. Service of process is not at issue since counsel for Lavi stated at oral argument that, if the court determined that jurisdiction was appropriate, he would waive any technical difficulties in service of process.

Not Reported in A.2d                                                      Page 5

Not Reported in A.2d, 2004 WL 1517127
**(Cite as: Not Reported in A.2d)**


For the foregoing reasons, Lavi's motion to dismiss
is DENIED. IT IS SO ORDERED.

Del.Ch.,2004.
In re Silver Leaf, L.L.C.
Not Reported in A.2d, 2004 WL 1517127

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5

Westlaw.

Not Reported in F.Supp.2d

2003 WL 1873523 (D.Del.)

**(Cite as: 2003 WL 1873523 (D.Del.))**

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
In re: TRICORD SYSTEMS, INC. Debtor
RCG INTERNATIONAL INVESTORS, LDC,
Plaintiff,
v.
Joan WRABETZ, Keith Thorndyke, Louis C. Cole,
Yuval Almog, Tom R. Dillon,
Donald L. Lucas, Fred G. Moore, and John
Mitcham, Defendants.
No. 02-82361, 02-04943.

April 11, 2003.

MEMORANDUM ORDER

ROBINSON, J.

I. INTRODUCTION

*1 On April 5, 2002, plaintiff RGC International Investors, LDC ("RGC") initiated the instant litigation in the Delaware Court of Chancery against Tricord Systems, Inc. ("Tricord") and its current and former directors. On May 15, 2002, RGC amended its complaint; the amended complaint contains claims grounded in Delaware state law for breach of contract, common law fraud, breach of fiduciary duty and waste. RGC sought the liquidation of Tricord and damages against Tricord and its directors "for their refusal to consider a plan of liquidation and conscious decision to simply burn through Tricord's remaining assets in the face of its (self recognized) hopeless business reality." (D.I. 4 at 4)

On August 2, 2002, two months before trial was scheduled to commence, Tricord filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota. On that same date, Tricord and the individual defendants removed the Chancery Court action to the United States Bankruptcy Court for the District of Delaware pursuant to 28 U.S.C. § 1452 and, within days, filed a motion to transfer the venue to Minnesota. On September 18, 2002, the bankruptcy court in Minnesota approved a settlement stipulation entered into by RGC and Tricord regarding RGC's claims as a preferred stockholder.

On January 10, 2003, RGC voluntarily dismissed without prejudice its claims against Tricord. On that same date, RGC filed a motion to remand the action to the Delaware Court of Chancery and filed its opposition to the transfer motion. On January 23, 2003, the individual defendants filed an amended notice of removal in this court, purporting to remove the action to this court pursuant to 28 U.S.C. §§ 1332 and 1441 on the basis that diversity jurisdiction exists. Concomitantly, defendants filed in the Delaware Bankruptcy Court a motion to withdraw the bankruptcy reference. On March 24, 2003, the Bankruptcy Court issued a memorandum opinion and order granting RGC's motion to remand, thus mooting the pending motion to transfer. (D.I.36) Ironically, on that same date, this court granted defendants' motion to withdraw the reference. (D.I.7)

For the reasons that follow, the court shall revoke the withdrawal of reference so that the Bankruptcy Court's March 24, 2003 order has full effect.

II. STANDARD OF REVIEW

The exercise of removal jurisdiction is governed by 28 U.S.C. § 1441(a). The statute is strictly construed, requiring remand to state court if any doubt exists over whether removal was proper. *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 104 (1941). A court will remand a removed case "if

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 1873523 (D.Del.)

**(Cite as: 2003 WL 1873523 (D.Del.))**

at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c). The party seeking removal bears the burden to establish federal jurisdiction. *Steel valley Auth. v. Union Switch & Signal Div. Am Standard, Inc.,* 809 F.2d 1005 (3d Cir.1987); *Zoren v. Genesis Energy, L.P.,* 195 F.Supp.2d 598, 602 (D.Del.2002). In determining whether remand based on improper removal is appropriate, the court "must focus on the plaintiff's complaint at the time the petition for removal was filed," and assume all factual allegations therein as true. *Id.*

III. DISCUSSION

*2 Defendants filed a notice of removal in the Delaware Bankruptcy and Chancery Courts on August 2, 2002, pursuant to 28 U.S.C. § 1452 and Rule 9027(e) of the Federal Rules of Bankruptcy. (D.I. 4, Exs. A, G; D.I. 15, Ex. 3) Section 1452 provides that "[a] party may remove any claim or cause of action in a civil action ... to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." Rule 9027(e) provides that in a district (like Delaware) where "any and all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district," 28 U.S.C. § 157(a), the bankruptcy judge may then "issue all necessary orders and process ..." in said removed case. According to Rule 9027(a)(3), once the notice of removal was filed in the Chancery Court, "[t]he parties shall proceed no further in that court unless and until the claim or cause of action is remanded."

Defendants filed their amended notice of removal in this court on January 23, 2003 pursuant to 28 U.S.C. §§ 1441 and 1332. (D.I.1) Section 1441 provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court of the United States for the district and division embracing the place where such action is pending." (Emphasis added) Section 1332(a)(2) provides that the district courts shall have original jurisdiction of

all civil actions where the matter in controversy exceeds the sum or value of $75,000 and is between "citizens of a State and citizens or subjects of a foreign state." Section 1446(d) provides that the removing party "shall file a copy of the notice with the clerk of such State court, which shall effect the removal and the State court shall proceed no further unless and until the case is remanded." (Emphasis added) Neither the Chancery Court docket nor the Bankruptcy Court docket reflects that defendants filed a copy of the amended notice in any court other than the district court. (D.I.15, Ex. 3) On January 24, 2003, defendants filed a motion for withdrawal of the reference of the bankruptcy proceeding to this court. (D.I.7)

On March 24, 2003, the Bankruptcy Court granted RGC's motion for remand on the grounds of lack of jurisdiction; with the dismissal of the debtor Tricord from the litigation, "this action can have no impact on the administration of Tricord's bankruptcy estate.... Further, the action raises no bankruptcy issues but only issues related to Delaware state law." (D.I.36) On that same date, this court granted defendants' motion for withdrawal of the reference.

This court concludes that the amended notice of removal was not appropriately filed, since defendants concede that the Delaware Court of Chancery had no jurisdiction over the matter once the original notice of removal was filed, and since the law does not provide for "removal" of an action from a district's bankruptcy court to the district court. Although defendants filed a motion to withdraw the reference of the bankruptcy proceeding to this court, given the fact that the Bankruptcy Court concluded it lost jurisdiction once the debtor Tricord was dismissed from the litigation, the matter was not properly withdrawn by this court. Under this convoluted procedural history, brought about by defendants' faulty procedural posturing, the court shall revoke its order of withdrawal so that the Bankruptcy Court's order of remand remains the law of the case.

IV. CONCLUSION

*3 At Wilmington this 11th day of April, 2003, for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 3

2003 WL 1873523 (D.Del.)

**(Cite as: 2003 WL 1873523 (D.Del.))**

the reasons stated;

IT IS ORDERED that the court's order granting withdrawal of the reference is hereby revoked. Because the case was improperly removed to this court, the case shall be dismissed, thus mooting all remaining motions.

2003 WL 1873523 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6

Westlaw.

Not Reported in A.2d                                                                    Page 1

Not Reported in A.2d, 2002 WL 75473, 28 Del. J. Corp. L. 353
**(Cite as: Not Reported in A.2d)**

**H**
Not Reported in A.2d, 2002 WL 75473, 28 Del. J. Corp. L. 353

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
Greg JACOBSON, a California Citizen, Plaintiff,
v.
DRYSON ACCEPTANCE CORP., a Delaware Corporation, and Michael Dry, a Texas Citizen, Defendants.
**No. C.A. 17684.**

Submitted: Nov. 9, 2001.
Decided: Jan. 9, 2002.

Former officer, director, and employee brought action against corporation and principal shareholder and director, alleging breach of contract, breach of fiduciary duty, and conversion, among other claims. Defendants counterclaimed for breach of fiduciary duty, fraud, breach of contract, and negligence. On motions for summary judgment on counterclaims, the Court of Chancery , Lamb, Vice Chancellor, held that: (1) court lacked jurisdiction to hear claims brought against defendant director solely in his individual capacity; (2) genuine issues of material fact regarding plaintiff's purported status as a shareholder precluded summary judgment in favor of defendants on collection claim related to $100,000 advance, as well as claims for accounting, breach of contract, and breach of fiduciary duty; (2) plaintiff had no collection claim based on monetary advances that were repaid; (3) plaintiff's consent to transfer of corporate assets precluded conversion claim; and (4) plaintiff lost right to inspect corporate books and records when he was removed as a director.

Motions granted in part and denied in part.

West Headnotes

**[1] Corporations 101 ☞263(1)**
101k263(1) Most Cited Cases

**Corporations 101 ☞266**
101k266 Most Cited Cases
Service of process was obtained over corporate director pursuant to statute limiting scope of personal jurisdiction only to those actions against a director for acts on his part performed only in his capacity as a director and, consequently, court lacked jurisdiction to hear claims brought against director solely in his individual capacity. 10 Del.C. § 3114.

**[2] Judgment 228 ☞181(31)**
228k181(31) Most Cited Cases
Genuine issue of material fact surrounding transfer of $100,000 to corporation precluded summary judgment in favor of corporation and its principal shareholder on claim alleging that transfer represented lender's initial equity contribution to corporation that, by the terms of his oral agreement with shareholder, entitled lender to 10% of corporation's common stock.

**[3] Corporations 101 ☞309(2)**
101k309(2) Most Cited Cases
Former officer failed to establish collection claim against corporation based on advances to corporation, given unrebutted evidence that officer received either loans in exchange or was repaid.

**[4] Corporations 101 ☞182.4(3)**
101k182.4(3) Most Cited Cases
Minority shareholder failed to establish claims for conversion of the corporate assets against corporation and its principal shareholder and director, where minority shareholder was aware of and consented to the transactions between corporation and affiliate that formed basis of conversion claims, and those transactions were accounted for on the books of affiliate.

**[5] Judgment 228 ☞181(31)**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 2

Not Reported in A.2d, 2002 WL 75473, 28 Del. J. Corp. L. 353
**(Cite as: Not Reported in A.2d)**

228k181(31) Most Cited Cases
Genuine issue of material fact as to whether
sufficient relationship existed between corporation
and purported shareholder to support the imposition
on corporation of a duty in equity to account to
purported shareholder precluded summary
judgment on claim seeking accounting of corporate
assets.

[6] **Corporations 101** ☞**311**
101k311 Most Cited Cases
Former director lost his standing to pursue claim
demanding inspection of corporate books and
records when he was removed as a director. 8
Del.C. § 220(d).

[7] **Judgment 228** ☞**181(31)**
228k181(31) Most Cited Cases
Genuine issue of material fact as to former officer
and director's status as a shareholder precluded
summary judgment in favor of corporation and
principal shareholder on claims that principal
shareholder breached his fiduciary duty by
manipulating the corporate machinery so as to deny
former officer stock certificates representing his
20% ownership in corporation, and by failing to
make distributions to officer as 20% shareholder in
corporation.

[8] **Judgment 228** ☞**181(21)**
228k181(21) Most Cited Cases
Genuine issues of material fact regarding agreement
reached over former employee's compensation and
whether or how promotion of another employee
altered that agreement precluded summary
judgment on former employee's breach of contract
claims.

Michael F. Bonkowski , Esquire, Saul Ewing LLP,
Wilmington, Delaware, Attorneys for Plaintiff.
Bruce E. Jameson , Esquire, Prickett, Jones &
Elliott, Wilmington, Delaware, Attorneys for
Defendants.

MEMORANDUM OPINION

LAMB, Vice Chancellor.

I.

**\*1** [1] Greg Jacobson brings this action against
Michael Dry FN1 and Dryson Acceptance Corp. (“
DAC,” “the corporation,” or “the company”), a
Delaware corporation with its principal place of
business in Texas. DAC is a mortgage warehousing
company that originated and held mortgage loans in
order to sell them later at a lower discount to the
secondary mortgage market.

> FN1. Service of process was obtained over
> Dry pursuant to 10 *Del. C.* § 3114.
> Consequently, the court lacks jurisdiction
> to hear claims brought against him solely
> in his individual capacity. *See, e.g., Hana
> Ranch, Inc. v. Lent,* Del. Ch., 424 A.2d 28,
> 30-31 (1980) (limiting the scope of
> personal jurisdiction obtained pursuant to §
> 3114 “only to those actions ... against a
> director of a Delaware corporation for acts
> on his part performed only in his capacity
> as a director”).

In late 1997, Dry and Jacobson agreed to form
DAC as a special purpose corporation and agreed
that Jacobson would be employed by DAC to run
day-to-day operations. Dry and Jacobson both were
officers and directors of DAC from the time of its
formation in early January 1998. At that time, all
relevant corporate documents were prepared to
reflect 100% share ownership by Dry. Jacobson was
aware of this fact.

Around December of 1998, DAC's bank indicated it
would not renew its lending commitment when it
expired in February 1999. In searching for a new
lender for DAC, Jacobson came into contact with a
California-based company that offered him a job.
Jacobson accepted the job offer and moved to
California, resigning from DAC in April 1999. In
1998, he had been paid approximately $250,000 in
salary and bonus. In 1999, he received $40,000 in
compensation. Jacobson was removed as a director
of DAC at a meeting of shareholders held on May
21, 1999. The DAC board then removed him as an
officer of the corporation.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 3

Not Reported in A.2d, 2002 WL 75473, 28 Del. J. Corp. L. 353
**(Cite as: Not Reported in A.2d)**

Jacobson claims that he invested $100,000 of the $1,000,000 of equity needed to capitalize DAC and that he and Dry agreed that (i) Jacobson would receive 10% of the stock and (ii) DAC's documents would be later amended to reflect Jacobson's 10% ownership. Dry claims that he alone put up all $1,000,000 of the equity financing for DAC and denies any agreement to issue shares to Jacobson. These conflicting versions of DAC's capitalization form the crux of the principal issue in this case. Jacobson also claims that he is owed another 10% of DAC's stock in exchange for a 50% interest in a piece of real property he transferred to Dry in February 1998. Dry acknowledges receipt of the real property but denies having made any agreement to issue stock in exchange for it.

Jacobson's complaint also alleges that between January 1998 and April 1998 he loaned approximately $210,000 to DAC that has not been repaid. He also alleges that, in contrast, Dry was repaid for all loans he made to DAC. Dry has introduced substantial evidence showing that Jacobson loaned a total of $242,000 to DAC in 1998, all of which was repaid. This evidence is unrebutted.

There is also an issue in the litigation concerning Dryson Mortgage Finance Corporation ("DMFC"), an entity in which Dry and Jacobson each held an indirect 50% interest. Shortly after the formation of DAC, the assets of DMFC were transferred to DAC. Jacobson's complaint alleged that this transfer was made without consideration to DMFC and that he is entitled to be compensated for his 50% stake in DMFC. The defendants buttress their motion for summary judgment with evidence showing that Jacobson approved the transactions between DAC and DMFC, DAC assumed liabilities as well as assets of DMFC, and all transactions between the two entities were properly accounted for by DAC.

**\*2** Jacobson's complaint alleges that he demanded payment from Dry for the amounts he claims are due to him around July 1999. There followed a series of demands on Jacobson's part-including two letters to Dry in September 1999 and a third dated November 15, 1999-for an accounting from DAC and payment of the moneys he believed were owed

him.

On December 17, 1999, Jacobson filed this complaint naming Dry and DAC as defendants. The complaint is alleged in 8 counts, as follows:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                  Page 4

Not Reported in A.2d, 2002 WL 75473, 28 Del. J. Corp. L. 353
**(Cite as: Not Reported in A.2d)**

Count I:Specific Performance against DAC
Count II:Accounting against DAC
Count III:Books and Records Demand against DAC
Count IV:Breach of Fiduciary Duty against Dry
Count V:For Collection against DAC
Count VI:Conversion against DAC
Count VII:Conversion against Dry
Count VIII:Breach of contract against DAC

On February 11, 2000, Dry and DAC jointly answered and counterclaimed against Jacobson, alleging that during his employment at DAC Jacobson (i) facilitated the placement of improper loans with DAC, (ii) failed to adhere to the company's policies and procedures for verifying loans causing DAC to make loans it otherwise would not have made and on which it lost money, and (iii) left DAC to work for a competitor and attempted to bring DAC customers with him in contravention of his employment agreement. Based on these factual allegations, DAC and Dry counterclaim for breach of fiduciary duty, fraud, breach of contract, and negligence. As noted above, although Jacobson moved for summary judgment on these counterclaims, the state of the record is such that summary judgment is inappropriate. FN2

> FN2. Jacobson submitted affidavits in support of his motion that contradict the material allegations of the counterclaims. DAC and Dry, responded with affidavits substantiating their claims. Given the many material factual matters remaining to be decided, summary judgment on them is clearly unwarranted.

## II.

Pursuant to Court of Chancery Rule 56, summary judgment should be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FN3 In deciding a motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving party and the moving party has the burden of demonstrating that no material question of fact exists. FN4 "When a moving party has properly supported its motion, however, the non-moving party must submit admissible evidence sufficient to generate a factual issue for trial or suffer an adverse judgment." FN5 I will apply this standard to the analysis of Dry and DAC's motion for summary judgment.

> FN3. *See, e.g., Williams v. Geier,* Del.Supr., 671 A.2d 1368, 1375 (1996).

> FN4. *Tanzer v. International General Industries, Inc.,* Del. Ch., 402 A.2d 382, 385 (1979) (*citing Judah v. Delaware Trust Co.,* Del.Supr., 378 A.2d 624, 632 (1977)).

> FN5. *Id.;* Ch. Ct. R. 56(e).

[2] [3] Jacobson's claims focus on a series of transfers of funds made by him to DAC. These transfers are said to support his claims for the initial 10% stock interest and for moneys owed on account of loans to DAC. Having examined the testimony and documents relating to these fund transfers, I conclude that only one of them-the January 5, 1998 transfer of $100,000 from Jacobson to DAC-remains unexplained and gives rise to a triable issue of fact. In all other respects, the undisputed record establishes that whatever moneys were advanced by Jacobson to DAC were promptly repaid and were not accounted for as capital contributions by DAC. FN6 The following chart summarizes the evidence of such moneys presented by Jacobson, the evidence adduced by DAC and Dry to rebut Jacobson's claim, and whether I find

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 5

Not Reported in A.2d, 2002 WL 75473, 28 Del. J. Corp. L. 353
**(Cite as: Not Reported in A.2d)**

that a triable issue remains for each item:

> FN6. While the amounts reflected in
> Jacobson's bank statements and the DAC
> general ledger do not match exactly,
> Jacobson has neither rebutted defendants'
> explanations nor established which
> amounts on his list were not repaid.

| Am ount / Da te | Fr om / To | DA C Re bu ttal | Fi n di ng |
|---|---|---|---|

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2002 WL 75473, 28 Del. J. Corp. L. 353
**(Cite as: Not Reported in A.2d)**

| $100,000 / 1-5-98 | Jacobson's Account/DAC Account | Not recorded on DAC's books; Dry testimony that Jacobson paid money to Dry to induce his |
|---|---|---|

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7

Westlaw.

Not Reported in F.Supp.2d

2001 WL 940909 (D.Del.)

(Cite as: 2001 WL 940909 (D.Del.))

Page 1

C
Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Quentin KETTERSON, et al., Plaintiffs,
v.
Douglas H. WOLF, et al., Defendants.
No. Civ.A. 99-689-JJF.

Aug. 14, 2001.

Charlene Davis, and Richard L. Abbott, of the Bayard Firm, Wilmington, Delaware, Z. Lance Samay, Morristown, New Jersey, for Plaintiffs, of counsel.

R. Franklin Balotti, and Catherine G. Dearlove, of Richards, Layton & Finger, P.A., Wilmington, Delaware, Richard J. Idell, of Idell, Berman & Seitel, San Francisco, California, for Defendant Douglas H. Wolf, of counsel.

R. Franklin Balotti, and Catherine G. Dearlove, of Richards, Layton & Finger, P.A., Wilmington, Delaware, Richard B. Cooper, and Erik W. Kvam, of Cooper, Brown & Behrle, P.C., New York, New York, for Defendant Richard G. Buckingham, of counsel.

Andre G. Bouchard, and Joel Friedlander, of Bouchard Margules & Friedlander, Wilmington, Delaware, Robert L. Fila, Columbia, Maryland, for Defendant W. Lawrence Patrick, of counsel.

*MEMORANDUM OPINION*

FARNAN, J.

*1 Presently before the Court is Defendants Douglas H. Wolf's and Richard G. Buckingham's Motion to Dismiss for Lack of Diversity Jurisdiction (D.I.75), and Defendant W. Lawrence Patrick's Motion to Dismiss (D.I.79), pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. For the reasons discussed below, the Court will grant the motions.

BACKGROUND

The Amended Complaint filed in this action alleges the following facts. Plaintiff Quentin Ketterson ("Mr.Ketterson") is an investment banker based in New Jersey who is engaged in the business of facilitating transactions in the broadcast and computer software industries. Mr. Ketterson created Plaintiff Triangle Broadcasting Company, L.L.C. ("Triangle")(collectively "Plaintiffs"), which is a Delaware limited liability company, in the fall of 1995 "for the express purpose of specializing in acquiring control of, or in any way facilitating the sale of, the stock of broadcasting companies, which own groups of TV and/or radio stations." Defendant Douglas H. Wolf ("Mr.Wolf"), from San Francisco, California, and Defendant Richard G. Buckingham ("Mr.Buckingham"), from New York, are both attorneys and businessmen who specialize in "facilitating tax-driven business transactions." Defendant W. Lawrence Patrick ("Mr.Patrick") is a Maryland attorney who owns Patrick Communications Corporation, a radio and television station brokerage firm (the individual defendants are collectively "Defendants").

Mr. Ketterson and Mr. Patrick, who were introduced by a mutual friend in early 1995, agreed to become equal partners in a business of "soliciting broadcast station sellers, buyers and brokers." In July of 1995, as a result of their initial work on this venture, Mr. Ketterson and Mr. Patrick were introduced to Mr. Buckingham, who at the time was affiliated with Mr. Wolf in an unincorporated association. Mr. Ketterson and Mr. Patrick were impressed with some of Mr. Buckingham's business proposals and sought to work with him in the future. In anticipation of working with Mr. Buckingham and Mr. Wolf, on or about August 1, 1995, Mr. Ketterson and Mr. Patrick executed a letter

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2

2001 WL 940909 (D.Del.)

**(Cite as: 2001 WL 940909 (D.Del.))**

agreement establishing a partnership in which they would equally share any compensation earned as a part of their dealings with Mr. Buckingham and Mr. Wolf. At the end of October 1995, after several weeks of frequent communications among all four individuals, Mr. Ketterson and Mr. Patrick agreed with Mr. Buckingham and Mr. Wolf to formalize their business relationship by executing an agreement to create Triangle, a Delaware limited liability company, in which each individual would have a 25% interest. According to the terms of the agreement, Triangle's existence was effectuated on November 20, 1995. The purpose of Triangle was to "pursue and facilitate broadcast station sales transactions."

During the ensuing months, Mr. Ketterson and Mr. Patrick began working on Triangle's behalf, when, in February of 1996, they learned that Mr. Buckingham and Mr. Wolf had recently completed a $165 million broadcast station stock sale separate from Triangle's business operations. Mr. Ketterson and Mr. Patrick continued to learn of other independent business activities in which Mr. Buckingham and Mr. Wolf had been engaging, and the controversy among the four escalated in July of 1996 when Mr. Wolf expressed reluctance "to honor his contractual commitment to share equally Triangle's earnings with [Mr. Ketterson and Mr. Patrick]."

**\*2** Despite their concerns about Mr. Buckingham and Mr. Wolf, Mr. Ketterson and Mr. Patrick continued to work in securing transactions for Triangle, and they regularly sent Mr. Buckingham and Mr. Wolf update letters to detail their progress. In response to one of these letters, in August of 1996, Mr. Buckingham and Mr. Wolf informed Mr. Ketterson and Mr. Patrick of their desire to "redefine" their relationship. Rather than resisting and possibly irreparably damaging their relationship with Mr. Buckingham and Mr. Wolf, Mr. Ketterson and Mr. Patrick drafted a modification of their agreement reducing their respective share of Triangle's profits.

In October 1996, Mr. Ketterson received a copy of a letter authored by Mr. Patrick that indicated that

Mr. Ketterson had been completely excluded from a number of completed and pending Triangle transactions. On November 11, 1996, Mr. Ketterson received a letter from Mr. Buckingham and Mr. Wolf in which the two "purported to 'withdraw' from Triangle retroactively to August 1996." Mr. Ketterson quickly objected in writing to "the impropriety of the action of [Mr. Buckingham and Mr. Wolf in totally usurping Triangle's business and circumventing the LLC Agreement." In December 1996, Mr. Buckingham and Mr. Wolf informed Mr. Patrick that he could maintain his financial relationship with them, and could be indemnified by them, only if Mr. Patrick agreed to (1) withdraw from Triangle, (2) accept $140,000 as his share of earnings for all of his contributions to Triangle to that date, (3) exclude Mr. Ketterson from any future broadcast station transaction, and (4) deprive Mr. Ketterson of any monies owed to him and of any legal rights that he may have possessed. Mr. Patrick eventually sent a letter to Mr. Ketterson on December 24, 1996, that expressed his desire to formally end his business relationship with Mr. Ketterson and stating that he would continue doing business with Mr. Buckingham and Mr. Wolf. On May 27, 1997, Mr. Ketterson authored a letter to Mr. Buckingham and Mr. Wolf which demanded an accounting of all of Triangle's profits, but Mr. Ketterson received no response. His follow-up phone calls in late 1997 and early 1998 also went unanswered.

On November 10, 1998, Plaintiffs (Mr. Ketterson and Triangle) filed an action in the United States District Court for the District of New Jersey. (D.I. 88 at 1). Plaintiffs' Amended Complaint asserts claims for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) breach of fiduciary duties, (4) conversion, (5) oppressive conduct, (6) fraud and conspiracy to defraud, (7) unjust enrichment, and (8) tortious interference with business opportunities, and it also demands an accounting of all of Triangle's profits. On October 14, 1999, the New Jersey court transferred the action to this Court because of improper venue. (D.I. 88 at 2). Defendants filed the instant motions on March 10, 2000, seeking dismissal of Plaintiffs' Amended Complaint due to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 3

2001 WL 940909 (D.Del.)

**(Cite as: 2001 WL 940909 (D.Del.))**

lack of subject matter jurisdiction. (D.I. 88 at 2).

## DISCUSSION

**\*3** In order for the Court to have subject matter jurisdiction of an action containing only state law claims, there must be "complete diversity [of citizenship] between all plaintiffs and all defendants ." *Development Fin. Corp. v. Alpha Hous. & Health Care, Inc.,* 54 F.3d 156, 158 (3d Cir.1995). The burden to establish jurisdiction is on the plaintiff. *Kokkonen v. Guardian Life Ins. Co of Am.,* 511 U.S. 375, 377 (1994). Thus, in this case, if Plaintiffs fail to establish that the citizenship of every Defendant is different than the citizenship of every Plaintiff, the Court lacks jurisdiction and it must grant Defendants' motions.

## A. Citizenship of a Delaware Limited Liability Company

In order to resolve Defendants' motions, the Court must resolve the issue of a Delaware limited liability company's citizenship for diversity of jurisdiction purposes. After a review of the available case law, the Court concludes that a limited liability company is a citizen of the states of which its individual members are citizens. *See Carden v. Arkoma Assocs.,* 494 U.S. 185, 187-192 (1990)(holding that only corporations, and not other business entities such as limited partnerships, are considered citizens of the state which created it); *Handelsman v. Bedford Vill. Assocs. Ltd. P'ship,* 213 F.3d 48, 51-52 (2d Cir.2000)(holding that limited liability companies have the citizenship of all of its members).

Since Plaintiff Triangle is a Delaware limited liability company and Defendants were all indisputably members of Triangle, the only way for there to be complete diversity in the instant case is if each Defendant effectively withdrew from Triangle, and that after such withdrawal, each Defendant was a citizen of a different state than each Plaintiff. However, as explained below, the Court concludes that Plaintiffs have failed to adequately allege such facts.

## B. Defendants' Motions Raise Facial Challenges to

the Court's Jurisdiction

Two types of Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction may be brought by a defendant. One is a facial challenge to the Court's jurisdiction. *Gould Elecs. Inc. v. United States,* 220 F.3d 169, 176 (3d Cir.2000). When asserting a facial challenge, a defendant contends that the complaint alleges facts that, even if true, would not be sufficient to establish the court's jurisdiction. *Id.* In deciding a facial challenge, a Court "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Id.* However, a defendant can also assert a factual challenge to the court's subject matter jurisdiction, which contends that the allegations in the complaint establishing jurisdiction are not sufficiently supported by the facts. *Id.* When considering a factual challenge, a court can consider evidence outside of the pleadings. *Id.*

In the instant case, Defendants' motions present facial challenges to the Court's jurisdiction. In their motions, Defendants contend that Plaintiffs refuse to allege in their Amended Complaint that Defendants effectively withdrew from Triangle. (D.I. 96 at 7)(noting that the Amended Complaint repeatedly refers to Defendants' "purported" withdrawal). Thus, the Court concludes that it can only review and consider the Amended Complaint and its attached documents when resolving Defendants' motions.

**\*4** After reviewing Plaintiffs' Amended Complaint, it is clear that Plaintiffs do not allege that Defendants effectively withdrew from Triangle. Thus, Plaintiffs have failed to satisfy their burden of pleading the basis for the Court's jurisdiction, and Defendants' motions to dismiss must be granted.

## C. Plaintiffs Do Not Even Contend that the Amended Complaint Sufficiently Pleads the Basis of the Court's Jurisdiction

Plaintiffs contend that the Court should not construe Defendants' challenge as a facial challenge because there is a dispute of material fact as to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2001 WL 940909 (D.Del.)

**(Cite as: 2001 WL 940909 (D.Del.))**

Page 4

whether or not Defendants effectively withdrew from Triangle. In particular, Plaintiffs cite to a complaint and its attached documents that Defendants filed in the Delaware Court of Chancery ("Chancery Court") seeking a declaratory judgment that Defendants had effectively withdrawn from Triangle in 1996. [FN1] (D.I. 88 at 2, 11-12). Because Defendants' present motions raise facial challenges to the Court's jurisdiction, the Court concludes that whether or not Defendants actually withdrew is irrelevant. What is relevant is whether Plaintiffs have pleaded facts that establish that Defendants withdrew. Plaintiffs have not, and therefore, their contentions in opposition to Defendants' motions are unsupported. [FN2]

> FN1. The Chancery Court action has been stayed pending resolution of the instant action. (D.I. 88 at 2).

> FN2. It appears that Plaintiffs have made certain tactical decisions when drafting their pleadings, but the Court is limited by the facts pleaded when deciding Defendants' motions. *Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.,* 177 F.3d 210, 222 n. 13 (3d Cir.1999) (stating that, even if the parties do not dispute that diversity of citizenship exists, the complaint still must allege facts establishing diversity, or dismissal is warranted).

Plaintiffs contend that the Chancery Court complaint can be considered by the Court in resolving the instant motions, despite the Court's conclusion that Defendants' motions raise facial challenges, because the complaint is a public record. (D.I. 88 at 11)(citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196-97 (3d Cir.1993)). However, the cases that have allowed consideration of public records involved Rule 12(b)(6) motions to dismiss, and the Court concludes that to allow consideration of public records on a Rule 12(b)(1) facial challenge would be to disregard the facial challenge/factual challenge distinction. *See Gould,* 220 F.3d at 176 n. 6 (extending *Pension Benefit* to allow consideration

of documents attached to a complaint when deciding a Rule 12(b)(1) facial attack, but not discussing whether or not it would also allow consideration of public records); *Bell Atl.-Pa., Inc. v. Pennsylvania Pub. Util. Comm'n,* 107 F.Supp.2d 653, 658-59 (E.D.Pa.2000)(discussing how Courts can consider public records when analyzing Rule 12(b)(6) motions to dismiss, but recognizing that Rule 12(b)(1) motions to dismiss are analyzed under a different standard than Rule 12(b)(6) motions, and further, that can courts can consider documents outside the pleadings when analyzing Rule 12(b)(1) motions only if the motion presents a factual challenge). [FN3]

> FN3. One court has held that public records can be considered by a court in deciding a Rule 12(b)(1) facial challenge. *Hunter v. United States,* 2000 WL 1880257, at *3 (M.D.Pa. Dec. 15, 2000). The court noted that, when discussing what materials may be considered by a court in determining a Rule 12(b)(1) facial challenge, the *Gould* court cited *Pension Benefit,* which involved a Rule 12(b)(6) motion. *Id.* Since the *Pension Benefit* court allowed consideration of public records, the court in *Hunter* reasoned that *Gould* implicitly allows for the consideration of public records when deciding a Rule 12(b)(1) facial attack. *Id.* The court reasoned that this conclusion "comports with the fact that both a Rule 12(b)(6) motion and a Rule 12(b)(1) facial attack argue that the propriety of dismissal is apparent from the face of the complaint." *Id.*

The Court concludes that the reasoning in *Hunter* is not helpful for two reasons. First, the Court believes *Hunter* inaccurately characterizes the *Gould* court's citation of *Pension Benefit. Gould* merely cited *Pension Benefit* for the proposition that the Third Circuit could "think of no principled reason why a court, in resolving a 12(b)(1) facial attack should not also consider documents *attached to the complaint." Gould,* 220 F.3d at 176 n. 6 (emphasis

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 5

2001 WL 940909 (D.Del.)

**(Cite as: 2001 WL 940909 (D.Del.))**

added). *Gould* did not hold that public records can be considered in resolving a Rule 12(b)(1) facial challenge. Second, even if *Gould* had intended to suggest that public records could be considered in resolving a Rule 12(b)(1) facial attack, the Court concludes that the instant circumstances present a "principled reason" why they should not be considered. Plaintiffs hope to avoid dismissal on jurisdictional grounds by relying on public records, but Plaintiffs also do not want to be "bound" by the allegations in the public records for other issues, such as damages. It would be unfair to Defendants to allow Plaintiffs to rely on public records for purposes of jurisdiction, yet avoid having to plead the same facts in their Complaint because they may adversely affect other issues in the case.

Plaintiffs also contend that the Court should deny Defendants' motions because (1) it would be an abuse of discretion to rule on the jurisdictional issue without affording them an opportunity to conduct jurisdictional discovery, and (2) the decision resolving the jurisdictional issue should be postponed until trial because the jurisdictional issue is so intertwined with the merits of the case. (D.I. 88 at 13-16). As to Plaintiffs' first contention, because the Court concludes that Plaintiffs' Amended Complaint is facially deficient, the deficiency could not be cured by discovery. As to Plaintiffs' second contention, the Court concludes that it would be inappropriate to accept jurisdiction and consider the case on its merits where the challenge to the Court's jurisdiction is facial in nature. *See Society Hill Towers Owners, Ass'n v. Rendell,* 210 F.3d 168, 175 (3d Cir.2000)(noting that the Supreme Court "has recently cautioned against the practice of assuming jurisdiction and reaching the merits of a dispute," because issuing a decision based on such "hypothetical jurisdiction" is essentially an advisory opinion)(quoting *Steel Co. v. Citizens for Better Env't,* 523 U.S. 83, 93 (1998)).

**\*5** In sum, the Court concludes that Plaintiffs fail to meet their burden to affirmatively plead facts

necessary to establish the basis of the Court's jurisdiction. Thus, the Court concludes that Defendants' motions should be granted.

CONCLUSION

For the reasons discussed, the Court will grant Defendants' motions to dismiss for lack of subject matter jurisdiction.

An appropriate Order will be entered.

*ORDER*

At Wilmington this 14 day of August, 2001, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:
   1. Defendants Douglas H. Wolf's and Richard G. Buckingham's Motion to Dismiss for Lack of Diversity Jurisdiction (D.I.75) is *GRANTED.*
   2. Defendant W. Lawrence Patrick's Motion to Dismiss (D.I.79) is *GRANTED.*
   3. Motion of Defendants Wolf and Buckingham to Compel Discovery (D.I.73) is *DENIED AS MOOT.*

2001 WL 940909 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.