# TAB 1

Westlaw.

Not Reported in A.2d

2004 WL 443987 (Del.Ch.)

**(Cite as: 2004 WL 443987 (Del.Ch.))**

Page 1

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Ray AGOSTINO, individually and on behalf of all
others similarly situated,
Plaintiff,
v.
Thomas O. HICKS, Jack D. Furst, James N. Mill,
Timothy L. Conlon, Richard W.
Vieser, Kenneth F. Yontz, Thomas H. O'Brien,
Brian Mulroney, David M. Sindelar,
Hicks, Muse, Tate & Furst Incorporated,
Hmtf/Viasystems Partners, L.P., Hicks,
Muse, Tate & Furst Equity Fund III, L.P., HM3
Coinvestors, L.P., Hmtf Equity
Fund IV (1999), L .P., Hmtf Private Equity Fund IV
(1999), L.P., Hicks, Muse
PG-IV (1999) C.V., HM4-SBS (1999) Coinvestors,
L.P. and HM4-EQ (1999)
Coinvestors, L.P., Defendants.
**No. Civ.A. 20020-NC.**

Submitted Nov. 10, 2003.
Decided March 11, 2004.
Date Revised: March 22, 2004.
Pamela S. Tikellis and Robert J. Kriner, Jr., of
Chimicles & Tikellis, LLP, Wilmington, Delaware;
Robert S. Green and Robert A. Jigarjian, of Green
& Jigarjian LLP, San Francisco, California, for
Plaintiff of counsel.

James L. Holzman and Paul A. Fioravanti, Jr., of
Prickett, Jones & Elliott, P.A., Wilmington,
Delaware; Robert C. Walters and William L.
Wallander, of Vinson & Elkins L.L.P., Dallas,
Texas, for Defendants, of counsel.

*MEMORANDUM OPINION*

CHANDLER, J.

*1 Pending before the Court is defendants' motion
to dismiss plaintiff's amended complaint on the
ground that it states derivative, as opposed to
individual or direct, claims. Plaintiff was a
shareholder of Viasystems Group, Inc.
("Viasystems" or the "Company") until his shares
were eliminated without consideration after the
Company filed for bankruptcy. For the reasons
detailed below, I hold that the complaint states only
derivative claims, which were extinguished in
bankruptcy.

I. FACTUAL ALLEGATIONS
Viasystems was founded in 1996 by Hicks, Muse,
Tate and Furst Incorporated ("HMTF") and Mills
& Parners, Inc. as a supplier of circuitry
components to manufacturers of
telecommunications equipment. [FN1] Viasystems
raised roughly $890 million in an initial public
offering in March 2000. Viasystems' financial
performance improved after the IPO, but made a
turn for the worse after Viasystems' Board of
Directors approved a financing deal involving
HMTF on July 19, 2001. This transaction forms the
heart of the complaint.

FN1. The facts referenced in the Opinion
are drawn solely from the complaint.

The essence of the deal was an infusion of cash
into Viasystems by HMTF in exchange for
promissory notes and warrants to purchase
Viasystems stock. Specifically, pursuant to a
"Subscription Agreement" the Company received
$100 million from HMTF. [FN2] In return, HMTF
received $100 million in 14% promissory notes due
in 2007 [FN3] and warrants to purchase
10,000,000 shares of Viasystems stock for a penny
per share. The Subscription Agreement also
obligated the Viasystems Board to put the warrant

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 443987 (Del.Ch.)

**(Cite as: 2004 WL 443987 (Del.Ch.))**

issuance to a shareholder vote in order to satisfy certain New York Stock Exchange regulations. With two directors abstaining, the Board approved the Subscription Agreement unanimously on July 19, 2001. Separately, but on the same day, two directors signed a voting agreement with HMTF pledging to vote their personal Viasystems shares in favor of the Agreement.

> FN2. Throughout this Opinion, I refer to HMTF to include several affiliated limited partnerships, including HMTF/Viasystems Partners, L.P., Hicks, Muse, Tate & Furst Equity Fund III, L.P., HM3 Coinvestors, L.P., HMTF Equity Fund IV (1999), L.P., HMTF Private Equity Fund IV (1999), L.P., Hicks, Muse PG-IV (1999), C.V., HM 4-SBS (1999) Coinvestors, L.P., and HM4- EQ (1999) Coinvestors, L.P. All of these limited partnerships owned Viasystems common stock and/or received warrants to purchase such shares pursuant to the Subscription Agreement. Furthermore, all are affiliated with the corporate entity Hicks, Muse, Tate and Furst Incorporated.

> FN3. The notes contained a put feature that required the Company to repurchase the notes at 101% of their accreted value upon a change of control of the Company.

The Board of Viasystems at the time of the Subscription Agreement's approval included Thomas Hicks, Jack Furst, James Mills, Timothy Conlon, Richard Vieser, Kenneth Yontz, Thomas O'Brien, and Brian Mulroney. [FN4] A majority of the Board members were associated with HMTF apart from their role as directors of Viasystems: Hicks and Furst are HMTF partners; Mills manages HMTF affiliates; Vieser serves on the board of HMTF affiliates and is personally invested in HMTF; Yontz is personally invested in HMTF affiliates; and Mulroney is employed by HMTF. Although Hicks and Furst abstained from the July 19 vote, Mills, Vieser, Yontz, and Mulroney, all allegedly interested, voted for the transaction. Viasystems' Board on the date the Subscription

Agreement was approved, as well as HMTF, are defendants in this action. [FN5] As will become important later, Viasystems in not a defendant.

> FN4. Hicks and Furst, HMTF partners, were the two directors that abstained from the July 19 vote. Mills and Conlon signed the shareholders voting agreement.

> FN5. Plaintiff also asserts claims against David Sindelar. Sindelar was at all times relevant an officer of Viasystems and was a director at the time that the transaction was presented to shareholders, but he was not a director when the Board voted to approve the transaction.

HMTF, in addition to being a party to the Subscription Agreement, owned 49% of Viasystems common stock. When combined with defendants Mills and Conlon's shares (which was effectuated by the voting agreement executed on the same day as the Subscription Agreement), HMTF controlled over 50% of the voting shares. In other words, HMTF held sufficient voting power as of July 19 to approve the warrant issuance. On October 19, 2001, the Company held a special meeting to vote on the warrants and, unsurprisingly, shareholders approved the issuance of the warrants. But less than half of the shares not controlled by HMTF were voted in favor of the transaction.

**\*2** From the time the Subscription Agreement was approved until the time that shareholders voted to approve the warrants, Viasystems' stock moved markedly downward. On July 19, the date of Board approval, the stock was valued at $3 per share. On October 5, the date of Viasystems' final proxy statement regarding the special meeting held for shareholders to vote on the warrant issuance, the stock was valued at $0.44. Viasystems' market capitalization had declined by over $300 million in that timeframe. By the fourth quarter of 2001, the Company's ability to operate under the burden of its debt became increasingly difficult. In the first quarter of 2002, the Company retained an independent financial advisor to pursue debt-based restructuring. By April 2002, the New York Stock

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2004 WL 443987 (Del.Ch.)

**(Cite as: 2004 WL 443987 (Del.Ch.))**

directors....").

FN11. The basic necessity for the creation of standing to assert claims derivatively is described well by a leading corporations text: Litigation of any claim is costly and the results uncertain. As with other business decisions, corporate managers weigh the costs and benefits of enforcing claims via litigation, and generally choose to pursue only those actions that seem likely to produce a net benefit to the corporation. However, fiduciary litigation differs from ordinary claims in an obvious way--often the party sued will be one or more of the corporation's current directors. In calculating whether the corporation should sue, directors will be considering not only gains and losses to the corporation but also gains and losses to themselves. Thus, entrusting all fiduciary litigation to directors' judgment would arguably result in less than optimal enforcement of fiduciary duty.
Charles R.T. O'Kelley, Jr. & Robert B. Thompson, CORPORATIONS AND OTHER BUSINESS ASSOCIATIONS: CASES AND MATERIALS 459 (2d ed.1996).

**\*3** Generally a cause of action belonging to a corporation can be asserted only by the corporation. However, whenever a corporation possesses a cause of action which it either refuses to assert or, by reason of circumstances, is unable to assert, equity will permit a stockholder to sue in his own name for the benefit of the corporation solely for the purpose of preventing injustice when it is apparent that the corporation's rights would not be protected otherwise. [FN12]

FN12. *Taormina v. Taormina Corp.,* 78 A.2d 473, 475 (Del.Ch.1951).

As the above description reveals, a derivative action may not be pursued if the corporation is willing and able to assert the suit on its own behalf, *i.e.,* the complaining shareholder must give the

board of directors the opportunity to manage the litigation to its satisfaction or the board of directors must for some reason be incapable of pursuing the litigation.

The requirement that shareholders exhaust their remedies within the corporation before pursuing derivative litigation is found in Court of Chancery Rule 23.1. Rule 23.1 requires that the complaint in a derivative action "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Even if attempting to obtain the action that the plaintiff desires from the board of directors would be futile because a majority of the directors suffer some disabling interest, the board may appoint a special litigation committee of disinterested directors that may recommend dismissal of the derivative action after a reasonable investigation. [FN13] Rule 23.1 also requires, as does Section 327 of the Delaware General Corporation Law, that the complaint allege that "the plaintiff was a stockholder of the corporation at the time of the transaction." [FN14] Rule 23.1 further provides that a derivative action generally may not be dismissed or settled without approval of this Court and notice to other shareholders. [FN15] The requirements of Rule 23.1, while burdensome to the equitable device created by the courts to remedy harm inflicted upon a corporation, are necessary to prevent the potentially disruptive effects of derivative litigation on the ability of a board of directors to direct the business and affairs of a corporation. [FN16] The prerequisites to a derivative action, developed over time, have attempted to balance the Delaware prerogative that directors manage the affairs of a corporation with the realization that shareholder policing, via derivative actions, is a necessary check on the behavior of directors that serve in a fiduciary capacity to shareholders. [FN17]

FN13. *Zapata Corp. v. Maldonado,* 430 A.2d 779, 785-89 (Del.1981).

FN14. 8 *Del. C.* § 327.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 5

2004 WL 443987 (Del.Ch.)

**(Cite as: 2004 WL 443987 (Del.Ch.))**

FN15. Although not specified by Rule 23.1 , the corporation is an indispensable party to a derivative action. *Sternberg v. O'Neil,* 550 A.2d 1105, 1124 (Del.1988). In addition, as is relevant in the instant case, a derivative action becomes a part of the corporation's estate if it files for bankruptcy. *See, e.g., Garza v. TV Answer, Inc.,* 704 A.2d 844, 1997 WL 794505, at *5 (Del.1997) (ORDER) (affirming dismissal of derivative action pursuant to settlement agreement approved by bankruptcy court).

FN16. As the venerable case of *Joy v. North,* 692 F.2d 880, 887 (2d Cir.1982), recognized over twenty years ago, "[d]erivative suits may be brought for their nuisance value, the threat of protracted discovery and litigation forcing settlement and payment of fees even where the underlying suit has modest merit. Such suits may be harmful to shareholders because the costs offset the recovery ."

FN17. This balancing rationale extends to the bankruptcy concept, even though for a period of time the business and affairs of a Delaware corporation may be managed, for example, by a trustee pursuant to the bankruptcy code. As noted later in this Opinion, however, *see infra* note 86 and accompanying text, the balance may be tilted too far away from shareholders' ability to enforce fiduciary duties. It is quite possible that rigid application of federal bankruptcy law may interfere with the ability of Delaware corporate law to protect investors.

The exacting procedural prerequisites to the prosecution of a derivative action create incentives for plaintiffs to characterize their claims as "direct" or "individual" in the sense that they seek recovery not for harm done to the corporation, but for harm done to them. A decision finding that a complaint alleges direct claims allows plaintiffs to bypass the ability of the corporation's board to decide, in the best interests of the corporation, how to proceed with the litigation. In clear-cut cases, where the corporation has not been harmed by the conduct at issue in the litigation but the plaintiff has suffered injury, bypassing the board's involvement in the litigation is of little concern. In fact, it seems wholly inappropriate to allow a board of directors to control litigation where the corporation's concerns are only tangential and the corporation would not share any eventual recovery.

*4 In the instant case, the plaintiff attempts to characterize his claims as "direct" because he has no other alternative. The amended complaint makes no effort to comply with the pleading requirements of Rule 23.1 or 8 *Del. C.* § 327. The amended complaint does not even feign an attempt to plead demand futility. The corporation is not joined as a party. Moreover, as noted, the Company's claims, *i.e.,* those that could be asserted derivatively, were expressly released by the Bankruptcy Court *after* plaintiff's first complaint was filed here. All of these infirmities are sufficient, independently, for the Court to dismiss the complaint *if* it does not allege direct claims.

*B. Supreme Court Authority on the Derivative/Direct Distinction*

Although there is only one issue to resolve, it is a difficult issue to resolve in many cases. The distinction between direct and derivative claims is frustratingly difficult to describe with precision. Reference to Supreme Court opinions, while certainly instructive, does not conclusively resolve how this Court should draw the line between direct and derivative claims. The first Supreme Court case to address the direct/derivative distinction substantively was *Lipton v. News Int'l, Plc.* [FN18] In *Lipton,* the Supreme Court made specific reference to the concept of "special injury," [FN19] a term coined by an earlier Court of Chancery opinion. [FN20] Specifically, the Court stated that "a plaintiff alleges a special injury and may maintain an individual action if he complains of an injury distinct from that suffered by other shareholders or a wrong involving one of his contractual rights as a shareholder." [FN21] Two

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2004 WL 443987 (Del.Ch.)

**(Cite as: 2004 WL 443987 (Del.Ch.))**

years later, in *Kramer v. Western Pacific Industries, Inc.,* [FN22] the Supreme Court again addressed the direct/derivative distinction. In *Kramer,* the Court did not mention "special injury" when enunciating the standards it applied to the pertinent facts. Rather, the Court emphasized "[f]or a plaintiff to have standing to bring an individual action, he must be injured *directly* or *independently* of the corporation." [FN23] The standard used in *Kramer,* like the standard in *Lipton,* is also derived from an earlier Court of Chancery opinion. [FN24]

FN18. 514 A.2d 1075 (Del.1986).

FN19. *Id.* at 1078.

FN20. *Elster v. American Airlines, Inc.,* 100 A.2d 219 (Del.Ch.1953).

FN21. *Lipton,* 514 A.2d at 1078.

FN22. 546 A.2d 348 (Del.1988).

FN23. *Id.* at 351 (emphasis in original).

FN24. *Moran v. Household Int'l, Inc.,* 490 A.2d 1059 (Del.Ch.1985).

Several years later, in *In re Tri-Star Pictures, Inc. Litigation,* [FN25] the Supreme Court once again placed emphasis on the special injury concept, and failed to cite *Kramer* at all. In *Tri-Star,* the Supreme Court stated that it was *"well settled"* that the test used to distinguish between derivative and individual harm is whether the plaintiff suffered 'special injury' ' and reiterated the test for special injury set forth in *Lipton.* [FN26] Despite the statement in *Tri-Star* that it was "well settled" that "special injury" is the relevant test to distinguish between direct and derivative claims, that terminology was again dropped in the Supreme Court's decision in *Grimes v. Donald.* [FN27] In *Grimes* the Supreme Court stated:

FN25. 43 Conn.Supp. 91, 643 A.2d 319 (Del.1993).

FN26. *Id.* at 330, 643 A.2d 319 (emphasis

added).

FN27. 673 A.2d 1207 (Del.1996).

**\*5** Although the tests have been articulated many times, it is often difficult to distinguish between a derivative and an individual action. The distinction depends upon the nature of the wrong alleged and the relief, if any, which could result if plaintiff were to prevail. To pursue a direct action, the stockholder-plaintiff must allege more than an injury resulting from a wrong to the corporation. The plaintiff must state a claim for injury which is separate and distinct from that suffered by other shareholders or a wrong involving a contractual right of a shareholder which exists independently of any right of the corporation. [FN28]

FN28. *Id.* at 1213 (citations and internal punctuation omitted).

The most recent Supreme Court opinion on this issue, *Parnes v. Bally Entertainment Corp.,* [FN29] like *Grimes,* did not mention "special injury" and stated: "Stockholders may sue on their own behalf (and, in appropriate circumstances, as representatives of a class of stockholders) to seek relief for direct injuries that are independent of any injury to the corporation." [FN30]

FN29. *Parnes v. Bally Entm't Corp.,* 722 A.2d 1243 (Del.1999).

FN30. *Id.* at 1245.

An analysis of *Parnes* and *Kramer* reveals precisely how difficult the task of distinguishing between direct and derivative claims has become. In *Kramer,* a former stockholder of Western Pacific Industries alleged that a series of wrongful transactions resulted in the diminution of the amount paid to shareholders after a merger with the Danaher Corporation. The *Kramer* decision found that such allegations only amount to "waste" and the plaintiff was not injured "independently." [FN31]

FN31. *Kramer* also stated in the same

Not Reported in A.2d

2004 WL 443987 (Del.Ch.)

**(Cite as: 2004 WL 443987 (Del.Ch.))**

breath that the plaintiff was not injured "directly." Although there may be a limitation on the number of ways to describe a direct claim, it does not advance this Court's ability to distinguish between direct and derivative claims by describing a direct claim as one in which the plaintiff was injured directly. As one commentator has noted, perhaps the problem lies in the test itself:

An injury to the shareholder is direct, and therefore individual, only if the shareholder has the right to sue for redress of the injury, and it is indirect only if he does not have that right. But that is the very issue one is trying to resolve. The injury test, therefore, becomes tightly circular.

John W. Welch, *Shareholder Individual and Derivative Actions: Underlying Rationales and the Closely Held Corporation,* 9 J. CORP. L. 147, 155 (1984).

In *Parnes,* the complaint alleged that the Chairman and CEO of Bally wrongfully required that corporate assets be transferred to him in order to garner his consent in moving forward with a merger with Hilton Hotels Corporation. The *Parnes* decision found that such allegations "directly challenge[d] the Bally merger." [FN32] *Parnes* distinguished *Kramer* on the grounds that the complaint in *Kramer* only alleged that the wrongful conduct "reduced the amount paid to Western's stockholders" and "did not allege that the merger price was unfair." [FN33]

FN32. *Parnes,* 722 A.2d at 1246.

FN33. *Id.* at 1245.

The rationale given by the Supreme Court in *Parnes* for distinguishing *Kramer* is somewhat indeterminate. Although the complaint in *Kramer* may not have alleged that the merger price was unfair, it did allege that shareholders received less of the merger proceeds because of a series of wrongful transactions leading up to the merger. It

elevates form over substance to allow a complaint to go forward simply by adding a sentence to the complaint that alleges that the wrongful transactions at issue resulted in an unfair merger price. Such a standard would seemingly allow a plaintiff's designation to trump the body of the complaint. Additionally, if a merger price is fair, but shareholders are nonetheless harmed, that seems to be a case where the injury suffered is "independent" of the corporation's injury. Stated differently, if a corporation receives adequate consideration in a merger, but shareholders do not receive their fair share of that consideration, that would imply that only the shareholders, rather than the corporation itself, were harmed by the wrongful conduct. Conversely, a complaint that "directly challenges the fairness of the process and the price" [FN34] of a merger suggests, to my mind, that the corporation suffered harm in the form of inadequate consideration for the sale of itself as a going concern and that the harm suffered by shareholders is only a natural and foreseeable consequence of the harm to the corporation. [FN35]

FN34. *Id.*

FN35. It is unclear why a "direct" challenge to a merger price is *ipso facto* a "direct" claim. If a "direct" challenge to a transaction gives rise to a direct claim, I cannot ascertain in any principled manner why a "direct" attack on a non-merger transaction would not also state a "direct" claim obviating a plaintiff's need to adhere to the procedural prerequisites of bringing a derivative claim. It is also interesting to note that the Third Circuit Court of Appeals characterized the interaction of *Parnes* and *Kramer* as "the exception to *Kramer* set forth in *Parnes. Furst v. Feinberg,* 54 Fed.Appx. 94, 99 (3d Cir.2002).

**\*6** Another curious aspect of the *Parnes* decision is its citation to *Lewis v. Anderson.* [FN36] The Court, early in its discussion of whether the claim in *Parnes* was direct or derivative, states: "A stockholder who directly attacks the fairness or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 8

2004 WL 443987 (Del.Ch.)

**(Cite as: 2004 WL 443987 (Del.Ch.))**

validity of a merger alleges an injury to the stockholders, not the corporation, and may pursue such a claim even after the merger at issue has been consummated." [FN37] The Court cites as authority for this proposition footnote 10 in *Lewis* which sets forth two exceptions to the rule that a derivative shareholder must satisfy the "continuous ownership" requirement: "(1) where the merger itself is the subject of a claim of fraud; and (2) where the merger is in reality a reorganization which does not affect plaintiff's ownership of the business enterprise." [FN38] *Lewis* describes these as exceptions to the "rule of standing as applied to mergers." [FN39] *Lewis* did not categorize these two exceptions as instances where a plaintiff has alleged "injury to the stockholders, not the corporation." [FN40] Indeed, I am not sure why the Court would have done so because there is no continuous ownership requirement in a direct action that would be in need of an exception. But because of *Parnes'* reference to footnote 10 in *Lewis* it may now be the case that an exception to the standing requirement in a derivative action is, in fact, the same thing as a direct action. In my opinion, however, these are intellectually distinct inquiries. [FN41]

FN36. 477 A.2d 1040 (Del.1984).

FN37. *Parnes,* 772 A.2d at 1245.

FN38. *Lewis,* 477 A.2d at 1040 n. 10.

FN39. *Id.* at 1040.

FN40. *Parnes,* 772 A.2d at 1245.

FN41. Other members of this Court have raised questions regarding the application of *Parnes. See Golaine v. Edwards,* 1999 WL 1271882 (Del.Ch. Dec.21, 1999) (Strine, V.C.). Vice Chancellor Strine noted that, in his view, "*Parnes* deepens the merit-based nature of the derivative-individual distinction." *Id.* at *7. In the Vice Chancellor's view, whether a plaintiff has stated an individual claim is merging with whether a claim is stated

under Rule 12(b)(6) (at least in the merger context). *Id.* It may be the case that Delaware law is moving incrementally towards a "merits-based" exception to the test for derivative litigation, an exception that would allow plaintiffs to proceed with derivative litigation when a meritorious claim of fiduciary breach by directors causing injury to the corporation (at least in the merger context) has been stated.

Our jurisprudence on this issue is also ambiguous regarding the relevance of the concept of "special injury" in the direct/derivative analysis. Although the "special injury" terminology has disappeared in recent opinions, the earlier opinions of *Lipton* and *Tri-Star* have not been explicitly disavowed. Equally ambiguous is whether the standard enunciated in *Grimes* and *Parnes,* that a shareholder must suffer an injury independent of an injury to the corporation, is a distinct inquiry or whether it is grafted onto the special injury test. [FN42] What *is* clear is that *Lipton* and *Tri-Star* cannot be interpreted literally. A claim alleging disclosure violations, for example, does not state injury distinct from injury suffered by other shareholders, nor does it involve a contractual right of shareholders, but *Tri-Star* stated that alleged disclosure violations are direct in nature. [FN43] Perhaps the only standard worth noting is that each case turns on its own facts and that *Lipton, Kramer,* and their progeny merely serve as rough guideposts for this Court's analysis. Although such a state of affairs is conducive to expensive litigation, it falls woefully short of providing coherent guidance to this Court's constituents. [FN44]

FN42. Yet another ambiguity is the extent to which the adoption of what one commentator has referred to as the "categorical approach" interacts with the "special injury" test. *See* Welch, *supra* note 31, at 157. In other words, when the Court makes no mention of "injury," but nonetheless recognizes that one set of actions give rise to individual suits and another set give rise to derivative suits, to what extent does such a recognition inform

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2004 WL 443987 (Del.Ch.)

**(Cite as: 2004 WL 443987 (Del.Ch.))**

the application of the "special injury" test to undefined categories of actions?

FN43. 634 A.2d at 330 n. 12.

FN44. "The corporate planner must understand the 'comparative costs of planning, adapting, and monitoring task completion under alternative governance structures.' This requires sophisticated understanding not only of substantive business association law, but also the fundamental tensions present in any business organization and the characteristics and needs of the particular client." Charles R.T. O'Kelley, *Preparing the Corporate Lawyer: Delaware Corporation Law and Transaction Cost Engineering,* 34 GA. L.REV. 929, 938 (2000) (quoting OLIVER E. WILLIAMSON, THE ECONOMIC INSTITUTIONS OF CAPITALISM: FIRMS, MARKETS, RELATIONAL CONTRACTING 2 (1985)).

*C. Moving Forward*

Notwithstanding these ambiguities, the initial step of ascertaining whether a complaint alleges direct or derivative claims is uncontroverted and quite practical. This Court should look to the "nature of the wrong alleged" [FN45] and "the relief, if any, which could result if [the] plaintiff were to prevail." [FN46] Moreover, this Court should conduct such an inquiry by looking to "the body of the complaint, not the plaintiff's designation or stated intention." [FN47] Given the discussion above, however, the question is where to go from there. In my opinion, what must be discarded is the notion of using special injury, *i.e.,* "injury which is separate and distinct from that suffered by other shareholders" [FN48] as a talismanic entreaty to the assertion of an individual claim. [FN49] Although I have questions about how I should apply *Parnes,* it does move to, in my opinion, the more grounded approach of asking whether the plaintiff has suffered injury "independent of any injury to the corporation." [FN50] As noted by the Supreme

Court in *Grimes,* "[t]o pursue a direct action, the stockholder-plaintiff must allege more than an injury resulting from a wrong to the corporation." [FN51] This test is given more body by the American Law Institute:

FN45. *Elster,* 100 A.2d at 223 (quoting *Selman v. Allen,* 121 N.Y.S.2d 142, 146 (N.Y.Misc.1953)).

FN46. *Kramer,* 546 A.2d at 352 (citing *Elster,* 100 A.2d at 221- 23).

FN47. *Lipton,* 514 A.2d at 1078.

FN48. *Grimes* at 1213 (citations and internal punctuation omitted).

FN49. This notion may have already gathered favor in the Supreme Court by the fact that "special injury" is not mentioned in *Grimes* and *Parnes.*

FN50. 722 A.2d at 1245.

FN51. *Grimes,* 673 A.2d at 1213 (citations and internal punctuation omitted). While this statement made in *Grimes* is instructive, it goes on to state: "The plaintiff must state a claim for injury which is separate and distinct from that suffered by other shareholders or a wrong involving a contractual right of a shareholder which exists independently of any right of the corporation." *Id.* In my opinion the first part of that sentence, which is often referred to as "special injury," should not be viewed as essential to the assertion of a direct claim (even if the complaint does not involve a "contractual right"). It is an indicator that is helpful in analyzing whether a claim is direct or individual. The second part of that sentence also should not be read exclusively. Although a contractual right of a shareholder that exists independently of any right of the corporation may very well state a direct claim, I think that the focus is more

Not Reported in A.2d

Page 10

2004 WL 443987 (Del.Ch.)

**(Cite as: 2004 WL 443987 (Del.Ch.))**

productively aimed primarily at whether the wrong alleged resulted in harm to the shareholder, and not the corporation.

**\*7** A direct action may be brought in the name and right of a holder to redress an injury sustained by, or enforce a duty owed to, the holder. An action in which the holder can prevail without showing an injury or breach of duty to the corporation should be treated as a direct action that may be maintained by the holder in an individual capacity. [FN52]

> FN52. 2 American Law Institute, PRINCIPLES OF CORPORATE GOVERNANCE: ANALYSIS AND RECOMMENDATIONS § 7.01(b) at 17. The American Law Institute test was cited with approval in *Grimes,* 673 A.2d at 1213 .

In other words, the inquiry should focus on whether an injury is suffered by the shareholder that is not dependent on a prior injury to the corporation. In the context of a complaint asserting breaches of fiduciary duty-duty that under Delaware law runs to the corporation *and* the shareholder [FN53]-the test may be stated as follows: Looking at the body of the complaint and considering the nature of the wrong alleged and the relief requested, has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation? [FN54]

> FN53. "The directors and officers of a corporation independently owe fiduciary duties directly to the stockholders." *Arnold v. Soc. for Sav. Bancorp,* 1995 Del. Ch. LEXIS 86, at \*24 (Del. Ch. June 15, 1995) (citing *Smith v. Van Gorkom,* 488 A.2d 858, 890 (Del.1985)).

> FN54. Since the fiduciary duty of officers and directors runs to the corporation and the shareholder, *see id.,* the shareholder will always be able to assert a breach of duty owed to it, but plainly not all fiduciary duty claims are individual claims.

As such, in the context of fiduciary duty claims, the focus should be on the nature of the injury. In other contexts, the focus upon to whom the relevant duty is owed will allow the segregation of derivative claims. For example, if the owner of stock in a corporation is entitled to vote his shares (either by default rule of 8 *Del. C.* § 212(a) or otherwise), the stockholder is the holder of the right to vote (the corporation owing the duty to allow the stockholder to vote). If a corporation wrongfully prevents a stockholder from exercising his or her right to vote, the stockholder may assert individual ownership over the claim.

### III. ANALYSIS
*A. Plaintiff's Claims are Derivative*

The plaintiff alleges that the Subscription Agreement resulted in "a transfer of absolute voting control to the Hicks Muse Entities" and "included a draconian irrevocable lock up of the Company which precluded the pursuit of value maximizing transactions and the payment of a control premium to the stockholders without approval of the Hicks Muse Entities." [FN55] In his brief in opposition to the defendants' motion to dismiss, the plaintiff states that the Subscription Agreement allowed HMTF to take "majority voting control from minority stockholders without paying a control premium." [FN56] These alleged wrongs all flow from one aspect of the Subscription Agreement: the warrants. [FN57] The key feature of the warrants for purposes of this Opinion is that if they had ever been exercised, HMTF would have owned a majority of the outstanding shares of the Company.

> FN55. Am. Compl. ¶ 69.

> FN56. AB at 16. This statement is quite dubious, as it purports that HMTF took majority control from a minority of shareholders. *See infra* notes 67-68 and accompanying text.

> FN57. Plaintiff also stated at oral argument that the alleged "direct" injury was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2004 WL 443987 (Del.Ch.)

**(Cite as: 2004 WL 443987 (Del.Ch.))**

suffered as of July 19, 2001-the date the Board approved the Subscription Agreement. *See* Tr. at 22-23. In other words, plaintiff does not argue that HMTF's actions after July 19, or the subsequent bankruptcy proceedings, are determinative of whether the complaint alleges individual claims.

The first discernible injury allegedly suffered by plaintiff is that the Subscription Agreement precluded the pursuit of other "value maximizing transactions." [FN58] The rationale given in the complaint for this breach of the Subscription Agreement is that HMTF would exercise the warrants (allowing it to obtain voting control) and subsequently vote against any transaction that did not align with HMTF's purported predisposition towards a debt-based reorganization strategy. [FN59] The first problem with this purported injury is that there is no allegation that a value-maximizing transaction was on the horizon. A second, larger problem is that the warrants were never exercised, and were subsequently cancelled by the Confirmation Order. Consequently, HMTF did nothing to actually impede the pursuit of a value-maximizing transaction (even if that transaction actually existed). In sum, the alleged injury is rank speculation.

> FN58. I say discernible, because while the complaint is not "a pastiche of prolix invective," *Brehm v. Eisner,* 746 A.2d 244, 249 (Del.2000), it is poorly drafted and rife with conclusory allegations that serve to complicate the work of this Court.

> FN59. *See* Am. Compl. ¶ 43. I assume that the warrants could also simply have deterred another entity from exploring a transaction with Viasystems.

Even if I were to assume for the sake of argument that an alternative, value-maximizing transaction was a reality, that the warrants were exercised, and HMTF used its majority control to block the transaction, the plaintiff has not demonstrated that he can prevail on this issue without showing an injury to Viasystems. These series of events as described would have harmed the Company because the Company would have been precluded from entering into a transaction that would have maximized the return on its assets. The plaintiff has advanced no argument as to why all shareholders would not be affected equally by such an occurrence. [FN60] Nor is there any claim that the preclusion of alternative, value-maximizing transactions implicates a contractual right of plaintiff. In my opinion, the nature of this claim is nothing more than a claim of mismanagement that, "if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders." [FN61] As such, "the wrong alleged is entirely derivative in nature." [FN62]

> FN60. "[W]here a plaintiff shareholder claims that the value of his stock will deteriorate and that the value of his proportionate share of the stock will be decreased as a result of alleged director mismanagement, his cause of action is derivative in nature." *Kramer,* 546 A.2d at 353 (citing *Elster,* 100 A.2d at 222).

> FN61. *Id.*

> FN62. *Id. See also Thorbe v. CERBCO, Inc.,* 611 A.2d 5, 9 (Del.Ch.1991) ("[T]he diversion of the opportunity to sell ... on advantageous terms-is a corporate, not a shareholder claim.").

**\*8** The second type of injury discernible from the complaint, the transfer of voting control without the payment of a control premium, also does not state a cognizable direct claim. Plaintiff, in order to state an individual claim, relies on *Paramount Communications, Inc. v. QVC Network, Inc.,* [FN63] where the Supreme Court stated:

> FN63. 637 A.2d 34 (Del.1994).

The acquisition of majority status and the consequent privilege of exerting powers of majority ownership come at a price. That price is usually a control premium which recognizes not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2004 WL 443987 (Del.Ch.)

**(Cite as: 2004 WL 443987 (Del.Ch.))**

only the value of a control block of shares, but also compensates the minority stockholders for their resulting loss of voting power. [FN64]

> FN64. *Id.* at 43.

The Supreme Court's decision is of no assistance to the plaintiff, however, for four reasons. First, the Court in *Paramount* made no attempt to delineate whether the failure to pay a control premium states an individual or derivative claim. Second, since the warrants were never exercised, HMTF did not actually obtain majority status at the expense of the minority. [FN65] Third, HMTF paid a price for the warrants. The warrants were issued as partial consideration for providing $100 million to Viasystems (the benefits of which were indirectly shared by plaintiff). Plaintiff's claim seems merely to question the adequacy of the consideration the Company received for the warrants-undoubtedly a derivative claim. [FN66]

> FN65. *See In re Berkshire Realty Co., Inc. S'holder Litig.,* 2002 Del. Ch. LEXIS 146, at *15-16 (Del. Ch. Dec. 18, 2002) (categorizing claims as derivative because unexercised warrants "could not have been at the 'sole expense' of the minority shareholders"). For the same reason, the plaintiff cannot make out a claim under *Tri-Star,* 43 Conn.Supp. 91, 643 A.2d 319, because there is no allegation of actual vote dilution and, under the reasoning of *Berkshire,* contingent vote dilution does not form the basis of a direct claim.

> FN66. *See Kramer,* 546 A.2d at 353 ("[M]ismanagement resulting in corporate waste, if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders.").

The last and most important reason the plaintiff was not entitled to a control premium is because he did not have majority status. HMTF held 49% of the Company's shares before the transaction. The other named defendants' holdings, when combined with HMTF's holdings, exceeded 50%. The class, as

plaintiff has voluntarily chosen to define it, includes only a minority of Viasystems' outstanding shares as of the date of the Subscription Agreement-the date that plaintiff alleges the direct injury occurred. [FN67] Hence, under *Paramount,* there was no loss of voting power requiring compensation. [FN68] After recognizing the absence of any entitlement to a control premium, it becomes clear to this Court that the true nature of the alleged wrong is that the Company received inadequate consideration for the warrants. Plaintiff cannot prevail on his claim without showing that Viasystems was injured directly. The injury suffered by plaintiff, a devaluation of his stock, was a natural and expected consequence of the injury initially borne by the Company; the injury thus is not individual in nature.

> FN67. Tr. at 22-23.

> FN68. In addition, plaintiff cannot contend that the transaction resulted in a shift of voting control from a "fluid aggregation of unaffiliated stockholders," *Paramount,* 637 A.2d at 43, to HMTF. Defendants Conlon and Mills aggregated their shares with HMTF in order to approve the warrants-an act that, as shareholders, they were entitled to undertake. *See Bershad v. Curtiss-Wright Corp.,* 535 A.2d 840, 845 (Del.1987) ("Stockholders in Delaware corporations have a right to control and vote their shares in their own interest.").

*B. An Exception?*

Apart from the wrong alleged, plaintiff also argues that the limited group of stockholders seeking relief justifies labeling their claims as direct, Plaintiff's brief states:
[T]he Amended Complaint seeks a recovery for investors injured by Defendants' conduct--namely, Plaintiff and the Class. The Amended Complaint specifically excludes from the Class definition the Defendants and their affiliates. Plaintiff's claims are, therefore, direct in nature. [FN69]

> FN69. AB at 17.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2004 WL 443987 (Del.Ch.)

**(Cite as: 2004 WL 443987 (Del.Ch.))**

**\*9** This statement is profoundly unenlightening, but in support of it plaintiff cites to *In re Cencom Cable Income Partners, L.P. Litigation* [FN70] and *In re Gaylord Container Corp. Shareholders Litigation.* [FN71] These cases, along with *Fisher v. Fisher,* [FN72] create what commentators have described as an "unjust enrichment exception" to the classification of derivative claims. [FN73] Vice Chancellor, now Justice, Steele, explained the type of rationale that leads to the creation of such an exception:

    FN70. 2000 WL 130629 (Jan. 27, 2000).

    FN71. 747 A.2d 71, 81 (Del.Ch.1999).

    FN72. 1999 WL 1032768, at \*4 (Del.Ch. Nov.4, 1999).

    FN73. Kurt M. Heyman & Patricia L. Enerio, *The Disappearing Distinction Between Derivative and Direct Actions,* 4 DEL. L. REV . 155, 181 (2001).

An eventual victory for plaintiff, would achieve little since the individual defendants own an overwhelming interest in [the nominal defendant corporation]. The pleaded fundamental wrong alleged underlies both the asserted individual and derivative claims. Equity's appropriate focus should be the alleged wrong, not the nature of the claim which is no more than a vehicle for reaching the remedy for the wrong. As equity will not suffer a wrong without a remedy, I must permit plaintiff's individual claims to proceed. [FN74]

    FN74. *Fisher,* 1999 WL 1032768, at \*4.

Similar language, in a slightly different context, is found in *Gaylord,* [FN75] where Vice Chancellor Strine stated:

    FN75. 747 A.2d 71.

[S]hould the directors be entitled to recover damages for the economic injury they inflicted on themselves as stockholders? If the answer is no

because of the fact that they created the harm, this factor would support awarding relief to the class of innocent stockholders, not the corporation. [FN76]

    FN76. *Id.* at 80.

In *Cencom,* then-Vice Chancellor Steele commented on *Gaylord* by noting that "the potential inclusion of culpable parties in class due relief may affect the distinction between derivative and direct claims" [FN77] and that Vice Chancellor Strine's comments in *Gaylord* supported his finding "that the limited scope of the group of claimants seeking relief justifies labeling these claims as direct." [FN78]

    FN77. 2000 WL 130629, at \*5.

    FN78. *Id.*

I am unable to squeeze the plaintiff's derivative claim into the limited exception created by these authorities. *Cencom,* which involved a dissolving partnership, is limited to its own unique set of facts. In that case the Court found that "[w]ith the partnership in dissolution the 'partnership' entity is simply an artifice representing the relationship between two legally juxtaposed parties and is no longer relevant as a distinct legal creature for the purpose of resolving the final claims between these parties." [FN79] Here, Viasystems is still relevant as a distinct legal creature for the purposes of this litigation. Moreover, in *Akins v. Cobb,* [FN80] Vice Chancellor Strine "decline[d] the plaintiffs' invitation to read the fact-intensive [Cencom] decision ... broadly and to extend that broad reading into the corporate context." [FN81] I similarly decline to expand *Cencom* into the corporate context because once such a step is made, any attempt by later courts to limit the "unjust enrichment exception" would only add to the confusing ambiguities surrounding the direct/derivative distinction.

    FN79. 2000 WL 130629, at \*6.

    FN80. 2001 WL 1360038 (Del.Ch. Nov.1,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2004 WL 443987 (Del.Ch.)

**(Cite as: 2004 WL 443987 (Del.Ch.))**

2001).

FN81. *Id.* at *6 n. 18.

**\*10** *Gaylord* is similarly inapplicable because of factual circumstances not present in this case. In *Gaylord,* plaintiffs asserted claims that related to the adoption of defensive measures. [FN82] As Vice Chancellor Strine noted, "the injury suffered results from the directors' action impeding the stockholders from divesting themselves of their personal property, not from actions of the directors directly impairing the value of the enterprise itself to the indirect detriment of all stockholders." [FN83] In other words, Vice Chancellor Strine found that the plaintiffs in that case could prove an injury to themselves without necessitating any proof that the corporation itself was injured. As noted above, the plaintiff in this case is unable to make such a showing. [FN84]

FN82. 747 A.2d at 72.

FN83. *Id.* at 80.

FN84. I disagree with the proposition implicit in plaintiff's papers that exclusion of culpable parties in the class due relief may affect the distinction between derivative and direct claims. The identity of the culpable parties does not speak to whether the conduct of those parties injured the corporation, rather than its shareholders. Additionally, to hold otherwise would elevate the plaintiff's designation and stated intention over the true nature of the claims-focusing excessively on who is requesting relief rather than what relief is requested.

Even if I were inclined to expand and broaden the reach of these precedents, I am faced with a large obstacle: the Supremacy Clause. [FN85] In this case, unlike *Gaylord* and *Cencom,* federal law operated to extinguish plaintiff's claim entirely. Admittedly, the fact that the potential derivative claims were extinguished by the Bankruptcy Court is as compelling a reason as any for using this

Court's equitable powers to allow the lawsuit to proceed. When a Delaware corporation files for bankruptcy, meritorious derivative claims often disappear-a phenomenon noted by one scholar:

> FN85. U.S. CONST. ART. VI. Even if I was comfortable with using an equitable exception to circumvent federal law, I would still have some reservations invoking equitable principles to circumvent Delaware statutes and this Court's rules, *e.g.,* 8 *Del. C.* § 327 and Rule 23.1. It seems the province of the General Assembly and, perhaps, the Supreme Court, to make such a decision-not this Court.

[T]he filing of a bankruptcy petition spells doom for most derivative suits filed against the corporation's managers. Because of the frequent death of a derivative suit in the event a firm files for bankruptcy--a phenomenon I refer to as bankruptcy's 'black hole effect'--plaintiffs' attorneys are likely to discount the value of any given case, that is, diminish their initial investment to reflect the possibility of bankruptcy. Thus, bankruptcy exacerbates the incentives for plaintiffs' attorneys to underinvest in the individual lawsuits in their portfolio. [FN86]

> FN86. David A. Skeel, Jr., *Rethinking the Line Between Corporate Law and Corporate Bankruptcy,* 72 Tex. L.Rev. 471, 500 (1994). Professor Skeel advocates "return[ing] control over corporate bankruptcy to the states." *Id.* at 553.

The bankruptcy process may very well be altering the attempted balance under Delaware law between placing the responsibility for managing litigation with the directors of a corporation and the need for shareholder policing of directors' behavior. This may be a case where a meritorious derivative lawsuit is destroyed by the bankruptcy process, contrary to the effort of Delaware law to protect shareholders who have been wronged. The solution

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2004 WL 443987 (Del.Ch.)

**(Cite as: 2004 WL 443987 (Del.Ch.))**

to this problem, however, more properly lies with
the United States Congress, not this Court.

### IV. CONCLUSION

For all the reasons stated herein, I grant defendants'
motion to dismiss. The complaint states only
derivative claims and must be dismissed for failure
to join Viasystems as an indispensable party, failure
of plaintiff to adhere to the continuous ownership
requirement, and because these claims were
dismissed by the United States' Bankruptcy Court's
Confirmation Order. [FN87]

> FN87. Defendants raised other grounds
> upon which to dismiss the complaint, none
> of which I need reach.

IT IS SO ORDERED.

2004 WL 443987 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 2

Westlaw.

Not Reported in A.2d

2000 WL 130629 (Del.Ch.), 26 Del. J. Corp. L. 294

**(Cite as: 2000 WL 130629 (Del.Ch.))**

Page 1

▷
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
In re CENCOM CABLE INCOME PARTNERS,
L.P. Litigation
**No. C.A. 14634.**

Jan. 27, 2000.

Pamela S. Tikellis and James C. Strum of
Chimicles & Tikellis, Wilmington, Delaware,
Lawrence P. Kolker and Robert Abrams of Wolf
Haldenstein Adler Freeman & Herz, LLP, New
York, New York, for Plaintiffs, of counsel.

Daniel A. Dreisbach and Michael D. Allen of
Richards, Layton & Finger, Wilmington, Delaware,
Stephen B. Higgins and Robert J. Wagner of
Thompson Coburn LLP, St. Louis, Missouri, for
Defendants, of counsel.

*MEMORANDUM OPINION*

STEELE, Vice Chancellor.

**\*1** I am asked to decide whether claims brought by
limited partner plaintiffs related to liquidation of the
partnership are derivative claims or direct claims.
The general partner defendant contends the claims
are derivative and should therefore be dismissed for
failing to meet the pleading requirements of Court
of Chancery Rule 23.1. Plaintiffs disagree and ask
that I certify a class action so that they may pursue
these claims directly.

If: (1) a business association consists of only two
parties in interest, one a putative class of injured
plaintiffs and the other the defendant party that
controls the business association; and, (2) the
business association is effectively ended, but for the
winding up of its affairs; and, (3) the two sides

oppose each other in the final dispute over the
liquidation of that association; then a claim brought
in that context is direct. Under those circumstances,
which are the facts of this case, classifying claims of
collective injury as derivative ignores the reality
that the dispute is really between the *only* two
entities that make up the business association--the
limited partner class and the general partner. It is
not an action brought on behalf of the partnership
itself.

Accordingly, I deny defendant's motion for
judgment on the pleadings and grant the plaintiffs'
motion for class certification.

Defendants have also filed a motion to dismiss
plaintiffs' supplemental complaint which seeks to
enjoin the general partner's advancement of
litigation expenses to itself from partnership funds.
Defendant's motion to dismiss this complaint rests
exclusively on the argument that the claims in the
complaint are derivative. For the same reasons
articulated above, I deny the motion to dismiss the
supplemental complaint. Further, for reasons
explained below, I grant plaintiffs' request for a
permanent injunction. Defendant is ordered to
refrain from taking additional advances and to
account for and return all prior advances.

I. Background

In late 1995, limited partners of Cencom Cable
Income Partners, L .P sought to enjoin the sale of
partnership assets being conducted by the general
partner as part of the partnership's dissolution. On
February 15, 1996, I denied the limited partners'
motion to enjoin the sale.

On October 19, 1996, the plaintiffs filed a
consolidated amended class action complaint
alleging that the defendant general partner breached
the partnership agreement and breached its
fiduciary duties to a putative class of all limited
partners. In early February, 1997, the defendant

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 2

2000 WL 130629 (Del.Ch.), 26 Del. J. Corp. L. 294

**(Cite as: 2000 WL 130629 (Del.Ch.))**

moved for summary judgment. In March, 1997, the plaintiffs moved for certification of a class of:

> All unitholders of Cencom Cable Income Partners, L.P. as of October 3, 1995, or their successors in interest, except defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the defendants.

The parties agreed to stay the class certification motion until the Court had ruled on the defendants' motion for summary judgment. On October 15, 1997, I granted summary judgment to the general partner on all but five claims. The five remaining claims are:

**\*2** 1. Breach of a duty, voluntarily assumed by the general partner in the sale's disclosure statement, to have the law firm of Husch and Eppenberger provide an independent legal evaluation of the sale transaction upon which the limited partners could rely.

2. Breach of the partnership agreement by improperly terminating priority cash distributions owed to the limited partners under § 7.3 of the agreement.

3. Breach of the fiduciary duty of candor by failing to disclose the cash flows underlying the valuations of the Partnership.

4. Breach of the duty of loyalty by giving certain information to only one of three separate appraisers valuing the partnership's assets, allegedly in order to manipulate the ultimate appraisal figures.

5. Breach of the Partnership Agreement by not valuing the assets on a "going concern" basis, resulting in the partnership receiving less than the assets were worth.

In late February, 1998, the general partner moved for judgment on the pleadings on these five remaining claims, arguing that they are derivative claims that plaintiffs did not properly plead because plaintiffs never pleaded demand refused or, alternatively, pleaded why demand would be futile.

[FN1]

> FN1. Court of Chancery Rule 23.1.

Later in 1998, the limited partners filed a supplemental complaint seeking to enjoin preliminary and permanently the general partner from advancing itself litigation expenses from partnership funds and to force it to repay any litigation expenses already advanced. The limited partners allege that these advances violate the Partnership Agreement. The general partner also moves to dismiss this claim on grounds that the claim is derivative and has not been properly pleaded.

Presently, I must rule on: (1) defendant's motion for judgment on the pleadings on the five remaining claims; (2) defendant's motion to dismiss the supplemental complaint; (3) the plaintiffs' motion for certification of a class of all limited partners; and, (4) the plaintiffs' motion for preliminary and permanent injunction.

## II. Discussion

This case presents a situation very familiar to this Court: passive investors in a business enterprise seek redress against the entity controlling the affairs of that enterprise for alleged breaches of duties owed to those passive investors. When this dispute arises in the corporate context, the Court of Chancery is well served by a highly developed body of common law explaining principles that govern resolution of these disputes. Mechanistically applying the corporate common law rules surrounding derivative claims can sometimes defeat efficient resolution of claims made in other contexts, however. In cases like the present one involving alternative business entities, the Court looks at corporate law precedent but, while doing so, recognizes the need for flexibility in determining its applicability.

I will begin by addressing the five remaining claims, dealing first with the three of these claims that are clearly direct and then with the other two of these claims, which only appear to be derivative. I will then briefly discuss class certification. Finally, I

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 3

2000 WL 130629 (Del.Ch.), 26 Del. J. Corp. L. 294

**(Cite as: 2000 WL 130629 (Del.Ch.))**

will discuss the plaintiff's motion for preliminary and permanent injunction.

    III. The Five Remaining Claims: Derivative Versus Direct

A. The Legal Standard

**\*3** Determining whether a claim is derivative or direct requires application of a rather subtle test. [FN2] The distinction between direct and derivative claims depends upon " 'the nature of the wrong alleged' and the relief, if any, which could result if the plaintiff were to prevail." [FN3] In drawing this distinction, I must look to the body of the complaint itself and not to either party's characterization of the claims. [FN4]

    FN2. DONALD J. WOLFE, JR. AND MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 9-2(a), at 517 (1998).

    FN3. *Grimes v. Donald,* Del.Supr., 673 A.2d 1207, 1213 (1996) (quoting *Kramer v. Western Pacific,* 546 A.2d 348, 352 (1988), quoting *Elster v. American Airlines, Inc.,* Del.Ch., 100 A.2d 219, 221-23 (1953)).

    FN4. *Litman v. Prudential Bache Properties, Inc.,* Del. Ch., 611 A.2d 12, 15 (1992).

A direct claim seeks relief for injuries that fall distinctly upon the individual participants in the business association or involve the participants' contractual rights. [FN5] On the other hand, a derivative claim states injury against and seeks relief for a business association as a whole. Any relief flowing to the association's participants as individuals only comes to them indirectly, by way of their pro-rata stake in the association.

    FN5. *Moran v. Household Int'l, Inc.,* Del Ch., 490 A.2d 1059, 1070 (1985)

In the partnership context, the relationships among the parties may be so simple and the circumstances so clear-cut that the distinction between direct and derivative claims becomes irrelevant. I find this to be true where a partnership is in liquidation and *all* non-defendant partners in the resulting litigation constitute a uniform class of limited partners. When this is the case, superimposing derivative pleading requirements upon claims needlessly delays ultimate substantive resolution and serves no useful or meaningful public policy purpose.

B. The Clearly Direct Claims

(i) Voluntary Duty to Provide Counsel for Limited Partners

Plaintiffs allege that the general partner breached a voluntarily assumed duty to ensure that the law firm of Husch & Eppenberger would provide the limited partners independent counsel on which they could rely in deciding how to vote on the sale of partnership assets. As I stated in my Second Memorandum Opinion, the general partner appears to have assumed this duty to "actually confer a benefit on the Limited Partners or ... to induce their approval." [FN6] It is clear to me that a breach of this duty directly injures the limited partners. Accordingly, I deny defendant's motion for judgment on the pleadings for this claim.

    FN6. *In re Cencom Cable Income Partners, L.P. Litig.,* Del. Ch., C.A. No. 14634, mem. op. at 16, Steele, V.C. (Oct. 15, 1997), *motion for reargument denied, In re Cencom Cable Income Partners, L.P. Litig.,* Del. Ch., C.A. No. 14634, Steele, V.C. (Nov. 26, 1997).

(ii) Termination of Distributions

Plaintiffs allege that the general partner improperly terminated the limited partners' priority cash distributions in violation of § 7.3 of the Partnership Agreement. Defendant attempts to portray this claim as accruing to the entire partnership and, thus, as a derivative claim. I am simply not persuaded by defendants' attempt to gloss over the plain fact that §

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2000 WL 130629 (Del.Ch.), 26 Del. J. Corp. L. 294

**(Cite as: 2000 WL 130629 (Del.Ch.))**

Page 4

7.3 clearly confers an economic benefit exclusive to the limited partners.

The defendants argue that this claim is derivative because plaintiffs make "no claim that certain limited partners were treated more or less favorably than others ... this action is alleged to injure all limited partners in equal proportion to the amount of the units owned." [FN7] They say that a claim for which the injury "falls equally upon all investors ... must be pursued derivatively." [FN8] While I agree with their view that the alleged injury applies to *all* limited partners, I find that this injury affects only these limited partners as a distinct class within the partnership and is not brought to benefit the entire partnership. It is the limited partners alone that allegedly suffer injury here based upon the general partner's alleged failure to confer the economic benefit to which the limited partners are entitled by contractual right under § 7.3 of the Partnership Agreement. In the corporate context, if a class of preferred shareholders alleged that they were denied a priority right conferred exclusively on them by the controlling substantive corporate documents (i.e. charter, by-laws, or by a certificate), they would have a direct action. This basic premise likewise applies in the context of a limited partnership.

> FN7. Opening Brief in Support of Defs.' Mot. for Judgment on the Pleadings at 9.

> FN8. Id.

**\*4** Defendant's motion for judgment on the pleadings for this claim is denied.

(iii) Disclosure of Valuation Summaries

Plaintiffs allege that the defendant breached its duty of candor by failing to disclose the cash flows underlying the valuations of the partnership assets. It is easily conceivable that this type of disclosure would bear directly upon each Limited Partner's individual judgment about how to vote on the challenged transaction. Inadequate disclosures bearing on individual investors' right to cast a fully informed vote constitute direct claims. [FN9] Thus,

this claim is direct and defendant's motion for judgment on the pleadings for this claim is denied.

> FN9. *Wells Fargo & Company v. First Interstate Bancorp.*, Del. Ch ., C.A. No. 14696, 14623, mem. op. at 8, Allen, C. (Jan. 18, 1996) ("disclosure claim(s) ... are quite obviously individual as they affect the right to vote or the personal right to determine if one will sell or not one's investment").

C. Claims that appear Derivative

The two remaining claims of the five that survived summary judgment, breach of duty of loyalty and breach of the partnership agreement in connection with the appraisal process, at first appear derivative in nature since the alleged injury devalues the partnership's assets. Such a devaluation is a collective type of injury that appears only to affect the plaintiffs through the partnership form.

In this case, however, the partnership's business is complete, the liquidation sale is over, and the only two parties to the partnership are now clearly adversaries. Further, the remaining claims only challenge the conduct of the general partner in the final sale transaction, not any ongoing conduct, and the claims have already survived one summary judgment motion. For those reasons, the purposes for classifying claims as derivative and, in particular, the reasons for its attendant demand rule, are not present here. As a result, I find that my imposing derivative requirements on these two claims would only set up a legal artifice that has no justification and, therefore, put plainly, makes no sense.

Classifying claims to be derivative has two discernible purposes. First, it ensures that injury to a whole association is adjudicated on behalf of that whole and not just for the benefit of the individuals who have undertaken to pursue the claims. Second, it carries out the desired public policy of galvanizing a governing entity within the business association into taking action to redress injury on behalf of the business. Demand on the entity to do

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2000 WL 130629 (Del.Ch.), 26 Del. J. Corp. L. 294

**(Cite as: 2000 WL 130629 (Del.Ch.))**

so is required unless there is reasonable doubt regarding the entity's disinterest or valid exercise of business judgment. [FN10]

> FN10. *Aronson v. Lewis.* Del.Supr. 473 A.2d 805 (1984)

*(i) Reason # 1 for Derivative Actions: Claim Consolidation*

As to the first reason above for derivative classification (to ensure claims owing to an entire business association are brought on its behalf) I find that the claims here are not derivative, but direct, because the *only* injured party that may recover on these claims is in fact a class of all limited partners. It is an elementary principle of equity that defendants found liable for breaches of either fiduciary duties or contractual arrangements should not benefit from any remedy for these breaches. The practical effect of this is to exclude the defendant from the group of those that may potentially recover.

*\*5* In *Wells Fargo & Company v. First Interstate Bancorp,* [FN11] Chancellor Allen noted how the often murky distinction between derivative and direct claims may turn upon the scope of the class of claimants seeking relief. Though Chancellor Allen writes in the corporate context he suggests a practical approach that I find instructive:

> FN11. Del. Ch., C.A. No. 14696, 14623, mem. op. at 7, Allen, C. (Jan. 18, 1996).

Perhaps the best way to view these kinds of cases is to consider the remedy that may be appropriate. Where the remedy in a shareholder action will necessarily affect *all shareholders ....* not only is such a case permissible as a class claim (Rule 23(b)(1)) but, speaking prudentially, protection of all interests require that it be litigated once, for all (Rule 23.1). A derivative characterization accomplishes that result. [FN12]

> FN12. *Id.* (Emphasis added)

Reading Chancellor Allen's analysis reinforces my finding that the plaintiffs' claims are best suited to

Rule 23(b)(1), not Rule 23.1.

Similarly, in the Court's recent decision in *In re Gaylord Container Corporation Shareholders' Litigation,* [FN13] Vice Chancellor Strine incisively analyzed how the potential inclusion of culpable parties in the class due relief may affect the distinction between the derivative and direct claims. While Vice Chancellor Strine's decision in *Gaylord* fell in the context of fiduciary duty breaches (under *Unocal v. Mesa* [FN14]) resulting from corporate defensive takeover measures, I find that his comments support a finding that the limited scope of the group of claimants seeking relief justifies labeling these claims as direct. [FN15]

> FN13. Del. Ch., C.A. No. 14616, Strine, V.C. (August 10, 1999).

> FN14. Del.Supr., 493 A.2d 946 (1985).

> FN15. *Id.* at 8, stating,
> A consideration of which stockholders should recover damages in a case where the directors, as well as the public stockholders, hold stock and the plaintiffs demonstrate ... monetary harm to the stockholders also suggests an individual characterization of claim. *Grimes v. Donald,* Del.Supr., 673 A.2d 1207, 1213 (1996) (indicating that the relief which would flow to plaintiff is relevant to the derivative-individual claim distinction). In a case where wrongfully erected defenses are proved to have damaged the stockholders ... should the directors be entitled to recover damages for the economic injury they inflicted on themselves as stockholders? If the answer is no because of the fact that they created the harm, this factor would support awarding relief to the class of innocent stockholders, not to the corporation.

*(ii) Reason # 2 for Derivative Actions: The Demand Rule*

"The demand rule is intended [1] to act as a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2000 WL 130629 (Del.Ch.), 26 Del. J. Corp. L. 294

**(Cite as: 2000 WL 130629 (Del.Ch.))**

gatekeeper to both encourage extra judicial intra-corporate solutions to internal problems and [2] to bar meritless claims of self-interested decision making." [FN16] Imposing demand requirements here would serve neither of these purposes.

> FN16. *Seaford Funding Limited Partnership v. M & M Associates II, L.P.,* Del. Ch., 672 A.2d 66, 71 (1995).

As the partnership is in liquidation, there is no need to push plaintiffs into pursuing intra-partnership remedies. Further, I do not find that the general partner's authority is undercut by permitting a limited partner class to directly pursue these two claims.

Second, derivative classification here will not serve the purpose of barring "meritless claims of self-interested decision-making." These two claims have been shown meritorious enough to survive a motion for summary judgment. At this post-liquidation phase in the life of the partnership, and as the general partner obviously opposes all of the claims in this litigation, it is difficult for any reasonable person to expect that demand could be made with any hope of success. Application of the rule in this context evokes vestiges of arcane medieval canon law.

I find this case quite different from *Litman v. Prudential-Bache Properties, Inc.,* in which Vice Chancellor Chandler found a claim alleging diminution of value of partnership units in an *ongoing* partnership to be derivative. In the present case, the partnership is not ongoing, but is ended. Once the enterprise is terminated and the fiduciaries have acted to wind up the finances of the enterprise, the demand rule's purposes become irrelevant. To now classify these claims as derivative, purely as a matter of form, and to institute "demand analysis" only serves to impede efficient and final resolution of the remaining claims against those fiduciaries.

Equity holds Substance over Form

**\*6** Plaintiffs argue that since they seek relief from the general partner's actions the imposition of

derivative and demand requirements exalts the partnership form over the substance of this intra-partnership dispute. I agree with plaintiffs. With the partnership in dissolution the "partnership" entity is simply an artifice representing the relationship between two legally juxtaposed parties and is no longer relevant as a distinct legal creature for the purpose of resolving the final claims between these parties.

I am not prone to mechanistic or formalistic application of pleading requirements where doing so only tends to frustrate efficient claim resolution. "Unless prevented by some positive and mandatory law, equity regards substance rather than form." [FN17] I find the claims for breach of fiduciary duty and breach of the partnership agreement are, in substance, direct claims and may be prosecuted by a class of the limited partners, under Rule 23(b)(1). The defendant's motion for judgment on the pleadings on these two claims is denied.

> FN17. *Phillips Petroleum Co. et al. v. Arco Alaska, Inc. et al.,* Del. Ch., C.A. No. 7177, mem. op. at 13, Jacobs, V.C. (July 9, 1986) (citing *Judah v. Shanghai Power Co.,* Del.Supr., 494 A.2d 1244, 1249 (1985), *Monroe Park v. Metropolitan Life Insurance Co.,* Del.Supr., 457 A.2d 734, 737 (1983).).

D. Certification of the Limited Partner Class

Pursuant to Court of Chancery Rule 23(b)(1) the plaintiffs request certification of a class of all limited partners (excluding any defendants here) for pursuing the remaining claims. The only opposition to this motion came on grounds that the claims were derivative and thus not the subject matter of a Rule 23(b)(1) class action, but of Rule 23.1 derivative action.

I have ruled that Rule 23.1 does not apply in these circumstances and in doing so have rejected the sole argument raised against certification of a class of limited partners. I find that the facts of this case lend themselves to certification of a plaintiff class consisting of:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 7

2000 WL 130629 (Del.Ch.), 26 Del. J. Corp. L. 294

**(Cite as: 2000 WL 130629 (Del.Ch.))**

All unitholders of Cencom Cable Income Partners, L.P. as of October 3, 1995, or their successors in interest, except defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the defendants.

The plaintiffs' motion for class certification is granted.

E. Supplemental Complaint for Preliminary and Permanent Injunction

In their supplemental complaint, plaintiffs move to enjoin the general partner's use of partnership monies to fund its defense in this litigation and seek the return of any advances already made. Specifically, the plaintiffs argue that § 4.6C of the partnership agreement prohibits the general partner from advancing itself litigation expenses in any lawsuit brought by a limited partner.

(i) Motion to Dismiss the Supplemental Complaint

For the same reasons that I found the above claims direct, I find that derivative treatment here would ignore the reality of this litigation and the facts of this case. Further, "courts have been more prepared to permit the plaintiff to characterize the action as direct when the plaintiff is seeking only injunctive or prospective relief." [FN18] The defendant's motion to dismiss the supplemental complaint is denied.

> FN18. *Grimes v. Donald,* Del.Supr., 673 A.2d 1207, 1213 (1996) (quoting § 7.01 Comment D, The American Law Institute Principles of Corporate Governance: Analysis and Recommendations (1992)).

(ii) The Merits of the Complaint

**\*7** Plaintiffs may obtain a preliminary injunction if they establish the following three elements: (1) a reasonable likelihood of success on the merits, (2) imminent, irreparable harm will result if an injunction is not granted and (3) the damage to Plaintiff if the injunction does not issue will exceed

the damage to the defendants if the injunction does issue. [FN19] For a permanent injunction the factors are the same, except that the plaintiff must actually succeed on the merits. This relief is extraordinary and the test is stringent.

> FN19. *Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261, 1279 (1989).

(a) Success on the Merits

The plaintiffs not only demonstrate reasonable likelihood of success but they have conclusively shown that the Partnership Agreement prohibits advances to the general partner for any litigation in which the limited partners are plaintiffs.

§ 4.6C of the Partnership Agreement [FN20] states, in pertinent part:

> FN20. Supplemental Compl., Ex. 2.

> Expenses incurred by an Indemnitee in defending any legal action subject to this Section 4.6 shall, from time to time, be advanced by the Partnership prior to the final disposition of such legal action; provided that (i) such legal action relates to the performance of duties or services by such Indemnitee on behalf of the Partnership, (ii) such legal action is initiated by a third party who is not a Limited Partner, and (iii) the Partnership has received an undertaking given by or on behalf of the Indemnitee to repay such amount unless it shall be determined that such an Indemnitee is entitled to be indemnified as authorized in Section 4.6. [FN21]

> > FN21. "Indemnitee" is defined as "the General Partner and its affiliates" individually. The Agreement, § 4.6B.

I am asked to choose here between two readings of this provision. The plaintiffs argue that this provision sets out the only conditions under which the general partner will be advanced litigation expenses. They say the above three limitations, in particular the limitation conditioning advances on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                           Page 8

2000 WL 130629 (Del.Ch.), 26 Del. J. Corp. L. 294

**(Cite as: 2000 WL 130629 (Del.Ch.))**

the plaintiffs' not being limited partners, must be fulfilled or no advances will be paid.

The defendant answers that the use of the word "shall" means that § 4.6C merely specifies conditions under which advances are made. Defendant suggests that, absent a mandatory negative limitation, it may make these advances discretionarily, pursuant to its exclusive authority to "manage and control the business affairs of the Partnership ... and to take all such actions ... as it deems necessary or appropriate to accomplish the purposes of the Partnership." [FN22] Defendant also contends its right to these advances is consistent with its right to indemnification under the Agreement and under Delaware limited partnership law, 6 *Del. C.* § 17-108 (1990).

> FN22. § 4.1 of the Agreement.

I reject the defendant's arguments wholesale. First, I find that the defendant's reading of this provision would render the limiting language completely superfluous:

> "Expenses incurred by an Indemnitee ... shall be advanced ... provided that ... (ii) such legal action is initiated by a third party who is not a Limited Partner."

From this the parties present two conflicting readings:

*8 (1) Plaintiff's reading:
The legal action for which the general partner seeks advancement must have been initiated a third party, not a limited partner or the expenses incurred by an Indemnitee (the general partner) shall not be advanced.
(2) Defendant's reading:
Even if this legal action is initiated by a Limited Partner, expenses incurred by an Indemnitee (the general partner) *may* be advanced based on the Indemnitee's general discretion.

In my view, the defendant's reading simply does not comport with the existence of the limiting language, because it renders the limitation on the Indemnitee wholly illusory. The only reasonable reading of § 4.6C is that while it ensures the

conditions under which advances shall be made, it also specifies, by reverse inference, when the advances shall *not* be made.

After misconstruing the language of § 4.6C, defendant goes on to argue that it has "discretionary" authority to award these advances based on its own broad, general management powers under § 4 .1 of the Agreement. I find this highly dubious, given the clarity of the § 4.6C limitation. In short, defendant asks me to believe that § 4.1 grants it the discretionary power to circumvent the plain limitation of § 4.6C. It is obvious that the defendant did not have the benefit of reading the Court's recent decision in *Sanders v. Wang* [FN23] which reflects an adherence to the principle that general discretionary provisions in contracts, such as found in § 4.1 here, may not be fairly read as negating explicit limitations found elsewhere in the contract. Accordingly, defendant violates the Partnership Agreement by advancing itself any Partnership funds in this litigation.

> FN23. Del. Ch., C.A. No. 16640, mem. op. at 9, Steele, V.C. (November 10, 1999).

(b) Balancing of the Equities

I find that the equities heavily favor the plaintiffs. The plaintiffs are passive investors who have raised colorable claims about the defendant's conduct. Further, § 4.6C provides them a reasonable expectation that their investment will not be drained by the general partner in defending itself against their grievances. No investor in an entity party to an agreement *with a provision such as § 4.6C* should expect to be forced to fund the litigation for the very party that it has hailed into court.

Conversely, I find the defendant's advances indefensible. Defendant's actions are precisely the conduct that the Agreement sought to prevent: the general partner's draining the fixed resources of the partnership to defend itself from claims brought by limited partners.

(c) Imminent, Irreparable Harm

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 9

2000 WL 130629 (Del.Ch.), 26 Del. J. Corp. L. 294

**(Cite as: 2000 WL 130629 (Del.Ch.))**

I find that the element of imminent, irreparable harm also favors the plaintiff. The partnership is possessed of fixed assets at this stage and the insurance proceeds from which it may draw have a definite ceiling. The fact that this litigation has not even reached trial indicates that any advancement of funds to the general partner to defend itself will continue to deplete partnership assets at increasing risk to the limited partners.

**\*9** It is true that this complaint seeks return of monies already paid. It also seeks to prevent further actions breaching a clear agreement which makes injunctive relief inappropriate. The fact that this relief consists of easily calculable dollar amounts or that they are merely advances which *may* be repaid at some late date does not convince me that injunctive relief should not be awarded here. [FN24] The bottom line is that, quantifiable or not, the funds were wrongfully advanced and will continue to be absent injunctive relief. Imminent, irreparable harm will continue absent immediate injunction relief and the mandatory return of improperly advanced funds.

> FN24. *See Cantor Fitzgerald, L.P. v. Cantor,* Del. Ch., 724 A.2d 571, 579 (1998) (holding the elements of an injunction are not necessarily evenly weighted, and a strong showing on one element may overcome a weak showing on another element).

### IV. Conclusion

I grant plaintiffs' motion for a permanent injunction. Defendant is ordered to cease any further use of partnership funds in this action, to account for all funds already advanced, and to return these funds to the partnership's general account.

Defendant's Motion for Judgment on the Pleadings and to Dismiss the Supplemental Complant *are denied.* Plaintiff's Motion for Class Certification is *granted.*

Plaintiff will provide an appropriate order approved as to form.

2000 WL 130629 (Del.Ch.), 26 Del. J. Corp. L. 294

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.