# EXHIBIT A



**WILCOX & FETZER LTD.**

In the Matter Of:

# Polak

## v.

# Kobayashi and Pokobo, L.L.C.

C.A. # 05-330-SLR

Transcript of:

Werner L. Polak

May 11, 2007

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

```
            IN THE UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF DELAWARE

WERNER L. POLAK,                    )
                                    )
          Plaintiff,                )
                                    )  Civil Action No.
v.                                  )  05-330-SLR
                                    )
JOHN M. KOBAYASHI,                  )
                                    )
          Defendant                 )
                                    )
and                                 )
                                    )
POKOBO, L.L.C.                      )
                                    )
          Nominal Defendant         ).
```

       Deposition of WERNER L. POLAK, taken pursuant to notice at the law offices of Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware, beginning at 9:20 a.m., on Friday, May 11, 2007, before Terry Barbano Burke, RMR-CRR, and Notary Public.

APPEARANCES:

       SUSAN WOOD WAESCO, ESQ.
       MORRIS, NICHOLS, ARSHT & TUNNELL LLP
         1201 North Market Street
         Wilmington, Delaware  19899
         For the Plaintiff

       JOHN P. AKOLT, ESQ.
       Akolt & Akolt, LLC
         1880 Arapahoe Street, #2005
         Denver, Colorado  80202
         For the Defendant
         John M. Kobayashi

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

Polak v. Kobayashi and Pokobo, L.L.C.
Werner L. Polak

---

**142**

I said okay.
BY MR. AKOLT:
Q. Following the February 9 letter, was there any other correspondence or any other information ever provided to you with regard to the acquisition of the church property on behalf of POKOBO?
A. I believe yes, that I had further discussions with John.
As far as correspondence is concerned, I don't know. I would have to go through the file.
Q. Have you reviewed all of your files to determine whether or not there's a single document that relates to the closing of the transaction with the church on behalf of POKOBO?
A. Okay, with respect to the closing, no, I don't remember that. But with respect to the negotiations, there may have been other documents, certainly other telephone discussions after February 9th.
Q. Do you recall any other documents specifically? Because I don't believe any have been produced.
A. I don't know, but I'm telling you I don't know at the moment and I don't have the file in my mind. I haven't reviewed the entire file. I'm sorry.

---

**143**

Q. With regard to telephone conversations, can you relate the specific substance of any telephone conversations that occurred between you and John Kobayashi regarding the acquisition of the church property after February of 1999?
A. Yes, he told me that they agreed to 29 cents. And I said tremendous, get it done.
Q. When did he say to you that they agreed to 29 cents?
A. I don't know the date out of my head, but it was shortly after February 9th.
Q. And was that for the acquisition of 22 acres?
A. That was for, the concept was that we would get -- we would buy the 22 and we would go revert, so to speak, give them back five acres. Okay?
Then there were discussions that were had about the subdivision problems, how do we overcome that? And John came to me initially and says, We've got a lot of problems about how to do that on the subdividing issue and I've talked to Sapp and not only does he want the five acres, but he wants five acres more, et cetera, et cetera. He said, We've got a little bit of a problem, but the basic concept is, yes, we're going to do it. And I said, Get it done. He

---

**144**

said, Yes, don't worry about it, I've got an attorney involved, some other firm. Not Van Purnis, but another firm. And Fuke is working on it and we're going to handle it the right way. But it's going to take quite a bit of time in order to get the subdivision problems resolved. I said Okay, go to it.
Q. Were you at all involved in any of the further negotiations between POKOBO or John Kobayashi and the Lutheran Church?
A. I was personally not involved, no.
Q. Did you see any documents other than the February 9 letter with regard to any closing of the transaction with the church or any deeds or anything of that nature?
A. Deeds, no. The documents I can't recall. I don't have the full file. You're giving me a representation this was the last letter in the file. I just don't know that. If you'll represent it for me I will simply have to accept it for this deposition because I haven't reviewed my file. But I know there were telephone discussions which confirmed their acceptance of the 29 cents. That I do remember.
Q. Obviously I haven't reviewed your file.
A. Okay.

---

**145**

Q. I presume that you reviewed your entire file and provided all of the documents relating to the properties in your identification of documents and in your response to request for production; correct?
A. I am sure I did.
Q. So if there were more documents in your file, they would be in the documents that you produced; right?
A. Yes.
Q. How was the donation of the five acres back to the local church to be handled, how was that to occur?
A. One, there was a problem about subdivision, obviously, that had to be resolved because the five acres would have to be divided from the 22 acres, which had been applied to by the church to begin with. We were going to do it in addition to that, that's fine. Now it's going to be our job at our cost, fine, no problem.
John said to me that it's going to take a long time, or at least some time to get everybody focused on the subdivision problems. And he reminded me that the church had been at it for years and couldn't get it done. I said that's fine, no problem, as long as we're committed to buy it, no problem. He

---

37 (Pages 142 to 145)

146

1  said we're committed to buy it, but it's going to take
2  time for the subdivision problems to iron them out.
3      In the meantime, what I'd like to do is
4  be able to get a charitable contribution out of this
5  thing. I said, For what? And he said, For the five
6  acres we're going to give back to the church. I said,
7  Okay. And he said, The way I've discussed it with my
8  accountant is for us to be able to give the five acres
9  to the John Kobayashi family foundation trust, whatever
10 it was, and for them to hold it and then for the family
11 foundation to give it to the church.
12     I said, Is that going to work? And he
13 says, Yes, yes, yes, eventually don't worry, it's all
14 going to go in POKOBO's name, but in the meantime we're
15 going to have that five acres, in the family trust name
16 or in John Kobayashi's name. And I said, Are you sure
17 that's going to work? And he said, Believe me, it's
18 going to work, because we can get this year a
19 contribution of the value of the land. I said, John,
20 this doesn't sound right, but you think -- he says it's
21 going to be done, I've got -- Grubb said yes. It's
22 going to go through the attorneys. But don't worry,
23 eventually it's going to be deeded to POKOBO, but in
24 the meantime we're going to have this going through the

147

1  family foundation.
2      I said, Isn't that going to also create
3  some subdivision problems? He said, No, we're going to
4  try to resolve that early on and get it done.
5      John, I said, Okay, it's a little bit
6  obtuse to me, but okay. And he said, and the fact is
7  that we may be able to get a much higher value for the
8  -- we can use the market value for the contribution and
9  therefore we may be able to get a charitable
10 contribution more than the purchase value because we
11 can use market value, et cetera, and therefore you and
12 I will be able to get it because it will all be done
13 through the partnership.
14     I said, John, are you sure this is the
15 right thing to do? And he said, Yes, don't worry about
16 it. I said, Okay. Proceed.
17 Q.  Was that all part of the agreement that you
18 alleged to have been reached between you and John
19 Kobayashi, or was that separate?
20 A.  No, this was an ongoing thing. The agreement,
21 the basic agreement is in the complaint. But you asked
22 me specifically about the donation part of the five
23 acres. It was clear, as I mentioned in the complaint,
24 that we agreed at that point to give five acres back.

148

1  What I just told you was how he was going to accomplish
2  it, the means to accomplish it. But it's still part of
3  the overall agreement to give them five acres and it
4  was going to be a charitable contribution to the
5  church. But he's going to do it in a two step.
6      And he said this has all been passed by
7  Grubb, this is the way to do it. We will be able to
8  accomplish it and get higher charitable deductions. I
9  said, John, I am going to leave that one to you, but it
10 is a little dense to me how we are going to accomplish
11 that along with the subdivision problem, and I left it
12 up to him.
13 Q.  Did you ever see any appreciated deduction
14 come through POKOBO with regard to the donation of the
15 five acres back to the local church?
16 A.  No. The only ones that I saw -- I don't think
17 it was appreciated. It was the end of the year, Grubb
18 sent me a Schedule K-1, which indicated --   17
19 five. So double that for him, for John, that would be
20 35,000, which would be about the value of five acres,
21 yes.
22 Q.  That was a cash contribution; correct?
23 A.  No. Well, not in my view. My agreement was
24 that the -- not cash contribution. My agreement was

149

1  that the property would be given, not a cash
2  contribution.
3  Q.  Do you know whether or not any part of that
4  transaction ever occurred, that there was acquisition
5  of 22 acres and a gift or deed back of five acres or
6  thereabouts to the church?
7  A.  John did not produce, when I asked him for
8  when we were together in August of whatever, 2001, I
9  said, John, whatever happened to the transaction, is it
10 done? And he had previously told me, we've got these
11 problems, they're subdividing, we can't finalize any of
12 these things. I said, Okay, I haven't seen anything.
13 He said, Don't worry, I'll send it to you when we
14 close.
15     And then finally in August of '01, when
16 he was at my house, I again asked him this thing. And
17 he said, We got these problems, et cetera, et cetera.
18 And then in April when he was ill, April '01, the last
19 time I saw him, we actually, if it was discussed, it
20 was discussed in a minute or so. We actually didn't
21 discuss it any further because of his illness. He was
22 very ill at that time.
23     MS. WAESCO: Just to correct for the
24 record. You said April of '01.

162

BY MR. AKOLT:
Q. If on the way to a municipal hearing on zoning, or whatever, the Pastor Sapp would have run over a little kid on the way to the meeting, could that have conceivably caused a liability claim back against POKOBO?
    MS. WAESCO: Objection to form.
    THE WITNESS: I really don't know. I have no idea.
BY MR. AKOLT:
Q. Would you have allowed POKOBO to enter into any kind of a relationship that could have resulted in liability claims like that if it was within your ability to consider?
    MS. WAESCO: Objection to the form.
    THE WITNESS: I would have to weigh, obviously, the pluses and the minuses. So if somebody told me that I would be incurring a liability of, POKOBO would be incurring a liability, I would have insisted on getting some insurance to cover it before I would have entered into that kind of thing. I would have entered into it. It would really be weighing the pluses and minuses, is it tenancy in common, what are we gaining, what are they gaining, what does it cover,

163

do we get an indemnification agreement, do we have no indemnification agreement.
    There would be so many issues that I would have to look into as to whether or not I would want to proceed or I wouldn't want to proceed, and I haven't really thought about that, to be very honest with you.
BY MR. AKOLT:
Q. That's fair enough. Before you would have agreed to have entered into that, or have POKOBO enter into that, all of those would have been legitimate questions that you would have considered and resolved before proceeding forward; correct?
A. Probably, yes. It didn't enter into the equation because it didn't happen to me.
Q. Did POKOBO have any general premises liability insurance on the 64 acres during the course of time that it owned the property?
A. I don't know whether we had because it was undeveloped agricultural. I'm not sure whether we did. I know that we paid for a tree that fell down on our neighbor's lot. Whether it was covered by insurance or not I don't know.
Q. Turn to Paragraph 17 of your complaint.

164

    MS. WAESCO: Exhibit 2.
    THE WITNESS: 17?
BY MR. AKOLT:
Q. Please.
A. Yes.
Q. In Paragraph 17, you allege, I believe, that you did not learn that title to the 17 acre parcel was in John Kobayashi's name until approximately November 2002?
A. Uh-huh.
Q. How did you learn the status of the title to the 17 acres in November of 2002 or approximately November of 2002?
A. Okay, I learned earlier -- I learned earlier through John, John, when he visited me, that the 17 acres were in his name and that it was, don't worry, this is going to be put in POKOBO's deed as soon as the subdivision issues are resolved, okay.
    Then when I did not hear from John after April and I sent all these letters and phone calls and they weren't answered, I was worried. And I remember sending a letter, a fairly sharp letter to John somewhere in the fall. And when I didn't hear anything, during this time, I asked Miss Bronster to

165

help me out and find out what is happening. I told her very candidly that John wasn't responding to my phone calls and would she kindly find out what is happening with the property. Because I was worried that I hadn't received anything, and I had sent a letter to Matsukawa and he hadn't responded.
    And then in November of 2002, I learned from my attorney that the property had been put in John's name. Not in a tenancy in common, not anything. It was in John's name. That worried me.
Q. Did you finish your answer?
A. That's it. You asked me how I learned and I told you.
Q. As I understood your answer, you said John told you that it was in his name earlier in the year?
A. Yes.
Q. So you understood from that time on it was in his name?
A. I don't remember when exactly he told me. But I knew some time that it was in his name.
Q. And what did you do when you heard -- forget that, we'll start over again.
    In your previous answer, I believe you were relating a conversation from John Kobayashi to you

Polak v. Kobayashi and Pokobo, L.L.C.
Werner L. Polak

166

1  in which he said the property was in his name.
2   A. Yes.
3   Q. Is that the first time that you were aware
4  that the 17-acre property was in his name?
5   A. Let me go back to what I said earlier.
6      With respect to the donation problem,
7  when he told me at that point that there was a
8  possibility that to resolve this thing he would have to
9  put the property in the name of John Kobayashi,
10 whatever it was, a family, et cetera, et cetera, and
11 then it would go from this family trust to the church
12 and therefore it may well be that to resolve this thing
13 we're going to have to put the property in my name or
14 the family trust name or something, I said okay.
15     But ultimately he said this goes to
16 POKOBO and it will go to POKOBO. We're going to have
17 to do something with respect to the subdivision first.
18 I said okay.
19  Q. Before we get passed that. You were talking
20 about the portion to go to the church. Are you talking
21 about the entire 22 acres or five acres or 17 acres?
22 What specific piece were you taking about maybe having
23 to go into the Kobayashi Foundation to go to the
24 church?

167

1   A. He was unsure because of the subdivision
2  issues how it was going to be able to be done.
3   Q. What was your understanding, which property
4  would go into or which subdivision of the property
5  would go into the Kobayashi foundation and then to the
6  local church?
7   A. I had no understanding, because I did not know
8  how the subdivision issues were going to be resolved,
9  whether it's going to be the totality of the 22 acres
10 were going to go, the 17 acres or the five acres. I
11 did not know.
12     And he said it would have to be resolved
13 one way or the other, but don't worry, I hired an
14 attorney, we're doing this, we're doing that. Okay.
15     So, and I have forgotten exactly when,
16 but it was one of those last visits, if I remember
17 correctly. He said, Don't worry, it's in my name, but
18 as soon as we resolve these issues, it's all going to
19 be taken care of. I said, Okay, that's fine. So he
20 told me it was in his name, and I wasn't worried
21 because I trusted John. It was a partnership. We
22 called each other partner, by the way.
23     Then that was the last communication I
24 had with him, and then he hung up on a telephone call,

168

1  which really bothered me later on.
2   Q. Can you give a time frame we are talking about
3  here?
4   A. That was in the fall of 2002, and he wasn't
5  responding to my calls and I was calling Rose and
6  saying he's not answering my calls, he's not calling me
7  back, he's not answering my letters. Rose said, I
8  think he's fine, it's all right. I said, I'm worried
9  he was sick, et cetera, et cetera. She said, He's
10 fine, don't worry about it. I said, Please tell him to
11 call me.
12     Then in the fall when he hung up on
13 Karen, that really bothered me. That should never have
14 happened because we were under very good terms and
15 relationships. And so that was what I said earlier to
16 you caused me to call Miss Bronster to help me out.
17 And she then confirmed to me, which I hadn't known,
18 that, never mind the subdivision, there was no
19 subdivision. This thing was in his name, and the
20 church was in the church's name.
21  Q. Can you give me a time frame on that?
22  A. November. That's what I said in this letter.
23  Q. November of 2002?
24  A. Yes. That's what 17 is. November 2002 is

169

1  when I was told by Miss Bronster or her assistant.
2   Q. I am handing you what has been marked as
3  Deposition Exhibit 19, which is WLP 448. A May 3rd,
4  2002 letter.
5      Can you identify that document?
6   A. Yes. This is my letter to Rose Reed, May 3rd,
7  2002, enclosing a check for $25,000 to POKOBO and then
8  asking her with respect to some information regarding
9  accounting and asking her for a status of the capital
10 contributions. And then confirming that one of the
11 property tax bills that was in the 64 acres and the 17
12 acres was in John's name and no further confirmation
13 needed to be made if that is correct. That is, if the
14 two bills that were in the thing that I was supposed to
15 pay for were one for 64 and one for 17.
16  Q. Does that clearly reflect that it was your
17 understanding that the 17 acres was entitled to John
18 Kobayashi as of that time?
19     MS. WAESCO: Objection as to form.
20     THE WITNESS: Yes. Well, John told me
21 that this was, in fact, the case. John confirmed that
22 one of the property bills was, yes.
23 BY MR. AKOLT:
24  Q. So you knew by that date that the 17 acres was

43 (Pages 166 to 169)