IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WERNER L. POLAK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN M. KOBAYASHI, | ) | C.A. No. 05-330 (SLR) |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| POKOBO, L.L.C., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

**PLAINTIFF WERNER L. POLAK'S OPENING POST-TRIAL BRIEF**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Martin P. Tully (#465)
Rodger D. Smith II (#3778)
Susan W. Waesco (#4476)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
*Attorneys for Plaintiff Werner L. Polak*

February 12, 2008

i.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................

INTRODUCTION ....................................................................................................1

NATURE AND STAGE OF THE PROCEEDINGS .........................................2

STATEMENT OF FACTS ......................................................................................3

    A.    The Parties ........................................................................3

    B.    The Parties Form Pokobo And Purchase The 64 Acres............................3

    C.    The Parties Realize That Access To Lako Street Is Critically Important To The 64 Acres............................5

    D.    Defendant Negotiates With The Lutheran Church -- On Behalf Of Pokobo -- To Acquire Land Connecting The 64 Acres To Lako Street ............................6

    E.    Defendant Negotiates With The Lutheran Church -- On Behalf Of Pokobo -- To Purchase Additional Land From The Church............................8

    F.    The Parties Agree On A Plan To Finance Pokobo's Acquisition Of The 17 Acres ............................11

    G.    Defendant Purchases The 17 Acres -- Using Pokobo Funds To Pay Closing Costs............................15

    H.    Everyone Associated With Pokobo Understood That Pokobo -- Not Defendant -- Purchased The 17 Acres ............................19

    I.    Mr. Polak and Defendant Stop Communicating ........................................27

    J.    Defendant Rejects Mr. Polak's Proposal to Dissolve Pokobo ............................29

ARGUMENT ....................................................................................30

    I.    DEFENDANT HAS BREACHED HIS FIDUCIARY DUTIES............................30

    A.    Defendant Usurped A Corporate Opportunity When He Acquired The 17 Acres For Himself............................32

1.    Pokobo Was Financially Able To Purchase The 17 Acres ...................................................................32

2.    The Opportunity to Purchase the 17 Acres Was Within Pokobo's Line of Business ..................................33

3.    Pokobo Had An Interest And Expectancy In Purchasing The 17 Acres ...............................................34

4.    By Acquiring The 17 Acres For Himself, Defendant Placed Himself In A Position Inimicable To The Duties He Owed To Pokobo .........................................35

B.    Defendant Also Breached His Fiduciary Duties By Failing To Consult With Mr. Polak Regarding Pokobo's Ongoing Business ..................................................................36

II.    DEFENDANT HAS BREACHED SECTION 5.01 OF THE OPERATING AGREEMENT ...............................................37

III.    POKOBO SHOULD BE DISSOLVED PURSUANT TO 6 *DEL. C.* § 18-802..................................................................38

IV.    THE RELIEF REQUESTED IN MR. POLAK'S AMENDED COMPLAINT IS APPROPRIATE AND JUSTIFIED.........................41

A.    The Relief Requested Is Consistent With Pokobo's Operating Agreement, The Delaware LLC Act And Applicable Case Law ..............................................41

B.    Mr. Polak Is Entitled To A Full Accounting Of Pokobo As A Result Of Defendant's Breach Of Fiduciary Duty................................42

C.    The 17 Acres Should Be Deemed To Be Held In Constructive Trust For The Benefit Of Pokobo.........................................44

D.    If The 17 Acres Is Not Found To Belong To Pokobo, Mr. Polak Should Be Reimbursed For The Contributions That He Made To Pokobo To Pay For Expenses Associated With The 17 Acres ..................................................46

V.    DEFENDANT'S ACTIONS JUSTIFY AWARDING MR. POLAK HIS ATTORNEYS' FEES ............................................47

CONCLUSION....................................................................................49

<u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Abex, Inc. v. Koll Real Estate Group, Inc.*,
    1994 WL 728827 (Del. Ch.) ....................................................................... 47

*Brice v. State, Dept. of Correction*,
    704 A.2d 1176 (Del. 1998) ....................................................................... 47

*Broz v. Cellular Info. Sys., Inc.*,
    673 A.2d 148 (Del. 1996) .................................................................... 31, 32

*Cantor Fitzgerald, L.P. v. Cantor*,
    2000 WL 307370 (Del. Ch.) ............................................................... 47, 48

*Cantor Fitzgerald, L.P. v. Cantor*,
    2001 WL 536911 (Del. Ch.) ..................................................................... 47

*Chase Manhattan Bank v. Iridium Africa Corp.*,
    307 F. Supp. 2d 608 (D. Del. 2004) ........................................................... 37

*Equity Corp. v. Milton*,
    221 A.2d 494 (Del. 1966) .................................................................... 33, 36

*Fleer Corp. v. Topps Chewing Gum, Inc.*,
    539 A.2d 1060 (Del. 1988) .................................................................. 43, 46

*Guth v. Loft, Inc.*,
    5 A.2d 503 (Del. Ch. 1939) ............................................................... passim

*Haley v. Talcott*,
    864 A.2d 86 (Del. Ch. 2004) ..................................................... 38, 39, 41, 42

*H-M Wexford LLC v. Encorp, Inc.*,
    832 A.2d 129 (Del. Ch. 2003) ................................................................... 37

*In re Silver Leaf, L.L.C.*,
    2005 WL 2045641 (Del. Ch.) ................................................................... 38

*In re the Walt Disney Co.*,
    2004 WL 2050138 (Del. Ch.), *aff'd*, 906 A.2d 27 (Del. 2006) ....................... 45

*Jacobson v. Dryson Acceptance Corp.*,
    2002 WL 31521109 (Del. Ch.) ................................................................. 47

*Johnston v. Greene,*
    121 A.2d 919 (Del. 1956) ................................................................. 32, 34

*Kandalepas v. Economou,*
    547 N.E.2d 496 (Ill. App. Ct. 1989) ................................................. 41

*Loft, Inc. v. Guth,*
    2 A.2d 225 (Del. Ch. 1938) ............................................................... 43

*Metro Commc'n. Corp. BVI v. Advanced Mobilecomm Techs. Inc.,*
    854 A.2d 121 (Del. Ch. 2004) ........................................................... 30

*Northeast Harbor Golf Club, Inc. v. Harris,*
    725 A.2d 1018 (Me. 1999) ................................................................. 34

*Pan Am. Trade and Inv. Corp. v. Commercial Metals Co.,*
    154 A.2d 151 (Del. Ch. 1959) ........................................................... 44

*Pepsi-Cola Bot. Co. of Salisbury, Md. v. Handy,*
    2000 WL 364199 (Del. Ch.) .............................................................. 46

*Stephanis, by Sterianou v. Yiannatsis,*
    1993 WL 437487 (Del. Ch.) .............................................................. 45

*Technicorp Int'l II, Inc. v. Johnston,*
    2000 WL 713750 (Del. Ch.) .............................................................. 42, 43

**Statutes**

6 *Del. C.* § 18-802 ..................................................................................... 38

6 *Del. C.* § 18-803(a) ................................................................................ 42

6 *Del. C.* § 18-803(b) ................................................................................ 42

6 *Del. C.* § 18-1101(c) ............................................................................... 30

8 *Del. C.* § 273 ......................................................................................... 38

**Other Authorities**

Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial*
    *Practice in the Delaware Court of Chancery* § 12-6[a] ...................... 42

Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial*
    *Practice in the Delaware Court of Chancery* § 12-6[c] ...................... 44

Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial*
    *Practice in the Delaware Court of Chancery* § 12-7[b] ...................... 45

v.

Myron T. Steele, *Judicial Scrutiny of Fiduciary Duties in Delaware Limited Partnerships and Limited Liability Companies*, 32 Del. J. Corp. L. 1 (2007) ............................................................................................ 30

<u>INTRODUCTION</u>

   Much has changed since the time that plaintiff Werner L. Polak ("Mr. Polak") and defendant John M. Kobayashi ("Defendant") first decided to go into business together.  Since the parties acquired their first 64 acres together in 1997, Defendant has embarked on a pattern of deceptive and misleading behavior, including the misappropriation of an additional 17 acres of land in Hawaii that rightfully belongs to Pokobo.  Defendant has repeatedly changed his story as to how the land came to be titled in his name:  in his interrogatory responses, he claimed that Mr. Polak and he had spoken and Mr. Polak had affirmatively declined to participate in the purchase of the 17 acres for financial reasons; at his deposition, he testified that he had left Mr. Polak a voicemail message asking him whether he was interested in having Pokobo acquire the 17 Acres but never received a response from Mr. Polak; at trial, Defendant abandoned both of his previous stories and explained that he went ahead and purchased the land because Mr. Polak never responded to a voicemail message that Defendant supposedly left for Mr. Polak, inquiring whether Mr. Polak was interested in contributing $340,000 towards the purchase of the 17 acres and to finance a coffee mill operation on the land.  None of these explanations are credible.

   Moreover, despite the considerable evidence presented at trial that the parties' inability to work together has paralyzed Pokobo and made it impossible for any action to be taken on the Company's behalf, Defendant continues to insist that dissolution is unnecessary.  Simply because Defendant does not want to see Pokobo's properties sold is not a valid reason for the Court to deny Mr. Polak's petition to dissolve Pokobo.  Defendant's actions have made it impossible for trust to be restored between the parties so that Pokobo can continue to operate.  Dissolution is the only alternative.

2.

## NATURE AND STAGE OF THE PROCEEDINGS

Mr. Polak filed this action on February 23, 2005, in the Delaware Court of Chancery, seeking: (a) judicial dissolution of nominal defendant Pokobo, L.L.C. ("Pokobo") pursuant to 6 *Del. C.* §§ 18-801 and 18-802; (b) the winding up of Pokobo's business and affairs pursuant to the parties' LLC Agreement and 6 *Del. C.* §§ 18-803 and 18-804; (c) an accounting of each member's capital account and Pokobo's expenses; (d) a judicial declaration that certain property currently titled in Defendant's name rightfully belongs to Pokobo, is being held in constructive trust, and should be transferred to Pokobo. Mr. Polak also asserted breach of contract and breach of fiduciary duty claims against Defendant based on: (a) Defendant's mismanagement of Pokobo, including in the acquisition of the contested piece of property; (b) Defendant's failure to provide Mr. Polak with an accounting; and (c) Defendant's failure to keep Mr. Polak informed concerning ongoing litigation in Hawaii state court involving Pokobo.

Defendant removed the action to this Court on May 25, 2005 (D.I. 1). On August 22, 2005, the Court denied Mr. Polak's motion to remand (D.I. 19).

On June 26, 2007, Mr. Polak moved to amend his complaint to add specific allegations regarding: (a) Defendant's breach of his fiduciary duties, including his usurpation of a corporate opportunity; and (b) the tolling of the applicable statutes of limitations under the doctrines of equitable tolling and fraudulent concealment (D.I. 77). On August 3, 2007, the Court granted Mr. Polak's motion to amend with respect to equitable tolling and fraudulent concealment, but denied his motion to amend with respect to his breach of fiduciary duty claim (D.I. 84). During a teleconference on August 23, 2007, the Court indicated that its prior ruling had been in error, and clarified that Mr. Polak was permitted to proceed to trial on all of the allegations in his Amended Complaint (D.I. 97 at 3-4). The trial began on August 27 and 28, 2007, and concluded on December 11-13, 2007.

<u>STATEMENT OF FACTS</u>

A.     <u>The Parties</u>

Plaintiff Werner L. Polak is a New York resident and a former litigation partner at Shearman & Sterling in New York (Tr., Vol. A 30:14-31:4).[1]  Since retiring from Shearman & Sterling, Mr. Polak has worked as an in-house attorney for the German industrial gas company Linde AG, representing their U.S. subsidiaries (Tr., Vol. A 30:20-30:23).

Defendant John M. Kobayashi is a Colorado resident and a former litigator in the Denver area (Tr., Vol. C 389:19-23).

Nominal defendant Pokobo is a Delaware limited liability company that was formed on or about March 21, 1997 (D.I. 85, ¶ 5; D.I. 88, ¶ 5).

B.     <u>The Parties Form Pokobo And Purchase The 64 Acres</u>

In the late 1960's, following a visit that Mr. Polak made to his alma mater, Columbia Law School, Defendant approached Mr. Polak and introduced himself (Tr., Vol. A 32:5-13).  The two gentlemen struck up a friendship, which they maintained over the years by speaking on the telephone a few times a year and getting together whenever Defendant was in New York City (Tr., Vol. A 32:14-22).

In 1996, Mr. Polak met Defendant for lunch in New York City (Tr., Vol. A 32:23-33:2; Tr., Vol. C 407:22-408:20).  During that meeting, Defendant told Mr. Polak that he had recently purchased a home on the West Coast of Kona, Hawaii, and that Defendant was looking to purchase 64 acres of additional land near Kona that had recently become available ("the 64

---

[1]     Citations to testimony from the trial transcripts are in the following format:  "Tr., Vol. __ [page:line]–[page:line].  Volumes A (D.I. 99) and B (D.I. 100) contain trial testimony from August 27 and 28, 2007, respectively; volumes C (D.I. 105), D (D.I. 106) and E (D.I. 107) contain trial testimony from December 11, 12 and 13, 2007, respectively.

4.

Acres"), but did not have enough funds to purchase the property himself (Tr., Vol. A 32:23-33:21). The 64 Acres was an undeveloped tract of land that would eventually be bisected by a north-south highway known as the Ali'i Highway (Tr., Vol. A 34:12-35-3; PTX 238 (showing the proposed placement of the Ali'i Highway across the 64 Acres)). Although the placement of the Ali'i Highway had not been finalized, Defendant told Mr. Polak that he believed "it was a very good opportunity for us to buy the land" and hold it as "a longer term investment" (Tr., Vol. A 34:17-18, 35:18-22).

Mr. Polak agreed to proceed with the acquisition of the 64 Acres as part of a 50/50 partnership. Defendant handled the negotiations with the seller, and negotiated a purchase price of approximately $900,000 for the land (Tr., Vol. A 36:18-22). In February 1997, Mr. Polak contributed $25,000 towards the down payment for the property (PTX 4; PTX 3). The following month, Mr. Polak contributed his 50% share of the remaining purchase price -- $429,500 (PTX 6).

Before closing on the 64 Acres, the parties decided to form a Delaware limited liability company -- which they named Pokobo (Tr., Vol. A 40:12-19) -- to own the 64 Acres (Tr., Vol. A 37:9-11). Section 1.03 of Pokobo's Limited Liability Company Agreement (the "Operating Agreement") states that "[t]he purpose of the Company shall be to engage in any lawful act or activity for which a limited liability company may be organized under the Delaware Limited Liability Company Act, as amended, including the acquisition, development and sale of real property" (PTX 1, § 1.03; *see also* Tr., Vol. A 44:14-24). As Mr. Polak testified, "[w]e thought that if we created something, either a partnership or an LLC, . . . if this 64 Acres was successful, then we may want to acquire other pieces of property . . ." (Tr., Vol. A 45:5-9).

5.

Pursuant to Section 5.01 of the Operating Agreement, Pokobo was to be managed jointly by the parties (PTX 1, § 5.01).

The Company's acquisition of the 64 Acres, and each member's capital contribution in connection with the acquisition, was reflected in Pokobo's general ledger for 1997 (PTX 16 at CG000081; Tr., Vol. B 233:2-235:4), and in the year-end tax documents prepared by Pokobo's accountant, Colin M. Grubb ("Mr. Grubb") (PTX 20 at WLP000414, WLP000420, WLP000425; Tr., Vol. B 231:11-233:1).[2]

C.    The Parties Realize That Access To Lako Street Is Critically Important To The 64 Acres

In 1998, the parties met with Sidney Fuke, a land use consultant in Hawaii ("Mr. Fuke"), and discussed the need for access to the eastern portion of Pokobo's 64 Acres (Tr., Vol. A 52:20-53:14). As Mr. Polak testified, gaining access to Lako Street was critically important to Pokobo's plans for developing the 64 acres:

> We knew that the Ali'i Highway was going to bisect our property. We would be able to get access to the western part through Ali'i Drive, but we had no access, unfortunately, to the [eastern] portion of our property.
>
> So we were also aware that Lako Street ended at exactly -- almost 300 feet from our property, so we wanted to buy a small piece of land, or at least get an easement with respect to that small piece of land, about an acre, two or three acres in the corner where Lako Street ends, and then we would be able to build a road into [the 64 Acres].[3]

---

[2]    Mr. Grubb also served as Defendant's personal accountant and performed accounting services for Defendant's other business ventures (Tr., Vol. B 213:7-214:8).

[3]    At the time the parties were discussing Pokobo's acquisition of additional land, the County of Hawaii was contemplating constructing two roads that would affect the 64 Acres: (1) the Ali'i Highway, which was a north-south highway that bisected the 64 Acres; and (2) the Lako Street extension, a east-west road that would connect the existing

(Continued . . .)

> And so we decided that we would find out who owned the land and
> whether we could get the easement or buy that portion of the
> property.

(Tr., Vol. A 53:1-14).   As Mr. Fuke testified, both Mr. Polak and Defendant understood the

importance of acquiring additional land to connect Lako Street to the 64 Acres:

> So relative to the 64-acre parcel, having access from Lako Street
> would have provided easier time to develop the mauka, or the
> eastern end of the property, largely because . . . in the absence of
> the Lako -- an access from Lako Street would have meant that your
> only access would be from Ali'i Drive and you would have to
> extend the road quite a bit of distance. . . .  ***So all throughout the
> discussions with Mr. Kobayashi, the understanding was a Lako
> Street access was very essential to the successful development,
> you know, for the [64 Acres].***

(Tr., Vol. B 38:12-19, 39:7-20; emphasis added).   As Defendant himself testified, obtaining

access to Lako Street was "potentially very important to Pokobo" (Tr., Vol. E 522:25-523:20).

> D.     Defendant Negotiates With The Lutheran Church -- On
>        Behalf Of Pokobo -- To Acquire Land Connecting The 64
>        Acres To Lako Street

The parties discussed the possibility of Pokobo acquiring land adjacent to the 64

Acres that was owned by the Lutheran Church to provide access to Lako Street.   As reflected in

Mr. Polak's January 7, 1999 notes (PTX 17),[4] the parties originally discussed purchasing the

entire 22 acres owned by the Church "so that we would have some leverage with the county to

negotiate where the location of the Ali'i [Highway] would be, and sooner or later also have

_____

(. . . continued)
> Lako Street (which ended near the northern edge of the 64 Acres) to Ali'i Drive, a road
> that ran along the ocean.  *See* PTX 238 (showing the possible placement of the Ali'i
> Highway); DTX 77 at JMK005098-99 (showing possible alternatives for the placement
> of the Lako Street extension).

[4]     As Mr. Polak explained at trial, his notes were mistakenly dated January 7, 1998 (Tr.,
> Vol. A 54:20-55:4).

control over where Lako Street is, because we didn't know where the Lako Street extension was going to be" (Tr., Vol. A 56:15-19).

On January 29, 1999, the parties agreed that Pokobo would make an initial offer to purchase roughly three acres of land located in the southeastern corner of the 22 acres owned by the Lutheran Church (*see* PTX 31 at MIF000383-84 (delineating the 3 acres)).  As Mr. Polak testified, the parties were motivated by a desire to gain access to Lako Street:

> John said that we needed approximately 800 feet by 1,000 feet, but we could do with a little bit less, and here he gives some dimensions, which I made note of [in PTX 32].  But all he's -- the end was really that we needed to purchase sufficient area in order to permit Lako Street to make a little bit of a curve and enter our property.
>
> *    *    *
>
> And he also indicated that if, later on, after we wanted to make sure that we had the three acres in mind, because that was extraordinarily important for us to have access to the 64 acres. Otherwise, we would be -- we would have no access to any road once the Ali'i Highway was in place.

(PTX 32; Tr., Vol. A 60:12-17, 61:6-11).

That same day, Defendant sent a letter to the Lutheran Church -- on Pokobo letterhead -- in which Pokobo offered to purchase "not less than 1 ½ but up to 3 acres" from the Church at a price of 33 cents per square foot (PTX 31).  On February 2, 1999, Harvey Olson ("Mr. Olson") accepted Pokobo's offer on behalf of the Lutheran Church (PTX 31; PTX 35), as his notes of his conversation with Defendant confirm:

> <u>2/2/99</u>
>
> I agreed to [the] 400' sale ***to Pokobo*** for the sum of money expressed here [in PTX 31] + Pokobo's breaking out the church property so we can deed it to them at this time
>
> HO

8.

(PTX 31; emphasis added).

On February 9, 1999, Defendant sent a letter to Mr. Olson confirming Pokobo's

agreement to purchase the 3 acres:

> Thank you for confirming last Tuesday during our telephone conference that you accepted, on behalf of Mission Investment Fund, Pokobo's offer to purchase not less than 1 ½ acres and not more than 3 acres of land as described in my letter dated January 29, 1999 [PTX 31], at a price of 30 cents per sq. ft. payable in cash at closing and net of closing, legal, survey, permitting and other associated costs so the price in cash represents the net proceeds to the Mission Investment Fund.

(PTX 42 at WLP000315); *see also* PTX 46 (correctly stating a purchase price of 33 cents per

square foot).

> E.    Defendant Negotiates With The Lutheran Church -- On Behalf Of Pokobo -- To Purchase Additional Land From The Church

The parties subsequently discussed expanding Pokobo's acquisition from the

Lutheran Church from 3 acres to 17 acres (PTX 40; Tr., Vol. A 63:21-68:23) to avoid certain

issues caused by the Church's pending subdivision application for its land.  The Lutheran Church

had already committed to donating 5 of its 22 acres to the Local Church (Tr., Vol. A 64:20-25),

and had filed a subdivision application to permit the Lutheran Church to retain the 17 acres and

transfer the remaining 5 acres to the Local Church (*id.*).  In order to sell the 3 acre parcel to

Pokobo, the Lutheran Church would have had to file a new subdivision application (and begin

the subdivision process all over again) so that it could divide the 22 acres into three parcels -- 3

acres for Pokobo, 5 acres for the Local Church and the remaining 14 acres for the Lutheran

Church (PTX 36; PTX 37; PTX 42).

Mr. Fuke proposed a solution that involved Pokobo purchasing the 17 acres from the Lutheran Church and the Lutheran Church transferring the remaining 5 acres to the Local Church, as reflected in Mr. Polak's February 8, 1999 notes:

> But Mr. Fuke, in No. 8 [of Mr. Polak's notes in PTX 40], found a solution. That is, we would be in a position to buy the 17 acres and then the [Lutheran] [C]hurch could give five acres to the Local Church, because if you -- if we, Pokobo, acquired the 17 acres, it would be one owner with respect to that plot of land and the second plot would be the five acres to the [Local] [C]hurch.
>
> So you would start with two [pieces of land] and you would end with two, and that was permissible.

(Tr., Vol. A 66:20-67:2; PTX 40).

On February 9, 1999, Mr. Polak and Defendant spoke again and "decided that we wanted to make an offer to the [Lutheran] [C]hurch to buy the land for -- and we would be buying the 17.6 acres and the church could then give five acres back to the Local Church, consistent with what Sidney Fuke had advised us would be permissible without triggering the requirements to improve the property" (Tr., Vol. A 67:19-25; PTX 40).

That same day, February 9, 1999, Defendant sent a letter -- on Pokobo letterhead -- to the Lutheran Church setting forth Pokobo's offer to purchase the 17 Acres from the Church (PTX 42). Defendant made clear that he had discussed Pokobo's acquisition of the 17 acres with Mr. Polak, and that Pokobo (not Defendant) was interested in purchasing 17.86 acres from the Church:

> Please review the memo and note that the one solution that can assure avoidance of any significant subdivision infrastructure improvement requirements is expansion of ***Pokobo's purchase of approximately 17.86 acres***, that is, all land except the area that is to be transferred to the Local Church.

\*    \*    \*

> *. . . I have spoken to, and discussed at length, with my partner in Pokobo, various ideas, and Pokobo and its partners are willing to consider an offer of sale from the [Lutheran Church] of the 17.86 acres at a price acceptable to Pokobo . . . .*

(*Id.* at WLP000317-18; emphasis added).

As Mr. Polak testified, the purpose of Defendant's February 9, 1999 letter was to confirm the purchase price for the 3 acres and to make an offer to purchase an additional 14+ acres:

> . . . We had decided that we wanted to make absolutely certain that there was a written confirmation about the church's acceptance with respect to the three acres, so John, in the first paragraph, confirmed their sale to us of the three acres, because it was very important that we had access for the 64 acres by the Lako Street extension, so to speak, and we want[ed] to make certain that we had that access.
>
> And then the remainder of the letter is with respect to the solution that Sidney Fuke had for us, . . . for the church to be able to subdivide the 22 acres, sell us the 17 acres, and sell or give the five acres to the Local Church.

(Tr., Vol. A 70:17-71:4). *See also* Tr., Vol. A 70:5-76:20 (discussing PTX 42 in more detail).

In response to Defendant's letter, the Lutheran Church agreed to sell the 17 Acres to Pokobo:

> Q.     To your knowledge, did the church respond to Pokobo's February 9, 1999 letter?
>
> A.     Yes.
>
> Q.     And what was their response?
>
> A.     They agreed to sell us the 17 acres and there were discussions with price and they wanted to retain the price for the three acres that they had already agreed to at 33 cents, and they were willing to sell us the remaining portion of the 17 acres, meaning 14-plus acres, at the same price that we paid for the 64 acres.

11.

> So that was 29 cents.  So we were buying, Pokobo was buying three acres at 33 cents and the remaining 14 acres at 29 cents.

> Q.     And what is the basis for your understanding that the church accepted Pokobo's offer?

> A.     John told me.

(Tr., Vol. A 76:21-77:11).  *See also* Tr., Vol. A 85:2-14.

Defendant's notes of his February 16, 1999 conversation with Mr. Olsen indicate that the price for the original three acres was $0.33 per square foot, and that the price for the remaining 14.86 acres was $0.29 per square foot (PTX 34 at JMK 005365).  The next day, as reflected in Mr. Polak's notes, Defendant told Mr. Polak that the Lutheran Church had agreed to sell the "3 acres" to Pokobo for "33¢" per square foot and the "rest" (or the remaining 14.86 acres) to Pokobo for "29¢" per square foot (PTX 51).

F.     The Parties Agree On A Plan To Finance Pokobo's
       Acquisition Of The 17 Acres

At the time Pokobo was discussing the acquisition of the 17 Acres from the Lutheran Church, Mr. Polak and Defendant spoke several times about how they would finance the acquisition of the property.  They decided that Defendant would use the proceeds from the sale of property he owned in Montana to fund most of the purchase price for the 17 Acres, and that Mr. Polak would contribute the remainder of the purchase price and make additional contributions over time to cover operating expenses, until their capital contributions equalized.

Mr. Polak's notes of his conversations with Defendant on February 16 and 17, 1999 (PTX 50; PTX 51), show that the parties planned to use the proceeds from the sale of Defendant's Montana land to fund the purchase of the 17 acres:

> Q. And in Point 4, you wrote, Has $190,000 from Montana deal. And then below you wrote, Deed to Pokobo.
>
> What was discussed regarding that point?
>
> A. Okay. This is in furtherance of our discussion as to how we would finance the acquisition of the 17 acres, because we had an offer outstanding at this point and we needed to make sure that we would have the financing in place.
>
> So John told me that he had a piece of property in Montana and he was selling it and he said the approximate proceeds from that piece of property would be about $190,000. And he said he was talking to his accountant, and his accountant indicated that in order to take advantage of the tax laws, that he would want to contribute the $190,000 into another investment. But he said that his accountant indicated in order to get the advantage of that, it may well be that the land, that is the 17 acres when we buy it, would have to be in his name, or his foundation name, and I think he said his name.
>
> But, he reminded me, and this is the second line, Don't worry, that the deed would go to Pokobo as soon as the closing occurred, since Pokobo will be the owner. But he said for the tax advantages, . . . initially, the property may have to go into [his] name.

(Tr., Vol. A 81:4-82:8).

Because Defendant would be contributing more than his 50% share of the purchase price, the parties agreed that Mr. Polak would "catch up by paying the expenses" associated with the 17 Acres (Tr., Vol. A 83:6), which was reflected in Mr. Polak's notes of the parties' February 16, 1999 telephone conversation -- "later I pay more operating expenses" (PTX 50; Tr., Vol. A 84:5-8).

As of February 17, 1999, Mr. Polak believed that the parties had agreed that Pokobo would acquire the 17 Acres from the Lutheran Church (Tr., Vol. A 86:18-87:2), and Defendant never told him differently:

> Q.   Did Mr. Kobayashi ever tell you that the deal structure that
>       he discussed with you on those dates for the purchase of the
>       17 acres was not going to work?
>
> A.   No.
>
> Q.   Did he ever tell you that he didn't want Pokobo to purchase
>       the 17 acres?
>
> A.   Not at all, no.

(Tr., Vol. A 87:3-9).

Indeed, Defendant's handwritten notes reflect the same structure for financing the acquisition of the 17 Acres (PTX 248). Defendant would provide an initial cash payment of $193,000, and the "balance remaining" of $35,000 would come from Mr. Polak (*id.* at JMK 006000). Mr. Polak's capital account would have a deficit balance of $158,000, which Mr. Polak would "contribute as needed" (*id.* at JMK 006001). *See also* Tr., Vol. E 539:23-543:23.

The structure of the transaction was also reflected in contemporaneous memoranda prepared by Pokobo's accountant, Mr. Grubb (PTX 56; PTX 64; *see also* Tr., Vol. B 247:17-22, 248:9-11). In a February 19, 1999 memorandum, Mr. Grubb stated that Defendant planned to use the proceeds of the sale of his Montana land to finance his portion of the purchase price. *See* PTX 56 ("The contract price of the land must be at least the net proceeds of the Montana sale to defer the gain on the sale. This has been set at $195,000.").[5] In a February 24, 1999 memorandum, Mr. Grubb stated that Mr. Polak would make additional capital contributions over time to equalize the parties' accounts. *See* PTX 64 ("Werner agrees to

---

[5]     Defendant also told Mr. Fuke that the parties were planning to use the proceeds from the sale of his Montana land to fund the acquisition of the 17 Acres. *See* PTX 57 ("Time is of the essence . . . as you wish to have this purchase be made through a '1031' exchange.").

14.

contribute an[] additional $158,1900 over the next five years . . . to cover expenses incurred by the partnership to equalize the capital account.").

Mr. Grubb testified that his understanding of the transaction (prior to being corrected by Defendant several years later) was that Pokobo had acquired the 17 Acres based on the structure for the transaction set forth in his February 1999 memoranda (and as reflected in Mr. Polak's and Defendant's notes):

> Q.    To your knowledge, did Pokobo acquire the 17 acres using this four-step process [outlined in PTX 64]?
>
> A.    The steps that we've outlined here did, indeed, occur up to the point of actually 35,000 going from Pokobo's account to the foundation and then later to -- not the church, but Mission something, which we've talked about before.
>
> Q.    Okay.
>
> A.    And then based on the documents I received from John's office, subsequent to me preparing this memorandum, there was a schedule that showed John had indeed contributed the land to the partnership. So at the time that I prepared the 1999 return, I had every reason to believe that this transaction had been completed as shown.

(Tr., Vol. B 270:22-271:10).

The Lutheran Church had the same understanding as to who was purchasing the 17 acres -- and on what terms.  In correspondence with his lawyer, Mr. Olson confirmed that:  (a) 3 acres were being purchased at a price of 33 cents per square foot; (b) 14-plus acres were being purchased at a price of 29 cents per square foot; (c) the total sale price was approximately $228,000; (d) $193,000 of the sale price would be a cash payment (from Defendant's sale of the Montana property); and (e) Pokobo would contribute the remaining $35,000 as a charitable contribution to the Lutheran Church (PTX 63 at MIF000230; Tr., Vol. A 90:17-92:5).

15.

The $35,000 charitable contribution from Pokobo was funded through a capital contribution from Mr. Polak in the amount of $40,000 (Tr., Vol. A 92:6-17), which he forwarded to Defendant on March 10 (PTX 74). As Mr. Polak testified, this "represent[ed] the $35,000, my balance of the purchase price for the 17 acres, plus closing costs" (Tr., Vol. A 92:13-14).

> G.    Defendant Purchases The 17 Acres -- Using Pokobo Funds
>        To Pay Closing Costs

On March 20, 1999, Defendant entered into a Purchase and Sale Contract with the Lutheran Church through which he personally acquired an undivided interest in the 17 Acres owned by the Church (PTX 78). Under the agreement, Defendant could "cause Pokobo LLC" to pay his costs associated with acquiring the 17 Acres:

> 6.2    Buyer's Costs.    Buyer shall pay, or cause Pokobo LLC, a Delaware limited liability company, to pay for the following on behalf of Buyer:
>
> (a)    Buyer's attorneys' fees;
>
> (b)    all notary fees;
>
> (c)    all of the cost of the Owner's Title Policy;
>
> (d)    all of Escrow's fees;
>
> (e)    the cost of drafting of the Deed and all other conveyance documents;
>
> (f)    all recording and filing fees; and
>
> (g)    the conveyance and sales tax due on the conveyance and sale of the Property to Buyer.

(PTX 78, ¶ 6.2). Similarly, under paragraph 8.4(c) of the agreement, Defendant could "cause Pokobo LLC" to pay the costs of consolidation and resubdivision:

> (c)    Costs of Consolidation and Resubdivision or Subdivision.    Buyer shall pay, or cause Pokobo LLC, a Delaware limited liability company to pay, the costs of consolidation and resubdivision or subdivision.

16.

(*Id.*, ¶ 8.4(c)).  The agreement also included an address for providing notice to Pokobo under the agreement (*id.*, ¶ 11.13).  *See also* PTX 61 at JMK 005815 (draft agreement indicating -- in Defendant's handwritten -- that "Pokobo" should be added to notice provision); Tr., Vol. E 552:5-17.

      Despite a mountain of contemporaneous evidence showing the terms upon which the parties agreed that Pokobo would acquire the 17 Acres, Defendant testified at trial that he purchased the 17 Acres for his own benefit -- because Mr. Polak never responded to a voicemail message that Defendant supposedly left for Mr. Polak at his office on Sunday evening, February 21, 1999, asking whether Mr. Polak was interested in contributing $340,000 to purchase the 17 Acres and finance a coffee mill operation on the land:

> Q.    . . . [C]an you say approximately when the time was?
>
> A.    Yes.  In the period of approximately the middle of February '99 . . . -- on the 21st, I flew back from Newark, having been in New York . . . .
>
> Q.    Did you ultimately make a final proposal to Mr. Polak to either be in or out of the acquisition of the 17 acres?
>
> A.    I did.  When I returned the evening of the 21st, I had received a voicemail from Mr. Olson, who said that his management of board meeting had occurred, that they were in a position where they had to move forward with the subdivision.
>
>                      \*   \*   \*
>
> Mr. Olson said he needed to know by that Friday at the very latest. . . .
>
> Q.    Did you advise Mr. Polak of the requirement to either decide to come in or not to come into the 17 acres as part of the coffee operation?
>
> A.    That evening, . . . I did leave a message in Mr. Polak's office on his voice mail, asking if he was in or not in on the

> transaction for the coffee mill, because the land was now
> available, but I needed commitment for the $340,000.

Q.     Did Mr. Polak respond to that proposal?

A.     No.

(Tr., Vol. D 477:3-478:15).

The only documentary evidence that Defendant presented at trial concerning the
supposed discussions between the parties about a coffee mill on the 17 acres was Mr. Polak's
handwritten notes from his February 8, 1999 conversation with Defendant (PTX 40), which
included a reference to "$340,000." *See* Tr., Vol. E 580:15-21 ("That's the only document we
showed to the Court, yes."). According to Defendant, this reference to $340,000 referred to the
investment required from Mr. Polak to acquire the 17 acres and purchase the equipment
necessary for the coffee mill:

> Q.     So can you be more specific for the Court as to how the
> number 340,000, . . . would have been computed or discussed for
> land and that [coffee] facility?
>
> A.     Yes.  For a $480,000 facility, half would be $240,000.  If
> the land were $200,000, approximately, that would be another
> hundred thousand dollars.  A hundred thousand plus 240,000 equal
> $340,000, which was the commitment that Mr. Polak had to make
> for participating in any of the transactions as an individual.

(Tr., Vol. E 457:15-24).  But, as Mr. Polak testified, the reference to $340,000 had nothing to do
with a coffee mill; it was the simple multiplication of the potential price of $20,000 per acre for
the 17 Acres:

> Q.     What do these notes reflect?
>
> A.     . . .  And then the item No. 9, simply what I did is I took the
> 17 acres.  You see it is above the number 20,000, and I
> multiplied it by 20,000.  20,000 was what Mr. Kobayashi
> told me was probably the maximum amount that we would
> have to pay for the 17 acres, which is equivalent [to] about
> 45 cents.  And therefore I multiplied 17 by the 20,000, and,

> therefore, the total price for the 17 acres would be $340,000.
>
> It had nothing to do with the coffee mill or the price of the coffee mill. It's simply the total price of the 17 acres, so we were looking at saying to each other, oh, is there any problem with the $340,000 between the two of us? Answer: No.

(Tr., Vol. E 613:8, 613:16-614:3).

Indeed, Defendant's story about the coffee mill and Mr. Polak's lack of interest in participating in a coffee mill operation as the reason Defendant purchased the 17 Acres without Mr. Polak was a story that Defendant told for the first time at trial. At his deposition, when he was asked why he purchased the 17 Acres for his own benefit, without Mr. Polak, Defendant said nothing about a coffee mill:

> Q.    So in your deposition, there's no reference to any coffee mill conversation or any coffee mill voice mail, is there?
>
> A.    At that period of the 21st or 22nd?
>
> Q.    At any period with respect to a voice mail asking for Mr. Polak to fish or cut bait, in your deposition, there's no mention of a coffee mill; right?
>
> A.    I don't recall.
>
> &ast;   &ast;   &ast;
>
> Q.    Okay. The beginning of the second day, . . . Ms. Waesco came back and asked you what was in that voice mail [for Mr. Polak]. . . .
>
> "Answer: The voicemail, as I recall it, that things had changed and I needed confirmation from him that he wanted to go forward beyond our original agreement for the small square."
>
> &ast;   &ast;   &ast;
>
> Q.    You were asked that question and you gave that answer; is that right?

A.     Correct.

Q.     No mention of a coffee mill; right?

A.     It's implied in that. Things had gone beyond the initial small square.

Q.     The words "coffee mill" don't appear in your answer, do they?

A.     Not in that answer, no.

\* \* \*

Q.     The first time you mentioned the coffee mill as the sticking point between you and Mr. Polak was your testimony yesterday in this court; right?

A.     First time I mentioned it in testimony, correct.

(Tr., Vol. E 581:15-582:19, 587:6-9).

In his interrogatory responses, Defendant told yet another story (*see* Tr., Vol. E 585:12-586:12). Rather than Defendant leaving a voicemail about a supposed coffee mill on the 17 Acres, in his interrogatory responses, Defendant claimed that the parties had spoken and that Mr. Polak had affirmatively declined to participate in the acquisition of the 17 Acres:

> In oral discussions between Polak and Kobayashi, Polak stated his position that he did not want to invest in any additional property in Hawaii other than the initial 64-Acre parcel. Specifically, Polak stated to Kobayashi that he did not want to contribute cash to acquire the 17-Acre Parcel that is in dispute. On that basis, Kobayashi, using his own separate funds, purchased the 17-Acre Parcel for his own personal account.

(PTX 239 at 6; Tr., Vol. E. 585:12-568:12).

H.     Everyone Associated With Pokobo Understood That Pokobo -- Not Defendant -- Purchased The 17 Acres

The story that Defendant told at trial about how he purchased the 17 Acres for his own benefit is not only inconsistent with his deposition testimony and his interrogatory

20.

responses, but is also inconsistent with the contemporaneous evidence -- which shows that everyone associated with Pokobo believed that Pokobo (not Defendant) had purchased the 17 Acres.

For example, on February 23, 1999 -- consistent with the provision of the Purchase and Sale Agreement that Defendant could "cause Pokobo LLC" to pay the closing costs for the 17 Acres (PTX 78, ¶ 6.2) -- Defendant's assistant sent a cover letter on Pokobo letterhead and a $1,000 check drawn on Pokobo's bank account to the attorney retained to handle the acquisition of the 17 Acres from the Lutheran Church (PTX 59). *See also* Tr., Vol. E 558:23-559:1 ("Ms. Bennett paid the fees out of the Pokobo account, correct."). Defendant's assistant also paid the closing costs associated with the acquisition of the 17 Acres (including escrow fees and title insurance) using Pokobo's funds (PTX 87). *See also* Tr., Vol. E 562:7-11 ("Well, the check came from Pokobo, but it should not have.").

On February 23, 1999 -- consistent with the provision of the Purchase and Sale Agreement that Defendant could "cause Pokobo LLC" to pay subdivision costs associated with the 17 Acres (PTX 78, ¶ 8.4(c)) -- Mr. Fuke sent a memo to a surveying company seeking their help with the subdivision process for the 17 Acres:

> . . . [O]ne of my clients (POKOBO, LLC) is negotiating the possible purchase of a portion of the subject property. Part of this acquisition will involve having POKOBO, LLC assume the responsibility (and possible cost) to process the balance of the subdivision application. . . .

(PTX 60; Tr., Vol. B 56:18-58:9).

Mr. Polak also understood that the 17 Acres had been acquired for Pokobo's benefit. After the parties agreed on the terms of Pokobo's acquisition of the 17 Acres in February 1999, Mr. Polak continued to ask Defendant for updates on the status of the transaction

and was told on multiple occasions that the closing was delayed because the subdivision process

was taking longer than expected:

> Q.    Mr. Polak, after February of 1999, did you ask
> Mr. Kobayashi for updates on the status of the acquisition
> of the 17 acres?
>
> A.    Yes.  Periodically, when we talked on the phone, I would
> say, what's going on, and he would tell me that, regrettably,
> everything is bogged down, the bureaucracy is in full gear
> here in Hawaii and it's taking time to get everything done,
> but, don't worry, it will be done.
>
> *   *   *
>
> Q.    Mr. Polak, in late August of 1999, did you continue to ask
> Mr. Kobayashi about the progress of the closing of the 17
> acres?
>
> A.    Yes.  But I got the same line as before:  That everything
> was slow going and that it hadn't -- that the subdivision had
> not been approved yet, and the negotiations were going
> forward, and don't worry, it will close sooner or later.
> I just have to be patient.

(Tr., Vol. A 97:16-23, 101:18-25).

Nevertheless, the parties continued to discuss how they would develop both the

64 Acres and the 17 Acres.  On August 9, 1999, Mr. Polak and Defendant discussed a "master

plan" for the 81 acres:

> John told me that the county planning commission may make a
> decision on Lako Street soon and for us to be able to negotiate with
> respect to the road that we were going to give to the county, that is
> the Lako Street extension, we were going to give them 60 feet, all
> the way from the Lako Street where it stopped at the west end
> portion all the way through either the 17 or the 64 acres.
>
> And so [Defendant] suggested that in order for us to be able to talk
> meaningfully with the county planning commission in order to get
> credit, he wanted to get the offset credits and -- for impact costs.
> He said in order to have meaningful negotiations, he would like us
> to have a master plan for the 81 acres, that is the 64 plus the 17, so

> that we would be able to negotiate with them and the county would
> be able to recognize what we were going to do with the 81 acres.

(Tr., Vol. A 98:11-99:1; PTX 93).  *See also* PTX 95 (discussing "Overall Concept Plan"); Tr.,

Vol. B 59:1-61-1.

In October 1999, Mr. Polak and Defendant visited the Pokobo property in Hawaii

and "trotted onto our 17 acres, around the church area, and then tried to determine how and what

we were going to do" regarding the development of the land, including placing a community

center or a coffee mill on the eastern portion of the 17 Acres (Tr., Vol. A 100:4-101:17).

In a telephone conversation on January 24, 2000, as reflected in Mr. Polak's notes

(PTX 118), the parties agreed to obtain an archaeological study for the 17 Acres:

> In order to get any approval for anything, you had to make sure
> that you had approval with respect to any archaeological or cultural
> problems that you had:  Burial sites or anything of significance
> with respect to native Hawaiians on that land.  They had to be
> fenced off or blocked off in some way and you could not develop
> in those areas.  And we had to know where those archaeological
> problems were in order for us to determine where we would be
> able to build, for example, the coffee mill or the community center.

(Tr., Vol. A 102:22-103:6).  That same day, Mr. Fuke sent a memorandum to an archaeological

consultant requesting a fee proposal:

> My client, POKOBO, LLC, recently acquired a 17+ acre portion of
> the subject parcel. . . .  POKOBO, LLC is interested in having an
> archaeological inventory survey done of this area . . . .

(PTX 117).  *See also* PTX 116 (memorandum from Mr. Fuke requesting fee proposal for

engineering work for the 17 Acres).

On February 14, 2000, Defendant sent Mr. Polak a memorandum listing Pokobo's

past due expenses and "guesstimates" of Pokobo's expenses over the next six to nine months

(PTX 122).  Most of the expenses involved the 17 Acres (as opposed to the 64 Acres), and

included the costs of the archaeological and engineering work associated with the 17 Acres (Tr.,

Vol. A 104:18-105:23).  Defendant asked Mr. Polak to "send an initial amount to cover Category I [due and payable] expenses and as much of the Category II expenses [*i.e.*, estimates of expenses that Pokobo expected to incur in the future] as you think appropriate" (PTX 122). Mr. Polak immediately wrote a check to Pokobo in the amount of $25,000 (PTX 124).

On February 28, 2000, Defendant sent a letter on Pokobo letterhead and a $2,000 check drawn on Pokobo's bank account retaining Dr. Alan Haun to conduct an archaeological study on the 17 Acres.  *See* PTX 127 ("[W]e are authorizing you . . . to proceed on behalf of POKOBO, L.L.C. to conduct an archaeological survey of the 17.6 Acre portion . . . ."); *see also* PTX 123 ("At your request on behalf of POKOBO, LLC, Haun & Associates proposes to conduct an archaeological inventory survey of a 17+ acre [parcel] . . . ."); PTX 126 ("POKOBO has retained Dr. Alan Haun . . . to do the initial archaeological inventory and survey of the 17.6 acres.").

In early 2000, Mr. Polak received a list from Defendant of the parties' respective capital contributions to Pokobo for the years 1997, 1998 and 1999 (PTX 105), which reflected Defendant's contribution of the 17 Acres to Pokobo (or the $194,047.77 in proceeds from the sale of Defendant's Montana property) (*id.* at WLP000341), as well as Mr. Polak's $40,000 contribution to Pokobo to cover the balance of the $228,000 purchase price (*id.* at WLP000342). *See also* Tr. Vol. A 108:7-110:7.

In May 2000, Defendant attended Mr. Polak's birthday party in New York (Tr., Vol. A 110:8-112:24).  At the party, Defendant gave Mr. Polak an aerial photograph of Pokobo's Hawaii property, with Pokobo's land (both the 64 Acres and the 17 Acres) outlined in red (PTX 138).  *Compare* PTX 238 with PTX 138.

24.

In early December 2001, Mr. Polak spoke again with Defendant by telephone and discussed expenses incurred by Pokobo that had been paid by Defendant as well as current bills payable.  In that conversation, Defendant requested that Mr. Polak reimburse him for the bills that he had already paid and contribute funds sufficient to cover outstanding bills:

> Q.    And what was discussed in that [December 2001] conversation?
>
> A.    John told me that he was creating a list of bills that he had in his possession that remained unpaid, and he also collected a series of bills that he had paid for which he seeks reimbursement. . . .
>
> Q.    And were you going to pay a hundred percent of those bills or were you going to split them with Mr. Kobayashi?
>
> A.    No.  No.  This again would be my job as catch-up and therefore I would be paying the entire bills that remained unpaid as well as those that were reimbursement for John for payments in the past.

(Tr., Vol. A 121:23-122:17).  Consistent with the parties' understanding that Mr. Polak needed to catch up on his capital contributions, Mr. Polak immediately sent Defendant a check in the amount of $35,000 to cover the bills payable (PTX 173; PTX 174; Tr., Vol. A 126:1-7).

Shortly thereafter, Defendant sent Mr. Polak a letter dated December 14, 2001 (PTX 175), in which Defendant listed the various expenses the parties had discussed earlier in the month, acknowledged receipt of Mr. Polak's $35,000 check, and requested that Mr. Polak "send the amount of the remaining balance of the bills already paid by me sometime in January . . ." (*id.* at WLP000009).  The list of "Pokobo Expenses" included expenses associated with the 17 Acres (Tr., Vol. A 126:15-127:7).

After receiving this letter and the attached list of "Pokobo Expenses," Mr. Polak sent two additional checks to reimburse Defendant for the expenses he had already paid -- one in the amount of $20,000 (PTX 180), and the other in the amount of $25,000 (PTX 188; PTX 189).

25.

In total, Mr. Polak contributed $80,000 to Pokobo -- slightly more than the total expenses identified by Defendant in his December 14, 2001 letter -- to pay for expenses associated with the 17 Acres based on the understanding that the land belonged to Pokobo, and that Mr. Polak needed to contribute additional funds to equalize the parties' capital accounts (Tr., Vol. A 122:14-17).

Mr. Fuke testified at trial that it was his understanding from the beginning that Pokobo -- not Defendant -- was the party acquiring the land from the Lutheran Church:

> Q.    Was it your understanding in February 1999 that it would be Pokobo and not Mr. Kobayashi that would be procuring this small parcel of land from the [Lutheran] [C]hurch?
>
> A.    Yes.
>
> *    *    *
>
> Q.    At any point in time in the drafting of [PTX 37 and PTX 38] or any subsequent revisions, did Mr. Kobayashi ever correct you and say, no, it's Kobayashi, John Kobayashi, who's buying this property, not Pokobo?
>
> A.    No. It was always clear to me it was Pokobo, because [the additional land] was intended to service the Pokobo 64-acre property.

(Tr., Vol. B 46:16-19, 48:5-10). *See also* PTX 37; PTX 38.

When Mr. Fuke expanded his analysis to include Pokobo's possible acquisition of the 17 Acres, his understanding about who was purchasing the 17 Acres remained the same:

> Q.    Relative to your February 8, 1999 memo, what was your understanding as to who it was proposed would acquire the 17 acres? Was it Pokobo or Mr. Kobayashi?
>
> A.    Pokobo.

> Q.   And who gave you that understanding?  How did you come
>       to that understanding?
>
> A.   In my discussions with John [Kobayashi] and also in
>       looking at the memorandum, it's clear to me that there's no
>       reference to John Kobayashi's acquiring it.

(Tr., Vol. B 50:21-51:4).  *See also* PTX 114 ("I informed them that POKOBO . . . owns both

properties (including the lower portion of the Lutheran Church site."); PTX 135; PTX 146; PTX

147 ("POKOBO, LLC owns two parcels critical to this project.").

      Similarly, Pokobo's accountant, Mr. Grubb, also believed that Pokobo had

acquired the 17 Acres.  Many of the documents and schedules that Defendant provided to

Mr. Grubb in connection with the preparation of Pokobo's year-end tax documents indicate that

the 17 Acres was acquired by Pokobo.  *See, e.g.*, PTX 77 (crediting Defendant's capital account

with a contribution in the amount of $194,047.77 described as "JMK Property Exchange");

PTX 105 (same); PTX 106 (reflecting the charitable deduction mentioned in Mr. Grubb's

February 1999 memos that Mr. Polak took in connection with the acquisition of the 17 Acres, as

well as Defendant's $194,048 contribution to Pokobo); PTX 110 (listing Defendant's

contribution of the 17 Acres as a capital contribution to Pokobo); PTX 155 (calculating a

difference of $161,082.44 between parties' capital accounts due to Defendant's contribution of

the 17 Acres to the Company); PTX 176 (listing the total value of the land owned by Pokobo,

including both the 64 Acres and 17 Acres); PTX 190 (crediting Defendant for a $194,047.77

capital contribution in 1999 that represented the value of the 17 Acres contributed to Pokobo).

*See also* Tr., Vol. B 271:11-292:22, 304:19-308:14, 310:2-312:2, 314:1-315:7, 332:15-335:23.[6]

---

[6]   Defendant did not do anything to correct Mr. Grubb's misapprehension until March 2003
       -- more than four years after Defendant purchased the 17 Acres -- that Defendant, not
       Pokobo, owned the land (Tr., Vol. B 346:18-347:13, 348:17-22).  Around that time,
       Defendant instructed Mr. Grubb to prepare an "adjusting entry" to his work papers in the
       (Continued . . .)

I.     Mr. Polak and Defendant Stop Communicating

The last time that Mr. Polak spoke with Defendant was in April 2002, when Defendant was in New York (Tr., Vol. A 132:2-7). Because it was uncommon for Mr. Polak and Defendant to go several months without speaking, Mr. Polak became concerned and left several telephone messages for Defendant to make sure that everything was okay (Tr., Vol. A 136:15-24). Defendant did not respond to Mr. Polak's phone messages (*id.*). Mr. Polak also sent Defendant letters asking for an update regarding Pokobo and inquiring about Defendant's health (PTX 197; PTX 200). Again, these letters went unanswered (Tr., Vol. A 138:9-11, 142:22-143:2).

Mr. Polak also sent letters to Mr. Grubb and Michael Matsukawa ("Mr. Matsukawa"), Pokobo's then-attorney in Hawaii, explaining that he was having difficulty reaching Defendant and inquiring about Defendant's health (PTX 198; PTX 199). Neither Mr. Grubb nor Mr. Matsukawa responded to these letters (Tr., Vol. A 139:6-8, 140:18-19).

When Defendant did not respond to his November 18, 2002 letter (PTX 200), Mr. Polak contacted an attorney in Hawaii, Margery Bronster ("Ms. Bronster"), and asked her to look into what was happening regarding the 64 Acres and the 17 Acres owned by Pokobo (Tr., Vol. A 142:25-144:6). What Mr. Polak learned from Ms. Bronster came as a shock:

> Q.     Did you ever come to learn that the closing for the 17 acres had not occurred or had occurred? . . .
>
> A.     With the help of [Ms. Bronster], her legal assistant apparently went to the county and obtained information

---

(. . . continued)
amount of $194,047.77 that reflected the removal of the 17 Acres as a partnership asset, as well as a corresponding adjusting entry in the amount of $200,000 that represented the value of unspecified "services" Defendant purportedly provided to Pokobo (PTX 207; Tr., Vol. B 346:2-347:3).

with respect to the pieces of property, which included the 64 acres and the 17 acres. And in that report that I received in mid-November, it indicated that the subdivision of the 17 acres and the five acres had actually been approved much earlier, in 2000, and that the deal had closed. That is, that the deed apparently was given to John for the 17 acres and to the Local Church for the five acres, way back in 2000.

Q.     And that surprised you?

A.     Total surprise.

Q.     And why was that?

A.     Because John had always told me that the closing hadn't taken place, that Hawaii is just bureaucratic and it's taking a long time and that the subdivision approval was awaiting conclusion but it had not been approved by the county, and that's why he wasn't giving me any closing papers.

(Tr., Vol. A 143:12-144:6). Upon learning that Defendant had deceived him for more than three years, Mr. Polak wrote to Defendant on December 19, 2002, and described the effect that Defendant's recent actions were having on Pokobo:

It is a time of year where we usually exchange warm greetings for the holidays. Unfortunately, you have decided to sever our relationship, and refuse to respond to my mail and my telephone messages, which I regret very much. Needless to say, it will detrimentally affect POKOBO, LLC, since we are 50/50 partners and therefore any act requires the consent of both partners.

(PTX 202).

Over the next several years, Mr. Polak and Defendant communicated infrequently by letter. As those letters reveal, the parties' relationship continued to sour to the point where Pokobo was incapable of taking any action and development plans for the 64 Acres and the 17 Acres were put on hold (PTX 205; PTX 208; PTX 218; PTX 219; PTX 230). Defendant also instructed Pokobo's accountant, Mr. Grubb, not to release any documents or information regarding Pokobo to Mr. Polak (PTX 227 at WLP000098; PTX 228).

J.    Defendant Rejects Mr. Polak's Proposal to Dissolve
Pokobo

Prior to filing this lawsuit, Mr. Polak made one final effort to avoid litigation.  On

January 31, 2005, Mr. Polak wrote to Defendant and suggested that they dissolve Pokobo:

> The partnership has clearly broken down.  There is no longer any
> communication between us.  The investment will continue to
> suffer.  As a consequence, I propose that we sell both properties,
> conduct an accounting, distribute the proceeds, and dissolve
> Pokobo LLC.  There is no alternative under the circumstances.
>
> I await an early reply.  Since you have not responded to my
> previous letters, I must add that if I do not hear from you before
> February 15th, I will take you silence as a rejection of my proposal.

(PTX 230).  When Defendant did not respond, Mr. Polak filed this action to protect his rights.

<u>ARGUMENT</u>

I.     <u>DEFENDANT HAS BREACHED HIS FIDUCIARY DUTIES</u>

The Delaware Limited Liability Act (the "Delaware LLC Act") provides that any existing duties, including fiduciary duties, can be "expanded or restricted or eliminated" by a limited liability company agreement.  6 *Del. C.* § 18-1101(c).  In cases where a limited liability company's operating agreement is silent on fiduciary duties of members, courts will default to traditional corporate governance fiduciary duties.  *See* Myron T. Steele, *Judicial Scrutiny of Fiduciary Duties in Delaware Limited Partnerships and Limited Liability Companies*, 32 Del. J. Corp. L. 1, 26 (2007); *see also Metro Commc'n. Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 156 n.78 (Del. Ch. 2004) (noting that "corporate standards often serve as the default rule in the alternative entity context unless they are preempted by valid contracting decisions").

As a manager and member of Pokobo, Defendant owes fiduciary duties of care, loyalty and good faith to both Mr. Polak and Pokobo.  *Metro Commc'n.*, 854 A.2d at 153 (holding that the managers of a limited liability company owe fiduciary duties of loyalty and care to the company and its members).  Defendant is required to exercise the appropriate degree of care in the performance of his managerial duties, and "to refrain from doing anything that would work injury to the [Company] . . . ."  *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. Ch. 1939).  In particular, the duty of loyalty mandates that:

> Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders. A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that *demands* of a corporate officer or director, *peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed*

> *to his charge, but also to refrain from doing anything that would*
> *work injury to the corporation,* or to deprive it of profit or
> advantage which his skill and ability might properly bring to it, or
> to enable it to make in the reasonable and lawful exercise of its
> powers. The rule that requires an undivided and unselfish loyalty
> to the corporation demands that there shall be no conflict between
> duty and self-interest.

*Id.* at 510.

The corporate opportunity doctrine has evolved from these principles, and is based upon "broad considerations of corporate duty and loyalty," recognizing that a director's obligation to a corporation cannot be ignored in the pursuit of private gain. *Id.* at 511. The same principles apply in the context of alternative entities, such as limited liability companies. As the Delaware Supreme Court has stated, "[t]he doctrine of corporate opportunity represents but one species of the broad fiduciary duties assumed by a corporate director or officer." *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154 (Del. 1996).

Under Delaware law, the standard for proving usurpation of a corporate opportunity is a four-factor balancing test:

> [A] corporate officer or director may not take a business
> opportunity for his own if: (1) the corporation is financially able to
> exploit the opportunity; (2) the opportunity is within the
> corporation's line of business; (3) the corporation has an interest or
> expectancy in the opportunity; and (4) by taking the opportunity
> for his own, the corporate fiduciary will thereby be placed in a
> position inimicable to his duties to the corporation.

*Broz,* 673 A.2d at 155; *see also Guth*, 5 A.2d at 511 ("[I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.").

The Court must apply all four of these factors to determine "whether or not the director has appropriated for himself something that in fairness should belong to his corporation." *Johnston v. Greene*, 121 A.2d 919, 923 (Del. 1956); s*ee also Broz*, 673 A.2d at 155 (instructing that all four factors must be applied when applicable). Whether a corporate opportunity was usurped is a factual question that the Court should determine by "reasonable inference from objective facts." *Broz*, 673 A.2d at 155.

### A. Defendant Usurped A Corporate Opportunity When He Acquired The 17 Acres For Himself

Each of the four relevant factors in this case weighs heavily in favor of finding that Defendant usurped a corporate opportunity by purchasing the 17 Acres for himself and failing to transfer it to Pokobo once the land had been subdivided. To remedy this breach, the Court should find that Pokobo is the rightful owner of the 17 Acres, and that the land is being held by Defendant in constructive trust for the benefit of Pokobo.

### 1. Pokobo Was Financially Able To Purchase The 17 Acres

The undisputed facts show that the Pokobo's two members (and by extension the Company itself) were financially capable of purchasing the 17 Acres. Defendant had access to $190,000 from the sale of land in Montana (PTX 50; PTX 56; PTX 64; Tr., Vol. A 81:18-82:8); Mr. Polak testified that he was willing to pay as much as $340,000 for the property, and that the ultimate purchase price of $228,000 was a "very good" price for the land (Tr., Vol. A 67:3-13, 86:9-17).

There is no evidence that either party was unwilling or financially unable to contribute his portion of the purchase price. To the contrary, both Mr. Polak's and Defendant's notes of the negotiations demonstrate that they were prepared to fund the acquisition by having

33.

Defendant contribute $193,000 toward the acquisition of the 17 Acres, and having Mr. Polak contribute the balance of the purchase price ($35,000) and then play "catch up" until the parties' respective capital accounts were equalized (PTX 50; PTX 248).  The fact that the 17 Acres was ultimately purchased using funds from both Mr. Polak and Defendant, consistent with the structure reflected in Mr. Grubb's memoranda and the parties' notes (PTX 56; PTX 50; PTX 248), makes clear that Pokobo had the resources to purchase the 17 Acres.

> 2.     The Opportunity to Purchase the 17 Acres Was
>        Within Pokobo's Line of Business

The acquisition of the 17 Acres was in Pokobo's line of business.  In *Guth*, 5 A.2d at 514, the court explained that "[w]here a corporation is engaged in a certain business, and an opportunity is presented to it embracing an activity to which it has fundamental knowledge, practical experience and ability to pursue, which, logically and naturally, is adaptable to its business having regard for its financial position, and is consonant with its reasonable needs and aspirations for expansion, it may properly be said that the opportunity is within the corporation's line of business."

In *Equity Corp. v. Milton*, 221 A.2d 494, 497 (Del. 1966), the Delaware Supreme Court explained that, "when there is presented to a corporate officer a business opportunity which the corporation is financially able to undertake, and which, by its nature, falls into the line of the corporation's business *and is of practical advantage to it*, or is an opportunity in which the corporation has an actual or expectant interest, the officer is prohibited from permitting his self-interest to be brought into conflict with the corporation's interest and may not take the opportunity" (emphasis added).

There was clearly a practical advantage to be gained by Pokobo from acquiring the 17 Acres, and the acquisition of the 17 Acres was within Pokobo's line of business.  Under

34.

the terms of its Operating Agreement, Pokobo was permitted to engage in any lawful act, including the acquisition of real property (PTX 1, § 1.03).  Moreover, since its formation in 1997, Pokobo's only business had been the ownership and development of real estate in Hawaii. The acquisition of additional property in Hawaii to ensure that the 64 Acres would have access to Lako Street -- whether it was the original 3 acres or the 17 Acres -- was an absolute necessity for Pokobo to increase the value of the 64 Acres.  *See supra* pp. 5-7.

        3.        Pokobo Had An Interest And Expectancy In Purchasing The 17 Acres

"For the corporation to have an actual or expectant interest in any specific property, there must be some tie between that property and the nature of the corporate business." *Johnston*, 121 A.2d at 924.

> Whether in any case an officer of a corporation is in duty bound to purchase property for the corporation, or to refrain from purchasing property for himself, depends upon whether the corporation has an interest, *actual or in expectancy*, in the property, or whether the purchase of the property by the officer or director may hinder or defeat the plans and purposes of the corporation in the carrying on or development of the legitimate business for which it was created.

*Id.* at 923-24; *see also Northeast Harbor Golf Club, Inc. v. Harris*, 725 A.2d 1018 (Me. 1999) (finding that a golf club president usurped a corporate opportunity by purchasing land adjoining the club).

In this case, the connection between the 17 Acres and Pokobo's other business -- the ownership and development of the 64 Acres -- is clear.  The primary reason that Pokobo actively pursued additional, adjoining land was because the parties believed that they needed to gain access to Lako Street to increase the value of the 64 Acres.  The parties also believed that

35.

the more contiguous land that Pokobo owned, the more influence it would have with the County

in determining the alignment of the Lako Street extension (Tr., Vol. B 49:19-50:3).

> 4.    By Acquiring The 17 Acres For Himself, Defendant
> Placed Himself In A Position Inimicable To The
> Duties He Owed To Pokobo

The 17 Acres that Defendant purchased for himself from the Lutheran Church

includes both the 14+ acres immediately north of the 64 Acres that Defendant discussed with the

Church in his February 9, 1999 letter (PTX 42), and the 3 acres that the Church had originally

agreed to sell to Pokobo. *See* PTX 31 (containing Pokobo's offer and the Lutheran Church's

acceptance); PTX 42 (Pokobo's confirmation of the Church's acceptance); PTX 46 (correcting

the price on Pokobo's "above-referenced purchase" of 1 ½ to 3 acres). As discussed above, the 3

acres was critical to the development of the 64 Acres, as it provided the eastern portion of the 64

Acres with much-needed access to Lako Street (PTX 32; Tr., Vol. A 60:12-17, 61:6-11).

By no later than February 9, 1999, the Lutheran Church had agreed to sell the 3

acres to Pokobo (PTX 31; PTX 42). By entering into a contract between himself and the

Lutheran Church that included the 3-acre parcel that would have connected Lako Street to the 64

Acres, Defendant wrongfully placed his own interests before Pokobo's. Defendant had no right

to take that opportunity from Pokobo. In so doing, Defendant harmed Pokobo by leaving the 64

Acres with no eastern access to a major roadway.

Moreover, Defendant used Pokobo's resources to purchase the 17 Acres (PTX 74;

PTX 105), to cover the closing costs associated with the acquisition (PTX 87; PTX 78), and to

pay expenses associated with the 17 Acres after the property was acquired from the Lutheran

Church in early 1999 (PTX 122; PTX 123; PTX 124; PTX 127; PTX 173; PTX 175; PTX 180;

36.

PTX 188; PTX 189).   *See also* Tr., Vol. E 557:22-559:6, 560:11-561:24, 562:7-563:11

(admitting that Pokobo's funds were used to pay expenses connected with the 17 Acres).

Even if the Court were to decide that all the other factors weighed in favor of

Defendant, the undisputed facts show that Defendant wrongfully used Pokobo's resources to

acquire the land in 1999 and continued to use corporate funds to cover expenses associated with

the 17 Acres.

> A corollary of the *Guth* rule is that when a business opportunity
> comes to a corporate officer, which, because of the nature of the
> opportunity, is not one which is essential or desirable for his
> corporation to embrace, being an opportunity in which it has no
> actual or expectant interest, the officer is entitled to treat the
> business opportunity as his own and the corporation has no interest
> in it, *provided the officer has not wrongfully embarked the
> corporation's resources in order to acquire the business
> opportunity*.

*Equity Corp.*, 221 A.2d at 497 (emphasis added); *see also Guth*, 5 A.2d at 510-11.

> B.     Defendant Also Breached His Fiduciary Duties By Failing
>        To Consult With Mr. Polak Regarding Pokobo's Ongoing
>        Business

Defendant also breached his fiduciary duties by:  (a) failing to consult and

communicate with Mr. Polak regarding the ongoing business of Pokobo; and (b) by failing to

provide Mr. Polak with a full accounting of Pokobo.  The record is undisputed that Defendant

ceased virtually all communications with Mr. Polak in April 2002 (Tr., Vol. A 132:2-7; Tr., Vol.

E 590:2-4).  There is also no dispute that Mr. Polak's repeated requests to both Mr. Grubb and

Defendant for a full accounting of Pokobo went unanswered (Tr., Vol. A 169:18-170:11, 173:13-

15, 177:12-14; PTX 209; PTX 210; PTX 213; PTX 214; PTX 215; PTX 221; PTX 222; PTX

233).  These additional breaches of Defendant's fiduciary duties only strengthen the argument

for dissolving Pokobo.

## II.    DEFENDANT HAS BREACHED SECTION 5.01 OF THE OPERATING AGREEMENT

Section 5.01 of the Operating Agreement provides, in relevant part, that "[t]he Company shall be managed jointly by the Partners in accordance with this Operating Agreement" (PTX 1, § 5.01).   In violation of this contractual obligation, Defendant has: (a) improperly titled the 17 Acres -- including the 3 acres that the Lutheran Church had agreed to sell to Pokobo before Pokobo expanded its offer to acquire an additional 14+ acres -- in his own name instead of Pokobo's (as described above); (b) failed to consult and communicate with Mr. Polak regarding Pokobo's ongoing business affairs (Tr., Vol. A 132:2-7; Tr., Vol. E 590:2-4); and (c) failed to provide Mr. Polak with a full accounting (Tr., Vol. A 169:18-170:11, 173:13-15, 177:12-14; PTX 209; PTX 210; PTX 213; PTX 214; PTX 215; PTX 221; PTX 222; PTX 233).

Under Delaware law, the elements of a breach of contract are:  (1) a contractual obligation; (2) breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff.  *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).  A breach of a limited liability company agreement is a breach of contract.  *See Chase Manhattan Bank v. Iridium Africa Corp.*, 307 F. Supp. 2d 608, 612 (D. Del. 2004) (granting summary judgment on a breach of contract claim resulting from a party's failure to comply with a limited liability company agreement).

Defendant's breaches of Section 5.01 are further evidence that the trust that once marked his partnership with Mr. Polak has broken down to the point where it is not capable of repair.  Given that the parties' current relationship is virtually nonexistent, dissolution is the only viable option.

III.   POKOBO SHOULD BE DISSOLVED PURSUANT TO 6 *DEL. C.* § 18-802

Judicial dissolution of a Delaware limited liability company is warranted "whenever it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement."  6 *Del. C.* § 18-802.  As the Delaware Court of Chancery has explained, the central question is not whether it is *impossible* to continue the business, but whether it is *reasonably practicable* to continue the business.  *In re Silver Leaf, L.L.C.*, 2005 WL 2045641, at *10 (Del. Ch.).

In *Haley v. Talcott*, 864 A.2d 86 (Del. Ch. 2004), the plaintiff, one of two members of a Delaware limited liability company who held a fifty percent interest in the company, sought judicial dissolution of the company under 6 *Del. C.* § 18-802, claiming that it was not reasonably practicable to carry on the business because the parties were deadlocked.  Specifically, Haley wished to dissolve the company and sell its assets and received no response from his partner, Talcott.  To resolve the parties' dispute, the Court looked to Section 273 of the Delaware General Corporation Law, which authorizes the dissolution of a joint venture between two 50% shareholders when the parties are "unable to agree upon whether to discontinue the business or how to dispose of its assets."  *Haley*, 864 A.2d at 94; *see also* 8 *Del. C.* § 273.  In deciding to dissolve the company, the court found that the "very fact that dissolution has not occurred," coupled with the fact that Talcott was opposing Haley's claim for dissolution, were clear indicators that the two members were deadlocked.  *Haley*, 864 A.2d at 96.  The court also relied on the fact that the partners had not interacted in over a year, a fact which the court viewed as evidence of a genuine impasse between the partners.  *Id.*

In this case, each of the factors considered by the court in *Haley* is present.  Mr. Polak and Defendant are "unable to agree upon whether to discontinue [Pokobo] or how to

39.

dispose of its assets." *Id.* at 94. The parties are deadlocked, as Pokobo has yet to be dissolved, despite Mr. Polak's strong desire to do so. Moreover, Defendant continues to oppose dissolution, despite the fact that Mr. Polak and Defendant have not spoken for nearly six years. At trial, in response to a question from the Court, Defendant maintained his position that Pokobo should not be dissolved:

> As to the ongoing management of the property, there is not, as I say, much involved and not much reason for direct communication. And I suggest that, in addition, there is an issue of what would be appropriate at this point for any possible liquidation. This is absolutely the wrong time, the reasons I can explain later, to consider selling or liquidating one asset that Pokobo has.

(Tr., Vol. E 603:15-21).

Defendant's explanation for why Pokobo should not be dissolved is factually inaccurate and unpersuasive. As Mr. Polak testified, the parties cannot manage Pokobo if they are not communicating:

> Q.    Do you believe that you and Mr. Kobayashi can continue to co-manage Pokobo and its real estate holdings at this point?
>
> A.    There's no way we can do so. There's no communication with each other, nor is there any element of trust at this point, and there's no way to continue the partnership relationship on that basis.

(Tr., Vol. A 177:18-24).[7]

Mr. Polak also testified that, contrary to Defendant's position, there are current management issues that need to be addressed:

---

[7]    As further evidence of the breakdown of trust between the parties, Mr. Polak learned in the course of discovery that, in September 2003, he had been removed as a signatory on Pokobo's bank account, despite the fact that he never agreed to be removed as a signatory on the account and never discussed the matter with Defendant (PTX 263; Tr., Vol. A 48:25-50:8).

> The problems that we had at the very beginning, when it's still agricultural land, have been tremendous. We have not been able to overcome it. We have litigation right now in Hawaii, where Pokobo is unrepresented because we cannot agree on a counsel. We have not been able to do anything, negotiate, because we can't agree on the negotiations.
>
> It's only going to get worse as we talk about what we're going to do with the land in developing it, et cetera. Management must be present and people like ourselves, 50/50 ownership, have to agree on steps to be taken.
>
> There are lots of management decisions, I think.
>
> Mr. Kobayashi is incorrect to say that there will be nothing to do with respect to management. You almost have daily management decisions when you start beginning to develop that land. There's just no way that we would be able to agree, not having communicated for five years, so it would be impossible. My position would be it would be impossible to continue as is.

(Tr., Vol. E 605:15-606:9).

In order to develop the properties, Mr. Polak and Defendant need to communicate, so they can reach agreement regarding the best use of the land. Moreover, the County has yet to decide where the Ali'i Highway and Lako Street extension should be situated. Mr. Polak and Defendant will need to agree on how to approach the County to ensure that the placement of the roads is most advantageous to Pokobo. If the parties are deadlocked, dissolution should be granted and the properties sold within a commercially reasonable time so as to command the highest possible price.

Defendant's argument that Mr. Polak should have invoked Section 5.02 of the Operating Agreement -- the "Coin Flip Provision" -- when Mr. Polak proposed to dissolve Pokobo is also misplaced. Section 5.02 provides that "[i]n the event that the Partners cannot agree on a course of action, they shall flip a coin 3 times and the recommendation of the winner of 2 of the 3 coin flips shall be followed" (PTX 1, § 5.02). Neither Mr. Polak nor Defendant has

41.

invoked Section 5.02 at any time since Pokobo's formation in 1997 (Tr., Vol. A 47:10-15; Tr.,

Vol. E 591:12-17).  Moreover, Defendant's counsel conceded at trial that the Coin Flip Provision

does not to apply to disputes between Pokobo's members, stating that "the coin flip does not

apply to actions between partners.  It applies to actions of Pokobo" (Tr., Vol. E 590:23-24).

Delaware courts have refused to enforce an otherwise valid section of a limited

liability company agreement when the result would be inequitable.  In *Haley*, 864 A.2d at 88, the

limited liability company agreement contained an exit mechanism permitting one member to

buyout the other's interest.  The court declined to enforce the provision because it would have

imposed an inequitable result on one of the members, neither of whom wished to be bought out.

*Id.* at 96-98.  Moreover, courts have held that allowing a coin flip to make a potential end-of-life

decision for a company would be inequitable.  *See Kandalepas v. Economou*, 547 N.E.2d 496,

498 (Ill. App. Ct. 1989) (commenting that, despite both partners' agreement to let a coin flip

decide which partner's interest would be bought out, "[w]e can hardly consider [the coin toss] to

constitute a balancing of the equities of the case and, instead, feel that it violates public policy").

## IV.    THE RELIEF REQUESTED IN MR. POLAK'S AMENDED COMPLAINT IS APPROPRIATE AND JUSTIFIED

### A.    The Relief Requested Is Consistent With Pokobo's Operating Agreement, The Delaware LLC Act And Applicable Case Law

Mr. Polak seeks, among other things, an Order (a) decreeing that Pokobo is

dissolved pursuant to 6 *Del. C.* §§ 18-801 and 18-802, and (b) approving the winding up of the

affairs and business of Pokobo by Mr. Polak in accordance with the Operating Agreement and 6

*Del. C.* §§ 18-803 and 18-804 (D.I. 85 at 16).

Section 8.02 of the Operating Agreement provides that "[i]n all cases of

dissolution of the Company, the business of the Company shall be wound up and the Company

terminated as promptly as practicable thereafter . . . " (PTX 1).  The Delaware LLC Act grants a

manager who has not wrongfully dissolved the limited liability company the power to wind up

the affairs of the company.  *See* 6 *Del. C.* § 18-803(a).

Pursuant to 6 *Del. C.* § 18-803(b), the person or persons conducting the winding

up of an limited liability company may settle and close the company's business, dispose of the

company's property, discharge the company's liabilities, and distribute the remaining assets to

the company's members.  *See* 6 *Del. C.* § 18-803(b).   Section 8.02(b) of the Operating

Agreement provides that, upon dissolution, the "property and assets of the Company shall be

liquidated by the Partners or their representatives as promptly as possible, but in an orderly and

businesslike and commercially reasonable manner" (PTX 1).  Where, as here, a limited liability

company's sole asset is real property, upon dissolution, it is appropriate for the property to be

sold by the parties.  *See Haley*, 864 A.2d at 98 (ordering the parties "to sell the Property owned

by the LLC within a commercially reasonable time frame").

B.     Mr. Polak Is Entitled To A Full Accounting Of Pokobo As
       A Result Of Defendant's Breach Of Fiduciary Duty

Mr. Polak also asks the Court to "[o]rder[] a full and complete accounting of

Pokobo's expenses, and of each Partner's capital contributions to Pokobo since its formation in

1997" (D.I. 85 at 16).  Such relief is warranted, in light of the fiduciary obligations Defendant

owes to both Mr. Polak and Pokobo, as "[i]t is a well established principle of equity that

fiduciaries have a duty to account to their beneficiaries for their disposition of all assets that they

manage in a fiduciary capacity."  *Technicorp Int'l II, Inc. v. Johnston*, 2000 WL 713750, at *2

(Del. Ch.); *see also* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial*

*Practice in the Delaware Court of Chancery* § 12-6[a] at 12-86 ("It is well established that

corporate directors in some instances will have a fiduciary duty to account with respect to property that they control for the benefit of the corporation and its stockholders.").

An accounting is a traditional remedy for a manager's breach of fiduciary duty, especially in a case such as this one where the manager has usurped a corporate opportunity. *See Loft, Inc. v. Guth*, 2 A.2d 225, 238 (Del. Ch. 1938) (stating that a fiduciary who has wrongfully usurped a corporate opportunity "must account for the profits resulting from an unlawful act done to promote his own interest"). In the context of an accounting, fiduciaries have the burden of showing that they dealt properly with company assets and have a duty to account for their disposition of the assets by establishing the "purpose, amount, and propriety of the disbursements." *Technicorp*, 2000 WL 713750, at *16. "An accounting for profits is a means of measuring the benefits bestowed on an unjustly enriched defendant, . . . [who] . . . may be ordered to turn over to the plaintiff the profits earned through the use or possession of the plaintiff's property." *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1063-64 (Del. 1988). A fiduciary must account not only for the value of the corporate opportunity he took for his own, but also for "all the gains and profits derived therefrom." *Loft*, 2 A.2d at 238.

Mr. Polak does not have all the records he needs for an accounting:

Q.    Okay. With regard to your request for accounting, are you aware of whether or not you presently have all of the books and records of Pokobo that exist so far as Mr. Grubb or Mr. Kobayashi are aware?

A.    No.

Q.    What records do you not have at this moment in time?

A.    I do not have any copies of the checks or the bank statements. I do not have any details with respect to the expenses of Pokobo.

Q.    You do have the detailed expenses as of December 31, 2001; correct?

> A.    No, I don't have the details at all. . . .  I had no details as to
> whether or not [the expenses] were made for the benefit of
> Pokobo or for something else.

(Tr., Vol. B 14:10-15:1).  Indeed, the accuracy of the financial books and records of Pokobo that

Mr. Polak was able to obtain from Defendant and Mr. Grubb in discovery is subject to debate.

Mr. Grubb testified that he relied on the financial documents provided to him by Defendant's

office to prepare the year-end financials for Pokobo without requesting any supporting

documentation or taking any steps to verify independently the accuracy of the numbers he

received (Tr., Vol. B 222:22-226:4, 230:20-231:2).

Where, as here, Defendant has breached his duty of loyalty to Mr. Polak and

Pokobo, Mr. Polak should not be required to accept as true the financial documents prepared and

maintained by Defendant and his office staff (in accordance with his instructions).  Rather, an

accounting would necessarily involve a thorough review of both the financial records of Pokobo

*and* the underlying cancelled checks, bank statements and other supporting documents.[8]

> C.    The 17 Acres Should Be Deemed To Be Held In
> Constructive Trust For The Benefit Of Pokobo

In connection with Defendant's usurpation of the corporate opportunity to

purchase the 17 Acres, Mr. Polak seeks a judicial declaration that the 17 Acres is being held in

constructive trust for the benefit of Pokobo (D.I. 85 at 16).

---

[8]    Indeed, "an accounting action should be conducted in two stages, such method of procedure avoiding the confusion which arises from intermingling evidence on the issue of liability with evidence concerning the minutiae of an account."  *Pan Am. Trade and Inv. Corp. v. Commercial Metals Co.*, 154 A.2d 151, 155 (Del. Ch. 1959); *see also* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 12-6[c] at 12-90 to 12-91 (noting that an accounting is usually bifurcated into two separate procedural stages:  (1) the right to an accounting; and (2) the actual accounting proceeding, in which "[t]he details of the accounts at issue ordinarily are examined."

As the Delaware Supreme Court has explained, the proper remedy for the usurpation of a corporate opportunity is for the property to be placed in a constructive trust for the benefit of the company:

> *If an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation*, at its election, while it denies to the betrayer all benefit and profit. The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation. *Given the relation between the parties, a certain result follows; and a constructive trust is the remedial device through which precedence of self is compelled to give way to the stern demands of loyalty*.

*Guth*, 5 A.2d at 510 (emphasis added).

Constructive trusts are the remedy most often utilized in cases involving the usurpation of a corporate opportunity. *See* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 12-7[b] at 12-97; *Stephanis, by Sterianou v. Yiannatsis*, 1993 WL 437487, at *8 (Del. Ch.) (imposing a constructive trust on stock improperly purchased by a corporate director in violation of the duty of loyalty and corporate opportunity doctrine); *In re the Walt Disney Co.*, 2004 WL 2050138, at *5 n.51 (Del. Ch.), *aff'd*, 906 A.2d 27 (Del. 2006) ("[W]hen an officer or director of a corporation usurps a corporate opportunity, a constructive trust should be established for the benefit of the corporation.").

D.      If The 17 Acres Is Not Found To Belong To Pokobo,
        Mr. Polak Should Be Reimbursed For The Contributions
        That He Made To Pokobo To Pay For Expenses Associated
        With The 17 Acres

Under the basic theories of restitution and unjust enrichment, restitution is appropriate when a defendant is unjustly enriched at the expense of the plaintiff. *Fleer Corp.*, 539 A.2d at 1062; *see also Pepsi-Cola Bot. Co. of Salisbury, Md. v. Handy*, 2000 WL 364199, at *6 (Del. Ch.) ("A person who has been unjustly enriched at the expense of another is required to make restitution to the other."). "Restitution serves to deprive the defendant of benefits that in equity and good conscience he ought not to keep," and may be invoked regardless of whether or not the defendant is found to be a wrongdoer. *Fleer Corp.*, 539 A.2d at 1063. Restitution provides for "not only the restoration of the property to its rightful owner but also compensation or reimbursement for the benefits enjoyed by the defendant through the use or possession of plaintiff's property." *Id.*

At trial, Mr. Polak presented substantial evidence that he contributed funds to Pokobo to pay expenses associated with the 17 Acres. *See supra* pp. 22-25. Defendant does not dispute this; indeed, he now takes the position that, if Pokobo's funds were used to cover expenses related to the 17 Acres, that was a "mistake" or an "error" (Tr., Vol. E 558:16-559:6, 561:15-21). If the Court determines that Defendant, not Pokobo, is the rightful owner of the 17 Acres (which it should not, based on the evidence presented at trial), Mr. Polak should be reimbursed for any funds he contributed to Pokobo that were used to cover 17 Acres-related expenses.

V.    DEFENDANT'S    ACTIONS    JUSTIFY    AWARDING
      MR. POLAK HIS ATTORNEYS' FEES

      Based on the evidence presented at trial, two things are clear: (1) Defendant has no credible basis upon which to oppose Mr. Polak's request for judicial dissolution of Pokobo; and (2) Defendant's story about how he acquired the 17 Acres without Mr. Polak is not supported by any documentary evidence, conflicts with the testimony from Mr. Polak, Mr. Grubb and Mr. Fuke, and is inconsistent with his deposition testimony and his interrogatory responses. As a result of the baseless and meritless positions taken by Defendant in this litigation, Mr. Polak should be awarded his attorneys' fees.

      Awarding attorneys' fees is appropriate where "the action giving rise to the suit involves bad faith, fraud, conduct that was totally unjustified, or the like." *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 536911, at *4 (Del. Ch.); *see also Brice v. State, Dept. of Correction*, 704 A.2d 1176, 1179 (Del. 1998) (noting that attorneys' fees may be awarded to the prevailing party when the "losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons").

      Bad faith includes "[a]ctions by a defendant which necessitate judicial intervention to secure a clearly defined and established right" and actions "designed to force an opposing party to resort to litigation for the purpose of causing unreasonable delay." *Abex, Inc. v. Koll Real Estate Group, Inc.*, 1994 WL 728827, at *20 (Del. Ch.). Bad faith also includes instances "where a party misleads the court, alters his testimony or changes his position." *Jacobson v. Dryson Acceptance Corp.*, 2002 WL 31521109, at *16 (Del. Ch.). Bad faith also includes when a defendant "place[s] [his] own economic interests ahead of the partnership and force[s] the plaintiff into a position where it had no choice but to defend its interests by litigation." *Cantor Fitzgerald, L.P. v. Cantor*, 2000 WL 307370, at *32 (Del. Ch.).

48.

In cases involving a breach of the duty of loyalty such as this one, "potentially harsher rules come into play and the scope of recovery . . . is not to be determined narrowly." *Cantor Fitzgerald*, 2001 WL 536911, at *3.   Where defendant's conduct "constituted an egregious breach of the partnership agreement and their duty of loyalty," courts have not hesitated to award attorneys' fees. *Id.* at *4.

Defendant's actions here amount to an egregious breach of his duty of loyalty. Not only did Defendant wrongfully usurp the opportunity to acquire the 17 Acres, he then convinced Mr. Polak to contribute significant funds to cover expenses associated with the 17 Acres. *See supra* pp. 22-25.   At trial, Defendant concocted a new story to support his position that Pokobo never intended to purchase the 17 Acres (Tr., Vol. D 477:9-485:8; Tr., Vol. E 581:15-582:19, 587:6-9).   Finally, in the face of overwhelming evidence that the partnership between Mr. Polak and Defendant is irretrievable broken, Defendant offered no good explanation why he continues to oppose dissolving Pokobo (Tr., Vol. E 601:6-603:21).   Based on all these circumstances, Mr. Polak should be awarded his attorneys' fees.

49.

## CONCLUSION

For the foregoing reasons, Mr. Polak respectfully requests that the Court enter judgment in his favor and against Defendant.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Susan W. Waesco (#4476)*

_____

Martin P. Tully (#465)
Rodger D. Smith II (#3778)
Susan W. Waesco (#4476)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
   *Attorneys for Plaintiff Werner L. Polak*

February 12, 2008

## CERTIFICATE OF SERVICE

I, Susan W. Waesco, hereby certify that on February 12, 2008, I caused the foregoing PLAINTIFF WERNER L. POLAK'S OPENING POST-TRIAL BRIEF to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following in the manner indicated:

> Ben T. Castle
> Karen E. Keller
> Young, Conaway, Stargatt & Taylor LLP

and that on February 12, 2008, I caused copies to be served upon the following in the manner indicated:

> **BY HAND**
>
> Ben T. Castle
> Karen E. Keller
> Young, Conaway, Stargatt & Taylor LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, DE  19801
> bcastle@ycst.com
> kkeller@ycst.com

*/s/ Susan W. Waesco (#4476)*

Susan W. Waesco (#4476)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
(302) 658-9200
swaesco@mnat.com