UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF DELAWARE

WERNER L. POLAK, Plaintiff,            )
                                       )
          v.                           )
                                       )
JOHN M. KOBAYASHI, Defendant,          )    C.A. No.  05-330 SLR
                                       )
and                                    )
                                       )
POKOBO, L.L.C.,                        )
                                       )
                Nominal Defendant      )

### DEFENDANT JOHN M. KOBAYASHI'S RESPONSE POST-TRIAL BRIEF

Ben T. Castle (#520)
Karen E. Keller (#4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
kkeller@ycst.com

OF COUNSEL:

John P. Akolt, III (*Pro hac vice*)
AKOLT & AKOLT LLC
1880 Arapahoe Street, #2005
Denver, CO 80202

*Attorneys for Defendant
John M. Kobayashi*

Dated:  March 20, 2008

TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................ 1

I.   Procedural Background ........................................................... 1

II.  Statement of Facts ................................................................. 3

   A.   Parties ................................................................................. 3

   B.   General Background ............................................................ 4

   C.   Pokobo's Formation and Acquisition of the 64-Acre Parcel. ......... 5

   D.   Negotiations relating to the 17-Acre Parcel. ........................ 7

   E.   The Plaintiff has not established that a final agreement was concluded
        between himself and Mr. Kobayashi for the purchase of the 17-Acre
        Parcel. ................................................................................ 10

   F.   Kobayashi purchased the 17-Acre Parcel with his own personal funds. ..... 20

   G.   Time of Plaintiff's Discovery of the Alleged Breach of Contract. .......... 24

   H.   The Plaintiff received has received all the financial information. ........... 27

   I.   The Plaintiff has presented no evidence of damages from:  (1) breach of
        contract; (2) breach of fiduciary duty; (3) unjust enrichment. .............. 28

III. Argument ............................................................................... 28

   A.   Lack of Jurisdiction. ......................................................... 28

   B.   The Plaintiff has abandoned several of his claims. ............... 30

   C.   Claims Barred by the Statute of Limitations ........................ 32

   D.   The Plaintiff's Claims of Breach of Contract, Breach of Fiduciary Duty
        and Constructive Trust Fail for Lack of an Enforceable Contract. ......... 40

   E.   Plaintiff is Not Entitled to a Constructive Trust. ................. 42

   F.   The Plaintiff fails to prove usurpation of a corporate opportunity. ......... 46

IV.  Conclusion ............................................................................ 48

TABLE OF AUTHORITIES

**Cases**

*Artesian Water Co. v. Lynch*,
  283 A.2d 690 (Del. Ch.1971) ................................................................................ 34

*Broz v. Cellular Info. Sys., Inc.*,
  673 A.2d 148 (Del. 1996) ...................................................................................... 46

*Catts v. Suit*, 1977 WL 23827 (Del. Ch. 1977)......................................................... 42

*Conlew v. International Energy Corp.*,
  1982 WL 17875 (Del. Ch. 1982) ........................................................................... 47

*COPI of Delaware, Inc. v. Kelly*,
  C.A. No. 14529, Mem. Op. at 11, Steele, V.C. (Del. Ch. Oct. 25, 1996)........................... 40

*Diebold Computer Leasing, Inc. v. Commercial Credit Corp.*,
  267 A.2d 586 (Del. 1970) ...................................................................................... 43

*Durand v. Snedecker*,
  177 A.2d 649 (Del. Ch. 1962) ............................................................................... 40

*Fike v. Rugger*, 754 A.2d 254 (Del. Ch. 1999)......................................................... 34

*Halpern v. Barran*,
  313 A.2d 139 (Del. Ch. 1973) ............................................................................... 38

*Honeywell Intern. Inc. v. Air Products & Chemicals, Inc.*,
  872 A.2d 944 (Del. Super. 2005)........................................................................... 44

*Hood v. McConemy*,
  53 F.R.D. 435 (D. Del. 1971) ................................................................... 33, 35, 36

*Hughes Tool Company v. Fawcett Publications, Inc.*,
  297 A.2d 428 (Del. Ch. 1972) ............................................................................... 43

In re Dean Witter Partnership Litig.,
  C.A. No. 14816, Mem. Op.,
  1998 WL 442456, Chandler, C. (July 17, 1998). ................................. 34, 38, 39

*In re USACafes, L.P. Litig.*,
  1993 WL 18769 (Del. Ch. 1993) ........................................................................... 39

*Johnston v. Greene*,
   121 A.2d 919 (Del. 1956) ................................................................... 46

*Kahn v. Seaboard Corp.*,
   No. 11485, Allen, C. (Jan. 14, 1993) .............................................. 39

*Layton v. Allen*,
   246 A.2d 794 (Del. Sup. Ct. 1968) ................................................ 36

*Lee Builders, Inc. v. Wells*,
   95 A.2d 692 (Del. Ch.1953) ............................................................ 42

*Levinson v. Continental Ins. Services, Inc.*,
   1991 WL 50145 (Del. Ch. 1991) ..................................................... 43

*Merck & Co., Inc. v. SmithKline Beecham Pharms. Co.*,
   C.A. No. 15443, 1999 WL 669354 (Del. Ch. Aug. 5, 1999) ............. 34

*Reeves v. Transport Data Communications, Inc.*,
   318 A.2d 147 (Del. Ch. 1974) ........................................................ 42

*Shamrock Oil & Gas Corp. v. Sheets*,
   313 U.S. 100, 104 (1941) ................................................................ 30

*Spano v. Morse*,
   C.A. No. 20121, 2003 WL 22389542 (Del. Ch. Oct. 8, 2003) ............ 33

*Studiengesellschaft Kohle, mbH v. Hercules, Inc.*,
   748 F. Supp. 247 (D. Del. 1990) ............................................. 37, 38

*Theis v. Board of Educ.*,
   2000 WL 341061 (Del. Ch. 2000) ................................................... 43

*United States Cellular Inv. Co. of Allentown v. Bell Atlantic Mobile Sys., Inc.*,
   677 A.2d 497 (Del. 1996) ............................................................... 34

*Youell v. Maddox*, 692 F. Supp. 343 (D. Del. 1988) ............................... 33

## Statutes

10 *Del.C.* § 8106 ............................................................................ 32, 33

28 U.S.C. § 1447(c) (2004) ................................................................ 30

6 *Del. C.* § 18-201(b) ....................................................................... 47

DB02:6679320.1          065694.1001

6 *Del. C.* §§ 18-801 and 18-802......................................................................................... 30, 31

6 *Del. C.* §§ 18-803 and 18-804............................................................................................ 30

DB02:6679320.1

065694.1001

# INTRODUCTION

## I. Procedural Background

This action was initiated by the Plaintiff filing his complaint in the Court of Chancery of the State of Delaware on February 23, 2005. As reflected in the Plaintiff's statement of the Nature and Stage of the Proceedings, the action was removed by the Defendant to this Court (Pltf. Post-Trial Br. (D.I. 109) at 2) on May 25, 2005. The removal was pursuant to 28 U.S.C. §1441(a) (2004) (D.I. 1). Plaintiff filed his Motion for Remand, which was denied by the Honorable Judge Farnan on August 2, 2005 (D.I. 19).

In denying the Motion for Remand, Judge Farnan did not accept the position of either party as to the basis sustaining the federal jurisdiction over this case; rather he made his own determination of the "primary issue" in this lawsuit, which differed from the positions of both the Plaintiff and the Defendant as follows:

> Mr. Polak's Petition for Dissolution contains five counts: judicial dissolution, breach of contract, breach of fiduciary duty, declaratory judgment, and unjust enrichment. Mr. Polak contends that the primary issue is whether Mr. Kobayashi breached his fiduciary duty to Pokobo. (D.I. 9 at 9.) Mr. Kobayashi contends that this lawsuit hinges on Mr. Polak's breach of contract claim. (D.I. 13 at 11.)
>
> After reviewing the Petition For Dissolution (D.I. 1, Appendix A), the Court concludes that the primary issue in this lawsuit is whether Pokobo should be dissolved pursuant to 6 *Delaware Code* §§ 18-801 and 18-802. (Memorandum Order (D.I. 19) at 4).

Having determined what he concluded to be the primary issue in the lawsuit, Judge Farnan considered the nature of the claims asserted by the Plaintiff as they related to Pokobo, and determined that the Plaintiff had not established an independent claim for Pokobo, as an

1

entity, and therefore disregarded the citizenship of Pokobo in determining whether complete

diversity exists between the parties as follows:

> Because Mr. Polak has failed to establish that Pokobo itself has
> any interest distinct from the interests of Mr. Polak and Mr.
> Kobayashi, the Court concludes that Pokobo is not a real party
> to the dissolution issue and should remain a nominal defendant.
> Accordingly, the Court concludes that, in these circumstances,
> complete diversity of citizenship exists among the parties and
> the Court has subject matter jurisdiction to hear this lawsuit.
> (Memorandum Order (D.I. 19) at 4).

On June 26, 2007, Mr. Polak moved to amend his complaint. On August 3, 2007,

nineteen days prior to the trial of this case, the Court granted Mr. Polak's motion to add

allegations asserting that the Defendant usurped a corporate opportunity; and that the statute of

limitations was tolled under the doctrines of equitable tolling and fraudulent concealment; but

denied Plaintiff's Motion to Amend his complaint with respect to his claim that the Defendant

breached his fiduciary duties (D.I. 84).

As reflected at page 2 of the Plaintiff's Post-Trial Brief, by telephone conference on

August 23, 2007, four days prior to trial, the Court allowed the Plaintiff to include all the

allegations set forth in his Amended Complaint, inclusive of the claim of breach of fiduciary

duty owned to Pokobo, LLC and claim for a constructive trust for the benefit of Pokobo, LLC

(D.I. 97).

As Plaintiff's claims to August 23, 2007, did not include the breach of fiduciary duty to

Pokobo, LLC, with the requested relief of a constructive trust for the 17-Acre Parcel being

imposed for the benefit of Pokobo, LLC, Defendant objected to the inclusion of such claims

immediately prior to trial and renewed his request for resetting the trial date. The Court denied

Defendant's requests. Trial began on August 27 and 28, 2007, and concluded on December 11-

13, 2007.

## II. Statement of Facts[1]

### A. Parties

Plaintiff, Werner L. Polak, is a resident of New York. He was a former litigation partner at Shearman & Sterling in New York and following retirement from that firm has continued his practice as in-house counsel for Linde AG (Pltf. Post-Trial Br. at 3).

Defendant, John M. Kobayashi, is a Colorado resident. After service as a clerk on the 10th U.S. Circuit Court of Appeals, he was a former Assistant United States Attorney and partner in the Denver firm of Holme Roberts and Owen[2] before forming his own firm with a national practice (Tr. Vol. C 389: 16-19). Mr. Kobayashi was appointed by Chief Justice Rehnquist as the voting member of the Federal Rules of Evidence Advisory Committee and was appointed as the Rule 706 independent counsel in the Multi-District Panel in the national breast implant litigation.

Pokobo, LLC is a Delaware Limited Liability Company that was formed on March 21, 1997, equally owned by the Plaintiff and Defendant. (D.I. 85; D.I. 88). Prior to the Court's Orders granting the Defendant's Motion to Amend his Complaint on August 3, 2007 and August 23, 2007, the Defendant believes that Pokobo LLC was a nominal party. With the allowance of the Plaintiff's amended claims by the Orders of August 3 and August 23, 2007, Defendant now believes that the status of Pokobo, LLC has been changed and now constitutes a derivative party plaintiff. In such a circumstance, the Court Order dated August 3, 2007 may have divested this Court of its diversity jurisdiction.

---

[1] For consistency of reference, the Defendant will follow the same citation format as the Plaintiff, set forth in Plaintiff's Post Trial Brief, page 3 n. 1.

[2] Tr. Vol. C 389: 16-18 contains a typographical error in the firm's name.

B.    **General Background**

In addition to his legal practice, Mr. Kobayashi began investing in real estate.  His real estate investments have continued to aggregate since 1968 and by 2007 comprised a significant portfolio of residential and commercial properties (Tr. Vol. C 392: 4-12).

Beginning in the 1990's Mr. Kobayashi began to acquire properties in the state of Hawaii.  Among other properties, Mr. Kobayashi purchased and sold condominium units, vacant land, developed 12-acre coffee farm, a residence and also a developed a 47-acre addition to the original coffee farm. (Tr. Vol. C 392: 18-25; Tr. Vol. C 393: 5-10).

In 1969, Mr. Polak and Mr. Kobayashi became acquainted through Moot Court Competition at Columbia Law School. (Tr. Vol. A 32: 5-13).  The acquaintance between Mr. Kobayashi and Mr. Polak continued over the years, meeting occasionally when Mr. Kobayashi's practice brought him to New York City. (Tr. Vol. C 404: 22-25; Tr. Vol. C 405: 1-5).

In late 1995, Mr. Kobayashi and Mr. Polak discussed the prospects of several real estate prospects in Hawaii (Tr. Vol. C 405: 5-25).  In the initial conversation concerning investment in Hawaii real estate, Mr. Kobayashi stated that he did not want to purchase all the properties discussed because he was already "overweighted" in real estate investments (Tr. Vol. C 406: 1-5).  Mr. Polak stated that if the [properties] were attractive enough he would either loan Mr. Kobayashi money to purchase the properties or become a partner in purchasing property (Tr. Vol. C 406: 1-5).

Of the properties discussed, Mr. Kobayashi did purchase 230 acres of a 340-acre tract in his individual capacity in a transaction that did not involve Mr. Polak (Tr. Vol. C 406: 17-25).  Mr. Polak makes no claim of any kind against Mr. Kobayashi relating to that purchase or any other properties that were discussed.

4

Notwithstanding, through these conversations Mr. Polak was aware that Mr. Kobayashi had numerous real estate investments, in his individual capacity, in Hawaii (Tr. Vol. C 407: 1-21).

### C.    Pokobo's Formation and Acquisition of the 64-Acre Parcel.

Following further discussion, by late 1996 Mr. Kobayashi and Mr. Polak had focused on a 64-Acre Parcel and decided to jointly purchase it (Tr. Vol. C 407: 24 - 408: 24).

As part of the discussions concerning the 64-Acre Parcel, the financial risks were discussed (Tr. Vol. C 409: 1-12). Particularly, before moving forward with the acquisition, issues concerning the prospective condemnation of a right of way for the proposed Ali'i Highway that would bisect the parcel North to South and which would involve multiple archeological areas and other limitations were considered (Tr. Vol. C 410: 3-17).

Proceeding with the purchase of the 64-Acre Parcel, Mr. Kobayashi and Mr. Polak agreed to split the $900,000 purchase price equally. The business strategy in acquiring the property was to hold it as vacant land until the construction of the Ali'i Highway made the property attractive for someone to undertake development (Tr. Vol. C 411: 20 - 412: 2; *see also* Tr. Vol. A 35: 14-32).

When they acquired the 64-Acre Parcel, Mr. Polak acknowledged that neither he nor Mr. Kobayashi had any business plan for the parcel. As stated by Mr. Polak (Tr. Vol. A, 182: 14-15): "We had no specific business plan with respect to the 64 acres or the 70 acres."

Mr. Polak agreed to handle the creation of an LLC or partnership to execute the purchase of the 64-Acre Parcel. (Tr. Vol. A 36: 7-17). On March 21, 1997, the parties formed Pokobo, LLC ("Pokobo"), a Delaware Limited Liability Company. (D.I. 85, Paragraph 5; D.I. 88, ¶ 5; PTX 1).

5

> Mr. Polak was an active participant in the acquisition of the 64-
> acre parcel. (Mr. Polak personally reviewed the contract
> documents, closing documents, title documents and addressed
> the deposit of escrow of the earnest money into an interest
> bearing account for one week pending closing. (Tr. Vol. A 202:
> 24-203:11, 235 :2-7).

Management of Pokobo is vested jointly in Mr. Kobayashi and Mr. Polak (PTX 1,

Section 5.01). The LLC Agreement additionally includes a dispute resolution provision that

states as follows:

> SECTION 5.02. In the event that the Partners cannot agree on
> a course of action, they shall flip a coin 3 times and the
> recommendation of the winner of 2 of the 3 coin flips shall be
> followed. This provision has never been invoked, most notably
> on the one proposal in dispute: the sale of the 64-Acre parcel.
> (PTX 1).

The purpose of the company at the time of formation was to purchase the 64-Acre Parcel located

in Kona, Hawaii. (Tr. Vol. A 44: 21-24).

Mr. Polak acknowledged that there was no provision in the LLC Agreement that required

either he or Mr. Kobayashi to offer any real property to Pokobo before acquiring it in a personal

capacity, nor was there any independent agreement between Mr. Polak and Mr. Kobayashi to

submit any other real estate prospects between themselves before either party acquired such

parcel in his individual capacity. As Mr. Polak testified (Tr. Vol. A 207: 22-25  - 208: 1-13):

> Q. Is there anything in the LLC agreement that required either
> of the two of you in your capacity as members or managers to
> make any offer of transactions to the company before
> proceeding on an individual basis?
>
> A.    There's nothing in the LLC agreement to that effect that I
> know of.
>
> Q.    ... Was there any prior or separate agreement between you
> and Mr. Kobayashi as individuals that said that if Mr.
> Kobayashi came upon a particular transaction in Hawaii or

6

> anywhere else, that he would run it by you first for your
> participation?
>
> A. No. I'm talking only about a corporate opportunity that
> would affect the Pokobo problem. That's the only problem that
> I would raise as a potential violation of law, certainly the rules
> of ethics. But other than that, he could have bought any piece
> of property on his own and I could have done the same.

Following the acquisition of the 64-Acre Parcel and titling it to Pokobo, Mr. Polak and

Mr. Kobayashi made capital contributions to Pokobo, mostly for payment of property taxes for

the 64-Acre Parcel and annual fees associated with maintaining Pokobo's good standing in

Delaware. (Tr. Vol. A 50: 13-52). Beyond that, there was no undertaking by Pokobo to develop

the 64-Acre Parcel which is consistent with the original intent to simply buy and hold the 64-

Acre Parcel as an investment. Mr. Polak concurred that before a "rational plan" for Pokobo's

development can be made the County must first set the location of the Ali'i Highway and Lako

Street. (Tr. Vol. A 182: 16-22). Such plans are still pending. (Tr. Vol. A 183: 2-6).

### D.    Negotiations relating to the 17-Acre Parcel.

There is no disagreement that in 1998 Mr. Kobayashi identified a small piece of land (or

an easement across the land) that might be beneficial as additional access to the future

development of the 64-Acre Parcel. This tract was a 1 ½ to 3 acre portion of a 22-acre tract

owned by the Mission Investment Fund (Pltf. Post-Trial Br. at 5; Tr. Vol. A 54: 3-11) (*See* maps

at PTX 109, PTX 9). It is also clear that the interest on behalf of Pokobo was limited to a small

portion of the tract. As Mr. Polak testified:

> Q. Okay. And, Mr. Polak, just to clarify, is this the small
> portion, the three acres that you were looking to purchase
> (indicating)?
>
> A. Precisely. (Tr. Vol. A 53: 15-18).

7

That Pokobo's interest in the property was for access and nothing more was further restated by Mr. Polak as follows (Tr. Vol. A 52: 20-25 - 53: 11):

> Q. Mr. Polak, after Pokobo purchased the 64 acres, did you and Mr. Kobayashi discuss purchasing any other land for Pokobo?
>
> A. Yes. In 1998, when I was in Hawaii, we met with the -- our planning consultant, Sidney Fuke, and John, and we decided that we needed to have access to the eastern portion of our 64 acres. We knew that the Ali'i Highway was going to bisect our property. We would be able to get access to the western part through Ali'i Drive, but we had no access, unfortunately, to the western portion of our property. So we were also aware that Lako Street ended at exactly -- almost 300 feet from our property, so we wanted to buy a small piece of land, or at least get an easement with respect to that small piece of land, about an acre, two or three acres in the corner where Lako Street ends, and then we would be able to build a road into our property.

The evidence is not in conflict that the interest in a portion of the Church property to Pokobo was for access to Lako Street. While the Plaintiff emphasizes the importance of access to Lako Street from the 64-Acre Parcel, the evidence and testimony produced at trial establishes that a right of way access to present Lako Street would be of little value to the 64-Acre Parcel.

Present Lako Street is a secondary, residential street that winds through a middle class neighborhood with no commercial sites along it. (Tr. Vol. D 399: 8-15). Further, there are two other existing street access points on the North and East of the 64-Acre property, not including existing Lako Street. The first street is Halawi; the second is Seaview. (Tr. Vol. D 400: 5-22). The 64-Acre Parcel also abuts the main seaside highway, Ali'i Drive, along its entire western perimeter (Tr. Vol. D 401: 2-14).

Perhaps more importantly, the construction of the Ali'i Highway will completely bisect the 64-Acre Parcel from south to north. When that occurs, the parcel will be served by the major

8

highway with two stubbed intersections within the 64-Acre Parcel itself. (Tr. Vol. D 402: 11-19).
While represented by the Plaintiff as "extremely important", the acknowledged facts belie the
future importance of a connection to Lako Street, a secondary residential street, and one of four
existing routes into the property, for any significant development of the 64-Acre Parcel. (Tr.
Vol. C 403: 8-15).

Coffee operations were not part of Pokobo LLC's prospects, nor did Mr. Polak consider
the prospect for the use of the 17-Acre Church property to be a Pokobo prospect. As Mr. Polak
testified:

> Q.   And that [pulping plant or the coffee pulping mill] was at
> least a concept that was run by you as to whether or not you
> wanted to be a participant in that activity as well; is that
> correct?
>
> A.   That's correct.
>
> Q.   All right. And your participation in that project, if we'll
> call it a project or concept, was not necessarily with your
> Pokobo manager; isn't that correct?
>
> A.    I would have to make a decision to invest in a coffee
> business, which was, in fact, independent from our investments
> in Pokobo. (Tr. Vol. A 210: 16-25).

The testimony of Pokobo's land consultant, Sidney Fuke, is consistent with Mr.
Kobayashi's interest in the 17-Acre Parcel, aside from the 1 ½ -3 acre portion for access for
Pokobo, as being for coffee operations. As stated by Mr. Fuke:

> One of the other things, too, was during the course of that --
> my meetings with Mr. Kobayashi, this is back in November of
> 1998, I guess roughly about a year leading into the -- my
> retention by the L.L.C., was a discussion of, in the event that
> you're going to do a coffee mill or coffee processing facility,
> which Mr. Kobayashi appeared to be very interested in having
> done, I had mentioned to him that if it is going to be situated
> near the Lako Street area, that they should get consent, you

9

know, from the owners of the property. (Tr. Vol. B 41: 16-
25).

Mr. Fuke further testified:

> A.    If you look at the first page of that memorandum, where
> there's a discussion on overall concept plan.
>
> Q.    Yes.
>
> A.    The coffee processing facility, based on the discussions
> that I had with John, you know, leading up to that time, was
> going to be situated on the 17 -- portion of the 17-acre area.
> (Tr. Vol. B 41:16-22)

Pursuing the access right for the 64-Acre Pokobo property, on February 9, 1999 Mr.

Kobayashi sent a letter to Mr. Olsen, the representative of the Mission Investment Fund

("National Church"), copied to Mr. Polak, confirming the National Church's agreement to sell

"...not less than 1½ acres and not more than 3 acres of land..." (Tr. Vol. A 63: 2-9; PTX 42 at

WLP315).

Review of the February 9, 1999, letter confirms that the letter did not include any offer to

purchase the balance of the 22 acre parcel, but stated only that:

> ... Pokobo and its partners are willing to consider an offer of
> sale from the Mission Investment Fund of the 17.86 acres at a
> price acceptable to POKOBO that we believe will be
> reasonable to all parties, and provided we are given some
> flexibility regarding payment terms. (PTX 42 at WLP318).

The February 9, 1999, letter concluded with: "POKOBO believes it already has enough land to

accomplish its purposes ..." (PTX 42 at WLP 319).

### E.    The Plaintiff has not established that a final agreement was concluded between himself and Mr. Kobayashi for the purchase of the 17-Acre Parcel.

There is no letter, agreement, email, memo or any writing of any kind that sets forth the

terms or conditions of the agreement that Mr. Polak asserts was concluded with Mr. Kobayashi

10

for the purchase of the 22 acres, the 17 acres or any portion of the 17 acres except for the

February 9, 1999 (PTX 42) letter that clearly confirmed agreement only for 1 ½ to 3 acres.

Notwithstanding, Mr. Polak asserted that a binding agreement had been concluded between

himself and John Kobayashi prior to the February 9, 1999 letter to the Mission Investment Fund.

According to the Plaintiff, as of February 9, 1999,  a contract between Mr. Polak and Mr.

Kobayashi had been concluded to purchase the specific 17-Acre Parcel of land on behalf of

Pokobo.

> Q.    [Akolt] Okay.  Prior to February 9, 1999, do you assert
> that there was a binding complete agreement between yourself
> and Mr. Kobayashi with respect to the acquisition of all or a
> part of the 22 acres from the Mission Investment Trust?
>
> A.    [Polak] Yes.  We were in agreement to go ahead and buy
> not only the three acres, but to go ahead and make an attempt
> to get the 17 acres.  That was agreed to buy both John and
> myself.
>
> Q.    And you assert that that was a full and complete
> agreement, a meeting of the minds between the parties, prior to
> February 9, 1999?
>
> A.    Yes.
>
> Q.    Okay.  Was it dependent upon, as of February 9, 1999,
> additional considerations that were not within either your or
> Mr. Kobayashi's control?  Specifically, whether or not the
> Mission Investment Fund would consent to sell all or a part of
> the parcels that you had in mind to acquire?
>
> A.    Obviously.  We only agreed that we would do it, and if
> the other side wouldn't want to sell it to us, we obviously
> couldn't buy it. (Tr. Vol. A 187: 7-188:2).

The final agreement that Mr. Polak asserts constitutes "the agreement" that is the basis

for his claim against Mr. Kobayashi is the February 9, 1999, letter (PTX 42):

> Q.    Mr. Polak, what was your understanding of the purpose
> behind sending this letter [PTX 42] to the church?

11

> A.    This is our offer to purchase the 17 acres from the church
> and providing them a solution with respect to their subdivision
> plans. (Tr. Vol. A 74: 6-75: 7).

Mr. Kobayashi testified, consistent with the language of the letter, that the

document was not an offer to purchase the 17 acres:

> Q.    ....Were you making an offer to purchase the 17 acres
> in that letter [referring to the February 9, 1999 letter] for
> Pokobo?
>
> A.    I drafted that section with some care because Mr. Polak
> was unwilling to commit to the coffee mill at that time and was
> not willing to make his specific offer for the purchase of the 17
> acres. And the notion of [a] price acceptable to Pokobo and
> others, the others referenced – referenced Reverend Sapp. And
> then I asked for flexibility of terms. But it was in no way an
> offer to purchase. It was a request for an offer from Mission
> Investment for the sale of that property. (Tr. Vol. D, 469:22-
> 470:7).

Mr. Polak described the terms of agreement that he claims to have been concluded prior

to the February 9, 1999 letter variously as follows:

> Q.    What was the price that was stated in this, if this was, in
> fact, an offer to the church, what was the price that was stated
> for the purchase of the 17.86 acres?
>
> A.    The price -- according to John, the price had been
> discussed. It wasn't set forth in this letter, but the price had
> been discussed. (Tr. Vol. A 192: 14-19).
>
> Q.    That was for the one-and-a-half to three-acre property?
>
> A.    Yes, you're correct.
>
> Q.    Yes, but not for anything in excess of one-and-a-half to
> three acres; correct?
>
> A.    It's not set forth in this letter. (Tr. Vol. A 193: 4-9, 14-17,
> 21-22).

> * * *

12

Q.    Okay.  What were the payment terms that Mr. Kobayashi wanted for Pokobo to proceed forward with the acquisition of the 17.86 acres?

A.    I do not know.

Q.    Whether you needed it or not, what were the terms that Mr. Kobayashi wanted?

A.    I don't know.  He didn't discuss it with me. (Tr. Vol. A 195: 22-25; 196 1-7).

Q.    Second full paragraph, and specifically the portion of it that says, Pokobo believes it already has enough land to accomplish its purposes.  Was that a true statement, so far as you were aware, of the desire of Pokobo to acquire the access for the 64-acre property and had no need for the balance of the property?  It was the access that was important; is that correct?

A.    This was John's way of saying that the three acres probably would satisfy our minimum desire, but it was clear from John's discussion with me, and we both desired to control the 17 acres because we would have control over the Lako Street extension, and also the desire for us to be able to negotiate the impact credits much better if we had control over the longer piece of that road. But he is saying in this letter, in my view, that the three acres would suffice. (Tr. Vol. A 196: 8-15).

Q.    Is it fair to say that as of February 9, 1999, there was no binding agreement with the Mission Investment Church for the acquisition of the 17 acres or anything in excess of the one-and-a-half to three-acre parcel?

A.    I think that's fair to say, yes.

Q.    The church could walk from the transaction as of that date?

A.    Yes.  From the 17 acres, not the three acres. (Tr. Vol. A 198: 25; 199: 1-12).

Q.    Is there any way for Mr. Kobayashi to have worked a 1031 exchange on the Montana property and contributed cash

13

proceeds to Pokobo for a capital account and maintain a 1031 exchange?

A.    I don't know, but that may well be the reason why he told me that he needed -- his accountant told him that he may need to have title to the property in order to effect the property exchange.

Q.    That was different than the initial understanding, where you said that Mr. Kobayashi was going to contribute cash to the corporation and then have the corporation purchase the property; correct?

A.    Yes.  That would be different.  (Tr. Vol. A 199: 19-22).

Q.    Under the provisions of the Pokobo, L.L.C. agreement, the extent of future Pokobo expenses were within your control, were they not?

A.    We had to agree, obviously.  (Tr. Vol. A 200: 2-20).

Q.    That's correct.  Real estate taxes of approximately $8,000 a year for the 64-acre parcel?

A.    Yes.

Q.    How many years would it take at $8,000 a year to contribute $194,000?  25 years or so?

A.    Little less, but, yes.

Q.    Okay.  Was there any term that you had agreed to as to when your equalizing contributions would have to have been made regardless of what the extent of the Pokobo expenses would have been after 1999?

A.    No.

Q.    So in the event that you had simply decided that you were going to go into a hold-for-sale mode, that is just sit on the property, wait for the property to appreciate, hopefully, and sell at some date in the future, there would have been no expenses beyond what you voluntarily agreed to contribute that would have constituted your obligation to make capital contribution?

A.    Under your hypothesis, that's correct. (Tr. Vol. A 200 13-20).

Q.    For the time delay in the contribution of your capital, if Mr. Kobayashi contributed 194,000 on day one and it was a period of years, not 25, but still a significant number of years before you caught up on capital accounts, what was the agreement on the interest that would be paid on the time delay in your contributions?

A.    There would be no interest involved. I would just be paying all expenses as they were incurred.

Q.    All right. So if you paid in your equalizing capital contribution over a period of ten years, as an example, then there would be -- there was no agreement on payment of interest for the time delay on your capital contribution?

A.    No, there was no agreement on that. (Tr. Vol. A 201: 2-15).

Q.    So there were, in fact, as of February 9, 1999, terms and conditions that were yet conditional that had not been discussed or fully agreed between you and Mr. Kobayashi and between the two of you and the Mission Investment Trust; is that correct?

A.    The only one really that we didn't discuss as of that date, February 9, is the price. (Tr. Vol. A 205: 7-13)

Additionally, with regard to the "catch up" payments the Plaintiff stated a number of different payback periods shifting from four years to no period whatsoever. In his Complaint the Plaintiff alleged that he "would pay future operating expenses associated with both the 17-Acre Parcel and the 64-Acre Parcel until his aggregate contribution to Pokobo was equal to Defendant's aggregate contribution" (i.e. an indefinite payback period and at zero interest). (Complaint at 4, ¶ 14; Tr. Vol. A 199: 13-201: 23).

Yet, when discussing the alleged contract for the purchase of the 17-Acre Parcel, in his
opening remarks Plaintiff's counsel, referring to notes taken by the Defendant, described the
payback period as:

> Contribute as needed over four years, max. 158,000 divided by
> four would require Mr. Polak, on average, over four years, to
> contribute $52,000 a year to the expenses of the corporation.
> (Tr. Vol. A 10: 11-14 referring to PTX 248).

Neither was the Plaintiff able to identify precisely what the alleged agreement was with
regard to the extent and description of the property to be acquired. Plaintiff's testimony
regarding the acreage of land to be purchased by Pokobo varies throughout the testimony:

> Q.    [Waesco]  What were you and Mr. Kobayashi discussing?
>
> A.    [Polak]  John said that what we could do is we could buy
> the 17 acres and donate another five acres to the church. We
> would be left with 12-point-some acres, and we could do so
> through a family foundation.
>
> The family foundation that he refers to hear is the Kobayashi
> Family Foundation. That is his family foundation. And that
> way we could at least get a deduction for the five acres and
> then the foundation would donate it to the church.
>
> That was one way of accomplishing the desire of Pastor Sapp
> to get an additional five acres. (Tr. Vol. A 80: 23-81: 9).

Plaintiff further testified:

> Q.    [Waesco]  I would like you to focus first on the second
> point in your February 17th, 1999 notes.
>
> A.    [Polak]  Yes.
>
> Q.    What do those notes reflect?
>
> A.    Point 2 reflects that the church was willing to sell us the
> 17.86 acres, but they wanted a pledge that we would donate
> five acres in the future at the date of closing. That is, they
> wanted that option that we were discussing a minute ago, and
> that the price that they agreed to sell us the 17 acres would be

> 33 cents for the three acres and 29 cents for the remaining
> portion of a little over 14 acres.
>
> Q.    So as of this date, February 17th, Mr. Kobayashi told you
> that the church was willing to sell the 17 acres to Pokobo?
>
> A.    Yes. (Tr. Vol. A 84: 24-85: 14).

Yet in the Plaintiff's Complaint it was alleged that:

> 12. Plaintiff and Defendant agreed that if the Lutheran Church decided to
> sell to Pokobo the 22.86 acres of land contiguous to Pokobo's 64-Acre
> Parcel, Pokobo would donate approximately 5 acres of that land to the
> Lutheran Church, leaving Pokobo as the owner of approximately 17
> additional acres of land (the "17-Acre Parcel").
>
> 13. Defendant served as Pokobo's primary negotiator for the purchase of the
> 17-Acre Parcel. Upon information and belief, Defendant conducted all of
> his discussions with the Lutheran Church for the purchase of the 17-Acre
> Parcel on Pokobo's behalf and not in his individual. Throughout the
> negotiations, Pokobo, not Defendant, was to be the acquirer of the 17-Acre
> Parcel. (Complaint at 4, ¶¶ 12-13).

When cross-examined as to what the terms of the "final agreement" were that had been

reached with Mr. Kobayashi (alleged to have been complete and binding prior to the February 9,

1999, letter (PTX 42)) Mr. Polak admitted that he did not have any understanding of what the

agreement was. Mr. Polak testified:

> Q.    Well, separate and apart from the tax questions, the
> question is:  What was your understanding of the transaction
> that you say was the subject of the contract between you and
> Mr. Kobayashi?  Was it, in fact, that there would be no closing
> whatever until the church had resolved its – its subdivision
> process so it was like an option to purchase for an indefinite
> period?
>
> A.   No.
>
> Q.   Or was it to actually convey title from the church to an
> entity in 1999, and then there would be a resolution of the
> subdivision?  What was the specific understanding of the
> agreement?

A.    I didn't have a specific understanding of what the
agreements would be other than the resolution of the
subdivision problem, and until then, I would think that the
church would have title to the 22 acres. (Tr. Vol. A 225: 23-25
– 226: 1-14)

In support of his claim to the 17-Acre Parcel, the Plaintiff has relied upon PTX 63 (Pltf.

Post-Trial Br. at 14). Objection was made by the defendant and the Exhibit was admitted subject

to the objection (Tr. Vol. A 90: 9-12). Defendant restated his objection, as the Plaintiff has now

relied upon it. This document lacks any foundation as required by Fed. R. Evid. 602 for personal

knowledge, lacks any authentication of the statements proffered and constitutes compound

hearsay within hearsay and is without any circumstantial guarantees of trustworthiness.

The Plaintiff's assertions as to how the 17-Acre Parcel transaction was to be structured

also varied. In his Amended Complaint, Plaintiff alleged:

...Although the purchase of the 17-Acre Parcel was funded by Defendant,
title to the 17-Acre Parcel was to be placed in Pokobo's name.

15. Upon information and belief on May 24, 1999 Defendant made a capital
contribution in the amount of $194,047.77 to Pokobo to finance Pokobo's
acquisition of the 17 Acre Parcel.

17. In November 2002, Plaintiff first learned that, notwithstanding the
parties' agreement to title the 17-Acre Parcel in Pokobo's name, title to the
Parcel was in Defendant's name. (Complaint at 4-5, ¶¶ 14, 15, 17).

Following the Defendant's assertion of the statute of limitation as an affirmative defense,

the Plaintiff amended his Complaint to allege that the terms of the agreement were that the

Defendant would contribute cash proceeds from the sale of property for Pokobo to purchase the

17-Acre Parcel or that he,

...[would] contribute the land itself (valued at $194,047.77) to Pokobo.
Although Defendant told Plaintiff that, for consideration and/or subdivision
purposes the 17-Acre Parcel may need to be titled temporarily in
Defendant's name (or the name of a trust or foundation controlled by
Defendant). Defendant repeatedly reassured Plaintiff that the 17-Acre

18

Parcel would ultimately be transferred to Pokobo. (Amended Complaint
(D. I. 85) at ¶15).

In his testimony, the Plaintiff testified that he understood that the Defendant would use a

1031 exchange to purchase the property which would require the property to first be placed into

Defendant's name but that the property would be titled in Pokobo at closing.

> Q.    [Waesco] And in Point 4, you wrote, Has $190,000 from
> Montana deal. And then below that you wrote, Deed to
> Pokobo. What was discussed regarding that point?
>
> A.    [Polak] Okay. This is in furtherance of our discussion as
> to how we would finance the acquisition of the 17 acres,
> because we had an offer outstanding at this point and we
> needed to make sure that we would have the financing in place.
>
> So John told me that he had a piece of property in Montana and
> he was selling it and he said the approximate proceeds from
> that piece of property would be about $190,000. And he said
> he was talking to his accountant, and his accountant indicated
> that in order to take advantage of the tax laws, that he would
> want to contribute the $190,000 into another investment. But
> he said that his accountant indicated in order to get the
> advantage of that, it may well be that the land, that is the 17
> acres when we buy it, would have to be in his name, or his
> foundation name, and I think he said his name.
>
> But, he reminded me, and this is the second line, Don't worry,
> that the deed would go to Pokobo as soon as the closing
> occurred, since Pokobo will be the owner. But he said for the
> tax advantages, I may have to put the -- the --initially, the
> property may have to go into my name. (Tr. Vol. A 81: 10-82:
> 8).

Continuing the examination regarding the Plaintiff's notes taken on February 16, 1999

(PTX 50), Plaintiff stated:

> But finishing up on Point 5, I agreed with him, that he should
> only contribute the proceeds from his property. I would pay
> the balance of any purchase price with respect to that property.
> That is, I would contribute to Pokobo and Pokobo would buy
> it. And he said that was fine. (Tr. Vol. A 83: 8-13).

19

Either the Defendant took title to the property in his name, as actually occurred, or Pokobo using a portion of the Plaintiff's funds took title. The Plaintiff's testimony as to how title would be conveyed is inconsistent.

The Plaintiff never resolved in his own mind, much less with Mr. Kobayashi what the agreement was regarding the manner in which the 17-Acre Parcel was to be acquired. Nor did the Plaintiff ever consistently identify the specific land that was to be purchased and which was going to be donated to the Local Church. Plaintiff's testimony relates a few of the many options which were discussed during the negotiations between Defendant and the National Church. Plaintiff never resolved these matters with the Defendant.

### F.    Kobayashi purchased the 17-Acre Parcel with his own personal funds.

In prior negotiations the National Church had already committed 5 acres of the 22 acres to its local affiliate ("Local Church") and had applied to the County of Hawaii ("County") to subdivide the 22 Acres whereby 17 acres would be retained by the National Church and five acres to the Local Church. (Tr. Vol. A 64: 20-25). However, there was uncertainty whether the Local Church would be able to comply with the conditions for subdivision that were imposed by the County. (Tr. Vol. A 65: 19-22). Further, the National Church wanted to avoid the expense of the road improvements and water improvements that would have been required by the County if they retained the 17-Acre Parcel. (Tr. Vol. A 65: 1). Plaintiff's rationale for purchasing the 17 Acre Parcel was that Pokobo would gain an additional access point to the 64-Acre Parcel (Tr. Vol. A 52: 24-53: 5) and have an advantage with regard to the potential location of the Lako Street Extension. Plaintiff testified:

> Q.    [Waesco] And we've covered this a little bit, but what were the advantages to Pokobo owning the entire 17 acres?

20

A.    [Polak] The 17 acres would give us an opportunity to,
let's say, bargain with the county as to where the Lako Street
extension was going to be, because we would then have control
over the Lako Street extension, whether it would go straight
down to Alii Drive over the 17 acres or whether it would have
the S curve and go through the 64 acres and assist us in the
development of the 64 acres.

So we would have a little bit of an advantage in bargaining
with the county. (Tr. Vol. A 68: 24-69: 7; Tr. Vol. A 56: 12-
19).

The Plaintiff provided no analysis that would justify purchasing such a large

parcel of land merely to gain access to Lako Street.

The Defendant acknowledged that the Lako Street access would enhance the

value of the 64-Acre Parcel. (Tr. Vol. E 525: 22-526:1). However, the relevant question

was the extent to which a developer (potential purchaser) would pay significantly more

for an additional access road. (Tr. Vol. E 526: 1-3).   The prospective outlay of  $580,000

for the purchase of the 17-Acre Parcel (Tr. Vol. A 61: 15-18) is illogical if the purpose of

such acquisition was to gain, in Plaintiff's words: "a little bit of an advantage in

bargaining with the county." (Tr. Vol. A 69: 6-7).

No rationale was asserted as to why Pokobo would spend up to $600,000 (66% of

the initial purchase price of the 64-Acre Parcel), merely to gain a second access point and

an undefined and unspecified negotiating advantage with the County.

On the other hand, Mr. Kobayashi stated that the purpose of purchasing the 17-Acre

parcel was that it had the perfect location for his coffee processing plant. (Tr. Vol. D 454: 7-25).

The 17-Acre Parcel was ideally located in proximity to Defendant's coffee farm, it had the

proper climate, and it was zoned and isolated enough to install a processing mill. (Tr. Vol. D

454: 14-25). Defendant also testified that he discussed the purchase of the 17-Acre Parcel with

Plaintiff:

> Q.    [Akolt] Did you discuss the prospects for acquiring the 17
> acres with Mr. Polak for the coffee processing operation?
>
> A.    [Kobayashi] Yes. Mr. Polak became interested in some
> parts of the coffee business, retail, and also, in particular, as an
> individual investment potential for the coffee mill on the 17
> acres. (Tr. Vol. D 455: 1-7).

Despite Plaintiff's assertion that the "Defendant's story" was first told at trial (Pltf. Post-

Trial Br. at 18) the Defendant's testimony was confirmed by the Plaintiff's testimony at trial. Mr.

Polak testified:

> Q.    [Akolt] And that was at least a concept that was run by
> you as to whether or not you wanted to be a participant in that
> activity [coffee business] as well; is that correct?
>
> A.    [Polak] That's correct.
>
> Q.    All right. And your participation in that project, if we'll
> call it a project or concept, was not necessarily with your
> Pokobo manager; isn't that correct?
>
> A.    I would have to make a decision to invest in a coffee
> business, which was, in fact, independent from our investments
> in Pokobo. (Tr. Vol. A 210: 16-25).

Mr. Kobayashi never denied having discussions with the National Church relating to the

acquisition of 1½ to 3 acres of land for the benefit of Pokobo. Such discussion ended because

the National Church determined that Mr. Fuke's memorandums outlining the various options

were not correct. Describing the situation, the Defendant testified:

> They [National Church] had with their counsel and their planner considered
> Mr. Fuke's memos and determined that Mr. Fuke was not correct. And
> they, through their counsel Steve Lim, had determined that they would be
> able to sell an undivided interest in the 17 acres. And they would complete
> the subdivision because they could not sell the matter directly or they
> would invalidate their subdivision implication. (Tr. Vol. D 477: 17-24).

Following the end of the negotiations for the 1 ½ to 3 acre tract only, the National Church did offer to sell an undivided interest in the entire 22 acres because of its legal counsel's belief was that any direct sale would invalidate the subdivision requirements that already existed. *Id.* Further the National Church desired an outright sale and wanted the sale to proceed quickly. (Tr. Vol. D 478: 1-5).

From the beginning, Mr. Kobayashi testified that his interest in the 17-Acre Parcel – excepting the use of the southeast 1 ½-3 acres for prospective access to Lako Street – was for use in his coffee operations (Tr. Vol. D 455: 18-25). His acquisition of the totality of the parcel was in the context of the coffee operations. Mr. Polak offered no other purpose for acquisition of the entire tract either as a joint acquisition with Mr. Kobayashi, or for Pokobo, LLC (which had no involvement with the Kobayashi coffee operation).

Mr. Kobayashi testified that he did seek a response from the Plaintiff as to whether Mr. Polak would commit to investing in the coffee operations projected for the 17-Acre Parcel. Mr. Kobayashi testified that Mr. Polak did not respond to the proposal, and Mr. Kobayashi proceeded to consider the options for the acquisition of an undivided interest in the 22 acre Church Parcel. (Tr. Vol. D 478: 9-19).

Mr. Kobayashi testified that he did notify Mr. Fuke that he would individually close on the undivided interest in the 22-Acre Parcel and he proceeded to close the transaction in his individual capacity. (Tr. Vol. D 478: 9-15).

> Q.    [Akolt] Did you then proceed to, in fact, close the undivided interest in the 22-acre parcel for—on the church property?
>
> A.    [Kobayashi] Yes. I did not hear back anything from Mr. Polak. I believe he sent two memos to Ms. Bennett in early March, mid-March, and I proceeded, since I hadn't heard

anything with respect to my question, are you in or out of the
offer, I had made with respect to the coffee mill facility.

Q.    From the Olson deposition, which was Olson Deposition
Exhibit 21, which I believe is also parallel to the Plaintiff's
Exhibit 78, there is a purchase and sale agreement dated March
20 - excuse me – March 15, 1999, for a .771 interest in specific
property.

Was that the acquisition of the undivided interest by you in
March 1999?

A.    Yes. (Tr. Vol. D 485: 1-16).

The Defendant further explained the transaction:

Q.    As part of the transaction, Mr. Kobayashi, were there also
deeds escrowed at the time that would have converted your
undivided interest to a divided interest, and specifically into a
17-acre parcel instead of a .771 interest in a larger parcel?

A.    Yes.

The recorded deed for the undivided interest in the 22-Acre Parcel conveyed to

Kobayashi is PTX 78, recorded in the public records of Hawaii, on March 15, 1999. The deed,

PTX 140, conveying the 17-Acre Parcel to Mr. Kobayashi, had been executed in escrow in May,

1999, and was recorded in the public records of the State of Hawaii on July 26, 2000.

G.    **Time of Plaintiff's Discovery of the Alleged Breach of Contract.**

Plaintiff asserted that he learned that the 17-Acre Parcel was titled in John

Kobayashi's name only after he sent a number of letters inquiring about the Defendant's

health to the Defendant, Mr. Grubb and Michael Matsukawa (PTX 197; PTX 198; PTX

199) which went unanswered. (Tr. Vol. A 141: 3-143:2). He testified that after he did not

receive any response to the letters he became concerned and asked his friend Margery

Bronster, who was an attorney in Hawaii, to research what was happening regarding the

64 and 17-Acre Parcels. (Tr. Vol. A 142: 25-143: 11).

24

Q.    Did you ever come to learn that the closing for the 17 acres had not occurred or had occurred?  I'm sorry.

A.    With the help of Marjorie Bronster, her legal assistant apparently went to the county and obtained information with respect to the pieces of property, which included the 64 acres and the 17 acres.  And in that report that I received in mid-November, it indicated that the subdivision of the 17 acres and the five acres had actually been approved much earlier, in 2000, and that the deal had closed.  That is, that the deed apparently was given to John for the 17 acres and to the Local Church for the five acres, way back in 2000.

Q.    And that surprised you?

A.    Total surprise. (Tr. Vol. A 143: 12-25).

It is the Plaintiff's position that before his conversation with Ms. Bronster, he never took any steps to clarify any aspect of title or status of the land transaction.  Plaintiff acknowledged that he never received the final contract for sale. (Tr. Vol. A 214: 8-17).  Nor did he receive any of the closing documents:

Q.    Did you ever receive any title information from any title company or attorney or certificate or any other kind of title data with regard to the three acres or the 17 acres?

A.    No.  I asked him for the closing documents and he always said, We can't get it until we get approval of the subdivision plans, and therefore I will send you the closing documents after it closes.  I never got the closing documents, where there were title agreements or contracts.

Q.    You were aware, were you not, that there had to be some closing with some entity for the transaction to have concluded during 1999?

A.    Yes, I would hope so, but I do not know what those documents were and John didn't send them to me.

Q.    And do you have any information whatever with respect to whether or not Pokobo was involved in those transactions as they proceeded through 1999?

25

> A.    John did not involve me in the transactions. He took
> them on and I said, go ahead, but I'd like to see the documents.
> He always promised to send them to me, but he did not. (Tr.
> Vol. A 214: 18-215: 15).

As of mid to late-1999 the Plaintiff stated that he was aware that some sort of transaction occurred that related to the 17-Acre Parcel. (Tr. Vol. A 223: 18-224: 19). He stated that he repeatedly asked the Defendant verbally for the title documents, the closing statements, and anything about the title information for review. (Tr. Vol. A 215: 24-216:3).

Notwithstanding the requests that Mr. Polak asserts he repeatedly made to Mr. Kobayashi, Mr. Polak never made any written request for documentation, never contacted Mr. Olson or agents of the National Church, never contacted Mr. Fuke regarding the Church property transaction, and never requested any information from the County recorder in Hawaii. (Tr. Vol. A 215: 24-216: 19). Any one of those contacts would have disclosed that title to the 17-Acre Parcel had been deeded to Mr. Kobayashi in his individual capacity by deed, recorded on July 26, 2000 (PTX 140).

In his Opening Post-Trial Brief, Mr. Polak acknowledges that in the year 2000 he received an accounting of the members' capital accounts in Pokobo for 1999. The capital account exhibit is PTX 105. Exhibit PTX 105 is notable for two specific reasons: First, it reflects a capital account transaction for John Kobayashi in the amount of $194,047.77 as a "Property Exchange"; and second, four separate contributions by John Kobayashi are noted: (1) 8/27/99 in the amount of $8,500.00; (2) 8/31/99 in the amount of $5,000.00; (3) 9/10/99 in the amount of $1,500.00 and (4) 12/29/99 in the amount of $4,000.00. These entries are very important in two respects: First, the "Property Exchange" could not have occurred (accepting Plaintiff's contract claim arguendo) until Mr. Kobayashi had acquired the 17-Acre Parcel to

26

"Exchange" with Pokobo. Mr. Polak's testimony that he understood that Pokobo, LLC was to receive title to the 17-acres could only have occurred if the subdivision process had been completed, title to the 17-acres had been obtained by Mr. Kobayashi and conveyed by Mr. Kobayashi to Pokobo. Yet, not a single question was raised by Mr. Polak as to how this Exchange had occurred, or where any of the documentation relating to the conveyance to Pokobo was.

Second, the Kobayashi capital contributions that are reflected as having been made after the alleged agreement had been finalized were completely inconsistent with the agreement that Mr. Polak alleges had been concluded in February, 1999. If the agreement was that Mr. Polak would make all future capital contributions to Pokobo to "equalize" their accounts, continued capital contributions by Mr. Kobayashi is inexplicably in conflict with the agreement that is alleged to have been concluded in early 1999. Notwithstanding the notice that Mr. Polak had, there is no evidence that he ever made any inquiry whatsoever as to why Mr. Kobayashi was continuing to make capital contributions throughout 1999.

## H.    The Plaintiff received has received all the financial information.

The Plaintiff's Amended Complaint seeks a "full accounting of Pokobo" (Pltf. Post-Trial Br. at 42). The Plaintiff's accounting claim is determined by two lines of testimony presented to the Court. First, as acknowledged by the Plaintiff at page 24 of his Opening Post-Trial Brief, he received a letter from Mr. Kobayashi dated December 14, 2001 to which an extensive spreadsheet of Pokobo expenses was attached (PTX 175). This is not contested.

Second, the Plaintiff has all the financial information that he requested in his current possession. The deposition testimony of Mr. Colin Grubb, Pokobo's accountant, dated June 12, 2007, accepted into evidence, provides as follows:

27

Q.    [Akolt]  With the materials that have been printed out
September of 2006, the various general ledgers, is that – its not
formally an accounting, but does that, in general parlance,
provide all of the information Mr. Polak had previously
requested up to the date of September 2006?

A.    Yes.

I.    **The Plaintiff has presented no evidence of damages from:  (1) breach of
contract; (2) breach of fiduciary duty; (3) unjust enrichment.**

The Plaintiff made no showing of damages at trial.  There was no testimony and there

were no exhibits offered or introduced that can sustain any claim for monetary damages against

the Defendant.  The Plaintiff has not sustained his burden of proof that would allow this Court to

enter any judgment based upon the claims of breach of contract, breach of fiduciary duty or

unjust enrichment.


III.  **Argument**

A.    **Lack of Jurisdiction.**

As the Court is aware, the jurisdiction over this action is premised upon 28

U.S.C.§1441(a)(2004).  In considering the diversity jurisdiction between the parties, Judge

Farnan addressed the nature of the claims presented.  In his Order dated August 22, 2005 (D.I.

18), Judge Farnan considered the nature of the claim that the Plaintiff had asserted in its pleading

for Pokobo, LLC, and determined that:

> Because Mr. Polak has failed to establish that Pokobo itself has
> any interest distinct from the interests of Mr. Polak and Mr.
> Kobayashi, the Court concludes that Pokobo is not a real party
> to the dissolution issue and should remain a nominal defendant.
> Accordingly, the Court concludes that, in these circumstances,
> complete diversity of citizenship exists among the parties and
> the Court has subject matter jurisdiction to hear this lawsuit.

28

This determination was based upon a perception of the case that neither the Plaintiff nor the Defendant had argued. Whether Judge Farnan was correct or not in his determination, his Order was the law of the case that the Defendant was entitled to and did rely upon for preparation and presentation of his case.

On August 23, 2007, four days before trial was scheduled, the Court stated that its prior ruling was "in error" and, over the objection of the Defendant, permitted the Plaintiff to pursue the derivative claims on behalf of Pokobo for breach of fiduciary duty and for the claim of a constructive trust against a 17-Acre Parcel held by the Defendant Kobayashi in his individual capacity.

Having reversed what the Defendant understood to be the law of the case, and permitting the Plaintiff to pursue his personal and derivative claims on behalf of Pokobo, at a minimum the Court need have reconsidered the basis of the diversity jurisdiction upon which Judge Farnan had maintained diversity jurisdiction over this action.

The parties cannot consent to or confer jurisdiction upon this Court if it does not exist.

A claim for monetary damages, even though the Plaintiff never identified the basis or amount of the claim on behalf of Pokobo, and a claim for the imposition of a constructive trust for the benefit of Pokobo, LLC are significant issues. Defendant understood these matters not to be in the case, pursuant to Judge Farnan's Order dated August 22 2005 (D.I. 18). That understanding changed with the Order of this Court dated August 23, 2007. The Defendant believes that this Court would lose its subject matter jurisdiction if it were to consider or impose an award for the benefit of Pokobo, LLC. If the Pokobo claims are, in fact, considered, the Defendant believes that the jurisdiction of the Court over this matter has been divested. While the Court's Order of August 23, 2007 did allow for the derivative Pokobo claims to be litigated,

29

if the Court's Order of August 23, 2007 were rescinded *nunc pro tunc* to Judge Farnan's Order

of August 22, 2005, such would preserve, perhaps, the Court's jurisdiction over this case. If

such is not possible, Judge Farnan's statement of law:

> The statute is strictly construed, requiring remand to state court
> if any doubt exists over whether removal was proper.
> *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 104
> (1941). A court will remand a removed case "if at any time
> before final judgment it appears that the district court lacks
> subject matter jurisdiction." 28 U.S.C. § 1447(c) (2004).
> (Order (D.I. 18)).

is applicable and would need to be resolved. The remainder of the Defendant's Argument is

premised upon the assumption that the jurisdiction of this Court over this proceeding remains.

### B.    The Plaintiff has abandoned several of his claims.

In his Amended Complaint (D.I. 85 at 16), the Plaintiff sought eight specific claims for relief:

> (a)    Declaring that the 17-Acre Parcel rightfully belongs to
> Pokobo and is being held by Defendant in constructive trust for
> Pokobo, and directing Defendant to transfer title of the 17-Acre
> Parcel to Pokobo;
>
> (b)    Decreeing that Pokobo is dissolved pursuant to 6 *Del. C.*
> §§ 18-801 and 18-802;
>
> (c)    Approving the winding up of the affairs and business of
> Pokobo by Plaintiff in accordance with the LLC Agreement
> and 6 *Del. C.* §§ 18-803 and 18-804;
>
> (d)    In connection with the winding up of the affairs and
> business of Pokobo, ordering the sale of both the 17-Acre
> Parcel and the 64-Acre Parcel pursuant to Section 8.02(b) of
> the LLC Agreement;
>
> (e)    Ordering a full and complete accounting of Pokobo's
> expenses, and of each Partner's capital contributions to Pokobo
> since its formation in 1997;
>
> (f)    Granting Plaintiff monetary damages;

30

(g)    Awarding Plaintiff its costs in bringing this action, including reasonable attorneys' fees; and

(h)    Granting such other and further relief as may be appropriate in the circumstances.

In his Opening Post Trial Brief, the Plaintiff now seeks the following relief:

A.    Dissolution of Pokobo pursuant to 6 *Del. C.* §§ 18-801 and 18-802;

B.    Full Accounting of Pokobo;

C.    Imposing a constructive trust on the 17-Acre Parcel for the Benefit of Pokobo;

D.    Reimbursing contributions paid by Pokobo if 17 acre parcel found not to belong to Pokobo;

E.    Award of attorney fees. (D.I. 109).

The Plaintiff has now abandoned at least two of his claims for relief that were central issues for the Defendant in this proceeding: (1) monetary damages for breach of contract and for breach of fiduciary duty; and (2) unjust enrichment. It also appears that the Plaintiff has abandoned his claim that the Court order a judicial sale of the property of Pokobo, and the Defendant believes that such remedy is not provided for under 6 *Del. C.* §§ 18-801 and 18-802.

That the Plaintiff has abandoned any claim for monetary damages is the only course available since the Plaintiff presented no evidence of monetary damages from the date of the filing of the Complaint, throughout discovery and at trial. The Defendant is the prevailing party, by default, on the issue of monetary damages.

Similarly, for an award of unjust enrichment, the Plaintiff must show the existence and amount of enrichment that the Defendant has achieved. The Plaintiff has not presented any evidence of enrichment in that he has not shown that the value of any property, specifically the 17-Acre property which the Defendant believes may be the basis of the Plaintiff's unjust

31

enrichment claim, in fact, has any value in excess of the Defendant's or the Plaintiff's

contributions to the property, even if the property is confirmed to rightly be titled to the

Defendant.[3]

Further, as the Plaintiff never provided the basis for any monetary damages and never

presented any evidence or support of monetary damages, the Defendant is entitled to an award of

his attorney fees and costs for the defense of a claim that is without basis pursuant to Fed. R.

Civ.P. 11.

## C.    Claims Barred by the Statute of Limitations

The Plaintiff made no claim against Kobayashi relating to Kobayashi's acquisition of the

17-Acre Parcel until the filing of this action in the Delaware Court of Chancery on February 28,

2005. This was a period of more than five years after Kobayashi purchased the Lako Street

Parcel and recorded the deed to the 17-Acre Parcel in his own name in the Hawaii Records.

As to the Plaintiff's claims for accounting, as to all those expenses disclosed to the

Plaintiff in December, 2001 as part of PTX 175 (discussed *supra* at 33), to the extent that the

Plaintiff's claim for accounting is to provide a basis for a monetary award, such claim is also

barred by the applicable statute of limitations.

The applicable statute of limitation, 10 *Del. C.* § 8106  provides:

> No action to recover damages for trespass, no action to regain
> possession of personal chattels, no action to recover damages
> for the detention of personal chattels, no action to recover a
> debt not evidenced by a record or by an instrument under seal,
> no action based on a detailed statement of the mutual demands

---

[3] The concept of unjust enrichment on this issue is different than the reconcilliation of capital
accounts upon dissolution of an LLC. The Defendant has acknowledged that the Plaintiff is
entitled to reimbursement of any Pokobo funds expended on the 17-Acre parcel if the ownership
of the 17-Acre Parcel remains in the Defendant. This reimbursement is appropriate whether or
not Pokobo is dissolved.

32

> in the nature of debit and credit between parties arising out of
> contractual or fiduciary relations, no action based on a promise,
> no action based on a statute, and no action to recover damages
> caused by an injury unaccompanied with force or resulting
> indirectly from the act of the defendant shall be brought after
> the expiration of 3 years from the accruing of the cause of such
> action; subject, however, to the provisions of § 8108-8110,
> 8119 and 8127 of this title.[4]

In *Youell v. Maddox*, 692 F. Supp. 343 (D. Del. 1988), this Court determined that the law

of the State of Delaware was the applicable law for an action brought in Delaware for breach of

contract notwithstanding the contract was entered in the State of Pennsylvania and the location of

the incident where the claim arose was the District of Columbia. *See also Hood v. McConemy*,

53 F.R.D. 435, 445 (D. Del. 1971). Polak has filed his claims in Delaware and thus the

Delaware statute of limitations applies.

Addressing the time at which the statute of limitations begins to run, also applying

Delaware law, in *Youell*, supra at page 355, this Court determined:

> Delaware follows the generally accepted principle that a cause
> of action for breach of contract accrues at the time of the
> breach.

*Id.* at 355.

Delaware's three year statute of limitations has further been determined to apply to

claims arising from a claim of conversion, the imposition of a constructive trust and for

recognition of equitable title. This statute was applied by the Delaware Court of Chancery in

*Spano v. Morse*, C.A. No. 20121, 2003 WL 22389542 (Del.Ch. Oct. 8, 2003) as follows:

> The court is satisfied that the gravamen of the petition is the
> legal claim of conversion. The other claims for relief all clearly
> arise out of and depend upon proof of that claim because, if the
> petitioners are unable to prove that Morse misappropriated the

---

[4] None of the referenced statutes that are exceptions to 10 *Del.C.* § 8106 are applicable to
Polak's claims in this proceeding.

money, they cannot be entitled to an order imposing a
constructive trust on Morse's interest in the Property. In the
circumstances, the court should apply, by analogy, the three-
year statute of limitations found in 10 *Del. C.* § 8106.

In *Fike v. Ruger*, 754 A.2d 254 (Del. Ch. 1999), the Court of Chancery expressly

determined that Delaware's three year statute of limitations applied to a claim for breach of

contract and breach of fiduciary duty and also stated that such statute began to run as of the date

that the cause of action accrued.  The Court of Chancery stated at 260-261:

> Under Delaware law, a three-year statute of limitations applies
> to claims for breach of contract or breach of fiduciary duty.   10
> *Del. C.* § 8106.   While this Court is not specifically bound to
> apply the statute of limitations, "equity follows the law and, in
> appropriate circumstances, applies the statute of limitations by
> analogy, denying relief when claims are brought after the
> analogous statutory period." *Merck & Co., Inc. v. SmithKline
> Beecham Pharms. Co.*, C.A. No. 15443, 1999 WL 669354 (De.
> Ch. Aug. 5, 1999);  *see also United States Cellular Inv. Co. of
> Allentown v. Bell Atlantic Mobile Sys., Inc.*, 677 A.2d 497, 502
> (Del. Supr. 1996).  "[W]here the relief sought in equity in a so-
> called complaint for an accounting is actually the mere
> recovery of money, as is the case here," the case is analogous
> to an action for monetary damages. *Artesian Water Co. v.
> Lynch*, 283 A.2d 690, 692 (Del. Ch.1971).
>
> A cause of action accrues at the moment of the wrongful act,
> even if the plaintiff is ignorant of the wrong. *In re Dean Witter
> Partnership Litig.*, C.A. No. 14816, 1998 WL 442456 (Del.
> Ch. July 17, 1998).

Further, as stated by the Court of Chancery in *Artesian Water Co. v. Lynch*, 283 A.2d

690, 692 (Del.Ch. 1971) (internal citations omitted), cited by *Fike, supra*, where a claim in

equity is based upon the same facts as the action at law (i.e. breach of contract), the applicable

statute of limitations as to each claim is the same.

> In other words, the period of the applicable statute of
> limitations should be applied as a bar in those cases which fall
> within that field of equity jurisdiction which is concurrent with
> analogous suits at law.  And where the relief sought in equity

34

in a so-called complaint for an accounting is actually the mere recovery of money, as is the case here, an action for such type of relief is analogous to an action at law for the same or equivalent relief.

The statute of limitations applicable to a legal action analogous to the one at bar provides that a plaintiff must file his action within three years after his cause of action accrues, 10 *Del. C.* § 8106. Thus, in the case at bar, when the individual plaintiff failed to receive a full share of Artesian stock for the defendant Laird, Bissell & Meeds in January, 1960, and thereafter failed to receive any of the dividends declared on any of his Artesian stock, a fact which is reflected in the individual plaintiff's tax returns filed after the taxable year 1959, his cause of action arose. Furthermore, the fact that the individual plaintiff was unaware of the mistake in question at the time it was made does not, under the circumstances of record, stand in the way of the running of the statute.

The gravamen of the Plaintiff's claims for breach of contract and for the imposition of a constructive trust are founded upon his claim of breach of an oral contract and upon a claim of breach of fiduciary duty arising from Kobayashi's acquisition of the Lako Street Parcel and titling the Parcel to his own name. The action occurred on May 27, 1999; if titling of the 17-Acre Parcel to his own name is deemed to be the initiation of the claim, this occurred on July 26, 2000. Disclosure of the Pokobo expenses in December 2001 begin the initiation of the period of claim from the date of their disclosure (and may well have begun as of the date that Pokobo paid or reimbursed Mr. Kobayashi for the itemized expenses). Regardless of the characterization of the Plaintiff's claims as being in law or in equity, the three year statue of limitations set forth in the Delaware code is a bar to the claims.

It is also clear under Delaware law, that the accrual of a cause of action begins on the date that it occurs. In *Hood*, this Court stated:

> The second contention, that the cause of action does not accrue until the plaintiffs were aware of it, is without merit in these circumstances. Numerous Delaware cases have rejected this

35

'time of discovery' rule and have held that, absent other factors, the plaintiffs' ignorance of a cause of action does not affect the date on which the action accrues. The only case in which the doctrine was accepted was *Layton v. Allen*, 246 A.2d 794 (Del. Sup. Ct. 1968) . That case involved a suit for medical malpractice where the plaintiff felt no discomfort until seven years after the initial operation. Subsequent examination revealed that a hemostat had not been removed during the initial operation. The court concluded that the limitations period did not commence to run until the plaintiff's injury manifested itself. However, the court clearly delineated the factors relevant to its conclusion by citing the 'inherently unknowable' aspect of the internal injury situation. In light of the Delaware Supreme Court's specific and narrowly defined application of the 'time of discovery' doctrine in Layton, this Court cannot accept plaintiffs' argument that the statute of limitations does not accrue until their discovery of the dismissal of the first action.

*Hood*, 53 F.R.D. at 445 (internal citations omitted).

In the case at bar, Mr. Kobayashi's deed was placed of public record In July, 2000. There cannot be any more public declaration of an event than placing it of public record. As to the costs and fees disclosed in PTX 175, Mr. Kobayashi sent it to and it was received by Mr. Polak in December, 2001. There is no basis in either circumstance to be able to declare that the action claimed was in any way "inherently unknowable" by the Plaintiff.

Plaintiff has claimed that the running of the statute of limitations has been tolled under Delaware law. As to any monetary claim related to the accounting for expenses disclosed as part of PTX 175, Plaintiff can show no basis whatever that there was any concealment. It was the Defendant who sent the expense sheet to the Plaintiff.

As to the running of the statute of limitation against the Plaintiff's claims against the 17-Acre Parcel transaction, the basis of the Plaintiff's tolling argument was stated by the Plaintiff himself to be based solely on the date at which he became aware of the alleged malfeasance. Plaintiff's testimony was as follows:

36

Q. [Akolt]   Prior to the review for the amendment of your complaint on August 6th of 2007, had you ever asserted that the sole specific basis for the tolling of the statute of limitations was that you did not learn of the status of the title to the 17 acres until November of 2002?

A. [Polak]  I don't know whether I did or whether I didn't, but the fact is that I learned of it the first time from the documents sent to me by Jane Fenton. (Tr. Vol. A 239: 12-19).

The Plaintiff later stated:

Q. [Akolt]  I am going to hand you your deposition that was taken on May 11th of 2007, and if I can call your attention to -- you to read to yourself Lines 1 through 11 on Page 275 (handing deposition transcript to the witness).

A. [Polak]  Sure. (Pause.) THE WITNESS:  Correct.  I read it.

Q.   Okay.  Having read those lines on Page 275, does that refresh your memory with respect to whether or not, as of, at least as of May 11th of 2007, the sole basis for the tolling of the statute of limitations was stated to be that you did not know the status of title until November of 2002?

A.   I did say that, yes. (Tr. Vol. A 240: 16-241: 5).

The date of becoming aware of a circumstance is not and has never been the test for the running of the statute of limitations in Delaware.  Even if the Court were to disregard the Plaintiff's own testimony as to the basis for his claim for the tolling of the statute of limitations for the 17-Acre Parcel, the exception for concealment or "inherently unknowable" is narrowly applied.  *See Studiengesellschaft Kohle, mbH v. Hercules, Inc.*, 748 F. Supp. 247, 252 (D. Del. 1990)

In cases where the statute of limitations is tolled because an action is inherently unknowable the party seeking the relief must show they were blamelessly ignorant of the act or omission and the injury. *Id.*  Fraudulent concealment, like inherently unknowable, requires a party to overcome a single threshold question. *Id.*  First it must be shown that there is sufficient evidence from which the court can find that facts were fraudulently concealed. *Id.* Fraudulent

37

concealment requires a showing of an affirmative act by the party accused of the wrongful behavior. *Id*. In addition to actively concealing facts from the complaining party, the actor must have intended to prevent inquiry or knowledge of the injury. *Id*. Only if that question can be answered in the affirmative, does the issue of when the injured party did discover or should have discovered the injury arise so that the time for the statute of limitations to begin running can be set. *Halpern v. Barran*, 313 A.2d 139 (Del. Ch. 1973). Where a deed is placed of public record, in the full name of the party, active concealment of the fact is impossible to sustain.

Significantly, if a period of limitation is tolled by "inherently unknowable" or by active concealment, it is tolled only until the plaintiff discovers or exercising reasonable diligence should have discovered his injury. *In re Dean Witter Partnership Litig.*, 1998 WL 442456 at \*6 (Del. Ch. July 17, 1998); *Halpern*, 313 A.2d at 143. Thus, the limitations period begins to run when the plaintiff is objectively aware of the facts giving rise to the wrong, i.e., on inquiry notice. *Id*.

Inquiry notice is the legal standard in Delaware even in the case of active concealment or the condition of "inherent unknowability". The statute of limitations is tolled only until such time that a "person of ordinary intelligence and prudence would have facts sufficient to put them on 'inquiry which, if pursued, would lead to the discovery' of the injury." *Studiengesellschaft Kohle*, 748 F. Supp. at 252 (D. Del. 1990) (internal citations omitted).

Inquiry notice does not require actual discovery of the reason for the injury. *Studiengesellschaft Kohle*, 748 F. Supp. at 253. Nor does it require plaintiff's awareness of all of the aspects of the alleged wrongful conduct. Rather, the statute of limitations begins to run when plaintiff should have discovered the general fraudulent scheme. The plaintiff still must be reasonably attentive to his interests. *In re Dean Witter Partnership Litig.*, 1998 WL 442456, at

38

*8. "[B]eneficiaries should not put on blinders to such obvious signals as publicly filed documents, annual and quarterly reports, proxy statements, and SEC filings." *Id.* at *8 (internal citation omitted). "[I]nterest holders need not delve aggressively into the internal affairs of a ... limited partnership in order to assure that a non-public, self-dealing transaction is not foreclosed from attack by limitations, but when facts are disclosed that give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights." *In re USACafes, L.P. Litig.*, 1993 WL 18769 (Del. Ch. 1993); *see Kahn v. Seaboard Corp.*, No. 11485, Allen, C. (Jan. 14, 1993).

Even where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available. *In re Dean Witter Partnership Litig.*, 1998 WL 442456, at *8. In this matter, the public documents provide the basis for all of Plaintiff's claims.

In the present case, the Plaintiff had direct information in the 2000 capital account summary (PTX 105), *supra* at 32, alone was sufficient to place the Plaintiff on inquiry notice that circumstances were not as he thought them to be: given that both the "Property Exchange" in Mr. Kobayashi's favor, and the capital contributions made by Mr. Kobayashi were each contrary to the "agreement" that Mr. Polak asserts to have been finalized months before. At a minimum, Mr. Polak has to be deemed to have been on inquiry notice from that date. The inquiry notice is even more applicable when the transaction of which Mr. Polak claims was a matter of public record if he had inquired of Ms. Bronster, or the County Clerk, in 2000.

The underlying contract for the 17-Acre Parcel between the Defendant and the National Church was sent to Sidney Fuke. The contract clearly and unambiguously states that Defendant would obtain title to the 17-Acre Parcel. Likewise, all the public filings related to the 17-Acre Parcel corroborate these facts. Kobayashi's acquisition of the Lako Parcel and titling it in his

own name was an action that took place in the public record of the State of Hawaii that was

ascertainable to Polak or to anyone else who looked at the real property records in Kona, Hawaii.

Under the law of the State of Delaware, there can be no other conclusion but that the statute of

limitations on Mr. Polak's claims for breach of contract, breach of fiduciary duty, constructive

trust and any monetary claim for the expenditures that had been disclosed directly to the Plaintiff

in 2001 had expired before this case was filed.

**D.    The Plaintiff's Claims of Breach of Contract, Breach of Fiduciary Duty and Constructive Trust Fail for Lack of an Enforceable Contract.**

The burden of proving that an enforceable contract was formed, rests upon the plaintiffs.

*Durand v. Snedecker*, 177 A.2d 649, 652 (Del. Ch. 1962); *COPI of Delaware, Inc. v. Kelly*, C.A.

No. 14529, Mem. Op. at 11, Steele, V.C. (Del. Ch. Oct. 25, 1996).

The evidence establishes that no written contract exists between the Plaintiff and

Defendant; nor is there any letter, memorandum or other document that establishes what the

terms of the alleged contract are. Rather, Plaintiff has argued that the parties had an enforceable

oral contract that was concluded with finality before February 9, 1999. He asserts that the

agreement was complete as to all necessary particulars for the financing and purchase of the 17-

Acre Parcel from the National Church.

However, the evidence offered by the Plaintiff to support his claim that a final, binding

contract had been reached does not sustain his claim. The parties never had a meeting of the

minds as to the contract's essential terms.

Review of the testimony offered by the Plaintiff to support his contract claim  confirms

that there were material terms of the "contract" that had never been agreed to with finality.

40

1. Mr. Polak claimed that the agreement was complete and concluded before February 9, 1999. (*supra*, page 11-12);

2. Mr. Polak claimed that the February 9, 1999 (PTX 42) letter to the Mission Investment Fund was the offer to purchase the 17-Acre Parcel. (*supra*, page 12). Clearly it was not.

3. No price was agreed to. (*supra*, page 13).

4. No payment terms were agreed to. (*supra*, page 13).

5. The amount of property that was to be purchased and was to be donated back to the Local Church was never established. (*supra*, page 14).

6. There was no understanding as to how the transaction would be structured. (*supra*, pages 15-16).

7. The terms of the contract claimed by the Plaintiff in his original complaint and his amended complaint differed in essential terms. (*supra*, pages 20-2).

8. The time and method of taking title varied. (*supra*, page 15).

9. Mr. Polak acknowledged that the method of acquisition was different than their "initial understanding". (*supra*, page 15).

10. The time for Mr. Polak to "equalize" his capital account to Pokobo was not established, and equally importantly was within the control of the Plaintiff himself. (*supra*, page 15).

11. There was no agreement on the payment of any interest for "equalization" payments that could be spread across 20 years or more. (*supra*, pages 15-16).

In summary, the alleged contract lacks almost all of the essential terms normally found in contracts for the purchase and sale of real estate. Absent agreement on these essential terms,

41

there can be no finding that there was a binding agreement that has been proved by the Plaintiff.
His claim that a binding agreement had been reached fails for lack of proof, and with such failure
the Plaintiff's claims for breach of contract, breach of fiduciary duty and constructive trust for
the 17-Acre Parcel trust have not been established.

### E.    Plaintiff is Not Entitled to a Constructive Trust.

The Plaintiff has alleged a breach of contract by the Defendant with regard to the
acquisition of the 17-Acre Parcel in Kona, Hawaii. Plaintiff's remedy for breach of contract is
an action for monetary damages at law. Plaintiff is not entitled to the imposition of a
constructive trust for the 17-Acre Parcel where there is an adequate remedy at law.
Where monetary damages are available, Delaware law does not provide for the imposition of
equitable remedies. In *Catts v. Suit*, 1977 WL 23827 (Del. Ch. 1977) the Delaware Court of
Chancery stated:

> While injunctive relief may be granted in aid of the specific
> performance of a contract, it is in such case dependent upon the
> main theory of relief and thus stands or falls upon the right to
> specific performance. High, Injunctions (4th Ed.1905) § 1120.
> An action for specific performance will not lie where there is
> an adequate remedy at law for monetary damages. *Lee
> Builders, Inc. v. Wells*, Del.Ch., 95 A.2d 692 (1953). The fact
> that plaintiffs may not be able to make a determination as to
> their losses until the beach season is over does not necessarily
> mean that a measure of damages is unascertainable. At the very
> least it would appear under the theory of their case that they
> would be entitled to a judgment against the defendant for all
> profits made by him in wrongfully operating the concessions to
> their exclusion-assuming, of course, that they can otherwise
> establish that the assignment would have been approved by the
> State had the defendant fulfilled his obligation.

In *Reeves v. Transport Data Communications, Inc.*, 318 A.2d 147, 148 (Del. Ch. 1974) the
Court considered the availability of equitable remedies for breach of contract, where the intent of

42

the party was to recover money. Citing Vice Chancellor Marvel in *Hughes Tool Company v. Fawcett Publications, Inc.*, 297 A.2d 428, 431 (Del. Ch. 1972), the Court stated:

> '. . . the question as to whether or not equitable jurisdiction exists is to be determined by an examination of the allegations of the complaint viewed in light of what the plaintiff really seeks to gain by bringing his cause of action . . ..'

> From a review of the present complaint it is obvious that what the Plaintiff really seeks to gain by bringing this action is the difference between the value of her Transport Data stock during the spring of 1973 when she claims she desired to sell it and its value at the end of July 1973 when she actually sold it. In other words, money. In fact, that is all she seeks by her prayers: (1) a valuation of the stock at the time she feels she was entitled to it in an unrestricted status and (2) damages based on its decrease in value from that point.

Where there is an adequate remedy at law, equitable relief is not available, and the Delaware Court of Chancery, in which this action was originally brought, has no equitable jurisdiction to impost a constructive trust. *see Levinson v. Continental Ins. Services, Inc.*, 1991 WL 50145 (Del. Ch. 1991); *Hughes Tool Co. v. Fawcett Publications, Inc.*, 297 A.2d 428 (Del. Ch. 1972) , rev'd on other grounds, 315 A.2d 577 (Del. 1974) . The existence of equitable jurisdiction is ordinarily to be ascertained as of the time of filing the complaint. *Diebold Computer Leasing, Inc. v. Commercial Credit Corp.*, 267 A.2d 586 (Del. 1970).

Determining that the remedy of monetary damages for breach of contract existed, in *Theis v. Board of Educ.*, 2000 WL 341061 (Del.Ch. 2000) the Delaware Court of Chancery determined that equitable relief was not available and the Court in equity had no jurisdiction:

> The wrong alleged here is past breach of contract and anticipated breach of contract. The remedy available is an award of money damages for the difference between the amount the District should have paid or should pay and what they did pay and would be anticipated to pay, without a judgment in Theis' favor. Because plaintiff can adequately seek

43

>   monetary damages in a court of law for his breach of contract
>   claims, this Court does not have jurisdiction to hear and decide
>   this matter.

In *Honeywell Intern. Inc. v. Air Products & Chemicals, Inc.*, 872 A.2d 944 (Del.Super., 2005)

the Delaware Superior Court similarly addressed the availability of equitable relief when

monetary damages are available. The Court stated:

>   In response, Honeywell filed in the Court of Chancery an
>   action for breach of contract, in which it sought to enjoin Air
>   Products' acquisition of the Ashland ECD. The Court of
>   Chancery denied Honeywell's motion for a preliminary
>   injunction, concluding that although Honeywell had shown that
>   it was likely to succeed on the merits of its breach of contract
>   claim, Honeywell was not entitled to injunctive relief because
>   it had an adequate remedy at law, i.e., monetary damages.

In the case at bar, it is clear that the Plaintiff makes no claim that the 17-Acre Parcel is unique, or

that his interest is to possess or develop this parcel of real estate for any personal or commercial

purpose. He seeks the value of the property, both in the 17-Acre and the 64-Acre parcels. As the

Plaintiff testified:

>   Q. [Waesco] Directing your attention to Page 2 of the letter
>   [Referring to Plaintiff's Exhibit No. 230], Mr. Polak, what was
>   your proposal for dissolving the company?
>
>   A.    Well, I proposed that we will sell both properties, conduct
>   an accounting, distribute the proceeds and dissolve Pokobo,
>   L.L.C. (Tr. Vol. A 168: 19-24).

On cross-examination the Plaintiff was equally specific:

>   Q. [Akolt] I'd like to simply review with you for the moment
>   what your desires are with regard specifically to the 17-acre
>   parcel that's at issue in this proceeding.
>
>   As I understand it, your desire is basically that the property be
>   sold and the proceeds of that and the proceeds from the 64
>   acres be divided in accordance with the L.L.C. agreement; is
>   that correct?

DB02:6679320.1                                                                065694.1001

A. [Polak] Yes. In our dissolution request, we're asking that the dissolution take place in accordance with the limited liability company agreement as well as the laws of the Court of Delaware, and that would be the sale of the property.

Q. You're not seeking to build your vacation home on the 17 acres or to use it personally in the future?

A. No. We would not be able to develop it with – in the existing condition that we have it.

Q. You're not seeking to have it divided out in kind between you and Mr. Kobayashi? That is, convey an interest in the property to you as an individual, interest to him as an individual?

A. No. That would be very difficult because it would -- actually, the value of this property is, if you sell it in one lot, because the larger the lot for development purposes, the greater the value, so that would diminish the value if you divided it.

Q. And you believe that it's infeasible to further the development process of entitling it or building infrastructure and developing out the property to its maximum extent as far as the developed piece goes?

A. At the moment, there's -- first of all, I don't know how many years it will take to continue to battle with the city to get the roads in.

 Secondly, it's impossible for us to get an agreement on what to do with the conditions, not being able to talk with the partnership. So your answer is yes. (Tr. Vol. B 3: 18-5: 2).

The Plaintiff seeks to recover the value of the 17-acre property that is the subject of his complaint for breach of contract and breach of fiduciary duty. For this, his remedy is for damages at law. The equitable remedy of a constructive trust is not available to the Plaintiff, even if the breach of contract is determined to exist. The existence of breach of fiduciary duty is premised upon the determination of whether there has been a breach of contract, and is similarly limited in its remedy.

45

The Plaintiff's assertion of the equitable remedy of constructive trust is not available under Delaware law where there is an adequate remedy for monetary damages at law. That the Plaintiff chose not to present any evidence or valuation of monetary damages in this case, does not confer equitable jurisdiction upon this Court under Delaware law to impose the equitable remedy sought by the Plaintiff.

**F.    The Plaintiff fails to prove usurpation of a corporate opportunity.**

The Defendant accepts the formulaic test asserted by the Plaintiff . Under Delaware law, the standard for proving usurpation of a corporate opportunity is a four-factor balancing test:  A corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimical to his duties to the corporation. *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 155 (Del. 1996).  The Court must apply all four of these factors to determine "whether or not the director has appropriated for himself something that in fairness should belong to his corporation." *Johnston v. Greene*, 121 A.2d 919, 923 (Del. 1956).

That the Defendant agrees that Plaintiff has correctly set fort the legal requirements for sustaining a claim of usurpation of corporate opportunity, however, is far different from acknowledging that the Plaintiff has in any way proved the existence of the factors.

The most obvious failure to meet the required elements is whether the corporate entity was financially able to pursue the purchase.  In this case it was clearly established that Pokobo had no funds to pursue the purchase, and that any funding under the LLC Agreement was entirely within the discretion of the members (PTX 1).  The Plaintiff cannot conflate the financial

resources of the members of the LLC, with the resources of the LLC. Pokobo's financial resources were limited to the absolute discretion of the members. None of the cases cited by the Plaintiff in support of his claim allow consideration of discretionary contributions to the corporate entity as the measure of the financial ability of the company.

An LLC formed under Delaware law constitutes a separate legal entity. 6 *Del. C.* § 18-201(b). As such, it is the corporation itself that must have the financial resources to take advantage of the corporate opportunity itself. *Conlew v. International Energy Corp.*, 1982 WL 17875 (Del.Ch. 1982).

The evidence before this Court is also determinative that the Plaintiff has not and cannot establish either that the purchase of the 17-Ace Parcel was within Pokobo's "line of business" or that Pokobo had any "expectancy" in the opportunity to purchase the 17-Acre Parcel. It is clear that under the LLC Agreement (PTX 1, section 5.01), any activity or business opportunity other than holding the original 64-Acre Parcel for investment was completely determined by the discretion of either member. The "expectancy" of the LLC could not differ from the "expectancy" of either member. If either member did not share the "expectancy" of the other, Pokobo LLC, as an entity, cannot be deemed to have any "expectancy". The discretion of each member defines the "expectancy" of Pokobo. Here, regardless of Mr. Polak's "expectancy", the Court cannot find that the unilateral desire of either of the two members constitutes the corporate expectancy. And as for any claim that either of the members had any legal duty to refer opportunities to the LLC, Mr. Polak's own testimony is controlling of his claim. As Mr. Polak testified (Tr. Vol. A 207: 22-25 – 208: 1-13):

> Q. Is there anything in the LLC agreement that required either
> of the two of you in your capacity as members or managers to
> make any offer of transactions to the company   before
> proceeding on an individual basis?

47

A.   There's nothing in the LLC agreement to that effect that I know of.

Q.   ... Was there any prior or separate agreement between you and Mr. Kobayashi as individuals that said that if Mr. Kobayashi came upon a particular transaction in Hawaii    or anywhere else, that he would run it by you first for your participation?

A.   No. I'm talking only about a corporate opportunity that would affect the Pokobo problem.  That's the only problem that I would raise as a potential violation of law, certainly the rules of ethics.  But other than that, he could have bought any piece of property on his own and I could have done the same.

The Plaintiff has not and cannot sustain his claim for usurpation of a corporate opportunity, where the "intent" and "expectation" of the entity is determined entirely by the discretion of either member.  Pokobo LLC, as a separate legal entity, had no resources, intent or expectation separate from that of its members.

## IV.  Conclusion

The Plaintiff is entitled to a reconciliation of accounts.  He has all the data he requested and, as a managing member, he has the legal right to obtain any additional data that he believes that he may need.  He can undertake whatever financial review of Pokobo, LLC that he desires.

The results of such a reconciliation are likely to show that the Defendant has substantially over-contributed to the capital of Pokobo, LLC and that his capital account remains substantially disproportionate to the Plaintiff's contributions.  While dependent to some extent on the Court's determination of title to the 17-Acre Parcel, it is not contested that over the past 5 years, Mr. Kobayashi has contributed in excess of $100,000.00, not matched or reimbursed by the Plaintiff to sustain Pokobo LLC and to preserve its property.  I testimony of John Kobayashi (Tr. Vol. D 508: 14-22)

As to the remainder of the Plaintiff's claims, if the Court does determine to consider the

48

substantive claims asserted derivatively by Pokobo pursuant to the Court's Order of August 23, 2007, it must reconsider whether the effect of the Order was to divest this Court of its diversity jurisdiction. If the Court's Order did divest this Court of its jurisdiction, it has no option other than to remand the action to the courts of the State of Delaware.

Nonetheless, should the Court both entertain all of the Plaintiff's claims and determine that it retained jurisdiction over this action, the Defendant asserts the following:

Mr. Polak's claims for any monetary damages, if they ever existed, have not been proved and, to the extent they are asserted through his claim for accounting, are barred by the running of the statute of limitations.

Mr. Polak has failed in his burden to prove that there was ever any "meeting of the minds" on the purchase of the 17-Acre Parcel. His failure to establish the essential terms of the alleged agreement are determinative of his claims for breach of contract, breach of fiduciary duty and for the imposition of a constructive trust.

Mr. Polak's derivative claim on behalf of Pokobo, LLC that Mr. Kobayashi usurped a corporate opportunity fails as a matter of law. The evidence conclusively establishes that Pokobo's ability to finance *any* undertaking is subject to the complete discretion of *both* of the members. Under Delaware law a limited liability corporation is a separate legal entity. The Plaintiff cannot conflate the individual assets of its members with the assets of the company. Nor can Pokobo, LLC have any "expectancy" other than the discretionary "expectancy" of *both* of its members. The Plaintiff cannot and has not established that Pokobo, as an entity, had any "expectancy" because there was no common "expectancy" of its members.

Mr. Polak's claims for the imposition of a constructive trust are similarly barred by the running of the applicable stature of limitations and if not barred by the statute of limitations, they

49

are barred as an equitable remedy where there is an adequate remedy at law for monetary damages. That Mr. Polak did not present any basis upon which monetary damages can be founded does not affect their availability under the law.

For the Court to order dissolution of Pokobo, LLC, where the Plaintiff has not availed himself of the remedy for deadlock provided for by Section 5.02 of the LLC Agreement (PTX 1) would impermissibly re-write the contract that the parties agreed to (i.e. the LLC Agreement), and this the Court cannot do.

The remedies requested by the Plaintiff are not available as a matter of law, and the Plaintiff has not sustained his burden of proof for this Court to grant the relief requested by the Plaintiff.

The Complaint of the Plaintiff and each cause of action stated therein should be denied.

YOUNG, CONAWAY, STARGATT & TAYLOR, LLP

__/s/ Karen E. Keller_____
Ben T. Castle (#520)
Karen E. Keller (#4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
  *Attorneys for Defendant*
  *John M. Kobayashi*

OF COUNSEL
John P. Akolt, III (*Pro hac vice*)
AKOLT & AKOLT LLC
1880 Arapahoe Street, #2005
Denver, CO 80202

## CERTIFICATE OF SERVICE

I, Karen E. Keller, hereby certify that on March 20, 2008,  I caused to be electronically

filed a true and correct copy of the foregoing document with the Clerk of the Court using

CM/ECF, which will send notification that such filing is available for viewing and downloading

to the following counsel of record:

> Martin P. Tully, Esquire
> David A. Harris, Esquire
> Susan Wood Waesco, Esquire
> Morris Nichols Arsht & Tunnell LLP
> 1201 North Market Street
> PO Box 1347
> Wilmington, DE 19899-1347

I further certify that on March 20, 2008, I caused a copy of the foregoing document to be

served by hand delivery and e-mail on the above-listed counsel of record.

> YOUNG CONAWAY STARGATT & TAYLOR, LLP
>
> Karen E. Keller (#4489)
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, DE  19801
> (302) 571-6600
> kkeller@ycst.com
>
> *Attorneys for John M. Kobayashi*