IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WERNER L. POLAK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN M. KOBAYASHI, | ) | C.A. No. 05-330 (SLR) |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| POKOBO, L.L.C., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## PLAINTIFF WERNER L. POLAK'S REPLY POST-TRIAL BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Martin P. Tully (#465)
Rodger D. Smith II (#3778)
Susan W. Waesco (#4476)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
  *Attorneys for Plaintiff Werner L. Polak*

April 14, 2008

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ...............................................................................................1

ARGUMENT ......................................................................................................2

I.      POKOBO SHOULD BE JUDICIALLY DISSOLVED ...........................................2

II.     DEFENDANT USURPED A CORPORATE OPPORTUNITY WHEN HE ACQUIRED THE 17 ACRES FOR HIMSELF ...................................3

        A.    Pokobo Was Financially Able To Exploit The Opportunity .....................3

        B.    Pokobo Had An Interest And Expectancy In The Opportunity ...............................................................................6

        C.    The Opportunity Was In Pokobo's Line Of Business And Defendant Placed Himself In A Position Inimicable To His Duties To Pokobo By Acquiring The 17 Acres For Himself......................9

        D.    Mr. Polak's Usurpation Claim Does Not Depend On Establishing Breach Of An Oral Agreement ..................................9

III.    CONSTRUCTIVE TRUST IS THE PROPER REMEDY FOR USURPATION OF A CORPORATE OPPORTUNITY .......................................10

IV.     THE COURT SHOULD ORDER AN ACCOUNTING ......................................11

V.      MR. POLAK'S CLAIMS ARE NOT TIME-BARRED.......................................12

VI.     MR. POLAK'S DERIVATIVE CLAIMS DO NOT DESTROY DIVERSITY JURISDICTION ...............................................................19

VII.    MR. POLAK SHOULD BE AWARDED HIS ATTORNEYS' FEES ...............................................................................................23

CONCLUSION ..................................................................................................24

TABLE OF AUTHORITIES

Page(s)

**CASES**

*Abex, Inc. v. Koll Real Estate Group, Inc.,*
1994 WL 728827 (Del. Ch.) ....................................................23

*Agranoff v. Miller,*
1999 WL 219650 (Del. Ch.) ................................................. 4-5

*Brice v. State, Dept. of Correction,*
704 A.2d 1176 (Del. 1998) ....................................................23

*Broz v. Cellular Information Sys., Inc.,*
673 A.2d 148 (Del. 1996) .......................................................3

*Cantor Fitzgerald, L.P. v. Cantor,*
2001 WL 536911 (Del. Ch.) ...................................................23

*Conlew v. Int'l Envtl. Energy Corp.,*
1982 WL 17875 (Del. Ch.) ................................................. 3-4

*EBS Litigation LLC v. Barclays Global Investors, N.A.,*
304 F.3d 302 (3d Cir. 2002)....................................................13

*Employers Ins. of Wausau v. Crown Cork & Seal Co., Inc.,*
942 F.2d 862 (3d Cir. 1991)..............................................20, 22

*Guth v. Loft, Inc.*
5 A.2d 503, 510 (Del. 1939) ..................................................11

*Haley v. Talcott,*
864 A.2d 86 (Del. Ch. 2004)....................................................2

*In re Dean Witter Partnership Litigation,*
1998 WL 442456 (Del. Ch. 1998) ..........................................13

*In re Fruehauf Trailer Corp.,*
250 B.R. 168 (D. Del. 2000) ............................................ 13-14

*In re MAXXAM, Inc./Federated Development Shareholders Litigation,*
1995 WL 376942 (Del. Ch. 1995) ...................................... 12-13

*In re Silver Leaf, L.L.C.,*
2005 WL 2045641 (Del. Ch.) ..................................................2

*In re the Walt Disney Co.*,
   2004 WL 2050138 (Del. Ch.), *aff'd*, 906 A.2d 27 (Del. 2006) ...............................................11

*Jacobson v. Dryson Acceptance Corp.*,
   2002 WL 31521109 (Del. Ch.) ...............................................................................................23

*Johnston v. Greene*,
   121 A.2d 919 (Del. 1956) ........................................................................................................7

*Loft, Inc. v. Guth*,
   2 A.2d 225 (Del. Ch. 1938)....................................................................................................12

*Parfi Holding AB v. Mirror Image Internet, Inc.*,
   817 A.2d 149 (Del. 2002) .......................................................................................................10

*Weiss v. Swanson*,
   2008 WL 623324 (Del. Ch.) ...................................................................................................19

**STATUTES**

6 *Del. C.* § 18-801...................................................................................................................2

6 *Del. C.* § 18-802...................................................................................................................2

6 *Del. C.* § 18-803...................................................................................................................2

6 *Del. C.* § 18-804 ..................................................................................................................2

10 *Del. C.* § 8106....................................................................................................................13

## INTRODUCTION

Defendant's Post-Trial Brief is perhaps most notable for what it does *not* say. Defendant does *not* argue that it is reasonably practicable to continue Pokobo's business. He apparently concedes that Pokobo should be judicially dissolved.

Defendant does *not* address the contemporaneous notes and memoranda -- including his own -- which show that the parties agreed on how they would finance the acquisition of the 17 Acres. The parties executed that plan and acquired the 17 Acres using funds from both Mr. Polak and Defendant.

Defendant does *not* discuss whether the acquisition of the 17 Acres was in Pokobo's line of business, or whether his acquisition of the 17 Acres placed him in a position inimicable to his duties to Pokobo. The opportunity clearly was in Pokobo's line of business, and Defendant's acquisition of the property was contrary to his fiduciary duties to Pokobo. Indeed, Defendant admits that Pokobo's acquisition of the Church property would have "enhance[d] the value" of the 64 Acres.

Defendant does *not* explain why his trial testimony concerning his reasons for acquiring the 17 Acres in his own name was different from his deposition testimony and different from his interrogatory responses. He has no explanation. The story that he told at trial about the coffee mill and the phantom voicemail message to Mr. Polak is a figment of Defendant's imagination, with no support in any of the contemporaneous documents.

The Court should enter an Order: (a) declaring that the 17 Acres is held in constructive trust for the benefit of Pokobo; (b) declaring that Pokobo should be judicially dissolved; and (c) ordering an accounting of Pokobo's finances.

<u>ARGUMENT</u>

I.    <u>POKOBO SHOULD BE JUDICIALLY DISSOLVED</u>

Under Delaware law, judicial dissolution of a limited liability company is appropriate if "it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement."  6 *Del. C.* § 18-802; *see also In re Silver Leaf, L.L.C.*, 2005 WL 2045641, at *10 (Del. Ch.); *Haley v. Talcott*, 864 A.2d 86 (Del. Ch. 2004).

As Mr. Polak explained at trial and in his Opening Brief, it is not reasonably practicable to carry on Pokobo's business given the state of the parties' relationship, and Pokobo should be judicially dissolved (D.I. 109 at 38-41).  Defendant does not address this issue in his Post-Trial Brief, and has apparently conceded that dissolution is appropriate here.

Defendant's only argument against dissolution (which he makes in passing) is that dissolution is not appropriate because Mr. Polak "has not availed himself of the remedy for deadlock provided for by Section of 5.02 of the LLC Agreement" (D.I. 110 at 50).  At trial, however, Defendant's counsel conceded that Section 5.02 does not apply to disputes between Pokobo's members:  "[T]he coin flip does not apply to actions between partners.  It applies to actions of Pokobo" (Tr., Vol. E 590:23-24).

Because it is not reasonably practicable to carry on Pokobo's business given the state of the parties' relationship, the Court should enter an Order:  (a) decreeing that Pokobo is dissolved pursuant to 6 *Del. C.* §§ 18-801 and 18-802; and (b) approving the winding up of the affairs and business of Pokobo by Mr. Polak in accordance with the Operating Agreement (PTX 1) and 6 *Del. C.* §§ 18-803 and 18-804.

II.    DEFENDANT USURPED A CORPORATE OPPORTUNITY
WHEN HE ACQUIRED THE 17 ACRES FOR HIMSELF

There is no dispute concerning the legal standard for determining whether Defendant usurped a corporate opportunity.  Defendant agrees that "the standard . . . is a four-factor balancing test," and that "[t]he Court must apply all four of these factors . . ." (D.I. 110 at 46).  As discussed below, however, Defendant fails to address two of the factors.

Under Delaware law, a corporate fiduciary cannot take a business opportunity for himself if:

> (1) the corporation is financially able to exploit the opportunity;
> (2) the opportunity is within the corporation's line of business;
> (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation.

*Broz v. Cellular Information Sys., Inc.,* 673 A.2d 148, 155 (Del. 1996).  "No one factor is dispositive and all factors must be taken into account insofar as they are applicable."  *Id.*

A.    Pokobo Was Financially Able To Exploit The Opportunity

Defendant argues that Pokobo was not financially able to purchase the 17 Acres, because "it is the corporation itself that must have the financial resources to take advantage of the corporate opportunity itself," and Mr. Polak has "conflate[d] the financial resources of the members of the LLC, with the resources of the LLC" (D.I. 110 at 46-47).

The only case that Defendant cites in support of his argument is *Conlew v. Int'l Envtl. Energy Corp.*, 1982 WL 17875 (Del. Ch.) (D.I. 110 at 47).  That case does not support Defendant's position.  The court in *Conlew* held that plaintiff could not establish usurpation of a corporate opportunity because plaintiff had failed to show that the corporation had the necessary financial resources -- or had access to the necessary financial resources: "[P]laintiff has not

4.

borne his burden of showing the reasonable probability of success on the merits because it is unlikely that IEEC has **or can obtain sufficient financing** to develop the corporate opportunity . . . ." *Id.* at *2 (emphasis added); *see also Agranoff v. Miller*, 1999 WL 219650, at *20 (Del. Ch.) ("[E]ven though EMS is a relatively small company, it has engaged in sophisticated financing transactions in the past **and could have obtained the financing** to purchase these interests . . . .") (emphasis added).

Pokobo had access to the financial resources necessary to acquire the 17 Acres. The evidence presented at trial showed that the parties agreed on a plan for financing the acquisition of the 17 Acres, and executed that plan to acquire the 17 Acres. Indeed, it is telling that nowhere in his Post-Trial Brief does Defendant discuss the contemporaneous notes and memoranda -- including his own -- detailing the plan on which the parties agreed for financing the acquisition of the 17 Acres.

Mr. Polak's notes of his February 16, 1999 conversation with Defendant show that the parties planned to use the proceeds from the sale of Defendant's Montana land to fund the purchase of the 17 acres, that Mr. Polak would pay the difference in the purchase price, and that Mr. Polak would pay the future expenses to equalize their capital contributions (PTX 50):

> 4.   Has $190,000 from Montana deal
>      - deed to Pokobo
>
> 5.   WLP give $50,000 to Foundation -- get full
>      deduction for WLP
>
> 6.   later I pay more operating expenses

*See also* Tr., Vol. A 81:4-84:8.

Defendant's own handwritten notes evidence the same plan (PTX 248). Defendant would provide an initial cash payment of $193,000, and the "balance remaining" of $35,000 would come from Mr. Polak (*id.* at JMK 006000). Mr. Polak's capital account would

5.

have a deficit balance of $158,000, which Mr. Polak would "contribute as needed" (*id.* at JMK 006001). *See also* Tr., Vol. E 539:23-543:23. Defendant acknowledges that Mr. Polak made capital contributions to cover expenses associated with the 17 Acres, which is consistent with their agreement that Mr. Polak would contribute additional capital "as needed." *See* D.I. 110 at 32 n.3 ("Plaintiff is entitled to reimbursement of any Pokobo funds expended on the 17-Acre parcel if the ownership of the 17-Acre Parcel remains in the Defendant.").

The memoranda prepared by Pokobo's accountant, Mr. Grubb, also evidence the same plan for financing the acquisition of the 17 Acres (PTX 56; PTX 64; *see also* Tr., Vol. B 247:17-22, 248:9-11). Defendant planned to use the proceeds of the sale of his Montana land to finance his portion of the purchase price. *See* PTX 56 ("The contract price of the land must be at least the net proceeds of the Montana sale to defer the gain on the sale. This has been set at $195,000."). And Mr. Polak would make additional capital contributions over time to equalize the parties' accounts. *See* PTX 64 ("Werner agrees to contribute an[] additional $158,190 over the next five years . . . to cover expenses incurred by the partnership to equalize the capital account.").

The Lutheran Church also understood how the parties planned to finance the acquisition of the 17 Acres. In correspondence with its lawyer, the Church confirmed that: (a) the purchase price was approximately $228,000; (b) $193,000 of the sale price would be a cash payment (from Defendant's sale of the Montana property); and (c) the remaining roughly $35,000 would be received as a charitable contribution to the Lutheran Church (PTX 63 at MIF000230; Tr., Vol. A 90:17-92:5).

6.

As Mr. Grubb testified, the plan described in Mr. Polak's notes, Defendant's notes, Mr. Grubb's memoranda, and the correspondence from the Church was, in fact, the plan the parties used to acquire the 17 Acres:

> Q.     To your knowledge, did Pokobo acquire the 17 acres using this four-step process [outlined in PTX 64]?
>
> A.     The steps that we've outlined here did, indeed, occur up to the point of actually 35,000 going from Pokobo's account to the foundation and then later to -- not the church, but Mission something, which we've talked about before.
>
> Q.     Okay.
>
> A.     And then based on the documents I received from John's office, subsequent to me preparing this memorandum, there was a schedule that showed John had indeed contributed the land to the partnership.  So at the time that I prepared the 1999 return, I had every reason to believe that this transaction had been completed as shown.

(Tr., Vol. B 270:22-271:10).  Indeed, the 1999 Schedule K-1 Partnership Income Statement prepared by Mr. Grubb credited Defendant's capital account in the amount of $194,046 in connection with the "Land Deal" (PTX 106 at CG000222), and included charitable contributions in the amount of $39,000 (*id.* at CG000221).

The fact that the 17 Acres were purchased using funds from Mr. Polak and Defendant -- as part of a plan developed by the parties -- establishes that Pokobo was financially able to exploit the opportunity.

> B.     Pokobo Had An Interest And Expectancy In The Opportunity

Defendant argues that Pokobo did not have an interest or expectancy in the 17 Acres, because "[i]f either member did not share the 'expectancy' of the other, Pokobo LLC, as

7.

an entity, cannot be deemed to have any 'expectancy'" (D.I. 110 at 48).  That is not the proper analysis.

For a corporation to have an "interest" or "expectancy" in a piece of property, "there must be some tie between that property and the nature of the corporate business." *Johnston v. Greene*, 121 A.2d 919, 924 (Del. 1956).  A fiduciary cannot acquire property for himself if doing so defeats the plans of the corporation in carrying out the business for which it was created:

> Whether in any case an officer of a corporation is in duty bound to purchase property for the corporation, or to refrain from purchasing property for himself, depends upon whether the corporation has an interest, *actual or in expectancy*, in the property, or whether the purchase of the property by the officer or director may hinder or defeat the plans and purposes of the corporation in the carrying on or development of the legitimate business for which it was created.

*Id.* at 923-24 (emphasis in original).

Here, the connection between the 17 Acres and Pokobo's other business -- the ownership and development of the 64 Acres -- is clear.  Defendant admits that Pokobo was interested "in a portion of the Church property . . . for access to Lako Street" (D.I. 110 at 8), and that "the Lako Street access would enhance the value of the 64-Acre Parcel" (*id.* at 21). Defendant also admits that access to Lako Street was "potentially very important to Pokobo" (Tr., Vol. E 522:25-523:20), and that acquisition of the Church property "might be beneficial as additional access to the future development of the 64-Acre Parcel" (D.I. 110 at 7).

As Mr. Fuke testified, the parties understood that access to Lako Street was important to the 64 Acres:   "[A]ll throughout the discussions with Mr. Kobayashi, the understanding was a Lako Street access was very essential to the successful development . . . for the [64 Acres]" (Tr., Vol. B 39:17-20).  *See also* Tr., Vol. A 70:17-71:4 ("[I]t was very important

8.

that we had access for the 64 acres by the Lako Street extension, so to speak, and we want[ed] to make certain that we had that access.").

On February 9, 1999, Defendant sent a letter to the Church confirming Pokobo's agreement to purchase the 3 acres -- to give Pokobo access to Lako Street for the 64 Acres (PTX 42 at WLP000315). In the same letter, Defendant offered to have Pokobo purchase the 17 Acres from the Church: "Pokobo and its partners are willing to consider an offer of sale from the [Lutheran Church] of the 17.86 acres at a price acceptable to Pokobo . . ." (*id.* at WLP000317-18).

Now, years after the parties identified the importance of access to Lako Street and years after Defendant negotiated with the Church to obtain access to Lako Street, Defendant claims that "a right of way access to present Lako Street would be of little value to the 64-Acre Parcel" (D.I. 110 at 8). That belated assertion, however, is belied by Defendant's actions in negotiating with the Church in 1999 to obtain access to Lako Street. Moreover, the value of the opportunity is not part of the usurpation analysis. What is important is whether Pokobo had an interest and expectancy in the opportunity. And it is clear from the parties' discussions in 1999 and their negotiations with the Church that Pokobo had an interest and expectancy in the acquisition of the Church property.[1]

---

[1]     Defendant argues that Mr. Polak "provided no analysis that would justify purchasing [the 17 Acres] . . . merely to gain access to Lako Street" (D.I. 110 at 21). But as reflected in Mr. Polak's January 7, 1999 notes (PTX 17), and as he testified at trial, the parties originally discussed purchasing the entire 22 acres from the Church "so that we would have some leverage with the county to negotiate where the location of the Ali'i [Highway] would be, and sooner or later also have control over where Lako Street is, because we didn't know where the Lako Street extension was going to be" (Tr., Vol. A 56:15-19).

C.    The Opportunity Was In Pokobo's Line Of Business And
Defendant Placed Himself In A Position Inimicable To His
Duties To Pokobo By Acquiring The 17 Acres For Himself

In his Post-Trial Brief, Defendant does not address two of the four factors

regarding usurpation:   (a) whether the opportunity was in Pokobo's line of business; and

(b) whether Defendant placed himself in a position inimicable to his duties to Pokobo in taking

the opportunity.  As discussed in Mr. Polak's Opening Post-Trial Brief, the acquisition of the 17

Acres was clearly within Pokobo's line of business (*see* D.I. 109 at 33-34).  Under the terms of

its Operating Agreement, Pokobo was permitted to engage in any lawful act, including the

acquisition of real property (PTX 1, § 1.03).  Moreover, since its formation, Pokobo's only

business had been the ownership and development of real estate in Hawaii, and the acquisition of

additional property in Hawaii to ensure that the 64 Acres would have access to Lako Street was

important to increase the value of the 64 Acres.

Defendant's acquisition of the 17 Acres also placed him in a position inimicable

to his duties to Pokobo (*see* D.I. 109 at 35-36).  By entering into a contract between himself and

the Lutheran Church to purchase the 17 Acres -- which included the 3-acre parcel that would

have connected Lako Street to the 64 Acres -- Defendant put his own interests before Pokobo's

and put himself in a position inimicable to his duties to Pokobo.

D.    Mr. Polak's Usurpation Claim Does Not Depend On
Establishing Breach Of An Oral Agreement

Instead of addressing the factors relevant to Mr. Polak's usurpation claim,

Defendant relies on a straw-man argument suggesting that Mr. Polak is actually asserting a claim

for breach of an oral agreement concerning acquisition of the 17 Acres.  *See, e.g.,* D.I. 110 at 42

("Plaintiff has alleged a breach of contract by the Defendant with regard to the acquisition of the

17-Acre Parcel in Kona, Hawaii."); *id.* at 40 ("Plaintiff has argued that the parties had an

10.

enforceable oral contract . . . .").  Defendant also argues that Mr. Polak's ability to assert his

usurpation claim depends on establishing breach of an oral agreement.  *See* D.I. 110 at 45 ("The

existence of breach of fiduciary duty is premised upon the determination of whether there has

been a breach of contract . . . .").

     Defendant's argument is legally and factually incorrect.  Mr. Polak's claim for

usurpation of a corporate opportunity does not depend on the existence of a written or oral

agreement.  *See Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 158 (Del. 2002)

("The fiduciary duties Xcelera owes Parfi are beyond the contract and rest on an independent set

of rights provided for in the Delaware corporation law.").

   III.   CONSTRUCTIVE TRUST IS THE PROPER REMEDY FOR
        USURPATION OF A CORPORATE OPPORTUNITY

     Defendant argues that a constructive trust is not an appropriate remedy for

Mr. Polak's claim for breach of an oral agreement.  *See, e.g.,* D.I. 110 at 42 ("Plaintiff's remedy

for breach of contract is an action for monetary damages at law.").  Mr. Polak, however, is

asserting a claim for usurpation of a corporate opportunity.

     As the Delaware Supreme Court has explained, the proper remedy for usurpation

of a corporate opportunity is for the property to be placed in a constructive trust for the benefit of

the company:

> **If an officer or director of a corporation, in violation of his
> duty as such, acquires gain or advantage for himself, the law
> charges the interest so acquired with a trust for the benefit of
> the corporation,** at its election, while it denies to the betrayer all
> benefit and profit.  The rule, inveterate and uncompromising in its
> rigidity, does not rest upon the narrow ground of injury or damage
> to the corporation resulting from a betrayal of confidence, but upon
> a broader foundation of a wise public policy that, for the purpose
> of removing all temptation, extinguishes all possibility of profit
> flowing from a breach of the confidence imposed by the fiduciary
> relation.  **Given the relation between the parties, a certain result**

**follows; and a constructive trust is the remedial device through which precedence of self is compelled to give way to the stern demands of loyalty.**

*Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939) (emphasis added); *see also In re the Walt Disney Co.*, 2004 WL 2050138, at *5 n.51 (Del. Ch.), *aff'd*, 906 A.2d 27 (Del. 2006) ("[W]hen an officer or director of a corporation usurps a corporate opportunity, a constructive trust should be established for the benefit of the corporation.").

## IV.    THE COURT SHOULD ORDER AN ACCOUNTING

Defendant argues that Mr. Polak does not need an accounting, because Mr. Polak "has all the data he requested and, as a managing member, he has the legal right to obtain any additional data that he believes that he may need" (D.I. 110 at 48). That is incorrect.

Mr. Polak was removed as a signatory on Pokobo's bank account in September 2003, and does not have access, for example, to bank statements and cancelled checks concerning Pokobo's expenses (PTX 263; Tr., Vol. A 48:25-50:8). Moreover, despite repeated request for an accounting, Defendant instructed Mr. Grubb not to release any documents or information regarding Pokobo to Mr. Polak (PTX 227 at WLP000098; PTX 228). In addition, the accuracy of the few financial records that Mr. Polak did receive from Defendant and Mr. Grubb is suspect. Mr. Grubb never requested any supporting documentation or verified the accuracy of the numbers he received from Defendant's office (Tr., Vol. B 224:22-226:4, 230:20-231:2).

Where, as here, Defendant has breached his duty of loyalty to Mr. Polak and Pokobo and usurped a corporate opportunity, Mr. Polak should not be required to accept as true the financial documents prepared and maintained by Defendant and his office staff. *See Loft, Inc. v. Guth*, 2 A.2d 225, 238 (Del. Ch. 1938) (holding that fiduciary who has wrongfully

usurped a corporate opportunity "must account for the profits resulting from an unlawful act done to promote his own interest"). The Court should order an accounting that includes a review of the financial records of Pokobo *and* the underlying cancelled checks, bank statements and other supporting documents.[2]

### V.    MR. POLAK'S CLAIMS ARE NOT TIME-BARRED

Defendant argues that Mr. Polak's claims are barred by the statute of limitations, because Mr. Polak did not file suit until February 23, 2005, "more than five years after Kobayashi purchased the Lako Street Parcel and recorded the deed to the 17-Acre Parcel in his own name . . ." (D.I. 110 at 32). Mr. Polak's claims are not time-barred, however, because the statute of limitations was tolled here under the doctrines of equitable tolling and fraudulent concealment.

The policy underlying both doctrines is that "a defendant should not be permitted to use the statute of limitations as a shield where the defendant possesses information critical to the existence of an actionable claim of wrongdoing and prevents the plaintiff from discovering that information in a timely fashion." *In re MAXXAM, Inc./Federated Development Shareholders Litigation*, 1995 WL 376942, at *6 (Del. Ch.). The statue of limitations is tolled

---

[2]    Contrary to Defendant's suggestion in his Post-Trial Brief (D.I. 110 at 31), Mr. Polak has not "abandoned" his claims for monetary damages or unjust enrichment. Indeed, the accounting is necessary to determine the extent of any monetary damages or unjust enrichment suffered by Mr. Polak. As Mr. Polak stated in his Opening Post-Trial Brief, if the Court determines that Defendant, not Pokobo, is the rightful owner of the 17 Acres, Mr. Polak should be reimbursed for any funds he contributed to Pokobo that were used to cover 17 Acres-related expenses (D.I. 109 at 46). Defendant has conceded that Mr. Polak should be reimbursed for those expenses if the Court finds that Defendant properly owns the 17 Acres. *See* D.I. 110 at 32 n.3 ("Plaintiff is entitled to reimbursement of any Pokobo funds expended on the 17-Acre parcel if the ownership of the 17-Acre Parcel remains in the Defendant.").

under both doctrines until plaintiff knew or had reason to know of the facts constituting the wrong. *Id.*

Mr. Polak did not become aware that the subdivision had occurred, that he had been misled by Defendant, and that Defendant did not intend to transfer the 17 Acres to Pokobo until November 2002 (Tr., Vol. A 143:12-144:6). Mr. Polak filed suit on February 23, 2005 -- less than three years after becoming aware of the facts constituting the wrong. *See* 10 *Del. C.* § 8106.

"Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary." *In re Dean Witter Partnership Litigation*, 1998 WL 442456, at *6 (Del. Ch. 1998). Equitable tolling requires: (1) a fiduciary relationship between plaintiff and defendant; (2) actionable self-dealing by defendant; and (3) lack of inquiry notice by plaintiff. *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 193 (D. Del. 2000). The statute of limitations begins to run only when plaintiff is "*objectively* aware of the facts giving rise to the wrong." *EBS Litigation LLC v. Barclays Global Investors, N.A.*, 304 F.3d 302, 305 (3d Cir. 2002).

The statute of limitations is tolled under the doctrine of fraudulent concealment as a result of "an affirmative act of concealment by the defendant -- an 'actual artifice' that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put the plaintiff off the trail of inquiry." *In re Fruehauf Trailer*, 250 B.R. at 186 (quoting *In re Dean Witter*, 1998 WL 442456, at *5). Fraudulent concealment can involve either: (1) affirmative acts of misrepresentation; or (2) failure to disclose facts when there is a duty to disclose. *In re*

14.

*Fruehauf Trailer*, 250 B.R. at 186.  Fraudulent concealment can be established by showing "a business fiduciary relationship between Defendants and Plaintiffs and a duty to disclose."  *Id.*

Both equitable tolling and fraudulent concealment apply here.  Defendant is a fiduciary who engaged in actionable self-dealing, as well as numerous acts of concealment to prevent Mr. Polak from obtaining knowledge of the facts concerning the 17 Acres and Defendant's intentions with respect to that property, all of which were intended to put Mr. Polak off the trail of inquiry.

On numerous occasions from 1999 until early 2002, the parties discussed Pokobo's ownership of the 17 Acres, and Mr. Polak asked Defendant for updates on the status of the transaction and was told that the closing was delayed because the subdivision process was taking longer than expected:

> Q.  Mr. Polak, after February of 1999, did you ask Mr. Kobayashi for updates on the status of the acquisition of the 17 acres?
>
> A.  Yes.  Periodically, when we talked on the phone, I would say, what's going on, and he would tell me that, regrettably, everything is bogged down, the bureaucracy is in full gear here in Hawaii and it's taking time to get everything done, but, don't worry, it will be done.
>
> *   *   *
>
> Q.  Mr. Polak, in late August of 1999, did you continue to ask Mr. Kobayashi about the progress of the closing of the 17 acres?
>
> A.  Yes.  But I got the same line as before:  That everything was slow going and that it hadn't -- that the subdivision had not been approved yet, and the negotiations were going forward, and don't worry, it will close sooner or later. I just have to be patient.

(Tr., Vol. A 97:16-23, 101:18-25).

15.

In August 1999, the parties continued to discuss a "master plan" for the 64 Acres and the 17 Acres:

> John told me that the county planning commission may make a decision on Lako Street soon and for us to be able to negotiate with respect to the road that we were going to give to the county . . . 60 feet, all the way from the Lako Street where it stopped at the west end portion all the way through either the 17 or the 64 acres.

> . . . He said in order to have meaningful negotiations, he would like us to have a master plan for the 81 acres, that is the 64 plus the 17, so that we would be able to negotiate with them and the county would be able to recognize what we were going to do with the 81 acres.

(Tr., Vol. A 98:11-99:1; PTX 93). *See also* PTX 95 (discussing "Overall Concept Plan"); Tr., Vol. B 59:1-61:1.

In October 1999, Mr. Polak and Defendant visited the Pokobo property in Hawaii and "trotted onto our 17 acres, around the church area, and then tried to determine how and what we were going to do" regarding the development of the land (Tr., Vol. A 100:4-101:17).

In a January 24, 2000 telephone conversation, the parties agreed to obtain an archaeological study for the 17 Acres (*see* PTX 118; Tr., Vol. A 102:22-103:6).

On February 14, 2000, Defendant sent Mr. Polak a memorandum listing Pokobo's past due expenses and "guesstimates" of Pokobo's expenses over the next six to nine months (PTX 122). Most of the expenses involved the 17 Acres, and included the costs of the archaeological and engineering work associated with the 17 Acres (Tr., Vol. A 104:18-105:23).

In early 2000, Mr. Polak received a list from Defendant of the parties' respective capital contributions to Pokobo for the years 1997, 1998 and 1999 (PTX 105), which reflected Defendant's contribution of the 17 Acres to Pokobo (or the $194,047.77 in proceeds from the sale of Defendant's Montana property) (*id.* at WLP000341), as well as Mr. Polak's $40,000

16.

contribution to Pokobo to cover the balance of the $228,000 purchase price (*id.* at WLP000342). *See also* Tr. Vol. A 108:7-110:7.[3]

In May 2000, Defendant attended Mr. Polak's birthday party in New York (Tr., Vol. A 110:8-112:24). At the party, Defendant gave Mr. Polak an aerial photograph of Pokobo's Hawaii property, with Pokobo's land (both the 64 Acres and the 17 Acres) outlined in red (PTX 138). *Compare* PTX 238 with PTX 138.

In early December 2001, Mr. Polak spoke again with Defendant by telephone and discussed expenses incurred by Pokobo that had been paid by Defendant as well as current bills payable:

> A.      John told me that he was creating a list of bills that he had in his possession that remained unpaid, and he also collected a series of bills that he had paid for which he seeks reimbursement. . . .
>
> Q.      And were you going to pay a hundred percent of those bills or were you going to split them with Mr. Kobayashi?
>
> A.      No. No. This again would be my job as catch-up and therefore I would be paying the entire bills that remained unpaid as well as those that were reimbursement for John for payments in the past.

(Tr., Vol. A 121:23-122:17). Mr. Polak immediately sent Defendant a check in the amount of $35,000 to cover the bills payable (PTX 173; PTX 174; Tr., Vol. A 126:1-7).

---

3       Defendant actually argues that this list of capital contributions -- which stated that Defendant had been credited with a capital contribution in the amount of $194,047.77 as part of a "Property Exchange" -- should have put Mr. Polak on notice that Defendant did not intend to transfer ownership of the 17 Acres to Pokobo (*see* D.I. 110 at 26-27). That makes no sense. The document is consistent with the plan the parties had discussed for financing and acquiring the 17 Acres, and is a prime example of Defendant's efforts to conceal his true intentions with respect to the 17 Acres.

17.

On December 14, 2001, Defendant sent Mr. Polak a letter listing the various expenses the parties had discussed earlier in the month, acknowledged receipt of Mr. Polak's $35,000 check, and requested that Mr. Polak "send the amount of the remaining balance of the bills already paid by me sometime in January . . ." (PTX 175 at WLP000009).   The list of "Pokobo Expenses" included expenses associated with the 17 Acres (Tr., Vol. A 126:15-127:7). In that same letter, consistent with the parties' arrangement for financing the acquisition of the 17 Acres and Mr. Polak's obligation to play "catch-up" to equalize their capital accounts, Defendant reported to Mr. Polak where things stood:  "After crediting your capital account with this $35,000, Colin has computed that the balance remaining in your capital account, as an amount to be contributed, is approximately $134,000" (PTX 175 at WLP000009).[4]

Mr. Polak sent two additional checks to reimburse Defendant for the expenses he had already paid -- one in the amount of $20,000 (PTX 180), and the other in the amount of $25,000 (PTX 188; PTX 189).   In total, Mr. Polak contributed $80,000 to Pokobo -- slightly more than the total expenses identified by Defendant in his December 14, 2001 letter -- to pay for expenses that included expenses associated with the 17 Acres based on the understanding that

---

[4]     Defendant argues that Mr. Polak should have questioned certain "capital contributions" by Defendant because "continued capital contributions by Mr. Kobayashi is inexplicably in conflict" with the parties' plan for financing the acquisition (D.I. 110 at 26-27).   The circumstances of those "contributions" are not explained by Defendant, and may not reflect expenses of Pokobo for which Mr. Polak had to "catch up."  For example, the last of the contributions (in the amount of $4000) was supposedly made on December 29, 1999 (PTX 105).   Two days later, there is an entry on Pokobo's General Ledger indicating that $4000 was paid to the Kobayashi Family Foundation (PTX 107). Defendant provides no explanation why he would have contributed $4000 to Pokobo, and two days later Pokobo would have contributed $4000 to Kobayashi Family Foundation. It is also clear from the documents that Defendant paid certain expenses, and then later asked Mr. Polak for reimbursement.   *See* PTX 175 at WLP000009 ("If you can comfortably and conveniently send the amount of the remaining balance of the bills already paid by me sometime in January, that timing would be very helpful.") (emphasis added).

the land belonged to Pokobo, and that Mr. Polak needed to contribute additional funds to equalize the parties' capital accounts (Tr., Vol. A 122:14-17).

The last time that Mr. Polak spoke with Defendant was in April 2002, when Defendant was in New York (Tr., Vol. A 132:2-7).  Because it was uncommon for Mr. Polak and Defendant to go several months without speaking, Mr. Polak became concerned when he did not hear from Defendant, and left several telephone messages for him (Tr., Vol. A 136:15-24).  Defendant did not respond to Mr. Polak's phone messages (*id.*).  Mr. Polak also sent Defendant letters (PTX 197; PTX 200).  The letters went unanswered (Tr., Vol. A 138:9-11, 142:22-143:2).  Mr. Polak also sent letters to Mr. Grubb and Michael Matsukawa ("Mr. Matsukawa"), Pokobo's attorney in Hawaii (PTX 198; PTX 199).

When Defendant did not respond to Mr. Polak's November 18, 2002 letter (PTX 200), Mr. Polak contacted an attorney in Hawaii, Margery Bronster, and asked her to look into what was happening regarding the 64 Acres and the 17 Acres (Tr., Vol. A 142:25-144:6).  It was at that point that Mr. Polak learned that the subdivision had been approved in 2000, and that Defendant had repeatedly misrepresented the status of the title to the 17 Acres:

> Q.    Did you ever come to learn that the closing for the 17 acres had not occurred or had occurred? . . .
>
> A.    With the help of [Ms. Bronster], her legal assistant apparently went to the county and obtained information with respect to the pieces of property, which included the 64 acres and the 17 acres.  And in that report that I received in mid-November, it indicated that the subdivision of the 17 acres and the five acres had actually been approved much earlier, in 2000, and that the deal had closed.  That is, that the deed apparently was given to John for the 17 acres and to the Local Church for the five acres, way back in 2000.
>
> Q.    And that surprised you?
>
> A.    Total surprise.

Q.    And why was that?

A.    Because John had always told me that the closing hadn't
taken place, that Hawaii is just bureaucratic and it's taking
a long time and that the subdivision approval was awaiting
conclusion but it had not been approved by the county, and
that's why he wasn't giving me any closing papers.

(Tr., Vol. A 143:12-144:6).

Mr. Polak filed this action on February 23, 2005, less than three years after he became aware that the subdivision had been approved, that Defendant had misled him about the status of the 17 Acres, and that Defendant had no intention of transferring title to the 17 Acres to Pokobo.[5]

## VI.    MR. POLAK'S DERIVATIVE CLAIMS DO NOT DESTROY DIVERSITY JURISDICTION

In his August 22, 2005 Order, Judge Farnan applied the Third Circuit's "primary issue" test concerning diversity jurisdiction, and held that Mr. Polak's claims on behalf of Pokobo did not destroy diversity jurisdiction because the derivative claims are not the "primary issue" (D.I. 18).

Defendant argues now that "Judge Farnan . . . determined that the Plaintiff had not established an independent claim for Pokobo, as an entity, and therefore disregarded the

---

[5]    Defendant argues that Mr. Polak should have known about his claim earlier because the deed to the 17 Acres was in the public record. *See* D.I. 110 at 36 ("There cannot be any more public declaration of an event than placing it of public record."). There was no reason, however, for Mr. Polak to investigate the public record, because Defendant repeatedly told him that the subdivision had not occurred, and although the 17 Acres might be temporarily titled in Defendant's name, it would eventually be owned by Pokobo. *See Weiss v. Swanson*, 2008 WL 623324, at *12 (Del. Ch.) ("It would be inappropriate to infer . . . that Weiss was on inquiry notice of his claims simply because he could have pieced together the alleged practice of timing option grants from publicly available information.").

citizenship of Pokobo in determining whether complete diversity exists between the parties . . ."
(D.I. 110 at 1).  That is incorrect.  Judge Farnan held that Pokobo's interest in "whether a 17-acre
parcel . . . rightfully belongs to Pokobo" is "central only to Mr. Polak's secondary claims,"
which include the derivative claim of "whether Mr. Kobayashi breached his fiduciary duty to
Pokobo" (D.I. 18 at 5).

Notwithstanding Mr. Polak's derivative claims, Judge Farnan held that the Court
had jurisdiction over this case, because the "primary issue" was Mr. Polak's claim for judicial
dissolution of the LLC, in which Pokobo had no interest (D.I. 18 at 5-6).   As Judge Farnan
explained, "[i]n the Third Circuit, when determining whether diversity of citizenship exists, 'a
court must first identify the primary issue in controversy and then determine whether there is a
real dispute by opposing parties over that issue.'"  *Id.* at 4 (quoting *Employers Ins. of Wausau v.
Crown Cork & Seal Co., Inc.*, 942 F.2d 862, 864 (3d Cir. 1991)).

Judge Farnan identified four issues in dispute:  (1) "whether Pokobo should be
dissolved"; (2) "whether Mr. Kobayashi breached section 5.01 of the LLC agreement";
(3) "whether Mr. Kobayashi breached his fiduciary duty to Pokobo"; and (4) "whether
Mr. Kobayashi was unjustly enriched by his conduct with regard to the 17-acre parcel"  (D.I. 18
at 5).  Judge Farnan found that the "primary issue in this lawsuit is whether Pokobo should be
dissolved" (*id.*).  He found that Pokobo was not a "real party in interest for the dissolution," and
therefore the primary issue did not involve Pokobo as a "real party in interest" *(id.* at 5-6).  The
Court concluded that "complete diversity of citizenship exists among the parties and the Court
has subject matter jurisdiction to hear this lawsuit" (*id.* at 6-7).

Remarkably, Defendant now argues that he believed that Mr. Polak's derivative
claims were not in the case after Judge Farnan entered his August 22, 2005 Order.  *See* D.I. 110

at 29 ("Defendant understood these matters not to be in the case, pursuant to Judge Farnan's Order dated August 22, 2005."). Judge Farnan's August 22, 2005 Order, however, recognized that Mr. Polak had asserted, and continued to assert, derivative claims.

Indeed, since the filing of the original Complaint, Mr. Polak's claim for breach of fiduciary duty is and always has been a derivative claim in which Mr. Polak seeks to recover the 17 Acres for Pokobo. *See* Compl. ¶ 52 ("Plaintiff brings this claim derivatively on behalf of Pokobo and in his own right as a member of Pokobo."); *id.* at 13 (asking the Court to "declare that the 17-Acre Parcel rightfully belongs to Pokobo and is being held by Defendant in constructive trust for Pokobo, and [to] direct[] Defendant to transfer title to Pokobo"); *id.* ¶ 40 (alleging that demand -- a prerequisite for bringing a derivative claim -- is futile and therefore excused).

Similarly, in the briefing on the motion to remand, Mr. Polak made clear that he was asserting a derivative claim on behalf of Pokobo:

- "Pokobo has a real and genuine interest in recovering land rightfully belonging to it but wrongfully titled in Defendant's name" (D.I. 9 at 1).

- "Here, the Petition includes a derivative claim brought on behalf of Pokobo alleging that Defendant has breached his fiduciary duties of care, loyalty and good faith that are owed to both Plaintiff and Pokobo by, among other things, improperly titling the 17-Acre Parcel in his name, rather than Pokobo's. As is the case with any derivative claim, Plaintiff is pursuing this claim on Pokobo's behalf and any recovery (namely, the 17-Acre Parcel) will belong to Pokobo, not Plaintiff. Pokobo is therefore a real party in interest" (*id.* at 9).

- "Plaintiff's claims for breach of fiduciary duty, declaratory judgment and unjust enrichment allege that Defendant's actions have harmed Pokobo and seek recovery for the Company. Under the two-part test in *Tooley*, these claims are derivative -- Pokobo has been harmed by the loss of the 17-Acre Parcel and would receive the benefits of recovery of the land" (D.I. 15 at 7-8).

- "[T]he Petition alleges that Pokobo has been deprived of an asset to which it is rightfully entitled and seeks to recover that asset for Pokobo -- a classic derivative claim" (*id.* at 8-9).

In upholding the Court's jurisdiction over this case, Judge Farnan recognized that:

"The Petition also asserts a derivative claim on behalf of Pokobo for breach of fiduciary duty and claims for breach of contract and unjust enrichment" (D.I. 18 at 3). Judge Farnan did not determine that "Plaintiff had not established an independent claim for Pokobo," as Defendant now suggests (D.I. 110 at 1), but only that the existence of Mr. Polak's derivative claims on behalf of Pokobo did not destroy diversity jurisdiction because they are "secondary claims" (D.I. 18 at 5-6):

> Although in his Petition Mr. Polak also asks the Court to determine whether a 17-acre parcel of property titled solely in Mr. Kobayashi's name rightfully belongs to Pokobo, the Court concludes that the issue of ownership of the 17-acre parcel is central only to Mr. Polak's secondary claims: 1) whether Mr. Kobayashi breached Section 5.01 of the LLC Agreement; 2) whether Mr. Kobayashi breached his fiduciary duty to Pokobo, and 3) whether Mr. Kobayashi was unjustly enriched by his conduct with regard to the 17-acre parcel.

Under the Third Circuit's "primary issue" test, Pokobo was not aligned with Plaintiff or Defendant on the primary issue, because Pokobo had no interest in the dissolution. That does not mean, however, that Mr. Polak's derivative claims disappeared because Pokobo was a nominal party with respect to the "primary issue." Rather, Judge Farnan held that Pokobo's interest in Mr. Polak's "secondary" claims was not relevant for purposes of determining diversity jurisdiction. *See Wausau*, 942 F. 2d at 865 (noting that conflict between parties on subsidiary issues is irrelevant for diversity purposes).

## VII.    MR. POLAK SHOULD BE AWARDED HIS ATTORNEYS' FEES

Awarding attorneys' fees is appropriate where "the action giving rise to the suit involves bad faith, fraud, conduct that was totally unjustified, or the like." *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 536911, at *4 (Del. Ch.); *see also Brice v. State, Dept. of Correction*, 704 A.2d 1176, 1179 (Del. 1998).

Bad faith includes "[a]ctions by a defendant which necessitate judicial intervention to secure a clearly defined and established right" and actions "designed to force an opposing party to resort to litigation for the purpose of causing unreasonable delay." *Abex, Inc. v. Koll Real Estate Group, Inc.*, 1994 WL 728827, at *20 (Del. Ch.). Here, Defendant's opposition to the dissolution to Pokobo was totally unjustified, as the Court recognized at trial. *See* Tr., Vol. E 601:8-16 ("[D]espite the fact that he and Mr. Polak have not spoken for over five years, and despite the fact that apparently they didn't really communicate when they were communicating, and despite the fact that we have this litigation, . . . Mr. Kobayashi maintains that I should not dissolve this corporation . . . ."). Only now -- after three years of litigation -- has Defendant apparently conceded that dissolution is appropriate.

Bad faith also includes instances "where a party misleads the court, alters his testimony or changes his position." *Jacobson v. Dryson Acceptance Corp.*, 2002 WL 31521109, at *16 (Del. Ch.). Defendant makes no effort to explain why his trial testimony was different from his deposition testimony and different from his interrogatory responses (*see* D.I. 109 at 18-19), and makes no effort to explain his misunderstanding about the reference in Mr. Polak's notes to the $340,000 required to acquire the 17 Acres (*see id.* at 17-18). He has the audacity to suggest, however, that his testimony was actually "confirmed by the Plaintiff's testimony at trial" (D.I. 110 at 22). That is not correct. Mr. Polak's testimony at trial made clear that the

24.

parties' discussions about investing in a coffee business had nothing to do with their discussions about acquiring the 17 Acres. *See* Tr. Vol. A 211:1-6 ("[T]hat had nothing to do with land acquisition."). Defendant has absolutely no explanation for why he acquired the 17 Acres for himself. His trial testimony about the coffee mill and his phantom voicemail to Mr. Polak was created out of whole cloth.

As a result of the baseless and meritless positions taken by Defendant in this litigation, Mr. Polak should be awarded his attorneys' fees.

<u>CONCLUSION</u>

For the foregoing reasons and those set forth in his Opening Post-Trial Brief, Mr. Polak respectfully requests that the Court enter judgment in his favor and against Defendant.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II (#3778)*

Martin P. Tully (#465)
Rodger D. Smith II (#3778)
Susan W. Waesco (#4476)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
    *Attorneys for Plaintiff Werner L. Polak*

April 14, 2008

## CERTIFICATE OF SERVICE

I, Rodger D. Smith II, hereby certify that on April 14, 2008, I caused the foregoing PLAINTIFF WERNER L. POLAK'S REPLY POST-TRIAL BRIEF to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following in the manner indicated:

> Ben T. Castle
> Karen E. Keller
> Young, Conaway, Stargatt & Taylor LLP

and that on April 14, 2008, I caused copies to be served upon the following in the manner indicated:

### BY EMAIL AND HAND

> Ben T. Castle
> Karen E. Keller
> Young, Conaway, Stargatt & Taylor LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, DE  19801
> bcastle@ycst.com
> kkeller@ycst.com

*/s/ Rodger D. Smith II (#3778)*

Rodger D. Smith II
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
(302) 658-9200
rsmith@mnat.com