## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WERNER L. POLAK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 05-330-SLR |
| | ) |
| JOHN M. KOBAYASHI, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| POKOBO, L.L.C. | ) |
| | ) |
| Nominal Defendant. | ) |

---

Martin P. Tully, Esquire, Rodger D. Smith II, Esquire, and Susan W. Waesco, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware.  Counsel for Plaintiff.

Ben T. Castle, Esquire, and Karen E. Keller, Esquire, Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware.  Counsel for Defendant.  Of Counsel: John P. Akolt III, Esquire, Akolt & Akolt LLC, Denver, Colorado.

---

**OPINION**

Dated:  November 13, 2008
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

This action arises out of a dispute between the two members of Pokobo L.L.C. ("Pokobo"), a Delaware limited liability company, over, primarily, whether Pokobo should be judicially dissolved and whether Pokobo owns a 17-acre parcel in Hawaii titled in defendant's name. The issues were fully briefed post-trial. (D.I.109-110, 113) The court has jurisdiction over plaintiff's judicial dissolution and breach of contract claims pursuant to 28 U.S.C. § 1441(a). Having considered the documentary evidence and testimony, the court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. The Parties

1. Plaintiff Werner L. Polak is a New York resident and former litigation partner at Shearman & Sterling in New York City. (D.I. 99 at 30:14-31:4) Plaintiff currently works as in-house counsel for Linde AG.[1] (Id. at 30:20-30:23)

2. Defendant John M. Kobayashi is a Colorado resident and a former Assistant United States Attorney and partner at Holme, Roberts & Owen in Denver. (D.I. 105 at 389:16-19) Defendant currently owns his own law firm, Kobayashi Law Firm. (Id.) Defendant also owns investment properties in multiple states.[2] (Id. at 392:7-393:16)

---

[1]Linde AG is a German industrial gas company. (D.I. 99 at 30:20-30:23) Plaintiff represents Linde AG's United States subsidiaries. (Id.)

[2]Most of defendant's investment properties are located in Denver, Colorado, where he owns approximately 30 rental units. (D.I. 105 at 392:9-12) In the early 1990s, defendant began engaging in property transactions in Hawaii, including the purchase and sale of condominiums and undeveloped real estate and the development of a coffee farm. (Id. at 392:13-393:10)

3.  Nominal defendant Pokobo is a Delaware limited liability company.  (D.I. 85 at ¶ 5; D.I. 88 at ¶ 5; PTX 1)

4.  Plaintiff and defendant met in 1969 at Columbia Law School and became friends.  (D.I. at 32:6-22)  They maintained contact over the years, regularly meeting for lunch or dinner when defendant's practice brought him to New York City.  (*Id.*)

### B.  Formation of Pokobo L.L.C. and the Purchase of Property in Hawaii

5.  In late 1996, during lunch together, defendant told plaintiff about a potential investment opportunity in Hawaii.  (*Id.* at 32:25-33:21)  Defendant wanted to purchase 64 acres of land ("the 64 acre parcel") near Kona, Hawaii, but lacked sufficient funds to do so without a partner.  (*Id.*)  The 64 acre parcel was, and remains today, an undeveloped tract that eventually will be bisected by the Ali'i Highway.  (*Id.* at 34:12-35:3)  Although the path of the Ali'i Highway had not (and still has not) been determined and the highway remains unbuilt, defendant told plaintiff that the 64 acre parcel was "a good long term investment."[3]  (*Id.* at 34:17-18, 35:18-22)  Plaintiff and defendant agreed to acquire the 64 acre parcel and hold it as vacant land until the construction of the Ali'i Highway made the property attractive for development.  (*Id.* at 35:14-32; D.I. 105 at 411:20-412:2)

6.  On March 21, 1997, plaintiff and defendant formed Pokobo.[4]  (D.I. 85 at ¶ 5; D.I. 88 at ¶ 5; PTX 1)  Each party acquired a fifty percent interest in Pokobo with equal

---

[3]The 64 acre parcel was owned by a Japanese company that was forced to sell the property at a low price because of financial problems.  (D.I. 99 at 36:18-25)

[4]Defendant went by the nickname "Kobo."  Plaintiff and defendant decided to add the first two letters of plaintiff's last name to defendant's nickname and use the resulting name for the L.L.C.  (D.I. 100 at 93:12-16)

2

management rights.[5]  (D.I. 99 at 41:22-25) Section 1.03 of the Limited Liability Company Agreement of Pokobo, L.L.C. ("the Agreement"), includes the acquisition, development, and sale of real estate as purposes for Pokobo's creation. (PTX 1, § 1.03)

7.  On April 1, 1997, plaintiff and defendant each contributed $450,000 towards purchasing the 64 acre parcel, which was sold to Pokobo for approximately $900,000. (D.I. 99 at 38:12-13) Because plaintiff and defendant intended to leave the land undeveloped at first, they did not anticipate many management responsibilities. (Id. at 35:13-36:3) Defendant offered to handle the minimal work relating to the 64 acre parcel because he already traveled to Hawaii two or three times each year to manage his other Hawaiian properties, most notably his Kona coffee farm. (Id.)

8.  Later in 1997, Pokobo hired Sidney Fuke ("Fuke"), a land use consultant, to provide "broad land use related advice." (D.I. 100 at 35:13-37:12) Fuke's responsibilities with respect to the 64 acre parcel included preparing an evaluation of potential uses, researching applicable regulations and their potential impact, and identifying infrastructure limitations and environmental constraints. (Id. at 37:8-38:5)

9.  Fuke determined that the eastern portion of the 64 acre parcel lacked road access. (Id. at 38:5-39:20) Plaintiff and defendant considered purchasing three additional acres ("the three acres") in order to connect the 64 acre parcel to Lako Street, a residential street located only several hundred feet from the eastern border of

_____

[5]Section 5.02 of the Agreement provides that "in event the partners cannot agree on a course of action, they shall flip a coin 3 times and the recommendation of the winner of 2 of the 3 coin flips shall be followed." (PTX 1, § 5.02)

3

the 64 acre parcel. (*Id.*)  Purchasing the three acres would enable the partners to extend Lako Street to the eastern border. (*Id.*)  Fuke testified that, "All throughout the discussions with [defendant], the understanding was [that] a Lako Street access was very essential to the successful development, you know, for the [the 64 acre parcel]." (*Id.*)

10.  During 1999, the three acres were part of a 22 acre parcel ("the 22 acres") owned by the Mission Investment Fund, "the banking arm" of the national Evangelical Lutheran Church ("the national church"). (*Id.* at 161:13-162:25)  The Mission Investment Fund had applied to the county for permission to subdivide the 22 acres, intending to commit five of the 22 acres to the local Lutheran Church ("the local church") and retain the remaining 17 acres ("the 17 acre parcel"). (D.I. 99 at 64:18-25)

11.  On January 29, 1999, plaintiff and defendant decided to purchase the three acres needed for the Lako Street extension. (D.I. 100 at 164:14-167:23)  Defendant sent a letter to the national church on behalf of Pokobo offering to purchase "not less than one and a half but up to three acres" of the 22 acres. (*Id.*)  On February 2, 1999, the national church agreed to sell the three acres, through the Mission Investment Fund, to Pokobo. (*Id.*; PTX 31, 35)

12.  Shortly after agreeing to purchase the three acres, plaintiff and defendant discussed the possibility of Pokobo purchasing the 17 acre parcel. (D.I. 99 at 63:21-68:23)  Purchasing the 17 acre parcel would enable Pokobo to avoid certain issues caused by the national church's pending subdivision application and facilitate a

4

smoother transaction.[6] On February 9, 1999, defendant sent a letter to the national church confirming Pokobo's purchase of the three acres and stating that "Pokobo and its partners are willing to consider an offer of sale from the Mission Investment Fund of the 17.86 acres at a price acceptable to Pokobo." (D.I. 100 at 164:14-167:23; PTX 42 at WLP315, WLP318)

13. Defendant agreed to sell one of his Montana investment properties to fund most of the purchase price for the 17 acre parcel. (D.I. 99 at 81:18-21) Plaintiff agreed to contribute the remaining $35,000 of the purchase price for the 17 acre parcel and to pay Pokobo's future operating expenses until the capital contributions from each partner were equal. (*Id.* at 83:4-19) Because of tax implications, plaintiff agreed to give the funds to Pokobo, which would in turn donate the funds in the form of a charitable contribution to the Kobayashi Family Foundation.[7] (*Id.* at 80:23-82:8) The Kobayashi Family Foundation would then transfer the funds to the Mission Investment Fund of the national church. (*Id.*) Consistent with these terms, plaintiff contributed $35,000 of capital to Pokobo on March 10, 1999, representing "[his] balance of the purchase price for the 17 acres." (*Id.* at 92:13-14)

---

[6]Selling the three acres to Pokobo would require the national church to file a new subdivision application (and otherwise restart the subdivision process) requesting division of the 22 acres into three separate parcels: three acres for Pokobo, five acres for the local church, and 14 acres for the national church. (D.I. 99 at 63:21-68:23; PTX 36, 37, 42) However, under Hawaiian law, a new subdivision application would not be needed if Pokobo purchased the 17 acre parcel from the national church and the national church transferred the remaining five acres to the local church. (*Id.*)

[7]The Kobayashi Family Foundation is, as the name suggests, defendant's family foundation. Defendant told plaintiff that, according to his accountant, this was the best way to structure the transaction in order to avoid negative tax consequences. (D.I. 99 at 80:23-82:8)

5

14. Defendant told plaintiff prior to purchasing the 17 acre parcel that "it may well be that the land, that is the 17 acre parcel when [defendant] bought it, would have to be in [defendant's] name, or [defendant's] foundation name" in order for defendant to receive the tax benefits. (*Id.* at 82:1-8) However, defendant assured plaintiff that the deed would go to Pokobo as soon as the closing occurred, since Pokobo would be the owner of the 17 acres. (*Id.*)

15. On March 20, 1999, defendant entered into a Purchase and Sale Contract with the national church and personally acquired an undivided interest in the 17 acre parcel. (PTX 78) Pursuant to this agreement, defendant could "cause Pokobo LLC" to pay his costs associated with acquiring the 17 acre parcel. (*Id.* at ¶ 6.2) Similarly, defendant could "cause Pokobo LLC" to pay the costs of consolidation and resubdivision. (*Id.* at ¶ 8.4)

## C. Pokobo's Apparent Ownership of the 17 Acre Parcel

16. In October 1999, plaintiff visited the recently-purchased 17 acre parcel. Plaintiff and defendant discussed future development options for the 17 acre parcel, including potentially placing a community center or a coffee mill on the eastern portion of the 17 acre parcel. (D.I. 99 at 100:4-101:17)

17. Plaintiff also began paying a disproportionate share of Pokobo's operating expenses in order to equalize the capital accounts.[8] (PTX 173, 174, 180, 188, 189) Between 2000 and mid-2002, plaintiff sent multiple checks to defendant to reimburse

---

[8]Defendant regularly sent lists of Pokobo's expenses to plaintiff, including general explanations for each item. Plaintiff would then send a check to defendant for the requested amount. (D.I. 99 at 124:22-131:25)

6

defendant for Pokobo's expenses, both defendant's and plaintiff's portions. (Id.; D.I. 99 at 127:16-128:16) The checks sent from plaintiff to defendant included payments for property taxes on the 17 acre parcel. (Id. at 126:18-23)

18. Plaintiff and defendant had agreed when they formed Pokobo that defendant and his staff at Kobayashi Law Firm would manage Pokobo's financial matters, such as opening bank accounts and paying basic expenses. (D.I. 105 at 414:4-6) Accordingly, defendant authorized Rose Reed ("Reed") and Laura Bennett ("Bennett"), both former secretaries at Kobayashi Law Firm, to "take care of all the bookkeeping and check writing, pay matters, handle some of the management, unless it was a major question, and go forward." (Id. at 416:19-417:4; D.I. 100 at 93:4-11) Reed and Bennett billed Pokobo for expenses involving the 17 acre parcel, and their bookkeeping reflects Pokobo ownership of the 17 acre parcel.[9]

19. In May 2000, defendant attended plaintiff's birthday party in New York. (D.I. 99 at 110:8-112:24) As a birthday gift, defendant gave plaintiff an aerial photograph of Pokobo's Hawaiian properties, with both the 64 acre and the 17 acre parcels outlined in red. (PTX 138)

---

[9]The closing costs associated with the acquisition of the 17 acre parcel (including escrow fees and title insurance) were paid directly by Pokobo and accompanied by cover letters on Pokobo letterhead. (PTX 59, 87) On February, 28, 2000, $2,000 was withdrawn from Pokobo's account to fund an archaeological survey of the 17 acre parcel and sent to Dr. Alan Huan, along with a cover letter on Pokobo letterhead. In early 2000, plaintiff received a list from defendant of plaintiff's and defendant's respective capital contributions to Pokobo for 1997-1999 identifying defendant's contribution of the 17 acre parcel to Pokobo ($194,047.77 in proceeds from the sale of defendant's Montana property) and plaintiff's contribution to Pokobo to cover the balance of the purchase price for the 17 acre parcel. (PTX 105 at WLP000341, WLP000342)

20. From the time the 17 acre parcel was purchased until March 2003, Colin M. Grubb ("Grubb"), Pokobo's accountant, treated the 17 acre parcel as belonging to Pokobo when preparing tax and other accounting documents for Pokobo. These documents reflect Grubb's understanding that most of the funds for purchasing the 17 acre parcel came from defendant's sale of a Montana rental property and that the remainder came from plaintiff, with plaintiff agreeing to pay Pokobo expenses until his capital account equaled defendant's.[10]

21. During that same period, Fuke sent multiple documents to defendant, as well as to contractors, surveyors, archaeologicalists, and the county government, listing Pokobo as owner of the 17 acre parcel. (D.I. 100 at 46:16-19, 48:5-10; PTX 37, 38) Defendant never told Fuke prior to March 2003 that he, not Pokobo, owned the 17 acre parcel.

## D. The Relationship Between Plaintiff and Defendant Deteriorates

22. The last time plaintiff spoke to defendant was April 2002 in New York. (D.I. 99 at 132:2-7) Defendant suggested that Pokobo initiate permit litigation against the county "to achieve a delay and perhaps some leverage with respect to our property so

---

[10]Grubb prepared many of Pokobo's year-end tax documents indicating that Pokobo owned the 17 acre parcel. *See, e.g.*, PTX 77 (crediting defendant's capital account with a contribution to Pokobo of the exact amount defendant used to purchase the 17 acre parcel); PTX 106 (reflecting a charitable contribution made by plaintiff in connection with the acquisition of the 17 acre parcel); PTX 110 (listing defendant's contribution to the purchase of the 17 acre parcel as a capital contribution to Pokobo); PTX 155 (reflecting a difference of $161,082.44 between plaintiff's and defendant's capital accounts due to defendant's contribution of the 17 acre parcel to Pokobo); PTX 176 (considering the value of the 17 acre parcel in calculating the total value of Pokobo's land holdings). It was not until March 2003, four years after the purchase of the 17 acre parcel, that defendant told Grubb that the 17 acre parcel belonged to him individually, not Pokobo. (D.I. 100 at 346:18-347:13; 348:17-22)

8

that we could negotiate a better deal [regarding the placement of the Ali'i Highway]."
(Id. at 132:14-134:10)  Plaintiff opposed Pokobo initiating permit litigation against the
county because he did not want to sour any relationship between Pokobo and the
county.  (Id.)

23.  In the following months, plaintiff attempted unsuccessfully to contact
defendant.  (Id. at 136:15-24)  Plaintiff became concerned and left several telephone
messages for defendant, seeking to make sure that Pokobo matters were running
smoothly and inquiring about defendant's health.  (Id.)  These messages, along with
multiple letters asking for an update regarding Pokobo, went unanswered.  (Id. at 138:9-
11, 142:22-143:2; PTX 197, 200)

24.  Unable to reach defendant, plaintiff sent letters to Grubb and Michael
Matsukawa ("Matsukawa"), Pokobo's attorney in Hawaii, explaining that he could not
reach defendant regarding Pokobo matters and was also worried about defendant's
health.  (PTX 198, 199)  Neither Grubb nor Matsukawa responded to plaintiff's letters.
(D.I. 99 at 139:6-8, 140:18-19)

25.  When defendant did not respond to plaintiff's November 18, 2002 letter
(PTX 200), plaintiff contacted Margery Bronster ("Bronster"), an attorney in Hawaii, and
asked her to "look into what was happening regarding the 64 acres and the 17 acres
owned by Pokobo."  (D.I. 99 at 142:25-144:6; D.I. 109 at 27)  Plaintiff was surprised to
learn from Bronster that the 17 acre parcel had been purchased in 1999 and was
currently owned by defendant individually.[11]  (D.I. 99 at 143:12-144:6)  Plaintiff also

_____

[11]Defendant had been telling plaintiff for three years that sale of the 17 acre
parcel had not closed yet because "Hawaii is just bureaucratic and it's taking a long

9

learned from Bronster that defendant had initiated permit litigation against the county in

Pokobo's name, despite plaintiff having clearly expressed that he did not want Pokobo

to initiate such litigation. (*Id.* at 144:1-18) Upon hearing of the lawsuit, plaintiff wrote to

Matsukawa, who was representing Pokobo in the permit litigation, informing him that he

was not authorized to represent plaintiff's interest in Pokobo. (*Id.*)

26. On December 19, 2002, plaintiff wrote to defendant and described, for the

first time, his concern for the future viability of Pokobo. (PTX 202) Within the letter,

plaintiff expressed regret that defendant had "decided to sever [their] relationship, and

refuse[d] to respond to [plaintiff's] mail and telephone messages." (*Id.*) Plaintiff added

that the situation would "detrimentally affect Pokobo, since [plaintiff and defendant] are

50/50 partners and, therefore, any act requires the consent of both parties." (*Id.*)

27. Thereafter, the relationship between plaintiff and defendant further

deteriorated. Plaintiff repeatedly requested an accounting from both defendant and

Grubb, complete with both plaintiff's and defendant's current capital accounts, detailed

expense records, and information on Pokobo's revenues. (D.I. 99 at 169:18-170:13;

PTX 209, 210, 213, 215, 221, 222) Plaintiff estimated that he requested this

accounting from Grubb "at least 25 times." (*Id.*)[12]

28. In late 2003, defendant sent a letter to plaintiff offering to buy his fifty

_____

time and that the subdivision approval was awaiting conclusion but it had not been
approved by the county." (D.I. 99 at 143:12-144:6)

[12]Plaintiff was removed, without his knowledge, as a signatory on Pokobo's
account in September 2003 and cannot access Pokobo's bank records. (PTX 263; D.I.
99 at 48:25-50:8) In addition, defendant instructed Grubb to not release any
information to plaintiff regarding Pokobo. (PTX 227; PTX 228)

10

percent interest in Pokobo for the total amount of plaintiff's capital contributions.[13]  (D.I. 99 at 163:23-164:15)  Plaintiff responded that he was willing to sell his interest in Pokobo, but only based on an independent evaluation of the market value of the property. (*Id.* at 165:13-17)  Plaintiff also informed defendant that they needed to resolve all issues regarding the ownership of the 17 acre parcel before discussing a buyout. (*Id.*)

29.  On March 11, 2004, plaintiff received a letter from Grubb in response to plaintiff's request for a K-1 from Pokobo, as well as a full accounting.  (D.I. 99 at 173:20-174:4; PTX 226)  Grubb informed plaintiff that Pokobo had an outstanding balance of over 90 days with Grubb's firm.  (*Id.*)  Grubb told plaintiff that his firm would not work on Pokobo matters until Pokobo had paid its overdue balance. (*Id.*)

30.  On January 31, 2005, plaintiff wrote to defendant and suggested the sale of both the 64 acre and the 17 acre parcels, an accounting, a distribution of proceeds, and Pokobo's dissolution. (PTX 230)  Plaintiff received no response.  Plaintiff testified that Pokobo could not continue under these circumstances: "There's no communication with each other, nor is there any element of trust at this point, and there's no way to continue the partnership relationship on that basis." (D.I. 99 at 177:21-24)

### E. Procedural History

31.  On February 23, 2005, plaintiff filed the present action against defendant and Pokobo, as a nominal defendant, in Delaware's Court of Chancery.  (D.I. 1 at ¶ 1)

---

[13]According to defendant's calculations, plaintiff's total capital contributions equaled $630,596.70.  (D.I. 99 at 164:13-15)

11

On May 25, 2005, defendant filed a notice of removal.[14]  (D.I. 1)

32.  On June 15, 2005, plaintiff moved to remand, arguing that Pokobo's citizenship in New York and Colorado gave it the same citizenship of both plaintiff and defendant and thus prevented the court from exercising diversity jurisdiction.  (D.I. 8, 9) On August 22, 2005, the court held that only plaintiff's and defendant's citizenship, not Pokobo's citizenship, should be considered for purposes of determining diversity jurisdiction because the suit primarily concerned Pokobo's dissolution, an issue over which plaintiff and defendant were at odds but in which Pokobo had no interest.  (D.I. 18 at 5-7) ("the remand opinion")  Accordingly, the court denied plaintiff's motion to remand.  (D.I. 19)

## F. Jurisdiction

33.  "[F]ederal courts are courts of limited jurisdiction, empowered to hear cases only as provided for under Article III of the Constitution and congressional enactments pursuant thereto." *Employers Ins. of Wausau v. Crown Cork & Seal Co., Inc.*, 905 F.2d 42, 45 (3d Cir. 1990) ("Wausau I"); *see also Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005).  The court, then, must "'consider its own jurisdiction preliminary to consideration of the merits.'" *Wausau I*, 905 F.2d at 45 (quoting *Trent Realty Assocs. v. First Fed. Sav. & Loan Ass'n of Philadelphia*, 657 F.2d 29, 36 (3d Cir.

---

[14]The time that elapsed between plaintiff filing his action in state court and defendant filing his notice of removal suggests that defendant untimely filed his notice of removal, which is to be filed within thirty days of receiving service. *See* 28 U.S.C. § 1446(b). However, the untimeliness of removal is a procedural defect that plaintiff must raise within thirty days after the notice of removal. *See* 28 U.S.C. § 1447(c). It appears that plaintiff did not timely challenge the defendant's notice of removal on timeliness grounds and so waived that objection. *See, e.g., In re FMC Corp. Packaging Sys. Div.*, 208 F.3d 445, 450-52 (3d Cir. 2000).

1981)).

34. The court may exercise jurisdiction over this suit if the suit is one over which federal district courts have original jurisdiction. *See* 28 U.S.C. § 1441(a). Federal district courts have original jurisdiction over, *inter alia*, "civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between . . . citizens of different States." 28 U.S.C. § 1332(a). The court finds, and the parties do not dispute, that this suit is a civil action where the matter in controversy exceeds $75,000. The court also finds that there is diversity of state citizenship sufficient to confer jurisdiction on the court.

35. "[C]omplete diversity of citizenship must exist between the parties to invoke . . . diversity jurisdiction" pursuant to 28 U.S.C. § 1332. *Butcher & Singer, Inc. v. Kellam*, 623 F. Supp. 418, 421 (D. Del. 1985). "That is, all parties on one side of the controversy must be citizens of different states from all parties on the other side." *Id.* "A failure of complete diversity . . . contaminates every claim in the action[,]" and deprives the court of jurisdiction. *Exxon Mobil*, 545 U.S. at 564. Thus, in a multi-party, multi-claim suit, a court having original jurisdiction over one claim between diverse parties cannot exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over claims involving non-diverse parties, even where those claims are part of the same transaction or occurrence as the jurisdictionally-proper claim. *See id.* at 566 ("Under § 1367, the court has original jurisdiction over the civil action comprising the claims for which there is no jurisdictional defect. . . . [But] the special nature and purpose of the diversity requirement mean that a single nondiverse party" can introduce a fatal

13

jurisdictional defect.).  Put another way, where a court's original jurisdiction is based on diversity, a court may not exercise supplemental jurisdiction over claims that would destroy that diversity.

36.  In this case, plaintiff's claims dictate that the court's original jurisdiction could only be based on diversity.  A court determining diversity of citizenship "must first identify the primary issue in controversy." *Employers Ins. of Wausau v. Crown Cork & Seal Co., Inc.*, 942 F.2d 862, 864 (3d Cir. 1991) ("Wausau II").  The court is to "direct[ ] its attention exclusively to this 'primary' . . . claim." *In re Texas E. Transmission Corp. PCB Contamination Ins. Coverage Litigation*, 15 F.3d 1230, 1240 (3d Cir. 1994) (discussing "primary purpose" test set forth in *City of Indianapolis v. Chase Nat'l Bank*, 314 U.S. 63, 69-70 (1941)).  The court finds, consistent with the remand opinion, that the primary issue or claim in this case is Pokobo's dissolution.  (D.I. 18 at 5)

37.  Having identified the primary issue, the court "then determine[s] whether there is a real dispute by opposing parties" over that issue. *Wausau II*, 942 F.2d at 864.  In determining this, the court is to realign the parties according to their substantive interests in the litigation.  (D.I. 18 at 4) (citing *Wausau II*, 942 F.2d at 864)  Consistent with the remand opinion, the court finds that, whereas plaintiff and defendant oppose each other on the issue of Pokobo's dissolution, Pokobo itself has no interest.  (D.I. 18 at 6-7)  Realigning nominal defendant Pokobo, then, as being neither a plaintiff nor a defendant with respect to Pokobo's dissolution leaves only plaintiff and defendant as real parties to the primary dispute.

38.  As noted in the remand opinion, "[A] federal court must disregard nominal or

14

formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy." (D.I. 18 at 4) (quoting *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 461 (1980)) Accordingly, the court looks at the citizenship of plaintiff and defendant – the only real parties to the dissolution dispute – to determine whether the suit is one "between . . . citizens of different states."[15]  Because plaintiff and defendant are citizens of different states, the suit satisfies 28 U.S.C. § 1332(a), and the court has diversity jurisdiction over the dissolution claim.

39. With respect to plaintiff's other claims, the court does not have jurisdiction over those for which Pokobo's citizenship would be considered, *i.e.*, where Pokobo is a real party in interest, because Pokobo's dual-citizenship destroys diversity.  The question, then, is whether Pokobo is a real party in interest to plaintiff's other claims. That question turns on whether plaintiff's other claims are direct or derivative.  Pokobo is a real party in interest to derivative claims. *See Ross v. Bernhard*, 396 U.S. 531, 538 (1970)) (corporation is the real party in interest in a stockholder's derivative action); *see also Midland Food Servs., LLC v. Castle Hill Holdings V, LLC*, 792 A.2d 920, 931 (Del. Ch. 1999) (derivative actions "belong to the corporation").

40. Whether a claim is direct or derivative "turns solely on who suffered the alleged harm and who would receive the benefit of any recovery or other remedy."

---

[15]Pokobo's citizenship is deemed to be that of its individual members. *See C.T. Carden v. Arkoma Assocs.*, 494 U.S. 185, 195-96 (1990); *see also, e.g., Ketterson v. Wolf*, 2001 WL 940909, at *3 (D. Del. 2001); *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998); *Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004); *Handelsman v. Bedford Village Assocs. Ltd. P'ship*, 213 F.3d 48, 51-52 (2d Cir. 2000).  Thus, Pokobo is deemed to be a citizen of both New York and Colorado.

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033, 1035 (Del. 2004).

To be a direct claim, plaintiff's alleged injury "must be independent of any alleged injury

to [Pokobo]." *Tooley*, 845 A.2d at 1039. In other words, plaintiff "must demonstrate

that the duty breached was owed to [him] and that he . . . can prevail without showing

an injury to [Pokobo]." *Id.* In determining whether plaintiff has done this, the court

looks beyond plaintiff's characterization of the claims. *See Dietrich v. Harrer*, 857 A.2d

1017, 1027 (Del. Ch. 2004) ("Even after *Tooley*, a claim is not 'direct' simply because it

is pleaded that way . . . . Instead, the court must look to all the facts of the complaint . .

. ."); *In re Syncor Int'l Corp. Shareholders Litig.*, 857 A.2d 994, 997 (Del. Ch. 2004)

(courts applying *Tooley* "look at the nature of the wrong alleged, not merely at the form

of the words in the complaint"). "[T]he same set of facts can give rise to both a direct

claim and a derivative claim." *Gentile v. Rossette*, 906 A.2d 91, 100 n.19 (Del. 2006)

(internal quotation marks omitted).

41. Applying the foregoing here, the court finds that, besides the judicial

dissolution claim, plaintiff's claim for breach of contract is the only direct claim in the

suit.[16]  Looking at the allegations in the complaint, the breach of contract claim is based

___

[16]To the extent that this conclusion is inconsistent with the remand opinion or any
of the court's previous pronouncements, it is nevertheless proper.  "A court has power
to revisit prior decisions of its own or of a coordinate court in any circumstance,
although as a rule courts should be loathe to do so in the absence of extraordinary
circumstances such as where the initial decision was 'clearly erroneous and would work
a manifest injustice.'" *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800,
817 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 n.8 (1983)). "In other
words, the law of the case doctrine does not limit a federal court's power, rather it
directs its exercise of discretion." *Lambert v. Blackwell*, 387 F.3d 210, 236 n.20 (3d Cir.
2004) (citing *Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.*,
123 F.3d 111, 116 (3d Cir. 1997)). It is appropriate for the court to revisit and depart
from a previous ruling where it concerns a fundamental principle such as jurisdiction.

16

on defendant's unilateral decision-making for Pokobo, which impaired plaintiff's contractual right to jointly manage Pokobo. (D.I. 85 at ¶ 57) This harms plaintiff (not Pokobo) and plaintiff (not Pokobo) would receive the benefit of any remedy on this claim. (Id. at ¶ 58)

42. In contrast, plaintiff's claims for breach of fiduciary duty, declaratory judgment, and unjust enrichment are, at least in part, derivative claims. Plaintiff's declaratory judgment claim is based on defendant's improperly titling the 17 acre parcel in his own name instead of Pokobo's. (Id. at ¶ 67) This harms Pokobo, and holding the 17 acre parcel in constructive trust would inure in the first instance to the benefit of Pokobo, not plaintiff. (Id. at ¶ 68) Plaintiff's claims for breach of fiduciary duty and unjust enrichment are also based in part on defendant's misappropriation of the 17 acre parcel. (Id. at ¶¶ 61, 71) This harms Pokobo and the remedy, the constructive trust, would inure in the first instance to the benefit of Pokobo, not plaintiff. While the latter two claims also allege harm to plaintiff sufficient to support direct claims, that is, plaintiff could prevail on the claims without showing an injury to Pokobo, the claims' derivative components make them claims for which Pokobo is a real party in interest.

43. The court, then, must consider Pokobo's citizenship for the breach of fiduciary duty, declaratory judgment, and unjust enrichment claims. Because Pokobo's citizenship destroys diversity on those claims, the court cannot exercise jurisdiction over them. Accordingly, those claims must be remanded. The court retains jurisdiction over

17

the judicial dissolution and breach of contract claims.[17]

## G. Breach of Contract

44. Under Delaware law, the elements of a breach of contract claim are: (a) a

contractual obligation; (b) breach of that obligation by the defendant; and (c) resulting

damage to plaintiff. H-M Wexford LLC v. Encorp, Inc., 832 A.2d 129, 140 (Del. Ch.

2003). Based on the record evidence, the court finds these elements satisfied.

45. Pursuant to Section 5.01 of the Agreement, defendant had an obligation to

manage Pokobo jointly with plaintiff. (PTX 1, § 5.01) Without consulting with plaintiff

(in violation of this obligation), defendant: (a) initiated permit litigation in Pokobo's

---

[17]Defendant argues that, pursuant to 10 Del. C. § 8106, a three-year statute of limitations applies to plaintiff's claims and that those claims are time-barred because they accrued more than three years prior to plaintiff filing the instant suit. (D.I. 110 at 32) Plaintiff does not dispute the application of a three-year statute of limitations; rather, plaintiff argues that his claims accrued fewer than three years prior to his filing suit and thus are not time-barred. (D.I. 113 at 12) The court agrees with plaintiff, at the very least because of the doctrine of fraudulent concealment.

The doctrine of fraudulent concealment tolls the statute of limitations wherever the defendant affirmatively acts to prevent plaintiff from "gaining knowledge of the facts" or engages in "some misrepresentation that is intended to put a plaintiff off the trail of inquiry." Halpern v. Barran, 313 A.2d 139, 143 (Del. Ch. 1973). Fraudulent concealment can involve either: (1) "the commission of affirmative acts of misrepresentation" or (2) "failure to disclose facts when there is a duty to disclose." Litman v. Prudential-Bache Properties, Inc., 1994 WL 30529, at *4 (Del. Ch. 1994).

The court finds that defendant, inter alia, affirmatively misrepresented to plaintiff the ownership status of the 17 acre parcel. By 2000, defendant had received the deed to the 17 acre parcel. (D.I. 99 at 143:12-144:6) Nevertheless, defendant persistently misrepresented to plaintiff after that time that the sale had not yet closed and that the deed had not yet been transferred because of bureaucracy-related complications. (Id.) Plaintiff did not learn of this misrepresentation until November 2002 when he sent Bronster to investigate. (Id.) Thus, even assuming arguendo that plaintiff's claims are based on the misappropriation of the 17 acre parcel and not later events, plaintiff's claims did not accrue until November 2002, making timely a lawsuit asserting those claims in February 2005.

18

name; (b) failed to title the 17 acre parcel in Pokobo's name after using Pokobo to facilitate the transaction and bear the ownership costs; and (c) failed to provide plaintiff with a full accounting. As a result of defendant's conduct, plaintiff has been deprived of his contractual right to jointly manage Pokobo and has incurred expenses for (a) the 17 acre parcel titled in defendant's name and (b) his investigation into ownership of the 17 acre parcel and Pokobo's dealings. Accordingly, the court finds that defendant is liable to plaintiff on the breach of contract claim.

## H. Judicial Dissolution

46. Under Delaware law, judicial dissolution of a limited liability company is proper "whenever it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement." 6 Del. C. § 18-802. Based on the record evidence, the court finds that it is not reasonably practicable to continue the business in conformity with the Agreement.

47. In *Haley v. Talcott*, 864 A.2d 86 (Del. Ch. 2004), the court found that judicial dissolution of an LLC pursuant to 6 Del. C. § 18-802 was proper where its two members, each owning a fifty percent interest, were deadlocked regarding its dissolution and had not interacted in over a year. *Haley*, 864 A.2d at 94-96. Similar to the parties in *Haley*, the parties in the case at bar each own a fifty percent interest in Pokobo, are deadlocked regarding its dissolution, and have not amicably communicated for several years. In addition, defendant's wrongful retention of the 17 acre parcel belonging to Pokobo and his unilateral management of Pokobo have destroyed plaintiff's trust in defendant as a joint manager of Pokobo. Without

19

communication and trust, the parties cannot effectively manage Pokobo going forward. Under these circumstances, it is not reasonably practicable to continue the business in conformity with the Agreement. Accordingly, the courts finds that Pokobo should be dissolved.

## III. CONCLUSION

For the reasons stated, the court concludes that plaintiff has proven, by a preponderance of the evidence, that defendant breached the Agreement, that the 17 acre parcel rightfully belongs to Pokobo, and that Pokobo should be dissolved pursuant to 6 Del. C. §§ 18-801 and 18-802. An appropriate order shall issue.[18]

---

[18]Although a federal court sitting in diversity is not free to expand the relief available to a party under the substantive law of the state, see, e.g., City of Philadelphia v. Lead Indus. Ass'n, Inc., 994 F.2d 112, 122 (3d Cir. 1993), the relief ordered at bar is consistent with the "historic powers" of the Court of Chancery to grant relief "as the facts of a particular case may dictate." Weinberger v. UOP, Inc., 457 A.2d 701, 714 (Del. 1983). See also Eureka VIII LLC v. Niagara Falls Holdings LLC, 899 A.2d 95, 107 (Del. Ch. 2006) (quoting Gotham Partners, L.P. v. Hallwood Realty Partners, L.P., 817 A.2d 160, 176 (Del. 2000) (where "a contract or agreement is silent as to the remedy for a breach, 'the [court] has the discretion to award any form of legal and/or equitable relief and is not limited to awarding contract damages for breach of the agreement'")).